## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO, ex rel.,
HECTOR BALDERAS, Attorney General of
New Mexico,

        Plaintiff,

vs.                                       No. CIV 17-0251 JB\LF

REAL ESTATE LAW CENTER, P.C., a
California professional corporation; ERIKSON
M. DAVIS, an attorney and resident of
California, individually, and dba Real Estate
Law Center, P.C., a California professional
corporation; DEEPAK S. PARWATIKAR, an
attorney and resident of California, individually,
and dba Balanced Legal Group, an unidentified
trade name or entity, dba
www.pinnaclelawcenter.com; CHAD T.
PRATT, an attorney and resident of California,
individually, and formerly dba Real Estate Law
Center, P.C.; the BALANCED LEGAL
GROUP, an unidentified trade name or entity
located in California, and PINNACLE LAW
CENTER, P.C., a California professional
corporation,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant Deepak S. Parwatikar's

Motion for Summary Judgment, filed April 25, 2019 (Doc. 132)("MSJ"); (ii) the Notice of Joinder

of Chad T-W Pratt, Sr. In Motion for Summary Judgment, filed May 3, 2019

(Doc. 135)("Joinder");[1] and the Defendant Parwatikar's Objections to Plaintiff's Untimely Filings

---

[1]Plaintiff State of New Mexico complains regarding Defendant Chad T. Pratt's untimely filing of the Joinder and asks the Court to disregard the Joinder. See Plaintiffs' Response to Pratt's

and Disclosures, filed May 25, 2019 (Doc. 147)("Marked Exhibits Objections"). The Court held

a hearing on May 28, 2019. See Clerk's Minutes at 1, filed May 28, 2019 (Doc. 151). The primary

issues are: (i) whether Plaintiff State of New Mexico has shown a genuine issue of material fact

whether Defendants Deepak S. Parwatikar,[2] Balanced Legal Group, and Pinnacle Law Center,

P.C., (collectively, the "Parwatikar Defendants"), and Defendant Chad T. Pratt[3] violated the

---

Notice of Joinder in Motion for Summary Judgment at 1-2, filed May 13, 2019 (Doc. 140)("Joinder Response"). The Court agrees with New Mexico that Mr. Pratt filed the Joinder on May 3, 2019, eight days after the April 25, 2019, deadline for non-discovery pretrial motions. See Memorandum Opinion and Order at 2, 20, filed March 19, 2019 (Doc. 116); Joinder Response at 1. Cf. Fed. R. Civ. P. 6(a)(1)(B) (directing courts to count every day when calculating periods stated in days). Mr. Pratt should have filed the Joinder, asking for summary judgment in his favor, or a motion for summary judgment, before April 25, 2019. See Fed. R. Civ. P. 56(b) (providing that a motion for summary judgment should be filed by the time "set by local rule" or the time "the court orders otherwise").

   Nevertheless, the Court considers Mr. Pratt to have joined the MSJ. Defendants Deepak S. Parwatikar, Balanced Legal Group, and Pinnacle Law Center, P.C. (collectively, the "Parwatikar Defendants") did not file the MSJ which Mr. Pratt joins until April 25, 2019, so Mr. Pratt had little time within the deadline to join the MSJ. Even had Mr. Pratt not filed the Joinder, rule 56 of the Federal Rules of Civil Procedure permits the Court to grant summary judgment for a nonmovant, see Fed. R. Civ. P. 56(f)(1), or even, "[a]fter giving notice and a reasonable time to respond," to "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute," Fed. R. Civ. P. 56(f)(3). Mr. Pratt's Joinder necessarily involves issues the Court considers in deciding the MSJ. Should the Court's conclusions on the Parwatikar Defendants' legal arguments counsel summary judgment for Mr. Pratt, denying Mr. Pratt summary judgment and proceeding to trial on a legal theory on which New Mexico cannot succeed wastes the Court's and the parties' time. In the interests of judicial efficiency, therefore, the Court will not disregard the Joinder.

   [2]Not all State of California actors in this case are in good standing with the State Bar of California, but the Court notes that Mr. Parwatikar is currently an active member of the State Bar of California. See Deepak Sadashiv Parwatikar #187683, The State Bar of California, http://members.calbar.ca.gov/fal/Licensee/Detail/187683 (last visited June 22, 2019).

   [3]Mr. Pratt is currently an active member of the State Bar of California. See Chad Thomas Pratt #149746, The State Bar of California, http://members.calbar.ca.gov/fal/Licensee/Detail/149746 (last visited June 22, 2019).

Mortgage Assistance Relief Services ("MARS") Rule, 12 C.F.R. § 1015,[4] by accepting advance payment for mortgage assistance relief services as alleged in Count I of the Complaint for Violations of the New Mexico Mortgage Foreclosure Consultant Fraud Prevention Act (MFCFPA),[5] Mortgage Assistance Relief Services (MARS) Rule, the New Mexico Unfair

---

[4]The MARS Rule prohibits "mortgage assistance relief service providers" from, among other things, "[r]equest[ing] or receiv[ing] payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief the provider obtained from the consumer's dwelling loan holder or servicer." 12 C.F.R. § 1015.5. For further discussion of the MARS Rule, see the Relevant Law Regarding the MARS Rule section infra.

[5]The New Mexico Mortgage Foreclosure Consultant Fraud Prevention Act, N.M. Stat. Ann. §§ 47-15-1 to -8 ("MFCFPA"), prescribes specific practices, forms, and language for foreclosure consultants' contracts. See N.M. Stat. Ann. § 47-15-3. It also provides, among other things: "It is a violation of the Mortgage Foreclosure Consultant Fraud Prevention Act for a foreclosure consultant to: A. claim, demand, charge, collect or receive any compensation until after the foreclosure consultant has fully performed every service the foreclosure consultant contracted to perform or represented the consultant would perform." N.M. Stat. Ann. § 47-15-5. The MFCFPA defines foreclosure consultant:

> a person who, directly or indirectly, makes a solicitation or offer to an owner to perform services for compensation or who, for compensation, performs a service that the person represents will:
>
> (a)      stop or postpone a foreclosure sale;
>
> (b)      obtain any forbearance from a beneficiary or mortgagee;
>
> (c)      assist the owner to exercise the right to reinstatement;
>
> (d)      obtain an extension of the period within which the owner may reinstate the owner's obligation;
>
> (e)      obtain a waiver of an acceleration clause contained in a promissory note, deed of trust or contract secured by a mortgage on a residence in foreclosure or contained in the mortgage;
>
> (f)      assist an owner in foreclosure or loan default to obtain a loan or advance of funds;

Practices Act (UPA)[6] and Petition for Injunctive Relief ¶¶ 77-85, at 18-19, filed February 22, 2017 (Doc. 1)("Complaint"); (ii) whether New Mexico has shown a genuine issue of material fact whether the Parwatikar Defendants and Mr. Pratt violated the New Mexico Mortgage Foreclosure Consultant Fraud Prevention Act, N.M. Stat. Ann. §§ 47-15-1 to -8 ("MFCFP"), by failing to conform to the MFCFP's requirements for foreclosure consultant contracts and by requesting

---

> (g)    avoid or ameliorate the impairment of an owner's credit resulting from the recording of a notice of default or from a foreclosure sale; or
>
> (h)    otherwise save an owner's residence from foreclosure[.]

N.M. Stat. Ann. § 47-15-2(B)(1).

For more information on the MFCFP, see the Relevant Law Regarding the MFCFP section _infra_.

[6]The New Mexico Unfair Practices Act, §§ 57-12-1 to -26 ("NMUPA"), states: "Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."  N.M. Stat. Ann. § 57-12-3.  Unfair or deceptive practices include:

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person.

N.M. Stat. Ann. § 57-12-2(D).  Unconscionable trade practices include:

> act[s] or practice[s] in connection with . . . the extension of credit in the collection of debts that to a person's detriment:
>
> > (1)    take[] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or
> >
> > (2)    result[] in a gross disparity between the value received by a person and the price paid.

N.M. Stat. Ann. § 57-12-2(E).

advance fees for foreclosure consultant services as the Complaint's Count II alleges, see Complaint ¶¶ 86-101, at 19-22; (iii) whether New Mexico has shown a genuine issue of material fact whether the Parwatikar Defendants and Mr. Pratt violated the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to -26 ("NMUPA"), by requiring from New Mexico consumers an advance fee and monthly maintenance payments for sham lawsuits, by promising valuable legal services while filing the value of which was disproportionate to the value paid, and by promising foreclosure lawsuit defense but not providing such services, as the Complaint's Count III alleges, see Complaint ¶¶ 102-108, at 22-23; and (iv) whether New Mexico has established a genuine issue of material fact justifying injunctive relief barring the Parwatikar Defendants and Mr. Pratt from engaging in those practices enumerated in items (i) through (iii) and from engaging in the unauthorized practice of law as the Complaint's Count IV alleges, see Complaint ¶¶ 109-11, at 23. The Court grants the MSJ and the Joinder in part and denies them in part. The Court concludes that New Mexico has shown a genuine issue of material fact whether: (i) the Parwatikar Defendants and Mr. Pratt are liable for MARS Rule violations; and (ii) the Parwatikar Defendants and Mr. Pratt are liable for MFCFP violations. Specifically, genuine disputes of material fact exist whether Defendant Real Estate Law Center, P.C. violated the MARS Rule and the MFCFP; whether Real Estate Law, Balanced Legal, and Pinnacle Law operated a common enterprise such that Balanced Legal and Pinnacle Law are liable for Real Estate Law's alleged MARS Rule and MFCFP violations;[7] whether Mr. Parwatikar and Mr. Pratt are individually liable for Real Estate

---

[7]Courts have adopted a common-enterprise doctrine under which courts hold defendants jointly and severally liable where the individuals and the entities use "corporate structures to circumvent" legal prohibitions. F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d 799, 808-09 (D.S.D. 2013)(Lange, J.)(citing P.F. Collier & Son Corp. v. F.T.C., 427 F.2d 261, 267 (6th Cir. 1970)). "Under the theory of common enterprise, each entity in a group of interrelated companies can be

Law's alleged MARS Rule and MFCFP violations;[8] whether Mr. Parwatikar and Pinnacle Law

substantially assisted the other Defendants' alleged MARS Rule violations;[9] and what penalties

the Court should assess should it find the Parwatikar Defendants and Mr. Pratt liable for the MARS

Rule and the MFCFP violations.[10]  New Mexico has not produced, however, sufficient evidence

---

held jointly and severally liable for the actions of other entities in that group."  F.T.C. v. Johnson, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015)(Du, J.)(citing F.T.C. v. Network Servs. Depot, Inc., 617 F.3d 1127, 1142-43 (9th Cir. 2010)).

[8]To establish an individual's liability for an entity's MARS Rule violations, a plaintiff must establish three elements.  See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1203 (10th Cir. 2005).  First, the plaintiff must show that the entity committed a violation.  See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1202-03.  Second, the plaintiff must "show the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control them." F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997)).  Third, the plaintiff "must establish the individual knew or should have known of the entity's" acts.  F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Amy Travel Serv., Inc., 875 F.2d 564, 574 (7th Cir. 1989)).
    The Court predicts that the Supreme Court of New Mexico would apply federal FTC caselaw to determine the Parwatikar Defendants' and Mr. Pratt's liabilities for Real Estate Law's alleged MFCFPA violations.  The NMUPA directs New Mexico courts to look to the FTC for guidance in interpreting the NMUPA, see N.M. Stat. Ann. § 57-12-4, and the MFCFPA is a specific form of NMUPA violation, see N.M. Stat. Ann. § 47-15-7(A).  Moreover, in interpreting New Mexico law, the Supreme Court of New Mexico has previously looked to caselaw on federal statutes that resemble New Mexico statutes.  Featherstone v. Bureau of Revenue, 1954-NMSC-080, ¶ 6, 273 P.2d 752, 753; Lopez v. Singh, 1949-NMSC-022, ¶ 7, 205 P.2d 492, 493.

[9]The MARS Rule states: "It is a violation of this rule for a person to provide substantial assistance or support to any mortgage assistance relief service provider when that person knows or consciously avoids knowing that the provider is engaged in any act or practice that violates this rule."  12 C.F.R. § 1015.6.

[10]Three tiers of penalties are applicable to MARS Rule violations:

(A)     First tier

For any violation of a law, rule, or final order or condition imposed in writing by the Bureau, a civil penalty may not exceed $5,000 for each day during which such violation or failure to pay continues.

to survive summary judgment on a theory based on Defendant Erickson Davis'[11] alleged MARS

Rule violations; on Balanced Legal and Pinnacle Law's violation of the MARS Rule independent

of Real Estate Law; on Mr. Parwatikar's and Mr. Pratt's participation in a common enterprise with

---

(B)     Second tier

Notwithstanding paragraph (A), for any person that recklessly engages in a violation of a Federal consumer financial law, a civil penalty may not exceed $25,000 for each day during which such violation continues.

(C)     Third tier

Notwithstanding subparagraphs (A) and (B), for any person that knowingly violates a Federal consumer financial law, a civil penalty may not exceed $1,000,000 for each day during which such violation continues.

12 U.S.C. § 5565(c)(2).  When considering the penalty to assess, a court should consider:

(A)     the size of financial resources and good faith of the person charged;

(B)     the gravity of the violation or failure to pay;

(C)     the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided;

(D)     the history of previous violations; and

(E)     such other matters as justice may require.

12 U.S.C. § 5565(c)(3).  The MFCFPA permits a court to award actual damages, and attorney's fees and costs, N.M. Stat. Ann. § 47-15-7(B), on a basis cumulative with other remedies, see N.M. Stat. Ann. § 47-15-7(B).  Additionally, the MFCFPA authorizes a court to award "exemplary damages up to three times the compensation charged by the foreclosure consultant if the court finds that the foreclosure consultant violated a provision of Section 5 of the Mortgage Foreclosure Consultant Fraud Prevention Act and that the foreclosure consultant's conduct was willful or in bad faith."  N.M. Stat. Ann. § 47-15-7(D).

[11]Davis is currently disbarred in California.  See Erikson McDonnel Davis #197841, The State Bar of California, http://members.calbar.ca.gov/fal/Licensee/Detail/197841 (last visited June 22, 2019).

Real Estate Law, Balanced Legal, and Pinnacle Law; and on Mr. Pratt's reckless or knowing violation of the MARS Rule, or willful violation of the MFCFPA, so the Court grants summary judgment in the Parwatikar Defendants' and Mr. Pratt's favor on these theories. The Court concludes, furthermore, that New Mexico has not established a genuine issue of material fact whether: (i) the Parwatikar Defendants and Mr. Pratt are liable for NMUPA violations other than the MFCFP violations;[12] and (ii) New Mexico is entitled to injunctive relief. As New Mexico has not produced evidence on which a reasonable factfinder could conclude that Real Estate Law knowingly made false or misleading misrepresentations such that New Mexico can establish its unfair or deceptive practices claims,[13] and has not shown sufficient evidence on which a reasonable factfinder could conclude that Real Estate Law engaged in unconscionable practices, New Mexico cannot show the Parwatikar Defendant's or Mr. Pratt's liability for the non-MFCFP NMUPA violations. New Mexico has also not produced evidence of ongoing, continuous, or recent MARS Rule, MFCFP, or other NMUPA violations to survive summary judgment on its requests for

---

[12]The MFCFPA provides that MFCFPA violations are deemed to be NMUPA violations. See N.M. Stat. Ann. § 47-15-7(A).

[13]To succeed on an NMUPA claim of an unfair or deceptive trade practice, the plaintiff most show four elements:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. *Ashlock* [v. Sunwest Bank of Roswell, N.A.], [1988-NMSC-026, ¶ 4,] . . . 753 P.2d [346,] 347. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." *Id*. Third, the conduct complained of must have occurred in the regular course of the represener's trade or commerce. *Id*. Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person." *Id*.

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 12, 811 P.2d 1308, 1311.

injunctive relief. The Court overrules the Parwatikar Defendants' objections in the Marked Exhibits Objections, because the Marked Exhibits attached to the Plaintiff's Notice of Filing of Marked Exhibits to Response to Motion for Summary Judgment at 1, filed May 24, 2019 (Doc. 145)("Marked Exhibits Notice"), will help the Court decide the MSJ and the Joinder, and because the Marked Exhibits differ from the exhibits attached to the Plaintiff's Response to Parwatikar Motion for Summary Judgment, filed May 10, 2019 (Doc. 137)("MSJ Response"), only in that, in the Marked Exhibits, New Mexico highlights excerpts for the Court's attention.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in: (i) the MSJ; (ii) the MSJ Response; (iii) the Joinder; and (iv) the Plaintiffs' Response to Pratt's Notice of Joinder in Motion for Summary Judgment, filed May 13, 2019 (Doc. 140)("Joinder Response"). Mr. Parwatikar owns Pinnacle Law and owned Balanced Legal. See MSJ Response ¶ 16, at 8 (asserting this fact)(citing Defendant Deepak Parwatikar's Answers, Responses and Objections to Plaintiff's First Set of Interrogatives and Requests for Production, Interrogatory No. 1, at 1-2, filed May 24, 2019 (Doc. 145-1)[14]("Parwatikar First Set Response"); Consulting

---

[14]The Court overrules the Parwatikar Defendants' objections to the Marked Exhibits Notice and will consider the Marked Exhibits as evidence. See Marked Exhibits Objections at 1-2. The Parwatikar Defendants object to the Marked Exhibits Notice only on timeliness grounds. See Marked Exhibits Objections at 1-2. Aside from New Mexico's marking the Marked Exhibits to bring relevant excerpts to the Court's attention and the Marked Exhibits' exclusion of some exhibit pages, the Marked Exhibits do not differ significantly from the exhibits New Mexico attaches to the MSJ Response. Compare generally Marked Exhibits, with MSJ Response. The Court sees no harm to the Parwatikar Defendants from its considering the Marked Exhibits, and the Marked Exhibits will aid the Court in analyzing the evidence for the MSJ and the Joinder. The Court notes, throughout the Memorandum Opinion and Order, where the cited evidence exists in different forms in the MSJ Response and the Marked Exhibits.

Agreement at 1, filed May 24, 2019 (Doc. 145-1); Deposition of Deepak S. Parwatikar at 70:1-71:2 (taken May 9, 2018), filed May 25, 2019 (Doc. 145-1)("Parwatikar Depo. Doc. 145-1")[15]); Reply in Support of Defendant's Motion for Summary Judgment at 6, filed May 24, 2019 (Doc. 146)("MSJ Reply")(admitting this fact).  In 2010, prior to Real Estate Law's foundation, the Attorney General for the State of Minnesota sued Mr. Parwatikar and Balanced Legal for charging advance fees for mortgage modification services.  See MSJ Response ¶ 7, at 4 (asserting this fact)(citing Minnesota v. Balanced Legal Group, Case No. 27 CV 10-27052 (4th Jud. Dist. Minn. 2010)("Minn. v. Balanced Legal & Parwatikar");[16] Parwatikar Depo. Doc. 145-1 at 70:1-73:25).[17]

_____

[15]New Mexico and the Parwatikar Defendants each file Parwatikar Depo. excerpts, and the excerpts contain different excerpted pages.  To identify the referenced excerpt, the Court refers to the excerpts by the document number.

[16]The Court cannot locate documents from Minn. v. Balanced Legal & Parwatikar that reflect this fact, but Mr. Parwatikar explains in the Parwatikar Depo. Doc. 145-1 that the State of Minnesota brought the suit because it had concerns about his charging "up front fee[s] for mortgage [modification] services within their state."  Parwatikar Depo. Doc. 145-1 at 70:20-22.

[17]The Parwatikar Defendants object to the text's fact as inadmissible hearsay, as immaterial, and as in conflict with rule 404(b) of the Federal Rules of Evidence.  See MSJ Reply Plaintiff's Assertion 11, at 7.  None of these arguments convince the Court that New Mexico can introduce no evidence of Minn. v. Balanced Legal & Parwatikar.  First, the Parwatikar Defendants' hearsay arguments do not persuade the Court.  "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801.  New Mexico cites the Parwatikar Depo. Doc. 145-1 as evidence of the text's fact.  See MSJ Response ¶ 7, at 4. Mr. Parwatikar has personal knowledge regarding the lawsuit against him and Balanced Legal, and the Court presumes that he can testify to the events from his memory rather than from hearsay evidence.  Cf. Fed. R. Civ. P. 56(c) (stating a court can consider depositions on summary judgment).  The Court considers, accordingly, Mr. Parwatikar's testimony regarding Minn. v. Balanced Legal & Parwatikar, which includes the text's fact, admissible to support the text's fact.
New Mexico also cites Minn. v. Balanced Legal & Parwatikar as evidence of Mr. Parwatikar's awareness of the MARS rule, of advanced fee prohibitions for mortgage modification services, and of his possible MARS Rule violations.  See Draft Transcript of Hearing at 16:17-25 (taken May 28, 2019)(Anaya-Allen)("Tr.")(The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version; any final transcript may contain

slightly different page and/or line numbers.).  To the extent New Mexico uses evidence of <u>Minn. v. Balanced Legal & Parwatikar</u> for such purposes, the evidence is admissible, because New Mexico does not use <u>Minn. v. Balanced Legal & Parwatikar</u> for the truths of the matters that "a declarant in the Minnesota Attorney General's Office" asserts.  MSJ Reply Plaintiff's Assertion 11, at 7.  The Court deems the evidence when used for such purposes non-hearsay.  The Court notes that it will not consider, in this Memorandum Opinion and Order or in a later trial, evidence of the truths of the matters that the Minnesota Attorney General alleges unless New Mexico introduces that information through non-hearsay evidence or through evidence otherwise excepted from the hearsay rule.

The Parwatikar Defendants' materiality arguments also do not convince the Court to exclude the text's fact from the Factual Background.  The Court "has previously held that a 'relevance argument similarly does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion."  <u>Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs</u>, No. CIV 16-0127 JB/JHR, 2018 WL 3210531, at *1 (D.N.M. June 29, 2018)(Browning, J.)(quoting <u>S.E.C. v. Goldstone</u>, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.)).  The Court will, accordingly, deem this fact undisputed and will consider its relevance in the Analysis section <u>infra</u>.

Last, the Court deems this evidence admissible under rule 404(b).  Rule 404(b) provides:

Crimes, Wrongs, or Other Acts.

> (1)    Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2)    Permitted Uses; Notice in a Criminal Case.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  On request by a defendant in a criminal case, the prosecutor must:

>> (A)    provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

>> (B)    do so before trial -- or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b).  The United States Court of Appeals for the Tenth Circuit has noted:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test . . . :

>> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403

> determination of whether the probative value of the similar acts is
> substantially outweighed by its potential for unfair prejudice; and
> (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request,
> instruct the jury that evidence of similar acts is to be considered only
> for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(quoting United States v. Roberts, 185 F.3d 1125, 1141 (10th Cir. 1999)).  To the extent New Mexico introduces Minn. v. Balanced Legal & Parwatikar as evidence of Mr. Parwatikar's notice of the MARS Rule and of other advance fee prohibitions, see Tr. at 16:17-25 (Anaya-Allen), New Mexico introduces the evidence for a permitted use -- "knowledge," Fed. R. Evid. 404(b).  The evidence is relevant as evidence of the Parwatikar Defendants' knowledge of such prohibitions and, consequently, of the Parwatikar Defendants' scienter.  Minn. v. Balanced Legal & Parwatikar's probative value -- evidencing the Parwatikar Defendants' scienter and advancing New Mexico's theory that Real Estate Law took over Balanced Legal's activities to protect Mr. Parwatikar and his entities from liability, see Tr. at 50:7-51:6 (Anaya-Allen) -- outweighs concerns about prejudice and cumulative evidence, see Fed. R. Evid. 403.  Contrary to the Parwatikar Defendants' assertions, see Tr. at 44:15-18 (Harrison), New Mexico, as a plaintiff in a civil case here, does not need to provide notice of its intent to use rule 404(b) evidence.  Rule 404(b)'s notice requirement applies only to prosecutors in criminal cases.  See Fed. R. Evid. 404(b)(2)(B).

At the hearing, the Court and the parties also discussed Minn. v. Balanced Legal & Parwatikar's collateral estoppel effects.  See Tr. at 45:10-12 (Court); id. at 43:15-17 (Court); id. at Tr. at 43:18-19 (Harrison); id. at 43:22-44:9 (Harrison)  The Court here discusses, therefore, this collateral estoppel issue, and preliminarily, notes that Minn. v. Balanced Legal & Parwatikar settled.  See Parwatikar Depo. Doc. 145-1 at 71:15-72:4.  "In determining the preclusive effect of a state court judgment, the full faith and credit statute, 28 U.S.C. § 1738, 'directs a federal court to refer to the preclusion law of the State in which judgment was rendered.'"  Nichols v. Bd. of Cty. Comm'rs of Cty. of La Plata, 506 F.3d 962, 967 (10th Cir. 2007)(quoting Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985))).  Here, accordingly, Minnesota law applies to the Minnesota judgment in Minn. v. Balanced Legal & Parwatikar.  Minnesota law provides:

> Collateral estoppel may be applied when:
>
> (1) the issue was identical to one in a prior adjudication; (2) there
> was a final judgment on the merits; (3) the estopped party was a
> party or in privity with a party to the prior adjudication; and (4) the
> estopped party was given a full and fair opportunity to be heard on
> the adjudicated issue.

Willems v. Comm'r of Pub. Safety, 333 N.W.2d 619, 621 (Minn. 1983)(quoting Victory Highway Village, Inc. v. Weaver, 480 F. Supp. 71, 74 (D. Minn. 1979)).  We do not rigidly apply collateral estoppel, and we will not apply collateral

After this suit, in 2011, Mr. Parwatikar and Pinnacle Law helped Adlore Clarambeau[18] incorporate

Real Estate Law. See MSJ Response ¶ 15, at 8 (asserting this fact)(citing Parwatikar Depo.

---

estoppel if its application would work an injustice on the party to be estopped. *See Hauschildt* [v. Beckingham], 686 N.W.2d [829,] 837 [(Minn. 2004)]; *Johnson v. Consol. Freightways*, *Inc.,* 420 N.W.2d 608, 613-14 (Minn. 1988).

State v. Lemmer, 736 N.W.2d 650, 659 (Minn. 2007). When discussing collateral estoppel -- or issue preclusion -- and res judicata -- or claim preclusion -- the Supreme Court of Minnesota has cited approvingly and followed the Restatement of Judgments. See, e.g., Rucker v. Schmidt, 794 N.W.2d 114, 118 (Minn. 2011)(citing Supreme Court of Minnesota cases relying on Restatement (First) of Judgments); State v. Lemmer, 736 N.W.2d at 659, 61-62 (citing Restatement (Second) of Judgments provisions); Matter of Welfare of M.D.O., 462 N.W.2d 370, 376 (Minn. 1990)(citing Restatement (Second) of Judgments provisions). The Court accordingly predicts that the Supreme Court of Minnesota would follow the Restatement (Second) of Judgments statements. Regarding the issue preclusive effect of stipulations, the Restatement (Second) of Judgments states: "[N]or is [an issue] actually litigated if it is the subject of a stipulation between the parties. A stipulation may, however, be binding in a subsequent action between the parties if the parties have manifested an intention to that effect." Restatement (Second) of Judgments § 27 (Am. Law Inst. 1982). Similarly, the Restatement (Second) of Judgments explains:

> In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section does not apply with respect to any issue in a subsequent action. The judgment may be conclusive, however, with respect to one or more issues, if the parties have entered an agreement manifesting such an intention.

Restatement (Second) of Judgments, supra, § 27. Cf. In re Hauck, 466 B.R. 151, 167 (Bankr. D. Colo. 2012)(Brooks, J.)("[C]ollateral estoppel *does not* necessarily bind parties to issues originally at issue but later compromised and settled without a trial on the merits because the issue *may not have been actually litigated and determined in the prior proceeding, unless specific language affirmatively points to it*." (emphasis in In re Hauck)), aff'd, 489 B.R. 208 (D. Colo. 2013), aff'd, 541 F. App'x 898 (10th Cir. 2013). Accordingly, although, as the Court does not have access to the Minn. v. Balanced Legal & Parwatikar settlement agreement, and although the Court cannot determine the agreement's contents, the Court notes that the settlement agreement likely will not have any collateral estoppel effect. Moreover, as Pinnacle Law was not a party to Minn. v. Balanced Legal & Parwatikar, Minn. v. Balanced Legal & Parwatikar would have no collateral estoppel effect against it.

---

[18]Clarambeau is currently disbarred in California. See Adlore Virgil Clarambeau #174540, The State Bar of California, http://members.calbar.ca.gov/fal/Licensee/Detail/174540 (last visited June 22, 2019).

Doc. 145-1 at 20:19-25:25).[19]  Clarambeau, see MSJ ¶ 1, at 2 (asserting this fact)(citing Deposition of Deepak S. Parwatikar at 25:8-9, filed April 25, 2019 (Doc. 132-1)("Parwatikar Depo. Doc. 132-1")), Mr. Pratt, see MSJ ¶ 1, at 2 (asserting this fact)(citing Parwatikar Depo. Doc. 132-1 at 26:8-13), and Davis consecutively owned Real Estate Law Center, see MSJ ¶ 1, at 2 (asserting this fact)(citing Parwatikar Depo. Doc. 132-1 at 108:12-13, id. at 108:17-19).  See also MSJ Response ¶ 1, at 2 (admitting with this sentence's facts).

"Sometime between 2011 and 2013, RELC [(Real Estate Law)] used an attorney-client fee agreement with clients, which purported to charge a $5,000 retainer, 80% of which would be paid to Pinnacle Law Center."  MSJ ¶ 2, at 2-3 (asserting this fact)(citing Complaint ¶¶ 21, 46, at 6, 10).[20]  See MSJ Response ¶ 1, at 2 (admitting this fact).  Such provisions affected the twenty-three New Mexico consumers that the Complaint identifies.  See MSJ ¶ 2, at 2 (asserting this fact)(citing Plaintiff's Second Supplemental Response to Defendant Parwatikar's First Set of Interrogatories, and Requests for Production, Interrogatory No. 10, at 11, filed April 25, 2019 (Doc. 132-3)("New Mexico Second Set Response")); MSJ Response ¶ 1, at 2 (admitting this fact).  Mr. Parwatikar

---

[19]The Parwatikar Defendants dispute MSJ Response ¶ 15, at 8, on hearsay grounds and as a violation of rule 403 of the Federal Rules of Evidence.  See MSJ Reply Plaintiff's Assertions 12, 13, 14, 16, and 19, at 7.  New Mexico cites, however, the Parwatikar Depo. Doc. 145-1 for evidence of the text's fact, and this evidence is admissible in deciding summary judgment.  See Fed. R. Civ. P. 56(c) (including depositions on the list of potential evidence for summary judgment arguments).  The Court also concludes that the probative value of the text's fact -- describing the fact of Real Estate Law's origins and supporting New Mexico's theory about Mr. Parwatikar's and Pinnacle Law's roles in Real Estate Law's foundation, see Tr. at 50:7-51:6 (Anaya-Allen) -- outweighs any prejudice or other concerns against which rule 403 protects, see Fed. R. Evid. 403.

[20]The Court notes that, although the Complaint is not sufficient evidence to support the text's fact, the Attorney-Client Fee Agreement ¶ 10, at 3, filed May 24, 2019 (Doc. 137-5), supports the fact.

- 14 -

knew that Real Estate Law engaged in mass joinder lawsuits and mortgage modification.  See MSJ

Response ¶ 15, at 8 (asserting this fact)(citing Parwatikar Depo. Doc. 145-1 at 82:9-13).[21]  In 2013,

the State Bar of California undertook disciplinary actions against Mr. Pratt in connection with Real

Estate Law, and such actions culminated in his disbarment in 2013.  See MSJ Response ¶ 8, at 4

(asserting this fact)(citing In the Matter of Chad Thomas Pratt, Nos. 13-O-12312 (13-O-12367;

13-O-12757)(State Bar Ct. Cal. Sept. 18, 2014), aff'd, No. S222942 (Cal. Jan. 29, 2015)("In re

Pratt")).[22]  The State Bar of California also subjected Davis to multiple disciplinary actions before

_____

[21]The Parwatikar Defendants dispute MSJ Response ¶ 15, at 8, on hearsay and rule 403 grounds.  See MSJ Reply Plaintiff's Assertions 12, 13, 14, 16, and 19, at 7.  New Mexico cites, however, the Parwatikar Depo. Doc. 145-1 for evidence of the text's fact, and this evidence is admissible.  See Fed. R. Civ. P. 56(c) (describing depositions as evidence for courts to consider in deciding summary judgments).  The Court also concludes that the probative value of the text's fact -- suggesting that Mr. Parwatikar knew of Real Estate Law's litigation and loan modification activities -- outweighs any prejudice or other concerns against which rule 403 protects.  See Fed. R. Evid. 403.

[22]The decision in In re Pratt is available at: In the Matter of Chad Thomas Pratt, No. 13-O-12312, Decision, at 1 (State Bar Cal. Sept. 18, 2014), http://members.calbar.ca.gov/fal/Licensee/Detail/149746 (last visited June 17, 2019)("In re Pratt Decision").  The Parwatikar Defendants object to New Mexico's use of evidence from In re Pratt on hearsay and rule 403 grounds.  See MSJ Reply at 3-4; MSJ Reply Plaintiff's Assertions 12, 13, 14, 15, 16, and 19, at 7.  At the hearing, New Mexico mentioned several hearsay exclusions and exceptions under which it might seek to introduce assertions from a State Bar of California disciplinary case document.  See Tr. at 51:24-52:8 (Anaya-Allen); id. at 52:15-53:12 (Anaya-Allen); id. at 51:24-52:8 (Anaya-Allen); id. at 52:9-14 (Anaya-Allen, Court).  New Mexico makes these arguments in relation to the In the Matter of: Erikson McDonnell Davis, No. 15-O-14599, Stipulation re: Facts, Conclusions of Law and Disposition and Order Approving Actual Suspension (State Bar Ct. Cal. July 21, 2016), available at http://members.calbar.ca.gov/fal/Licensee/Detail/197841 (last visited June 26, 2019), aff'd, Case Nos. S237442 (Cal. Dec. 7, 2016), and the In the Matter of: Erikson McDonnell Davis, Case No. 16-O-13378, Stipulation re: Facts, Conclusions of Law and Disposition and Order Approving, Order of Involuntary Inactive Enrollment, Disbarment (State Bar Ct. Cal. April 17, 2017), available at http://members.calbar.ca.gov/fal/Licensee/Detail/197841 (last visited June 26, 2019), aff'd, Case No. S242390 (Cal. August 22, 2017), but the Court expects that New Mexico would raise similar arguments in relation to the In re Pratt Decision and other In re Pratt documents.  The Court addresses, therefore, New Mexico's proposed exclusions and exceptions here.

The Court agrees in part with the Parwatikar Defendants and will exclude evidence of the truths of the matters that the State Bar of California and the Supreme Court of California assert. See Fed. R. Evid. 801. New Mexico mentioned as a potentially applicable exclusion rule 801(d)(2) of the Federal Rules of Evidence, which excludes from hearsay an opposing party's statement. See Tr. at 51:24-52:8 (Anaya-Allen). The Court concludes that this exclusion applies against Mr. Pratt, but not against the Parwatikar Defendants. This rule excludes from hearsay a statement that

> is offered against an opposing party and:

>> (A)     was made by the party in an individual or representative capacity;

>> (B)     is one the party manifested that it adopted or believed to be true;

>> (C)     was made by a person whom the party authorized to make a statement on the subject;

>> (D)     was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

>> (E)     was made by the party's coconspirator during and in furtherance of the conspiracy.

> The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

Fed. R. Evid. 801(d)(2). "Rule 801(d)(2)(A) does not . . . permit such a statement to be used against anyone other than the party who made the statement, such as codefendants." United States v. DeLeon, 287 F. Supp. 3d 1187, 1256 (D.N.M. 2018)(Browning, J.)(citing United States v. Wolf, 839 F.2d 1387, 1393 & n.4 (10th Cir. 1988); Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 801.02[6][c] (11th ed. 2017)). Any of Pratt's statements which the In re Pratt Decision and other In re Pratt documents contain are, therefore, admissible against Pratt, but not against the Parwatikar Defendants.

The Court notes, however, that New Mexico must also identify a hearsay exclusion or exception that permits it to introduce the In re Pratt Decision or other In re Pratt documents that contain Pratt's statements. Hearsay within hearsay is excluded unless each part of the statement satisfies a hearsay exclusion or exception. See Fed. R. Evid. 805. For the MSJ's purposes, New Mexico has not identified a rule making such documents admissible. The Court agrees with the Parwatikar Defendants that Herrick v. Garvey, 298 F.3d 1184 (10th Cir. 2002), prohibits the application of rule 803(8) of the Federal Rules of Evidence -- the public records hearsay exception -- to judicial and state bar factual findings. See MSJ Reply at 2-4. Contra Tr. at 52:15-53:12 (Anaya-Allen). Rule 803(8) exempts from the hearsay prohibition:

A record or statement of a public office if:

> (A)     it sets out:
>
>> (i)     the office's activities;
>>
>> (ii)     a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>>
>> (iii)     in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B)     the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8). The Tenth Circuit states: "Rule 803(8) was not intended to allow the admission of findings of fact by courts." Herrick v. Garvey, 298 F.3d at 1192. New Mexico argues that the Tenth Circuit's decision rests on the assumption that judicial findings will inappropriately influence juries. See Tr. at 52:15-53:12 (Anaya-Allen). The Court reads, however, Herrick v. Garvey to reflect that, in reaching the holding, the Tenth Circuit emphasized the Federal Rules of Evidence's distinction between executive branch investigators and judicial entities, and commented on juries only as a policy rationale justifying this distinction. Contra Tr. at 52:15-53:12 (Anaya-Allen). The Court concludes that Herrick v. Garvey applies equally to bench and jury trials and agrees with the conclusion of the Honorable Philip A. Brimmer, United States District Judge for the United States District Court for the District of Colorado, that Herrick v. Garvey also precludes the admission of findings from judicial-style bar disciplinary proceedings such as those in In re Pratt. See Auguste v. Sullivan, No. CIV. 03-CV-02256-PAB-KLM, 2009 WL 807446, at *2 (D. Colo. March 25, 2009)(Brimmer, J.); State Bar of Cal. Rules of Procedure of the State Bar of California at 1-222 (May 17, 2019), http://www.statebarcourt.ca.gov/Procedures-Programs-and-Rules (last visited June 13, 2019).

The Court also concludes that rule 807 of the Federal Rules of Evidence -- the residual exception -- does not apply here. See MSJ Reply at 3-4. Contra Tr. at 51:24-52:8 (Anaya-Allen). Rule 807 provides:

> (a)     In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
>
>> (1)     the statement has equivalent circumstantial guarantees of trustworthiness;

───────────────────

(2)      it is offered as evidence of a material fact;

(3)      it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4)      admitting it will best serve the purposes of these rules and the interests of justice.

(b)      Notice. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

Fed. R. Evid. 807. That the Federal Rules of Evidence "specifically allow for the admission of certain kinds of judgments or their underlying facts as evidence," Herrick v. Garvey, 298 F.3d at 1192 (citing Fed. R. Evid. 803(22)-(23)), suggests that all judicial-style fact findings and judgments do not carry equivalent "guarantees of trustworthiness," Fed. R. Evid. 807(a)(1), and that such findings' admission does not always "best serve the purposes of [the Federal Rules of Evidence] and the interests of justice," Fed. R. Evid. 807(a)(4). In the Court's view, the State Bar of California's findings lack "equivalent guarantees of trustworthiness," Fed. R. Evid. 807(a)(1), because the findings likely reflect the State Bar of California's weighing of competing facts and witness credibility. The Court also reasons that New Mexico could introduce evidence on Real Estate Law's operations through other means, such as testimony from Mr. Pratt or from other Real Estate Law employees, like Susan Murphy, so the Court cannot say that findings from In re Pratt are more probative than other evidence, or that their admission serves the Federal Rules of Evidence's purposes and the interests of justice better than other evidence's admission. See Fed. R. Evid. 807(a)(3)-(4). The Court, as the factfinder, can itself reach factual findings and does not need guidance from the State Bar of California or from the Supreme Court of California. Cf. Auguste v. Sullivan, 2009 WL 807446, at *2 ("There is no reason effectively to preempt the duties of the jury in this case to resolve factual disputes by introducing as evidence the findings of a judge in the California disciplinary proceeding.").

The Court will not, accordingly, consider admissible against the Parwatikar Defendants or against Mr. Pratt evidence depending on the truths of the matters that the State Bar of California or the Supreme Court of California assert. The Court disregards, accordingly, MSJ Response ¶ 12, at 6-7, which relies entirely on In re Pratt for factual information about Real Estate Law. The Court also notes that, although Mr. Pratt's suspension from law practice is an action, the judgment imposing the suspension, like the final judgment of a conviction, is hearsay. See Fed. R. Evid. 803(22) (providing an exception for judgments of conviction).

To the extent, however, New Mexico uses the fact of In re Pratt's occurrence for purposes other than the truths of the matters asserted, the Court considers such evidence in this Memorandum Opinion and Order, and will consider such evidence at trial. Evidence that In re Pratt occurred is admissible evidence of, for instance, the Parwatikar Defendants' awareness of Real Estate Law's activities, of the possible illegality of the activities, and of the State of

California's concerns about the activities. The Court notes additionally that, if New Mexico proffers other non-hearsay purposes for In re Pratt as this case proceeds to trial, the Court will consider New Mexico's arguments for that evidence's admissibility and may admit the evidence.

Last, the Court concludes that, should New Mexico seek to use non-hearsay evidence of In re Pratt to show scienter, rule 403 would not preclude such evidence's introduction. Contra MSJ Reply at 7. If the Parwatikar Defendants and Mr. Pratt had warning that their actions violated federal and possibly state laws, such warning speaks to scienter. The Court deems, therefore, the probative value of such non-hearsay purposes to outweigh the risk of prejudice or cumulative evidence. See Fed. R. Evid. 403.

At the hearing, the Court and the parties also discussed In re Pratt's collateral estoppel effects. The Court applies the law of the state of the judgment to determine a judgment's collateral estoppel effects. See Nichols v. Bd. of Cty. Comm'rs of Cty. Of La Plata, 506 F.3d at 967 ("In determining the preclusive effect of a state court judgment, the full faith and credit statute, 28 U.S.C. § 1738, 'directs a federal court to refer to the preclusion law of the State in which judgment was rendered.'" (quoting Marrese v. Am. Acad. Of Orthopaedic Surgeons, 470 U.S. at 380). Here, California law governs the preclusive effects of the State Bar of California's and the Supreme Court of California's decisions.

California law provides:

> "Traditionally, collateral estoppel has been found to bar relitigation of an issue decided at a previous proceeding if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding]. It is implicit in this three-prong test that only issues actually litigated in the initial action may be precluded from the second proceeding under the collateral estoppel doctrine. An issue is actually litigated [w]hen [it] is *properly raised,* by the pleadings or otherwise, and is submitted for determination, and is *determined*."

People v. Carter, 117 P.3d 544, 562 (Cal. 2005), as modified (Oct. 26, 2005)(third alteration in People v. Sims, 651 P.2d 321 (1982); and other alterations and emphasis in People v. Carter)(quoting People v. Sims, 651 P.2d at 331). California courts caution that "collateral estoppel 'is not an inflexible, universally applicable principle; policy considerations may limit its use where the . . . underpinnings of the doctrine are outweighed by other factors.'" Vandenberg v. Superior Court, 982 P.2d 229, 237 (Cal. 1999)(quoting Lucido v. Superior Court, 795 P.2d 1223, 1226-27 (Cal. 1990); and citing Kelly v. Trans Globe Travel Bureau, Inc., 131 Cal. Rptr. 488, 492 (Cal. Ct. App. 1976)). "Collateral estoppel . . . is intended to preserve the integrity of the judicial system, promote judicial economy, and protect litigants from harassment by vexatious litigation." Vandenberg v. Superior Court, 982 P.2d at 237 (citing Lucido v. Superior Court, 795 P.2d at 1227). "[A] particular danger of injustice arises when collateral estoppel is invoked by a nonparty to the prior litigation. Such cases require close examination to determine whether nonmutual use of the doctrine is fair and appropriate." See Vandenberg v. Superior Court, 982 P.2d at 237 (citing

Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326-33 (1979); Imen v. Glassford, 247 Cal. Rptr. 514, 517-18 (Cal. Ct. App. 1988); Kelly v. Trans Globe Travel Bureau, Inc., 131 Cal. Rptr. at 492-93). Among courts' concerns about offensive collateral estoppel -- wherein "a plaintiff . . . seek[s] to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff," Parklane Hosiery Co. v. Shore, 439 U.S. at 329 -- are concerns about verdicts' consistencies, see Parklane Hosiery Co. v. Shore, 439 U.S. at 330 ("Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant."); Sandoval v. Superior Court, 190 Cal. Rptr. 29, 36-38 (Ct. App. 1983)(discussing when not to apply collateral estoppel because of prior inconsistent verdicts), worries about the character of the prior proceeding, see Parklane Hosiery Co. v. Shore, 439 U.S. at 330 (describing collateral estoppel as unfair where, between the suits, a defendant has different motives for defending himself), and concerns about a defendant's motivation to fully litigate an issue, see Vandenberg v. Superior Court, 982 P.2d at 237 ("Whether collateral estoppel is fair and consistent with public policy in a particular case depends in part upon the character of the forum that first decided the issue later sought to be foreclosed.").

The Parwatikar Defendants were not in privity with Pratt such that In re Prattcollaterally estops them from relitigating the factual issues. Although, in California, collateral estoppel may prevent a co-conspirator, or an aider and abettor, from relitigating issues in a conspiracy claim, or an aiding and abetting claim, where the principal actor was not found liable for the underlying wrongful act, see Richard B. LeVine, Inc. v. Higashi, 32 Cal. Rptr. 3d 244, 249-51 (2005)("Of course, liability for invasion of that primary right must be established against each party charged with the invasion. But if plaintiff's primary right is not violated at all, no defendant is liable."), "[j]oint and several liability alone does not create such a closely aligned interest," DKN Holdings LLC v. Faerber, 352 P.3d 378, 388 (Cal. 2015). As, to the extent the Parwatikar Defendants are principally liable for Real Estate Law's alleged violations, they are joint defendants and as, to the extent the Parwatikar Defendants' liability rests on their substantial assistance of Real Estate Law's actions, no principal actor has explicitly been found not liable for Real Estate Law's activities in another case, In re Pratt has no collateral estoppel effect on the Parwatikar Defendants. Cf. Patel v. Crown Diamonds, Inc., 201 Cal. Rptr. 3d 593, 596, 602 (2016)(describing, in a suit against a prior defendant's business partners, "[the prior defendant] represented only himself and his own interests in the bankruptcy litigation . . . . His interests were at stake; [the defendants] had no rights in the action to turn over to him, such as to defend or control the action on their behalf, nor to appeal," and comparing the situation to "codefendants in a civil conspiracy action," "each [of whom] advances his or her own interests, and therefore does not necessarily represent the others, particularly where each is an alleged direct tortfeasor" (emphasis in Patel v. Crown Diamonds, Inc.)), as modified (April 29, 2016).

On the other hand, as the party in In re Pratt, Mr. Pratt may be bound by collateral estoppel from relitigating factual issues. The Supreme Court of California's decisions in disciplinary matters, including decisions not to review State Bar of California decisions, are final judgments. See In re Rose, 993 P.2d 956, 962-63 (2000). See also Khanna v. State Bar of Cal., 505 F. Supp. 2d 633, 638 (N.D. Cal. 2007)(Chen, M.J.), aff'd, 308 F. App'x 176 (9th Cir. 2009). Cf. Pac. Lumber Co. v. State Water Res. Control Bd., 126 P.3d 1040, 1054-55 (2006)(recognizing that collateral

estoppel may be applied to administrative agency decisions).  In re Pratt resulted, therefore, in a final judgment on the merits against the party New Mexico seeks to collaterally bind.  Without additional information, however, the Court cannot determine if "the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated."  People v. Carter, 117 P.3d at 562.  The Court cannot identify with certainty which issues from In re Pratt the parties would litigate.  The Court presumes that the parties would litigate issues of Real Estate Law's functioning, structure, representations, and lawsuits.  As, in In re Pratt, the State Bar of California disciplines Mr. Pratt for activities surrounding Real Estate Law, the Court suspects that Mr. Pratt litigated such issues in In re Pratt.  As, however, the parties have not fully argued the collateral estoppel issue, the Court cannot now determine with confidence how fully Mr. Pratt litigated facts about Real Estate Law as opposed to the facts about the cases underlying the misconduct of which the State Bar of California accused him and whether, in fairness, the Court can collaterally estop Mr. Pratt from litigating these issues.

The Court worries that applying collateral estoppel against only Mr. Pratt would result in inconsistent verdicts on the Parwatikar Defendants' and Mr. Pratt's liability.  In determining the Parwatikar Defendants' liability, the Court will consider anew issues involving Real Estate Law's operations.  Fairness' interests may not be served if New Mexico can attach liability to Mr. Pratt, because the State Bar of California tried Mr. Pratt in a disciplinary proceeding carrying different risks than this case, but, because the State Bar of California and no other entity disciplined the Parwatikar Defendants, New Mexico cannot, on its own evidence, hold the Parwatikar Defendants liable.

The Court is, however, willing to apply collateral estoppel if the factors counsel it.  California courts have not prioritized concerns about inconsistent verdicts between co-defendants.  These courts have not, for instance, concluded that a prior proceeding against one co-defendant precludes litigation of similar issues against another co-defendant.  See, e.g., DKN Holdings LLC v. Faerber, 352 P.3d at 388 (discussing civil co-obligors), see People v. Lawley, 38 P.3d 461, 504 (Cal. 2002)("'[I]n cases where there are multiple [criminal] defendants, or in multiple cases arising out of the same offense, the mere fact standing alone that verdicts are, or appear to be, inconsistent, does not give rise to collateral estoppel.  Specific issues may be decided differently in different cases.'" (quoting People v. Howard, 749 P.2d 279, 300 n.13 (Cal. 1988); and citing People v. Palmer, 15 P.3d 234, 240-41 (Cal. 2001)).

Moreover, Mr. Pratt's concerns about facing the equivalent of "double jeopardy," see Tr. at 111:1-10 (Pratt), do not persuade the Court.  Preliminarily, the Court notes that the double jeopardy doctrine applies in the criminal context:

> "Our cases have recognized three separate guarantees embodied in the Double Jeopardy Clause [of the Fifth Amendment to the Constitution of the United States]:  It protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense.  Illinois v. Vitale, 447 U.S. 410, 415 (1980).  The primary goal of barring reprosecution after acquittal is to prevent the State from mounting successive prosecutions and thereby wearing down the defendant. . . .  The primary purpose of foreclosing a second prosecution after

disbarring him for his misconduct at Real Estate Law.  See MSJ Response ¶ 9, at 4-5 (asserting

this fact)(citing In the Matter of: Erikson McDonnell Davis, Case No. 16-O-13378, Stipulation re:

Facts, Conclusions of Law and Disposition and Order Approving, Order of Involuntary Inactive

Enrollment, Disbarment (State Bar Ct. Cal. April 17, 2017),

http://members.calbar.ca.gov/fal/Licensee/Detail/197841 (last visited June 26, 2019)("2017 In re

Davis Stipulation"), aff'd, Case No. S242390 (Cal. August 22, 2017); In the Matter of: Erikson

McDonnell Davis, No. 15-O-14599, Stipulation re: Facts, Conclusions of Law and Disposition

and Order Approving Actual Suspension (State Bar Ct. Cal. July 21, 2016),

http://members.calbar.ca.gov/fal/Licensee/Detail/197841 (last visited June 26, 2019)("2016 In re

Davis Stipulation"), aff'd, Case Nos. S237442 (Cal. Dec. 7, 2016))(collectively, "In re Davis")).[23]

---

conviction, on the other hand, is to prevent a defendant from being subjected to
multiple punishments for the same offense."

United States v. Leal, 330 F. Supp. 3d 1257, 1275 (D.N.M. 2018)(Browning, J.)(emphasis
omitted)(quoting Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 306-07 (1984)), aff'd,
921 F.3d 951 (10th Cir. 2019).  New Mexico sues Mr. Pratt in a civil action.  The Court takes,
however, Mr. Pratt's point that he feels reprimanded twice for the same actions.  New Mexico does
not pursue Mr. Pratt for ethical attorney misconduct like the State Bar of California did.  New
Mexico contends that Mr. Pratt failed to follow federal and state law for loan modification services.
See Complaint ¶¶ 1-111, at 1-23.  Mr. Pratt must recognize that multiple, different violations may
result in multiple, different suits on such violations.  Moreover, Mr. Pratt's complaints do not touch
the Court's collateral estoppel analysis.  Offensive collateral estoppel is permissible, and, even if
the Court did not apply collateral estoppel, Mr. Pratt would have to resolve with New Mexico the
Complaint's claims.

    The Court notes that, should collateral estoppel apply, it would not, as discussed infra,
change the Court's analysis.  The Court notes additionally that, should it apply collateral estoppel,
Mr. Pratt could not relitigate the issues in, for instance, MSJ Response ¶ 12, at 6-7, about Real
Estate Law's description of itself as an expert in bank litigation, although Mr. Pratt had no
experience in the area, and about consumers' descriptions of Real Estate Law's unauthorized
practice of law, pressures, and inducements.  See MSJ Response ¶ 12, at 6-7.

[23]The Parwatikar Defendants object on hearsay grounds and on rule 403 grounds to the
text's fact.  See MSJ Reply Plaintiff's Assertions 12, 13, 14, 16, and 19, at 7.  The Court disregards

In <u>Alexander v. Wells Fargo Bank</u>, Case No. 2:14-cv-01303-R-CW (C.D. Cal.), in granting

Mr. Davis' voluntary dismissal, the Honorable Manuel L. Real, then-United States District Judge

for the United States District Court for the Central District of California, concluded that "Erikson

---

as evidence against the Parwatikar Defendants and against Mr. Pratt the truths of the matters that the <u>In re Davis</u> documents assert, including evidence of Davis' disbarment, but considers it as evidence of notice. <u>See</u> MSJ Response ¶ 9, at 4-5. To the extent the statements result from the State Bar of California's and the Supreme Court of California's findings, the Court's reasoning for deeming the findings inadmissible is the same as its reasoning <u>supra</u> note 22. Evidence from <u>In re Davis</u> is also inadmissible to the extent the evidence rests on Davis' stipulations in the <u>2017 In Re Davis Stipulation</u> and the <u>2016 In Re Davis Stipulation</u>. New Mexico mentioned rule 801(d)(2) as a potentially applicable hearsay exclusion. <u>See</u> Tr. at 51:24-52:8 (Anaya-Allen). As Davis is no longer a party to the liability issues in this case, this exclusion is, however, inapplicable. New Mexico also offered as an exception rule 803(8), <u>see</u> Tr. at 52:15-53:12 (Anaya-Allen), but the Court concludes that a stipulation, which records parties' agreements to facts, does not fall within rule 803(8). A stipulation records no office's activities, no matters that someone under a legal duty to report records, and, as the Tenth Circuit recognizes in <u>Herrick v. Garvey</u>, "Rule 803(8) is [otherwise] limited to investigations" by executive officers. <u>Herrick v. Garvey</u>, 298 F.3d at 1192. <u>See</u> Fed. R. Evid. 803(8). The Court will also not apply rule 807. <u>See</u> MSJ Reply at 3-4. <u>Contra</u> Tr. at 51:24-52:8 (Anaya-Allen). The <u>2017 In Re Davis Stipulation</u> and the <u>2016 In Re Davis Stipulation</u> lack "equivalent circumstantial guarantees of trustworthiness," Fed. R. Evid. 807(a)(1), because a stipulation does not necessarily reflect a party's agreement to the stipulated facts' truth. The evidence is material, because it reflects Real Estate Law's activities, but New Mexico can elicit this evidence through Mr. Pratt and other Real Estate Law employees. <u>See</u> Fed. R. Evid. 807(a)(2)-(3). The evidence does not "best serve the purposes of these rules and the interests of justice," because Davis entered the stipulations, from his own interests, in a disciplinary proceeding in which the Parwatikar Defendants and Mr. Pratt had no representation. Fed. R. Evid. 807(a)(4).

The Court considers admissible, however, the text's fact as evidence of, for instance, the Parwatikar 'Defendant's awareness of Real Estate Law's activities, of the possible illegality of the activities, or of the State of California's concerns about the activities. Such purposes do not use <u>In re Davis</u> for the truths of the facts that the <u>2017 In Re Davis Stipulation</u> and the <u>2016 In Re Davis Stipulation</u> state. As with evidence of <u>In re Pratt</u>, should New Mexico articulate other non-hearsay uses for <u>In re Davis</u> documents as trial approaches, the Court will consider New Mexico's arguments for those uses.

The Court notes two additional rulings. The Court incorporates its rule 403 ruling from note 22. Furthermore, the Court concludes that, for the reasons <u>In re Pratt</u> does not have collateral estoppel effects against the Parwatikar Defendants, <u>In re Davis</u> affects neither the Parwatikar Defendants nor Mr. Pratt.

Davis, had acted in bad faith 'because [the allegations] indicate that the Complaint was filed without any concern over whether it was legally or factually plausible,'" and, in awarding the defendant sanctions of $126,400.00, stated: "'The amount of this sanction is appropriate in light of the frivolous nature of the Complaint, the blatant misjoinder of Plaintiffs, and Plaintiffs' Counsel's voluntary dismissal of the case to avoid an adverse ruling.'"  MSJ Response ¶ 10, at 5 (asserting this fact)(emphasis from MSJ Response omitted)(quoting Alexander v. Wells Fargo Bank, Case No. 2:14-cv-01303-R-CW, Order Granting in Part and Denying in Part Wells Fargo's Motion for Attorneys' Fees, at 4, 5 (C.D. Cal. filed June 11, 2014 Doc. 34)("Alexander v. Wells Fargo Bank Fees Order").[24]  Judge Real then entered a stipulated judgment awarding Defendant

---

[24]The Parwatikar Defendants object that the text's fact violates the hearsay prohibition and unfairly prejudices the Parwatikar Defendants.  See MSJ Reply at 7.  The Court agrees with the Parwatikar Defendants that no hearsay exclusions or exceptions apply such that New Mexico may admit evidence of the truths of the matters asserted in the Alexander v. Wells Fargo Bank Fee Order.  See supra note 22.

> A court judgment is hearsay "to the extent that it is offered to prove the truth of the matters asserted in the judgment."  United States v. Boulware, 384 F.3d 794, 806 (9th Cir. 2004), cert. denied 546 U.S. 814 . . . (2005); see also 2 [Kenneth S. Broun et al., ]McCormick on Evidence . . . § 298, at 337 [(6th ed. 2006)](noting the historic treatment of prior judgments as hearsay).  It is even more plain that the introduction of discrete judicial factfindings and analysis underlying the judgment to prove the truth of those findings and that analysis constitutes the use of hearsay.

United States v. Sine, 493 F.3d 1021, 1036 (9th Cir. 2007)(citing also Herrick v. Garvey, 298 F.3d at 1191-92).  Contra Tr. at 13:1-14:7 (Anaya-Allen).  If a judgment is hearsay, an order like the Alexander v. Wells Fargo Bank Fees Order is also hearsay.  The Court deems, however, this evidence admissible for purposes of, and the Court will consider this evidence for purposes of, showing the Parwatikar Defendants', Mr. Pratt's, and Real Estate Law's awareness that courts had dismissed Real Estate Law's cases for frivolousness, and dismissed the cases with sanctions.  Moreover, New Mexico may introduce evidence that Mr. Parwatikar knew that Real Estate Law was sanctioned, although he did not know in which case.  See Parwatikar Depo. Doc. 137-4 at 79:19-25.

Wells Fargo Bank $227,251.00 in sanctions and fees, inclusive of the other sanctions.  See MSJ

Response ¶ 10, at 5 (asserting this fact)(citing Alexander v. Wells Fargo Bank, Case No. 2:14-cv-

01303-R-CW, Stipulated Judgment at 3 (C.D. Cal. filed August 4, 2014 Doc. 42)("Alexander v.

Wells Fargo Bank Stipulated Judgment").[25]  Likewise, in Aghaji v. Bank of America, 202 Cal.

---

[25]See supra note 24.  The Court here discusses also Alexander v. Wells Fargo Bank's
collateral estoppel effects, which the Court and the parties addressed at the hearing.  See Tr. at
42:1-2 (Court); id. at 42:11-13 (Harrison); id. at 56:1-10 (Anaya-Allen).  The Court concludes that
collateral estoppel does not preclude the relitigation of Alexander v. Wells Fargo Bank's issues.
"Federal law governs the scope of the preclusive effect given to federal-court decisions." Stan Lee
Media, Inc. v. Walt Disney Co., 774 F.3d 1292, 1297 (10th Cir. 2014)(Semtek Int'l Inc. v.
Lockheed Martin Corp., 531 U.S. 497, 500 (2001)).  The Court applies, therefore, federal
preclusion law to determine the preclusive effect of the federal-court case Alexander v. Wells
Fargo Bank.
In the Tenth Circuit, four elements must be shown to establish collateral estoppel:

"(1) the issue previously decided is identical with the one presented in the action in
question, (2) the prior action has been fully adjudicated on the merits, (3) the party
against whom the doctrine is invoked was a party, or in privity with a party, to the
prior adjudication, and (4) the party against whom the doctrine is raised had a full
and fair opportunity to litigate the issue in the prior action."

Sinfuego v. Curry Cty. Bd. of Cty. Comm'rs, No. CV 15-0563 JB/GF, 2018 WL 6047438, at *12-
13 (D.N.M. Nov. 19, 2018)(Browning, J.)(quoting Adams v. Kinder-Morgan, Inc., 340 F.3d 1083,
1093 (10th Cir. 2003)).  "'A prior issue has not been finally adjudicated on the merits unless the
adjudication was necessary to the judgment.'" Sinfuego v. Curry Cty. Bd. of Cty. Comm'rs, 2018
WL 6047438, at *13 (quoting Edwell v. Chase, No. CIV 05-34 JB/RHS, 2005 WL 3664804, at *4
(D.N.M. Dec. 7, 2005)(Browning, J.)).  "Privity requires, at a minimum, a substantial identity
between the issues in controversy and showing the parties in the two actions are really and
substantially in interest the same." Pelt v. Utah, 539 F.3d 1271, 1281 (10th Cir. 2008)(citing
Lowell Staats Min. Co. v. Philadelphia Elec. Co., 878 F.2d 1271, 1275 (10th Cir. 1989)).

Taylor[v. Sturgell, 553 U.S. 880 (2008),] noted six categories of recognized
exceptions to the general rule against nonparty preclusion: (1) when a person agrees
to be bound by the determination of issues in an action between others; (2) when a
pre-existing substantive legal relationship exists; (3) when a nonparty was
"adequately represented by someone with the same interests who [wa]s a party" in
an earlier suit; (4) when the nonparty assumed control over the earlier litigation;
(5) when a party who did not take part in litigation, as a way of avoiding preclusion,
later sues as the designated representative of a person who was a party to the earlier

suit; and (6) when a special statutory scheme, such as bankruptcy, so directs. [Taylor v. Sturgell, 553 U.S. at 893-95.]

> . . . *Taylor* reaffirmed the limitations attending nonparty preclusion based on adequate representation:

>> A party's representation of a nonparty is "adequate" for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative were aligned, *see Hansberry*[ v. Lee], 311 U.S. [32,] 43, [(1940)]; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the non-party, *see Richards*[ v. Jefferson Cty.], 517 U.S. [793,] 801-802 [(1996)]. In addition, adequate representation sometimes requires (3) notice of the original suit to the persons alleged to have been represented, *see Richards*, 517 U.S. at 801 . . . . In the class-action context, these limitations are implemented by the procedural safeguards contained in Federal Rule of Civil Procedure 23.

> *Id*. at 2176.

Pelt v. Utah, 539 F.3d at 1281-82 (first alteration added).

The Court concludes that the third and fourth collateral estoppel elements are not met here. The first collateral estoppel requirement is satisfied, because New Mexico wants to use Alexander v. Wells Fargo Bank to show Davis' bad faith, the "frivolous nature of the Complaint, the blatant misjoinder of Plaintiffs, . . . Plaintiffs' Counsel's voluntary dismissal of the case to avoid an adverse ruling," and the propriety of $227,251.00 in sanctions against Real Estate Law in Alexander v. Wells Fargo Bank. MSJ Response ¶ 10, at 5 (emphasis from MSJ Response omitted)(citing Alexander v. Wells Fargo Bank Fees Order at 3-5; Alexander v. Wells Fargo Bank Stipulated Judgment at 3). As the Alexander v. Wells Fargo Bank Stipulated Judgment incorporates the sanctions, the Court concludes that the sanctions were necessary to the judgment, see Alexander v. Wells Fargo Bank Stipulated Judgment at 3, but the Court cannot determine the extent to which the parties litigated the sanctions or the judgment, see Alexander v. Wells Fargo Bank Fees Order at 1-5; Alexander v. Wells Fargo Bank Stipulated Judgment at 3. The third requirement is not satisfied, because, although, "by virtue of their activities as representatives," Plotner v. AT&T Corp., 224 F.3d 1161, 1169 (10th Cir. 2000)(stating that attorneys are in privity with the clients that they represent (citing Henry v. Farmer City State Bank, 808 F.2d 1228, 1235 n.6 (7th Cir. 1986))), Real Estate Law and Mr. Davis were in privity with the consumer plaintiffs in Alexander v. Wells Fargo Bank, as discussed infra, a genuine issue of material fact exists regarding the Parwatikar Defendants' or Mr. Pratt's relationships with Real Estate Law and Mr. Davis during Alexander v. Wells Fargo Bank. As the parties have not fully contested the collateral estoppel issue, the Court lacks evidence to say that the Parwatikar Defendants' or Mr. Pratt's interests, and Real Estate Law's and Mr. Davis' interests were aligned. The Court

Rptr. 3d 619 (Cal. Ct. App. 2016), the California Court of Appeals upheld a dismissal of twenty-

two consolidated cases, and because, after "'four failed attempts to allege a justiciable action, there

was no reasonable possibility that additional amendment would cure the defects'"; "the plaintiffs

failed to show that their proposed additional facts supported an unfair business practices claim,"

and the plaintiffs' claims were misjoined, as they did not arise from the same transaction or

occurrence.  MSJ Response ¶ 11, at 6 (asserting this fact)(quoting 202 Cal. Rptr. 3d at 625; and

citing 202 Cal. Rptr. 3d at 622).[26]  Similarly, in Armstrong v. Nationstar, No. MISC15-01122

(Super. Ct. Cal. July 14, 2016), the court sustained a "demurrer filed by Nationstar and dismiss[ed

---

cannot say, accordingly, that the third element is met or, regarding the fourth element, that "the
party against whom the doctrine is raised" -- the Parwatikar Defendants and Mr. Pratt -- did not
have an opportunity to litigate the issue in Alexander v. Wells Fargo Bank.

[26]For Aghaji v. Bank of America to have collateral estoppel effect, three elements must be
satisfied:

> (1) the issue necessarily decided at the previous [proceeding] is identical to the one
> which is sought to be relitigated; (2) the previous [proceeding] resulted in a final
> judgment on the merits; and (3) the party against whom collateral estoppel is
> asserted was a party or in privity with a party at the prior [proceeding].

People v. Carter, 117 P.3d at 562.  See supra note 22.  The Court notes that, although Aghaji v.
Bank of America's dismissal is a final judgment on the merits, whether the lawsuit was frivolous
is a different issue than whether to dismiss Aghaji v. Bank of America.  Additionally, the Court
cannot say that the Parwatikar Defendants and Mr. Pratt were in privity with a party -- the
consumer plaintiffs -- against whom the dismissal in Aghaji v. Bank of America was entered, or
with Real Estate Law or Mr. Davis, who were in privity with the consumer plaintiffs.  See supra
note 25.  The Court concludes, accordingly, that collateral estoppel does not apply.  Otherwise, the
Court will consider the text's fact pursuant to the ruling it discusses supra note 24.

a] mass joinder case filed by RELC." MSJ Response ¶ 11, at 6 (asserting this fact)(citing

Armstrong v. Nationstar, 2016 WL 7321864[27]).[28]

In representing New Mexico consumer Larry Madrid, Real Estate Law asked him to pay

$5,000.00 in advance fees, with a $29.95 monthly maintenance fee. See MSJ Response ¶ 13, at 7

(asserting this fact)(citing Email from Green By Phone to Larry C. Madrid at 1 (dated May 16,

2013), filed May 10, 2019 (Doc. 137-5)[29]("Receipt Email")).[30] Real Estate Law told Madrid that

---

[27]For the order sustaining the demurrer, see Armstrong v. Nationstar, No. MISC15-01122, Order on Defendant Nationstar Mortgage LLC's Demurrer to Third Amended Complaint; and Final Judgment of Dismissal with Prejudice, filed in County of Contra Costa, Superior Court of California September 1, 2016 (Super. Ct. Cal. August 31, 2016), http://icms.cc-courts.org/tellme/tellme/tellmecasereport.asp?language=ENGLISH&courtcode=A&casenumber=MSC15-01122&casetype=CIV (last visited June 26, 2019)("Armstrong v. Nationstar Order").

[28]The Court concludes that Armstrong v. Nationstar has no collateral estoppel effect in this case for the same reasons that Aghaji v. Bank of America does not. See supra note 26. Otherwise, the Court will consider the text's fact pursuant to the ruling it discusses supra note 24.

[29]The Court cites to the MSJ Response's attachments for the Declaration and Affidavit of Larry C. Madrid, filed May 24, 2019 (Doc. 37-5)("Madrid Decl."), and the attachments thereto, because the Doc. 137-5 version of the Information Packet, described as Exhibit B, see Madrid Decl. ¶ 14, at 3 contains two additional pages which the Court understands to belong in the Information Packet and because the Doc. 137-5 version of the Email and FDD Package Attachment from germain@lenderlawlitigation.com to Larry Madrid (sent November 6, 2012), filed May 10, 2019 (Doc. 137-5)("Germain Email and FDD Package"), described as Exhibit C, see Madrid Decl. ¶ 16, at 3, includes additional pages which the Court understands to belong in the Germain Email and FDD Package.

[30]The Parwatikar Defendants object that, to support the text's fact, New Mexico cites solely to the Madrid Decl.'s attachments. See MSJ Reply Plaintiff's Assertion 17, at 7. According to the Parwatikar Defendants, these attachments lack foundation and are hearsay. See MSJ Reply Plaintiff's Assertion 17, at 7. The Parwatikar Defendants' arguments about the fact's foundation do not persuade the Court. Rule 901 of the Federal Rules of Evidence requires: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Testimony that an item is what it is claimed to be" satisfies rule 901's requirement. Fed. R. Evid. 901(b)(1). The Court concludes that New Mexico bases the text's fact on evidence that it has sufficiently identified. Madrid identifies based on his personal knowledge the Receipt

it "would lower his payments and stop or prevent the foreclosure of his home," and "described

itself as a 'powerhouse law firm.'" MSJ Response ¶ 13, at 7 (asserting this fact)(citing Email from

Keith Anthony, Real Estate Law Center PC to Larry Madrid at 1 (dated May 15, 2013), filed May

10, 2019 (Doc. 137-5)("Anthony Email"); Information Packet at 1, filed May 10, 2019 (Doc. 137-

---

Email as an email that he received about his $29.95 monthly payment. See Fed. R. Civ. P. 901(b)(1); Madrid Decl. ¶ 23, at 4.

 The Court agrees with the Parwatikar Defendants that New Mexico's reliance on the Receipt Email raises hearsay problems. New Mexico appears to rely on the Receipt Email's statement that Madrid paid $29.95 for the truth of the matter that Madrid asserts -- that he paid $29.95. See MSJ Response ¶ 13, at 7 (asserting this fact)(citing Receipt Email at 1). The Receipt Email is inadmissible hearsay for such a purpose, because New Mexico cites the Receipt Email's statement that Madrid paid $29.95 for evidence that he paid that amount. New Mexico may rely, however, on the Receipt Email as evidence that Madrid received acknowledgement of his payment, because the Receipt Email's existence and not the truth of the matter that the document asserts, supports that fact.

 The Court includes, however, the text's fact in the Factual Background, because the Madrid Decl. reflects Madrid's personal recollection of paying $5,000.00 in advance fees and $29.95 per month, see Madrid Decl. ¶¶ 8, 11, at 2, and the Attorney-Client Fee Agreement, filed May 24, 2019 (Doc. 145-1), reflects Madrid's agreement to pay and Real Estate Law's request for $5,000.00 and $29.95 in monthly maintenance fees, see Attorney-Client Fee Agreement ¶ 4, at 1-2. Madrid's testimony, based on his personal knowledge, of paying the requested fees, is admissible and non-hearsay. See Fed. R. Civ. P. 56(c). Moreover, the Attorney-Client Fee Agreement's provisions are admissible, non-hearsay.

> A "verbal act" is "[a] statement offered to prove the words themselves because of their legal effect (e.g., the terms of a will)." Black's Law Dictionary (10th ed. 2014). "A contract, for example, is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992). *See also Cagle v. The James St. Grp.*, 400 F. App'x 348, 356 (10th Cir. 2010).

Farley v. Stacy, No. 14-CV-0008-JHP-PJC, 2015 WL 3866836, at *5 (N.D. Okla. June 23, 2015)(Payne, J.), aff'd, 645 F. App'x 684 (10th Cir. 2016)(unpublished). The Attorney-Client Fee Agreement is a contract attaching to Madrid a duty to pay the fees, so it is admissible as non-hearsay.

5)).[31]  Real Estate Law provided Madrid a retainer agreement with a provision describing a fee-splitting agreement with Pinnacle Law and a "'Foreclosure Defense Checklist' that was nothing more than a loan modification application."  MSJ Response ¶ 13, at 7 (asserting this fact)(citing Attorney-Client Fee Agreement ¶ 10, at 3, filed May 10, 2019 (Doc. 137-5); Email and FDD[32] Package Attachment from germain@lenderlawlitigation.com to Larry Madrid at 2 (sent November 6, 2012), filed May 10, 2019 (Doc. 137-5)("Germain Email and FDD Package")).[33]  The FDD

---

[31]The Parwatikar Defendants object that, to support the text's fact, New Mexico cites solely to the Madrid Decl.'s attachments, and that the evidence has foundation and hearsay problems.  See MSJ Reply Plaintiff's Assertion 17, at 7.  The Parwatikar Defendant's arguments on foundation do not persuade the Court.  The Court concludes that Madrid provides an adequate foundation for the Anthony Email and the Information Packet, because he identifies, based on personal knowledge, the Information Packet that he received from Real Estate Law, and because he identifies, based on personal knowledge, the Anthony Email as an email that Real Estate Law sent him.  See Madrid Decl. ¶ 14, 21, at 2, 4.

The Court also concludes that no hearsay problems exist.  "'If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.'"  Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001)quoting Fed. R. Evid. 801 advisory committee's note).  The Court concludes that New Mexico introduces the Anthony Email's and Information Packet's statements to show that Real Estate Law made the statements and not for the statements' truth.  Indeed, New Mexico contends that statements in these documents are false.  The statements constitute, therefore, verbal acts that are not hearsay.

[32]The Court understands FDD to stand for Foreclosure Defense Department.  See Information Packet at 5 (stating "Foreclosure Defense Department, or FDD").

[33]The Parwatikar Defendants object that, to support the text's fact, New Mexico cites solely to the Madrid Decl.'s attachments, and that the evidence has foundation and hearsay problems.  See MSJ Reply Plaintiff's Assertion 17, at 7.  The Parwatikar Defendants do not convince the Court.  In the Madrid Decl., Madrid provides a foundation for the Attorney-Client Fee Agreement and for the Germain Email and FDD Package, identifying both documents as documents that he received from Real Estate Law.  See Madrid Decl. ¶ 14, 16, at 3.  The Attorney-Client Fee Agreement's fee-splitting provision, like the provisions for Madrid's fees, see supra note 30, is an admissible, non-hearsay verbal act.  The Court concludes likewise that New Mexico introduces the Germain Email and FDD Package as evidence that Real Estate Law requested mortgage-related information, and not for the truths of the matter that Real Estate Law asserts.  See Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d at 1087 (quoting Fed. R. Evid. 801 advisory

Package that Real Estate Law sent Madrid includes forms referencing Balanced Legal. See MSJ Response ¶ 13, at 7 (asserting this fact)(citing Germain Email and FDD Package at 7-8).[34] In 2013, Madrid received an email from Real Estate Law stating: "'Currently, we have dismissed the case and are waiting to re-file. It is our intention to gain the most favorable outcome for our clients; therefore, we are seeking to have this matter assigned to an overseeing judge who we believe will render a more favorable judgment for all litigants.'" MSJ Response ¶ 13, at 7 (asserting this fact)quoting Letter from Ashley Hanu to Larry Madrid at 1 (dated January 18, 2013), filed May 10, 2019 (Doc. 137-5)).[35]

---

committee's note). The Court concludes that, for this case's purposes, the Germain Email and FDD Package, at 2 statement is also a verbal ac.

[34]The Parwatikar Defendants object that, to support the text's fact, New Mexico cites solely to the Madrid Decl.'s attachments, and that the evidence has foundation and hearsay problems. See MSJ Reply Plaintiff's Assertion 17, at 7. The Court disagrees. The Court deems Madrid's identification of the Germain Email and FDD Package and the related files to provide an adequate foundation for the Germain Email and FDD Package at 7, 8. See Madrid Decl. ¶ 16, at 3. The Court also sees no hearsay problems with the text's fact, because New Mexico provides this fact as evidence that the name "Balanced Legal Group" appears in the Germain Email and FDD Package at 7, 8, and that the Germain Email and FDD Package at 7, 8, includes the name does not reflect the truth of any matters that the documents assert. See Germain Email and FDD Package at 7, 8. Cf. Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d at 1087 ("'If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.'" quoting Fed. R. Evid. 801 advisory committee's note).

[35]The Parwatikar Defendants object that, to support the text's fact, New Mexico cites solely to the Madrid Decl.'s attachments, and that the evidence has foundation and hearsay problems. See MSJ Reply Plaintiff's Assertion 17, at 7. These arguments do not sway the Court. Madrid identifies the emails in the Madrid Decl. ¶ 19, at 3, and the Court deems this identification, based on Madrid's personal knowledge, sufficient to establish foundation. The Court understands New Mexico to introduce this statement as evidence of the truth of the matters that the statement asserts -- that Real Estate Law planned to seek a more favorable judge. See Tr. at 54:22-56:3 (Anaya-Allen). Rule 803(3) of the Federal Rules of Evidence excepts, however, from hearsay statements of mental, emotional, or physical state:

New Mexico claims that: (i) the Defendants violated the MARS Rule by accepting advance payment for mortgage relief services, and/or Mr. Parwatikar and Pinnacle Law substantially assisted the violations, see Complaint ¶¶ 77-85, at 18-19; (ii) the Defendants, willfully and in bad faith, violated the MFCFPA, by failing to provide required warnings, notices, and disclosures, by failing to give New Mexico homeowners twenty-four hours before signing attorney-client agreements, and by requiring advance payment for their services, see Complaint ¶¶ 86-101, at 19-22; and (iii) the Defendants knowingly engaged in unlawful conduct violating the NMUPA by requiring advance fees and monthly maintenance fees while filing sham lawsuits, by leading New Mexico consumers to believe that the Defendants performed valuable legal services when the Defendants filed sham lawsuits with no value for New Mexico consumers, and by allowing New Mexico consumers to believe that the Defendants will defend foreclosure lawsuits, see Complaint ¶¶ 102-108, at 22-23. New Mexico asks that the Court enjoin the Defendants from continuing such violations, see Complaint ¶¶ 109-11, G, at 23-24, and requests restitution,

---

A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Fed. R. Evid. 803(3). Real Estate Law describes, in the text's quotation, its plan for handling the litigation discussed. See Letter from Ashley Hanu to Larry Madrid at 1. The Court concludes that this statement is admissible as "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 803(3). The Court also notes that, should the Court conclude that Real Estate Law acted in a representative capacity for the Parwatikar Defendants or Mr. Pratt, as received authority from the Parwatikar Defendants or Mr. Pratt to make a statement, or had an agency or an employee relationship with the Parwatikar Defendants and with Mr. Pratt, this statement, and any other Real Estate Law statements, would be admissible under Fed. R. Evid. 801(2)'s opposing party statement exclusion from hearsay.

disgorgement, civil penalties, and costs as the MARS Rule, the MFCFP, and the NMUPA permit, see Complaint ¶¶ (A)-(F), at 24. The Parwatikar Defendants and Mr. Pratt are the only Defendants remaining in this case on liability issues. On June 11, 2018, the Court entered a default judgment against Real Estate Law. See Default Judgment Against Real Estate Law Center at 1-2, filed June 11, 2018 (Doc. 75). On November 5, 2018, the Honorable Laura Fashing, United States Magistrate Judge for the United States District Court for the District of New Mexico, recommended entering a default judgment against Mr. Davis on issues of liability, reserving for litigation the issues of relief, see Proposed Findings and Recommended Disposition at 4, filed November 5, 2018 (Doc. 91), and, on January 18, 2019, the Court adopted Magistrate Judge Fashing's recommendation, see Memorandum Opinion and Order Adopting the Magistrate Judge's Proposed Findings and Recommended Disposition at 2, 9, filed January 18, 2019 (Doc. 106).

## 1. **The MSJ.**

The Parwatikar Defendants argue that a person violates the MARS Rule when that person either engages in prohibited representations,[36] see MSJ at 4-5 (citing 12 C.F.R. § 1015.3), or "provid[es] substantial assistance or support to any mortgage assistance relief service provider when that person knows or consciously avoids knowing that the provider is engaged in any act or practice that violates this rule," MSJ at 5 (quoting 12 C.F.R. § 1015.6). The Parwatikar Defendants aver that New Mexico bases Mr. Parwatikar's liability on the substantial assistance theory and that New Mexico cannot show that Mr. Parwatikar "substantially assisted" Real Estate Law's MARS

---

[36]The MARS Rule prohibits various misrepresentations related to mortgage assistance relief services. See 12 C.F.R. § 1015.3. This case addresses, however, not these provisions, but the prohibition on advance fees. See 12 C.F.R. § 1015.5(a).

Rule violations, because New Mexico cannot show that Real Estate Law collected advance fees for mortgage assistance relief services, rather than for litigation services. MSJ at 5. They add that New Mexico cannot show that Mr. Parwatikar substantially assisted any MARS Rule violations or knew of the violations -- as the MARS Rule requires for substantial assistance liability -- because Mr. Parwatikar does not own Real Estate Law, and did not write or know of the attorney-client fee agreements' provisions until 2013, when he objected to his involvement with these agreements. See MSJ at 5.

The Parwatikar Defendants next aver that New Mexico cannot show that Mr. Parwatikar violated the MFCFP. See MSJ at 5. According to the Parwatikar Defendants, to establish this claim, New Mexico must show that Mr. Parwatikar was a foreclosure consultant --

> "a person who, directly or indirectly, makes a solicitation or offer to an owner to perform services for compensation or who, for compensation, performs a service that the person represents will: (a) stop or postpone a foreclosure sale; . . . (g) avoid or ameliorate the impairment of an owner's credit resulting from the recording of a notice of default or from a foreclosure sale; or (h) otherwise save an owner's residence from foreclosure."

MSJ at 5-6 (quoting N.M. Stat. Ann. § 47-15-2(B)(1)(a), (g), (h)). According to the Parwatikar Defendants,

> "'[s]ervices,' as defined in the statute, include:
>
> (1) debt, budget or financial counseling of any type;
>
> (2) receiving money for the purpose of distributing it to creditors in payment or partial payment of an obligation secured by a lien on a residence in foreclosure;
>
> (3) contacting creditors on behalf of an owner;
>
> (4) arranging or attempting to arrange for an extension of the period within which the owner of a residence in foreclosure may cure the owner's default and reinstate the owner's obligation;

> (5)     arranging or attempting to arrange for a delay or postponement of the time of sale of the residence in foreclosure;
>
> (6)     advising the filing of any document or assisting in any manner in the preparation of any document for filing with a bankruptcy court; or
>
> (7)     giving advice, explanation or instruction to an owner, which in any manner relates to the cure of a default in or the reinstatement of an obligation secured by a lien on the residence in foreclosure, the full satisfaction of that obligation, or the postponement or avoidance of a sale of a residence in foreclosure, pursuant to a power of sale contained in a mortgage.

MSJ at 6 (quoting N.M. Stat. Ann. § 47-15-2(G)). In the Parwatikar Defendants' view, such services do not include law firm consulting services, and a law firm is not an "'owner'" for the MFCFP's purposes. MSJ at 6 (quoting N.M. Stat. Ann. § 47-15-2(D)). The Parwatikar Defendants argue that New Mexico can only prosecute MFCFP violations related to interactions with New Mexico consumers, and that, to establish such a violation, New Mexico must show:

> (1) that Mr. Parwatikar either "ma[de] a solicitation or offer to an owner to perform services" or actually "perform[ed] a service" for a New Mexico owner of a residence in foreclosure, NMSA 1978 § 47-15-2(B)(1); (2) that he received or requested "compensation," *id.*; (3) that this compensation was for "services" as described in NMSA 1978, § 47-15-2(G); and (4) that he "represent[ed]" that such services would "stop or postpone a foreclosure sale," affect a homeowner's credit, or "otherwise save an owner's residence from foreclosure," NMSA 1978 § 47-15-2(B)(1)(a), (g), (h); *cf.* Compl., at ¶ 87[, at 20].

MSJ at 6-7. According to the Parwatikar Defendants, New Mexico cannot show that Mr. Parwatikar performed mortgage relief services for New Mexico consumers or even handled files related to those consumers. See MSJ at 7. Additionally, according to the Parwatikar Defendants, New Mexico bases its claim on attorney-client fee agreements that "possibly affected twelve consumers prior to 2013," has no evidence that Mr. Parwatikar received compensation from these New Mexico consumers or that Real Estate Law paid him anything other than business consulting fees, and has established no communications between Mr. Parwatikar and the New

Mexico consumers or representations that Mr. Parwatikar made the New Mexico consumers. See MSJ at 7.

The Parwatikar Defendants then aver that New Mexico cannot show that Mr. Parwatikar violated the NMUPA. See MSJ at 7. The Parwatikar Defendants set forth four factors for an NMUPA violation:

> "First, the complaining party must show that the defendant made an oral or written statement, visual description, or other representation that was either false or misleading. Second, the false or misleading representation must have been knowingly made in connection with the sale, lease, rental or loan of goods or services. Third, the conduct complained of must have occurred in the regular course of the defendant's trade or commerce. And fourth, the representation must have been of the type that may, tends to, or does deceive or mislead any person."

MSJ at 8 (quoting Inge v. McClelland, 257 F. Supp. 3d 1158, 1170 (D.N.M. 2017)(Browning, J.), aff'd, 725 F. App'x 634 (10th Cir. 2018)(unpublished)). According to the Parwatikar Defendants, New Mexico cannot satisfy the first element -- making false or misleading comments -- because it cannot show that Mr. Parwatikar communicated with New Mexico consumers. See MSJ at 8. Second, the Parwatikar Defendants argue that Mr. Parwatikar did not agree to litigate for Real Estate Law and that New Mexico has only "slight" evidence of his participation in the New Mexico consumers' lawsuits. MSJ at 8. Third, according to the Parwatikar Defendants, the third element -- the knowing element -- was satisfied in late 2013, at which time Real Estate Law's attorney-client agreements were re-written to remove any alleged contact between Mr. Parwatikar and the New Mexico consumers. See MSJ at 8.

The Parwatikar Defendants then defend against New Mexico's injunctive relief request. See MSJ at 8-9. First, the Parwatikar Defendants aver that N.M. Stat. Ann. "§ 36-2-28.2 permits an attorney general to seek an injunction when individuals are practicing law without authorization or aiding or abetting other persons in the unauthorized practice of law," but that New Mexico has

not alleged unauthorized practice of law in New Mexico, so no unauthorized practice exists to enjoin. MSJ at 8-9. Second, according to the Parwatikar Defendants, N.M. Stat. Ann. "§ 57-12-8(B) permits some injunctive relief based on violations of the UPA," but New Mexico has established no NMUPA violations by Mr. Parwatikar, because he made no representations to the New Mexico consumers, and because it has shown no continuing NMUPA violations. MSJ at 9. Third, in the Parwatikar Defendants' views, a "state's attorney general may seek injunctive relief pursuant to 12 U.S.C. § 5538(b)(1)(A) where a case involves ongoing MARS Rule violations," but New Mexico has not established Mr. Parwatikar's liability for a MARS Rule violation and has not shown any continuing MARS Rule violations. MSJ at 9. Last, the Parwatikar Defendants argue that New Mexico cannot obtain a preliminary injunction as N.M. R. Ann. 1-006 permits, because New Mexico cannot satisfy the four preliminary injunction factors:

(1) it will suffer irreparable injury unless the injunction is granted; (2) the threatened injury outweighs any damage the injunction might cause the defendant; (3) issuance of the injunction will not be adverse to the public's interest; and (4) there is a substantial likelihood that the plaintiff will prevail on the merits.

MSJ at 9 (citing LaBalbo v. Hymes, 1993-NMCA-010, ¶ 11, 850 P.2d 1017, 1021). According to the Parwatikar Defendants, New Mexico is not likely to succeed on the merits, and cannot show a threat of irreparable injury. See MSJ at 9.

    2.    **The MSJ Response**.

New Mexico responds. See MSJ Response at 1-19. New Mexico begins by arguing that it has shown sufficient evidence to establish a genuine dispute of material fact whether Real Estate Law and the Parwatikar Defendants violated the MARS Rule. See MSJ Response at 8. New Mexico explains that the Defendants filed frivolous lawsuits to hide that they charged advance fees for mortgage modification services. See MSJ Response at 8. According to New Mexico, in

March, 2012, the Federal Trade Commission ("FTC") issued a consumer warning: "A new scam is targeting financially strapped homeowners across the country. So-called specialized law firms are sending invitations to homeowners, urging them to participate in 'mass joinder' lawsuits against their mortgage lenders as a way to get favorable loan modifications and stop foreclosure." MSJ Response at 8 (citing Mass Joinder Lawsuits, Federal Trade Commission, https://www.consumer.ftc.gov/articles/0256-mass-joinder-lawsuits (last visited June 17, 2019)). New Mexico identifies Real Estate Law's actions as such a scheme. See MSJ Response at 9. According to New Mexico, in In re Pratt, the State Bar of California concluded that Mr. Pratt filed "'meritless lawsuits' against lenders in exchange for advanced fees." MSJ Response at 9. New Mexico describes that, in operating Real Estate Law, Mr. Pratt used non-attorneys engaged in the unauthorized practice of law, did not account for the fees that he claimed to have earned, and did not refund unearned fees. See MSJ Response at 9 (citing In the Matter of Chad Thomas Pratt, Decision at 1, (State Bar Cal. Sept. 18, 2014), http://members.calbar.ca.gov/fal/Licensee/Detail/149746 (last visited June 17, 2019)("In re Pratt Decision")).

New Mexico argues that other courts have concluded that Real Estate Law "violated prohibitions on advance fees for mortgage modification services." MSJ Response at 9. New Mexico explains that the State Bar of California concluded that Real Estate Law "'was in the business of assisting client in obtaining loan modifications by challenging consumer and real estate lender practices.'" MSJ Response at 9 quoting In Re Pratt Decision at 3). New Mexico also describes Davis' disciplinary suits. See MSJ Response at 10 (citing generally 2016 In re Davis Stipulation; 2017 In re Davis Stipulation). New Mexico explains that Davis was the subject of several suits and was eventually disbarred for his activities at Real Estate Law, and that, in 2013,

Davis assumed ownership over Real Estate Law from Mr. Pratt. See MSJ Response at 10. New Mexico notes that the Supreme Court of California approved the State Bar of California's decisions. See MSJ Response at 10 (citing In re Erikson McDonnell Davis on Discipline, Case No. S237442 (S. Ct. Cal. December 7, 2016), aff'd, Case No. S242390 (S. Ct. Cal. August 22, 2017)). New Mexico describes that Davis stipulated:

    a.     "At all times relevant to the facts herein, RELC: (i) obtained clients through advertising using mail, television, and the internet; (ii) utilized non-attorney staff to meet with prospective clients; (iii) attempted to assist its clients in obtaining loan modifications by challenging the practices of their lenders and service providers; and (v) [sic] used mass joinder lawsuits and individual lawsuits in an attempt to achieve its loan modification goals."

    b.     "All of the complainants herein originally approached RELC to assist them with obtaining modifications of their respective home loans. Ultimately, all of the complainants filed fee agreements with RELC, which provided that they hired the firm to pursue litigation against their respective lenders. The fee agreements required the complainants to pay RELC an advanced fee ("AF"). The fee agreement also required the complainants to pay RELC a monthly "maintenance fee" ("MF"); however the firm did not collect a maintenance fee from every client."

    c.     "Respondent failed to adequately supervise RELC's non-attorney staff, which allowed them to represent to the complainants herein, prior to an attorney's review and evaluation of each of their respective matters, that RELC would represent them in litigation against their respective lenders for the initial advanced fee specified below, plus a monthly maintenance fee."

MSJ Response at 10-11 (quoting 2017 In re Davis Stipulation at 6, 7). New Mexico also directs the Court to the proceedings in and results of Alexander v. Wells Fargo Bank, Aghaji v. Bank of America, and Armstrong v. Nationstar, recited in the Factual Background, as evidence of the lawsuits' frivolousness. See MSJ Response at 11-12.

According to New Mexico, the Parwatikar Defendants provided at least substantial assistance and support in violation of the MARS Rule. See MSJ Response at 12 (citing 12 C.F.R. § 1015.6; F.T.C. v. Lake, 181 F. Supp. 3d 692 (D. Ct. Cal. 2016)(Carney, J.)). New

Mexico describes that Mr. Parwatikar arranged his relationship with Real Estate Law in the way that he did to avoid liability. See MSJ Response at 12 (citing F.T.C. v. Lake, 181 F. Supp. 3d at 692). New Mexico contends that, after Minn. v. Balanced Legal & Parwatikar, in which the Attorney General of Minnesota charged Mr. Parwatikar and Balanced Legal with violating advance fee prohibitions, Mr. Parwatikar knew the MARS Rule's prohibitions. See MSJ Response at 13.

Further, New Mexico avers that it has alleged a common enterprise between the Defendants. See MSJ Response at 13. According to New Mexico, the Declaration and Affidavit of Susan M. Murphy, filed May 24, 2019 (Doc. 145-1)("Murphy Decl."), shows a genuine issue of material fact what relationship Mr. Parwatikar had with Real Estate Law. See MSJ Response at 13. New Mexico also describes:

> Forms sent by RELC to New Mexico consumer Larry Madrid reference Balanced Legal Group. [German Email and FDD Package at 7,8]. Both forms are title[d] REAL ESTATE LAW CENTER PC. The "1st Mortgage Authorization Form" contains a paragraph stating: "This form will serve to acknowledge that the captioned mortgagor has authorized our firm, Balanced Legal Group to act in their behalf to resolve their mortgage problems." The "2d Mortgage Authorization Form" contains identical language referencing Balanced Legal Group.

MSJ Response at 13 (quoting Germain Email and FDD Package at 7-8). New Mexico argues:

> In *Florida v. Berger Law Group*, the U.S. District Court for the Middle District of Florida entered a default and final judgment against defaulting defendants for actions virtually identical to those of Real Estate Law Center. *Office of the Attorney General and The State of Floriday v. Berger Law Group et al*, Case No. 8:14-cv-1825-T-30MAP [**Doc 132**] (M.D. Fla. October 9, 2015). In the *Berger* case, the defendants held themselves out as a law firm, promising legal representation in mass joinder lawsuits, requiring advance fees and, in actuality, providing mortgage modification services in violation of Regulation O [the MARS Rule] and Florida and Connecticut consumer protection laws. The *Berger* Court awarded a money judgment of $1,914,669 for consumer restitution and civil penalties of $3,875,000. *Id*.

MSJ Response at 13.

New Mexico also argues that a genuine issue of material fact exists whether the Parwatikar Defendants violated the MFCFP.  <u>See</u> MSJ Response at 14.  New Mexico avers that a common enterprise existed between Real Estate Law and the Parwatikar Defendants.  <u>See</u> MSJ Response at 14 (citing Germain Email and FDD Package at 7-8).  According to New Mexico, therefore, the Court could conclude "that the Parwatikar Defendants directly (the fee-splitting agreement) and indirectly (through the common enterprise and Parwatikar's actions in supervising and directing the work of RELC) acted as foreclosure consultants within the meaning of the MFCFPA."  MSJ Response at 14.  To support this argument, New Mexico lists several of Mr. Parwatikar's actions relating to Real Estate Law: (i) "Parwatikar directed an RELC attorney to work on a loan modification for a client of RELC," MSJ Response at 14 (citing Email from Deepak Parwatikar to Susan Murphy at 1 (sent February 13, 2013), filed May 24, 2019 (Doc. 145-1)("Feb. 13 Email")); (ii) "Parwatikar ordered the RELC attorneys not to work on client matters until payment was received," MSJ Response at 14 (citing Email from Deepak Parwatikar to Susan Murphy at 1-2 (sent April 5, 2013), filed May 24, 2019 (Doc. 145-1)("April 5 Email"); (iii) "Parwatikar was on an RELC telephone list," MSJ Response at 14 (citing Real Estate Law Center, PC Telephone List at 1, filed May 10, 2019 (Doc. 132-1)("Telephone List")); and (iv) "Parwatikar was deeply involved in running RELC, in addition to having assisted in incorporating RELC, and having been paid over $3 million by RELC," MSJ Response at 14 (citing Parwatikar First Set Response, Interrogatory No. 13, at 9; Murphy Decl. ¶¶ 1-13, at 1-2; Parwatikar Depo. Doc. 145-1 at 20:19-21:8).  According to New Mexico, <u>In re Pratt</u> and <u>In Re Davis</u> confirm Real Estate Law's MFCFP violations.  <u>See</u> MSJ Response at 14.

Additionally, New Mexico avers that Real Estate Law provided Madrid foreclosure consultant services; Real Estate Law: (i) told Madrid "it could stop or postpone the foreclosure

sale of his home," MSJ Response at 14-15 (citing N.M. Stat. Ann. § 47-15-2(B)(1)(a), (h)); and (ii) provided "debt counseling, contacting creditors on behalf of an owner, delaying a foreclosure sale," MSJ Response at 15 (citing N.M. Stat. Ann. § 47-15-2(G)(1), (3), (5)).  According to New Mexico, Real Estate Law violated the MFCFP, because it: (i) failed to provide the MFCFP's required notices, see MSJ Response at 15 (citing N.M. Stat. Ann. § 47-15-3); (ii) failed to provide a right of recession, see MSJ Response at 15 (citing N.M. Stat. Ann. § 47-15-4); (iii) charged advance fees, see MSJ Response at 15 (citing N.M. Stat. Ann. § 47-15-4(A)); and (iv) required that, in the case of a lawsuit arising from Real Estate Law's services, New Mexico consumers consent to jurisdiction outside New Mexico and that Madrid agree to a venue outside Madrid's county of residence, see MSJ Response at 15 (citing N.M. Stat. Ann. § 47-15-5(G)).  New Mexico adds: "Not only did Mr. Madrid's Attorney-Client Fee Agreement provide that Pinnacle would receive 80% of the retainer fee, but the Foreclosure Defense documents state that Mr. Madrid is authorizing Balanced Legal Group to act on his behalf."  MSJ Response at 15 (citing Attorney-Client Fee Agreement ¶ 10, at 2; Germain Email and FDD Package at 7-8).  New Mexico argues that, even under the Parwatikar Defendants' theory of the case, Pinnacle Law received over $3 million from Real Estate Law in compensation, purportedly for consulting services, but actually for services furthering Real Estate Law's foreclosure consultant services.  See MSJ Response at 15.

New Mexico next argues that, if the Court identifies an MFCFP violation, the Court must also deem the NMUPA violated.  See MSJ Response at 15-16 (citing N.M. Stat. Ann. § 47-15-7(A)).  New Mexico also argues for its other NMUPA claims.  See MSJ Response at 16-17.  First, New Mexico argues that it shows a genuine issue of material fact regarding Real Estate Law's misrepresentations and that the Defendants engaged in "a pattern of dishonesty, misrepresentation,

and deceit," and repeats that the Parwatikar Defendants engaged in a common enterprise with Real Estate Law.  See MSJ Response at 16.  New Mexico argues that the Defendants filed dozens of frivolous lawsuits, most of which they voluntarily dismissed, and that this pattern suggests knowing misrepresentation of their services as valuable -- not frivolous or sham -- legal services, which constitutes a knowing violation of the NMUPA.  See MSJ Response at 16.  New Mexico cites as evidence of the lawsuits' frivolousness Judge Real's $126,400.00 sanction against Real Estate Law and his statement in Alexander v. Wells Fargo Bank: "'[t]he amount of this sanction is appropriate in light of the frivolous nature of the Complaint, the blatant misjoinder of Plaintiffs, and Plaintiffs' Counsel's voluntary dismissal of the case to avoid an adverse ruling.'"  MSJ Response at 16 (quoting Alexander v. Wells Fargo Bank Fees Order at 5).  Second, New Mexico avers: the "Defendants' practices were unconscionable in that Defendants took advantage of the lack of knowledge, ability, experience and capacity of consumers to a grossly unfair degree, with practices that were in gross disproportion between the value received and the price paid."  MSJ Response at 16 (citing N.M. Stat. Ann. § 57-12-2(E)).  New Mexico cites the 2017 In re Davis Stipulation as evidence to support this claim.  See MSJ Response at 16-17.  Third, New Mexico discusses the evidence showing Real Estate Law's representations about resolving foreclosure concerns, and argues that Real Estate Law's representations were misrepresentations, because Real Estate Law did not provide foreclosure defense.  See MSJ Response at 17.  New Mexico cites the Foreclosure Defense Checklist, see Germain Email and FDD Package at 2, that requests foreclosure defense materials and states that the materials will help in Madrid's foreclosure defense.  See MSJ Response at 17.  New Mexico summarizes that Real Estate Law asked Madrid for financial documents and for his summons for his foreclosure, and transmitted to him FDD Package, which Real Estate Law described was designed to postpone the foreclosure sale.  See

MSJ Response at 17 (citing Email from Tutu Gill to Larry Madrid (sent November 26, 2012), filed May 10, 2019 (Doc. 137-5)("Gill Email")). New Mexico also describes that Real Estate Law repeatedly told Madrid that it would solve Madrid's foreclosure concerns and obtain for him a loan modification. See MSJ Response at 17.

### 3. The MSJ Reply.

The Parwatikar Defendants begin their reply by objecting to much of New Mexico's evidence. See MSJ Reply at 1-4. The Parwatikar Defendants aver that the findings of fact from Alexander v. Wells Fargo Bank and Aghaji v. Bank of America are inadmissible hearsay, because the United States Court of Appeals for the Tenth Circuit has concluded that rule 803(8) of the Federal Rules of Evidence -- the public records exception -- does not encompass judicial factfinding. See MSJ Reply at 2 (citing Herrick v. Garvey, 298 F.3d 1184, 1191 (10th Cir. 2002)). The Parwatikar Defendants add that documents from In re Pratt, In Re Davis, and In the Matter of Adlor Virgil Clarambeau, Case No. 09-O-16588 (State Bar Ct. Cal. 2011)("In re Clarambeau"), are inadmissible hearsay and are not within the residual exception. See MSJ Reply at 3 (citing Auguste v. Sullivan, 2009 WL 807446, at *3 (applying Herrick v. Garvey to a California disciplinary decision)). The Parwatikar Defendants add that New Mexico does not seek even to apply the State Bar of California's findings against someone involved in In re Pratt, In Re Davis, or In re Clarambeau. See MSJ Reply at 3. The Parwatikar Defendants aver that New Mexico could introduce the facts into the record through other, better evidence, than In re Pratt, In Re Davis, and In re Clarambeau. See MSJ Reply at 4.

Regarding the purported MARS violations, the Parwatikar Defendants argue that New Mexico relies "almost exclusively on inadmissible evidence," which is insufficient to establish Real Estate Law's liability, a prerequisite to Mr. Parwatikar's liability. MSJ Reply at 8. Turning

to the MFCFP and NMUPA claims, the Parwatikar Defendants first reiterate that New Mexico has not established a genuine dispute of material fact on the MFCFP claim's four elements or on Mr. Parwatikar's representations to New Mexico consumers concerning Real Estate Law's lawsuits. See MSJ Reply at 9. The Parwatikar Defendants repeat that New Mexico has not shown a genuine dispute of material fact whether Mr. Parwatikar "solicited, offered to, or actually performed a foreclosure 'service,' for a single New Mexico consumer." MSJ Reply at 9 (quoting N.M. Stat. Ann. § 47-15-22(G)).

First addressing the MFCFP claim, the Parwatikar Defendants argue that New Mexico shows only that Mr. Parwatikar directed others' mortgage modification services "but the documents cited do not indicate those orders or directions came from Deepak Parwatikar, that any such 'directions' or 'orders' pertained to New Mexico consumers, or that Mr. Parwatikar solicited, offered to, or actually performed a foreclosure service for a homeowner." MSJ Reply at 9. The Parwatikar Defendants contend that New Mexico has shown no evidence that Mr. Parwatikar communicated with the New Mexico consumers such that he made any representations making him a foreclosure consultant. See MSJ Reply at 9 (citing N.M. Stat. Ann. § 47-15-2(b)(1)(a), (g), (h)). The Parwatikar Defendants additionally argue that New Mexico has insufficient evidence that Mr. Parwatikar received compensation for foreclosure consultant services, based on the facts about Mr. Parwatikar's involvement with the fee-splitting provision and that New Mexico shows no evidence that Pinnacle Law received the $3 million from Real Estate Law or that Mr. Parwatikar knew of these payments. See MSJ Reply at 9.

The Parwatikar Defendants contend, in relation to the alleged NMUPA violation, that New Mexico does not produce evidence of Mr. Parwatikar making misrepresentations to New Mexico consumers. See MSJ Reply at 10. The Parwatikar Defendants aver that New Mexico relies on

evidence of other attorneys' misconduct to prove Mr. Parwatikar's liability, but that this evidence cannot be used to show such liability. See MSJ Reply at 10. Moreover, the Parwatikar Defendants add that, even if this evidence involved Mr. Parwatikar, evidence of past violations cannot be used to show his liability here. See MSJ Reply at 10. The Parwatikar Defendants aver that New Mexico describes Mr. Parwatikar as engaged in a "common enterprise" with Real Estate Law, but that New Mexico does not indicate where it finds such language in any relevant statute or caselaw, or "address why Balanced Legal Group or Deepak Parwatikar personally should be liable in addition to Pinnacle." MSJ Reply at 10. The Parwatikar Defendants add: "In its Response, Plaintiff does not address Mr. Parwatikar's arguments that Plaintiff has presented no sound basis for the Court to grant injunctive relief. The Court should consequently dismiss Count IV." MSJ Reply at 10 (citing MSJ at 8-9).

### 4. **The Joinder.**

In the Joinder, Mr. Pratt joins the MSJ. See Joinder at 1. Mr. Pratt incorporates his arguments from the Notice of Motion, Motion to Dismiss for Improper Venue and/or In the Alternative Transfer to Los Angeles; Dec. of Pratt, filed March 14, 2019 (Doc. 113)("Motion for Change of Venue"), into the Joinder.[37] See Joinder at 2.[38] Mr. Pratt emphasizes that the attorney-

---

[37]The Court concludes that, as Mr. Pratt incorporates his Motion for Change of Venue, he also incorporates his Declaration of Pratt, filed March 14, 2019 (Doc. 113)("Pratt Decl."), attached thereto.

[38]The Court addresses, and denies, the Motion for Change of Venue in a separate Memorandum Opinion and Order. The Court will not herein address the Motion for Change of Venue arguments that Mr. Pratt incorporates.

client fee agreements provide, for disputes arising under the agreements, for venue in Los Angeles County, California, and the application of California law.[39]  See Joinder at 2.

### 5.    The Joinder Response.

New Mexico responds.  See Joinder Response at 1-2.  New Mexico argues that Mr. Pratt untimely filed his Joinder, see Joinder Response at 1, because, according to New Mexico, Mr. Pratt filed the Joinder after the April 25, 2019, deadline for filing pretrial motions.  See Joinder Response at 1.  New Mexico asks that the Court deny, accordingly, the requests in the Joinder and, in the alternative, incorporates its MSJ Response into the Joinder Response.  See Joinder Response at 1-2.[40]

### 6.    The Marked Exhibits Filings.

On May 24, 2019, New Mexico filed its exhibits with the relevant pages marked for the Court's reference, pursuant to D.N.M. LR-Civ 10.6.  See Marked Exhibits Notice at 1.  New Mexico explains that, "[p]ursuant to the local rules," it files "the exhibits including only the relevant pages and marked for reference."  Marked Exhibits Notice ¶ 2, at 1.  The Parwatikar Defendants object to the Marked Exhibits.  See Marked Exhibits Objections at 1-2.  The Parwatikar Defendants state that New Mexico filed the Marked Exhibits, "apparently changing all the exhibits cited in its Response to the MSJ.  It gave no explanation for this change except that it was 'pursuant

---

[39]The Court notes that, as New Mexico was not a party to this contract, this provision does not govern here.  Cf. EX REL., Black's Law Dictionary (11th ed. 2019)(On the relation or information of.  A suit ex rel. is typically brought by the government upon the application of a private party (called a relator) who is interested in the matter.").

[40]The Court addresses the timeliness dispute supra note 1.

to the local rules.'"  Marked Exhibits Objections at 2 (quoting Marked Exhibits ¶ 2, at 1).  The Parwatikar Defendants state that the Marked Exhibits Notice is untimely.  <u>See</u> Marked Exhibits Objections at 1-2.[41]

### 4.  <u>The Hearing</u>.

The Parwatikar Defendants began their summary judgment arguments by explaining that Mr. Parwatikar, Balanced Legal, and Pinnacle Law together bring the MSJ.  <u>See</u> Draft Transcript of Hearing at 9:25-10:2 (taken May 28, 2019)(Harrison)("Tr.").  The Parwatikar Defendants then argued that, to show that Real Estate Law violated the MARS Rule by accepting advance fees, New Mexico must show first that Real Estate Law accepted fees for mortgage assistance relief services,[42] and not for litigation services, which New Mexico has not done.  <u>See</u> Tr. at 10:5-17

---

[41]The Court addresses this dispute <u>supra</u> note 14.

[42]Mortgage Assistance Relief Service means any service, plan, or program, offered or provided to the consumer in exchange for consideration, that is represented, expressly or by implication, to assist or attempt to assist the consumer with any of the following:

> (1)  Stopping, preventing, or postponing any mortgage or deed of trust foreclosure sale for the consumer's dwelling, any repossession of the consumer's dwelling, or otherwise saving the consumer's dwelling from foreclosure or repossession;

> (2)  Negotiating, obtaining, or arranging a modification of any term of a dwelling loan, including a reduction in the amount of interest, principal balance, monthly payments, or fees;

> (3)  Obtaining any forbearance or modification in the timing of payments from any dwelling loan holder or servicer on any dwelling loan;

> (4)  Negotiating, obtaining, or arranging any extension of the period of time within which the consumer may:

>> (i)  Cure his or her default on a dwelling loan,

(Harrison). The Parwatikar Defendants added that New Mexico must show that Mr. Parwatikar,

Balanced Legal, or Pinnacle Law substantially assisted the MARS Rule violation and knew of the

violation, and that New Mexico cannot establish those elements. See Tr. at 10:17-25 (Harrison).

Mr. Pratt joined the Parwatikar Defendants' arguments. See Tr. at 11:7-10 (Pratt).

The Court turned to New Mexico. See Tr. at 11:11-13 (Court, Anaya-Allen). New Mexico

first noted that the Marked Exhibits are the same as the exhibits attached to the MSJ Response,

other than the marking of relevant exhibit portions. See Tr. at 11:15-12:8 (Anaya-Allen). New

Mexico then explained that "it seems undisputed . . . that Real Estate Law Center acted in violation

of the MARS rule, that the provision of so-called litigation services by attorneys who are not

licensed to practice in the State of New Mexico, which is an exception to the MARS rule, did not

---

        (ii)        Reinstate his or her dwelling loan,

        (iii)      Redeem a dwelling, or

        (iv)      Exercise any right to reinstate a dwelling loan or redeem a
                     dwelling;

(5)     Obtaining any waiver of an acceleration clause or balloon payment
contained in any promissory note or contract secured by any dwelling; or

(6)     Negotiating, obtaining or arranging:

        (i)        A short sale of a dwelling,

        (ii)       A deed-in-lieu of foreclosure, or

        (iii)      Any other disposition of a dwelling other than a sale to a
                     third party who is not the dwelling loan holder.

12 C.F.R. § 1015.2.

take place." Tr. at 12:11-15 (Anaya-Allen).[43]  New Mexico averred that a genuine question of material fact exists "whether or not the services that were actually being provided by Real Estate Law Center were mortgage modification or relief services, the same mortgage assistance services that were prohibited by the MARS rule and for which up front payments were required."  Tr. at 12:19-23 (Anaya-Allen).  New Mexico noted that the parties do not dispute whether the payments to Real Estate Law were advance fees.  See Tr. at 12:23-25 (Anaya-Allen).  New Mexico directed the Court to Alexander v. Wells Fargo Bank, Aghaji v. Bank of America, and Armstrong v. Nationstar as evidence that Real Estate Law did not engage in genuine litigation services, but filed frivolous lawsuits to conceal its mortgage assistance relief services, and added that the Court can consider this evidence without violating the hearsay prohibition, because the cases reflect legal conclusions about the lawsuits' frivolousness and not findings of fact.  See Tr. at 13:1-14:7 (Anaya-Allen).  New Mexico argues that, because the lawsuits were frivolous, a genuine dispute exists whether Real Estate Law engaged in actual litigation or used the litigation as a façade for mortgage modification services.  See Tr. at 14:7-14 (Anaya-Allen).

---

[43]An attorney is exempt from all of § 1015.5 where the attorney:

(1)    Provides mortgage assistance relief services as part of the practice of law;

(2)    Is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located; and

(3)    Complies with state laws and regulations that cover the same type of conduct the rule requires.

12 C.F.R. § 1015.7(a).   The attorney must also: "(1) Deposit[] any funds received from the consumer prior to performing legal services in a client trust account; and (2) Compl[y] with all state laws and regulations, including licensing regulations, applicable to client trust accounts." 12 C.F.R. § 1015.7(b).

New Mexico noted that the MARS Rule has a provision for substantial assistance and support, and averred:

> [I]f Mr. Parwatikar is not found to actually have been involved [directly in] the provision of these illegal services by Real Estate Law Center, we would suggest that there is at a minimum a genuine issue of material fact as to whether or not Mr. Parwatikar was providing substantial assistance and support.

Tr. at 14:19-15:2 (Anaya-Allen). New Mexico suggested that Real Estate Law's $3 million payments to Mr. Parwatikar and Pinnacle Law alone establish a genuine issue of material fact on this issue. See Tr. at 15:2-15 (Anaya-Allen).

The Court asked New Mexico what facts a factfinder would need to determine in this case, see Tr. at 15:18-21 (Court), and New Mexico responded, listing

> whether or not Real Estate Law Center was, in fact, a mortgage assistance relief provider, whether or not Real Estate Law Center received advance fees, whether Mr. Parwatikar provides . . . substantial assistance and support to Real Estate Law Center, or whether, . . . Mr. Parwatikar . . . was actually a principal of Real Estate Law Center utilizing his consulting agreement essentially as cover to protect himself. The question is also raised with respect to the substantial assistance and support provision, which is in the code of federal regulations, 12 CFR [§] 1015.6 . . . whether he knew or consciously avoided knowing that the provider, RELC, was engaged in any act or practice that violates the rule.

Tr. at 15:24-16:11 (Anaya-Allen). New Mexico added that a genuine issue of material fact exists regarding Mr. Parwatikar's knowledge, given that Minn. v. Balanced Legal & Parwatikar addressed Balanced Legal and Mr. Parwatikar's mortgage modification services, and argued that Minn. v. Balanced Legal & Parwatikar evidences Parwatikar's "knowledge of the MARS rule and knowledge of the prohibitions" before this case's events. Tr. at 16:24-25 (Anaya-Allen). See id. at 16:14-25 (Anaya-Allen). The Court asked for Minn. v. Balanced Legal & Parwatikar's date, see Tr. at 17:1 (Court), and New Mexico stated 2010, before Real Estate Law's 2011 founding, see Tr. at 17:2-5 (Anaya-Allen).

Mr. Pratt had no reply to New Mexico, see Tr. at 17:12-13 (Pratt), but the Parwatikar Defendants argued that the parties dispute whether Real Estate Law accepted advance payments for mortgage assistance relief services, see Tr. at 17:29-22 (Harrison). The Parwatikar Defendants averred that Real Estate Law's advance fees were for litigation services, and not for mortgage assistance relief services. See Tr. at 18:3-6 (Harrison); id. at 18:15-21 (Harrison). The Court stated that asking for a large retainer fee -- as Real Estate Law did -- is unusual where the law firm also requires a contingency fee. See Tr. at 18:22-19:1 (Court). The Parwatikar Defendants replied that they cannot opine on Real Estate Law's motivation for drafting the attorney-client fee agreements as it did, because Mr. Parwatikar was not involved in drafting the documents. See Tr. at 19:2-6 (Harrison). The Parwatikar Defendants averred that New Mexico has not produced evidence on the purposes for Real Estate Law's retainer provision or evidence showing Real Estate Law's purported mortgage assistance relief services or that the consumer payments were for mortgage assistance relief services. See Tr. at 19:2-18 (Harrison).

The Court asked whether litigation services could be mortgage assistance relief services. See Tr. at 19:19-22 (Court). The Parwatikar Defendants averred that mortgage assistance relief services do not include ligation services, and explained that, in their view, the MARS Rule advance fee prohibition exists, because an entity should not accept payment for a service before completing the service, but noted that such policy concerns do not apply in the litigation services context. See Tr. at 19:23-20:12 (Harrison). The Court asked the Parwatikar Defendants to define mortgage assistance relief services. See Tr. at 20:13-16 (Court). The Parwatikar Defendants responded:

> I will try to do that, Your Honor. I think that mortgage loan relief, or loan modification, is, and this will not [be] a technical definition, so forgive me, but it is the reduction or alteration, maybe even the forgiveness of a loan that [is] made between the debtor, the owner of the home, and some servicer or some bank, and it is the alteration of that loan, the modification of it, that is typically, obviously, to

reduce it, that is described in [§] 1015.5. That's my reading, Your Honor. I think that typically in these cases when you have a debtor that goes through the loan modification process, it is a negotiation with the bank in order to reduce the payments that they have to make, or in order to forgive a past default there. It is basically a financing, that is my understanding, Your Honor. . . . I don't want to say that it could never overlap with litigation, but I think in this case, it has not been demonstrated that it has. And the loan modification services that are described in the regulations are not litigation.

Tr. at 20:17-21:10 (Harrison). The Court persisted in this line of questioning, asking whether the MARS Rule mentions litigation services. See Tr. at 21:11-14 (Court). The Parwatikar Defendants responded that the MARS Rule does not explicitly exclude litigation services, but that the attorney exemption suggests that mortgage assistance relief services do not include litigation services, "because it doesn't really make sense that there would be an exception for lawyers providing these services if, in fact, litigation . . . overlaps with, or is subsumed by these regulations." Tr. at 21:20-23 (Harrison). See id. at 21:15-23 (Harrison). The Court asked whether the Parwatikar Defendants came within the MARS Rule attorney exemption, and the Parwatikar Defendants conceded that Mr. Parwatikar was not licensed in New Mexico. See Tr. at 21:24-22:2 (Court, Harrison). The Court returned to debating the MARS Rule's interpretation and inquired why the regulation would not cover a tool in the lawyer's arsenal -- litigation. See Tr. at 22:3-9 (Court). The Parwatikar Defendants responded:

I think because as I mentioned, Your Honor, . . . advance fee payments are impermissible under this regulation[. Y]ou're asking people who are typically already in debt or in default to pay up front for the promise of reducing their payments, or getting them forgiveness of their default, and that is the reason why it is prohibited. Providing other litigation services, it is just not clear to me that that even falls under the regulation because it is not . . . necessarily directly impacting your loan. Whether or not it is part of what an attorney could do in helping a debtor seems to me to be a different question, and that's not the violation that's been alleged here.

Tr. at 22:10-23 (Harrison).

The Court then asked the Parwatikar Defendants if they contend that the retainer and the contingency fee were for litigation services. See Tr. at 23:7-11 (Court). The Parwatikar Defendants responded that Mr. Parwatikar was not aware of the advance fee provision and that the evidence does not establish how much Real Estate Law received in monthly maintenance fees. See Tr. at 23:12-19 (Harrison). The Parwatikar Defendants explained that, although the contracts require payment of $5,000.00, the evidence does not show what the New Mexico or other consumers paid. See Tr. at 23:20-24:5 (Court, Harrison). The Court asked whether the payment issue raised a genuine issue of material fact, and the Parwatikar Defendants responded that the payment issue does not create such an issue, because the advance fees are not unreasonable, and because New Mexico, and not the Parwatikar Defendants, must provide evidence of the fees' payment, which New Mexico had not done. See Tr. at 24:10-19 (Harrison). The Court suggested that the Court and the parties did not know what purpose the $5,000.00 fee served. See Tr. at 25:3-8 (Court). The Parwatikar Defendants averred that, on the attorney-client fee agreement's face, the attorney-client fee agreement is an agreement for litigation services and that, to survive summary judgment, New Mexico must show that the attorney-client fee agreement served another purpose. See Tr. at 25:9-18 (Harrison).

The Parwatikar Defendant then moved to the MFCFP issue. See Tr. at 25:19-21 (Court, Harrison). The Parwatikar Defendants averred that the MFCFP does not apply to the Parwatikar Defendants, because the MFCFP requires communication with New Mexico consumers and New Mexico has presented no evidence that the Parwatikar Defendants communicated with New

Mexico consumers.[44]  See Tr. at 25:21-26:4 (Harrison).  The Parwatikar Defendants averred that

Mr. Parwatikar was not a foreclosure consultant for MFCFP purposes, so he could not violate the

statute.  See Tr. at 26:4-9 (Harrison).  The Parwatikar Defendants contended that, because the

MFCFP does not apply to business consulting services, such as law firms provide, and because,

for the statute's purposes, law firms are not "owners," the Parwatikar Defendants are not

"foreclosure consultants" for the MFCFP's purposes.[45]  Tr. at 26:5-15 (Harrison).  The Parwatikar

---

[44]The MFCFP regulates "foreclosure consultants" and defines "foreclosure consultant":

a person who, directly or indirectly, makes a solicitation or offer to an owner
to perform services for compensation or who, for compensation, performs
a service that the person represents will:

(a)    stop or postpone a foreclosure sale;

(b)    obtain any forbearance from a beneficiary or mortgagee;

(c)    assist the owner to exercise the right to reinstatement;

(d)    obtain an extension of the period within which the owner
may reinstate the owner's obligation;

(e)    obtain a waiver of an acceleration clause contained in a
promissory note, deed of trust or contract secured by a mortgage on
a residence in foreclosure or contained in the mortgage;

(f)    assist an owner in foreclosure or loan default to obtain a loan
or advance of funds;

(g)    avoid or ameliorate the impairment of an owner's credit
resulting from the recording of a notice of default or from a
foreclosure sale; or

(h)    otherwise save an owner's residence from foreclosure[.]

N.M. Stat. Ann. § 47-15-3(B)(1).

[45]See supra note 44.

Defendants contended that New Mexico argues that the Parwatikar Defendants are in a "common enterprise with Real Estate Law," but that the Parwatikar Defendants cannot locate such "common enterprise" language in the statues or caselaw relevant to this case. Tr. at 26:15-20 (Harrison). The Parwatikar Defendants added that they do not see why, if Real Estate Law is a foreclosure consultant, and the Parwatikar Defendants assisted it or Real Estate Law employed them, New Mexico named them and not simply Real Estate Law as Defendants. See Tr. at 26:20-27:2 (Harrison).

The Court responded that the MFCFP's foreclosure consultant definition is "incredibly broad." Tr. at 27:9 (Court). See id. at 27:8-15 (Court). The Court added that the MFCFP applies to an offer to a homeowner for services and that it did not see how an entity could enter a contract without making an offer of services. See Tr. at 27:23-28:1 (Court). The Parwatikar Defendants responded that, although the MFCFP is broad, New Mexico's authority is limited to the services provided to New Mexico consumers, and the Parwatikar Defendants did not receive compensation from or communicate with these New Mexico consumers and New Mexico shows no sufficient nexus between them and New Mexico consumers to satisfy the MFCFP. See Tr. at 28:11-29:8 (Harrison). Mr. Pratt briefly added that New Mexico also has not shown that he communicated with New Mexico consumers, and noted: "The wording of this statute says a foreclosure consultant stops a foreclosure. That's very specific, Your Honor. There is no evidence that any of the New Mexico residents were in foreclosure. They just wanted to sue their bank. And that's all I did." Tr. at 29:18-22 (Pratt).

New Mexico responded that it objects to Pratt untimely joining the MSJ. See Tr. at 30:2-7 (Anaya-Allen). New Mexico then argued that the MFCFP is broad, that "owner" means the owner of the home being foreclosed, and, given "the breadth of this particular statute, [']a person

who directly or indirectly makes a solicitation or offer['] would suggest that Mr. Parwatikar, as well as the other defendants, are certainly within the ambit of that definition." Tr. at 30:18-21 (Anaya-Allen). See id. at 30:2-21 (Anaya-Allen). New Mexico explained that Real Estate Law directly solicited New Mexico consumers, offering aid with mortgage and foreclosure concerns, and directed the Court to the Madrid Decl. for evidence of such solicitations. See Tr. at 30:21-12 (Anaya-Allen). New Mexico described that the Madrid Decl. reflects Real Estate Law's activities that violated the MFCFP. See Tr. at 31:12-32:16 (Anaya-Allen). New Mexico also indicated that FDD Package documents reference Balanced Legal, which raises a genuine issue of material fact about Mr. Parwatikar, Balanced Legal's, and Pinnacle Law's relationships with Real Estate Law. See Tr. at 32:16-33:5 (Anaya-Allen). New Mexico suggested that the $3 million payments from Real Estate Law to Mr. Parwatikar suggest that he filled more than a business consultant role with Real Estate Law. See Tr. at 33:4-9 (Anaya-Allen). New Mexico also directed the Court to the Murphy Decl. for evidence of Mr. Parwatikar's role with Real Estate Law and argued that, although Mr. Parwatikar maintains that he consulted for Real Estate Law, he received considerable compensation from the firm. See Tr. at 33:17-34:25 (Anaya-Allen). New Mexico argued that the question whether Mr. Parwatikar was directly or indirectly involved with Real Estate Law cannot be determined on summary judgment, and that, given the evidence, he might have been either directly or indirectly involved with Real Estate Law's activities. See Tr. at 34:25-35:5 (Anaya-Allen). According to New Mexico, Mr. Parwatikar claims to have been a consultant with Real Estate Law but could produce a consulting agreement dated only from 2013 and not from earlier. See Tr. at 35:5-16 (Anaya-Allen).

Pratt responded: "I would submit on what I stated, there is no evidence that I directly communicated with any New Mexico residents. All I did was litigation, and that's all I ever did

for them." Tr. at 36:6-9 (Pratt). The Parwatikar Defendants responded to New Mexico that New Mexico's contentions speak to Real Estate Law's role as a mortgage foreclosure consultant, and not to Mr. Parwatikar's direct or indirect communication with New Mexico consumers. See Tr. at 36:12-19 (Harrison). The Court asked the Parwatikar Defendants whether the $3 million from Real Estate Law suggests that Mr. Parwatikar had indirect communication with the New Mexico consumers. See Tr. at 36:20-37:2 (Court). The Parwatikar Defendants replied that the MFCFP does not require personal contact but repeated that, as evidence of Mr. Parwatikar's and Pinnacle Law's involvement with the New Mexico consumers, New Mexico has produced only the attorney-client fee agreement. See Tr. at 37:3-12 (Harrison). The Court asked whether the Email from Deepak Parwatikar to Susan Murphy at 1 (sent May 9, 2012), filed May 10, 2019 (Doc. 137-2)("May 9 Email"), the Feb. 13 Email, the Email from Deepak Parwatikar to Susan Murphy at 1 (sent February 14, 2013), filed May 10, 2019 (Doc. 137-2)("Feb. 14 Email"), and the April 5 Email indicate Mr. Parwatikar's close involvement with Real Estate Law. See Tr. at 37:13-18 (Court). The Parwatikar Defendants replied that Mr. Parwatikar performed consultant work for Real Estate Law and that he did not himself perform the tasks listed in the April 5 Email. See Tr. at 37:19-38:4 (Harrison). The Court asked the Parwatikar Defendants to clarify their theory of the Parwatikar Defendants' role with Real Estate Law. See Tr. at 38:5-18 (Court). According to the Parwatikar Defendants, Mr. Parwatikar provided human resource consulting for Real Estate Law and disclaims any involvement in Real Estate Law's litigation services. See Tr. at 39:8-40:3 (Harrison); id. at 40:23-41:7 (Harrison).

The Court asked the Parwatikar Defendants whether collateral estoppel made irrelevant their hearsay arguments regarding Alexander v. Wells Fargo Bank, Aghaji v. Bank of America, Armstrong v. Nationstar, In re Pratt, and In re Davis. See Tr. at 41:8-15 (Court). The Parwatikar

Defendants responded that collateral estoppel does not apply, because Mr. Parwatikar did not litigate the matters and had no opportunity to respond to the disciplinary hearings. See Tr. at 41:16-25 (Harrison). The Court asked about collateral estoppel in relation to Alexander v. Wells Fargo and Minn. v. Balanced Legal & Parwatikar, to which, respectively, Real Estate Law, and Mr. Parwatikar and Balanced Legal, are parties. See Tr. at 42:1-2 (Court); id. at 42:7-10 (Court). The Parwatikar Defendants responded that the Defendants cannot be conflated. See Tr. at 42:11-13 (Harrison). The Parwatikar Defendants explained that the Court has entered default judgments against Real Estate Law and Davis, so the Parwatikar Defendants cannot opine to the representation provided in any lawsuit involving Real Estate Law and Mr. Davis. See Tr. at 42:24-43:4 (Harrison). The Parwatikar Defendants then explained that Minn. v. Balanced Legal & Parwatikar did not have factual findings involving Real Estate Law, did not involve New Mexico consumers, and may have been resolved on a stipulation. See Tr. at 43:6-9 (Harrison); id. at 43:13-14 (Harrison); id. at 43:18-19 (Harrison); id. at 43:22-44:2 (Harrison). The Parwatikar Defendants explained that, while they are unsure whether Minnesota, Mr. Parwatikar, and Balanced Legal stipulated to a judgment in Minn. v. Balanced Legal & Parwatikar, admitting evidence of Minn. v. Balanced Legal & Parwatikar encounters problems under rule 404(b) of the Federal Rules of Evidence, because Minn. v. Balanced Legal & Parwatikar suggests Mr. Parwatikar's involvement in prohibited activities. See Tr. at 43:22-44:9 (Harrison). The Court asked whether such evidence of Minn. v. Balanced Legal & Parwatikar comes into the record for good faith and scienter purposes, see Tr. at 44:10-14 (Court), but the Parwatikar Defendants argued that rule 404(b) prohibits the evidence and New Mexico did not provide notice of a legitimate purpose for the evidence, see Tr. at 44:15-18 (Harrison). The Parwatikar Defendants explained that Mr. Parwatikar could testify whether Minn. v. Balanced Legal & Parwatikar alerted him to the

MARS Rule and that introducing other evidence of <u>Minn. v. Balanced Legal & Parwatikar</u> piles on evidence for prejudicial purposes. <u>See</u> Tr. at 45:6-25:12 (Harrison). The Parwatikar Defendants also emphasized that the MFCFP applies only to the New Mexico consumers. <u>See</u> Tr. at 45:15-46:3 (Harrison).

The Parwatikar Defendants then moved to the NMUPA arguments. <u>See</u> Tr. at 46:7-9 (Court, Harrison).[46] The Parwatikar Defendants averred that the NMUPA claim is limited to representations to and lawsuits on behalf of the New Mexico consumers, and reiterated their arguments about the lack of evidence of Mr. Parwatikar's communications with New Mexico consumers. <u>See</u> Tr. at 46:9-14 (Harrison). According to the Parwatikar Defendants, New Mexico has not shown evidence of communications between Mr. Parwatikar and the New Mexico consumers, and Mr. Parwatikar had even less involvement with the lawsuits than he had communication with the New Mexico consumers. <u>See</u> Tr. at 46:9-47:15 (Harrison). The Parwatikar Defendants added that they object on hearsay grounds and on 403 grounds to much of New Mexico's evidence about Mr. Davis and/or Real Estate Law. <u>See</u> Tr. at 47:18-48:4 (Harrison). The Court asked the Parwatikar Defendants why the Germain Email and FDD Package at 7, 8 names Balanced Legal Group. <u>See</u> Tr. at 48:5-13 (Court). The Parwatikar Defendants responded that the record is unclear why the forms contain that name and explained that, although New Mexico suggests that Real Estate Law obtained the forms from Balanced Legal, Balanced Legal was not in the business of practicing during the time Real Estate Law used the forms. <u>See</u> Tr. at 48:14-25 (Harrison).

---

[46]These arguments discuss the NMUPA claims other than the MFCFP claim. <u>See</u> N.M. Stat. Ann. § 47-15-7(A) (stating MFCFPA violations are to be treated as NMUPA violations).

The Court turned to New Mexico for its NMUPA arguments. See Tr. at 49:17-20 (Court). New Mexico averred that Mr. Parwatikar argues his non-involvement with Real Estate Law's mass joinder lawsuits, but acknowledges in the Parwatikar Depo. that he was aware of the lawsuits. See Tr. at 49:21-50:1 (Anaya-Allen). The Court interjected to ask New Mexico's theory of Mr. Parwatikar and Real Estate Law's relationship. See Tr. at 50:2-6 (Court). New Mexico explained:

> Well, our theory is after getting dinged by the Minnesota Attorney General, Mr. Parwatikar decided to set up a model that he felt would provide him with cover from similar type of charges. So he set up RELC. He was involved in the origin[al] [in]corporation of RELC. There was discussion of that at his deposition. He acknowledged that he was, quote unquote, I guess, hired or consulted by . . . [Clarambeau] in the incorporation of RELC, and that he acted in that incorporation process as the agent for RELC. Again, Mr. Parwatikar tries to be very hands off. He is just acting at the behest of a client. I mean, he doesn't . . . produce any documents that support any of his positions. He just denies without actually being able to provide anything that corroborates his position with respect to that. That after, you know, RELC was incorporated, set up by Mr. Parwatikar . . . through his law firm, he stated that he participated in the corporation of RELC. He took the [model] that he had been using with Balanced Legal Group in Minnesota and transferred it to California with Real Estate Law Center, which is indicated by these forms from Balanced Legal Group that were being used by Real Estate Law Center . . . . I mean, there is a lot more evidence, Your Honor, that we have on this point that's not part of this motion that's been in front of the Court.

Tr. at 50:7-51:6 (Anaya-Allen). New Mexico also directed the Court to the 2017 In re Davis Stipulation for evidence of Real Estate Law's activities, and argued that, because Davis stipulated to the facts in the 2017 In re Davis Stipulation, the statements are admissions admission and not hearsay. See Tr. at 51:4-23 (Anaya-Allen). The Court asked into which hearsay exception New Mexico would fit the statements, and New Mexico identified rule 801(d)(2) of the Federal Rules of Evidence -- opposing party's statements. See Tr. at 51:2452:2. The Court advised that Davis will not be a party at trial. See Tr. at 52:3-4. New Mexico then cited the catchall provision of the

Federal Rules of Evidence's rule 807, but the Court stated that it would likely not use that provision.  See Tr. at 52:9-14 (Anaya-Allen, Court).  New Mexico then explained why it believed that rule 803(8) applies, differentiating this case from Herrick v. Garvey, and arguing that, here, unlike in Herrick v. Garvey, the trial is a bench trial, so the Tenth Circuit's concerns about a jury giving disproportionate weight to judicial findings are irrelevant.  See Tr. at 52:15-53:12 (Anaya-Allen).  The Court indicated its doubt that the 2017 In re Davis Stipulation fits the rule 803(8) exception, because records of Real Estate Law's activities are records of private matters and a stipulation is likely not a matter observed in an investigation or while under a legal duty to report.  See Tr. at 53:18-54:5 (Court).  New Mexico offered that a state bar disciplinary hearing should be considered a legally authorized investigation.  See Tr. at 54:10-22 (Anaya-Allen).

New Mexico argued that Real Estate Law uniformly dismissed its lawsuits, because the lawsuits were a "mechanism that was being used to obtain loan modifications for the consumers." Tr. at 55:6-7 (Anaya-Allen).  See id. at 54:22-55:7 (Anaya-Allen).  New Mexico suggested that the conclusions of frivolousness in Alexander v. Wells Fargo Bank and Aghaji v. Bank of America are not findings of fact, but conclusions of law, and should have "some collateral estoppel effect," Tr. at 56:10 (Anaya-Allen).  See Tr. at 56:1-10 (Anaya-Allen).  New Mexico averred that the Murphy Decl. and the May 9 Email, the Feb. 13 Email, the Feb. 14 Email, and the April 5 Email evidence Mr. Parwatikar's involvement.  See Tr. at 56:11-18 (Anaya-Allen).

The Parwatikar Defendants responded.  See Tr. at 57:6-8 (Court, Harrison).  They first indicated that, if the 2016 In re Davis Stipulation and the 2017 In re Davis Stipulation are not judicial findings of fact, rule 803(8) does not except the stipulations from hearsay, and that, even if 2016 In re Davis Stipulation and the 2017 In re Davis Stipulation are judicial findings of fact, in Herrick v. Garvey, the Tenth Circuit concluded that rule 803(8) does not apply to judicial bodies'

findings of facts.  See Tr. at 57:8-21 (Harrison).  The Parwatikar Defendants added that, if 2016 In re Davis Stipulation and 2017 In re Davis Stipulation contain only Mr. Davis' stipulations, rule 801(d)(2) would not apply, because Mr. Davis is not a party opponent.  See Tr. at 57:17-58:4 (Harrison).  The Parwatikar Defendants added, regarding rule 807, that nothing indicates that Davis' stipulations provide the best evidence through which to introduce facts about Real Estate Law.  See Tr. at 58:4-10 (Harrison).

The Court asked whether New Mexico has other evidence to support its position on the NMUPA, and the Parwatikar Defendants replied that New Mexico has not established much of its evidence's admissibility.  See Tr. at 58:17-59:3 (Court, Harrison).  The Parwatikar Defendants agreed, however, with the Court that the Murphy Decl. and the attached emails from Mr. Parwatikar are admissible.  See Tr. at 59:4-12 (Court, Harrison); id. at 59:13-21 (Court, Harrison).  The Parwatikar Defendants described the question before the Court as whether, without the inadmissible evidence, New Mexico raised a genuine issue of material fact on the NMUPA claim.  See Tr. at 59:21-60:1 (Harrison).  The Court asked who, if not the Parwatikar Defendants, performed legal work at Real Estate Law, and the Parwatikar Defendants replied that Real Estate Law had attorneys.  See Tr. at 60:2-15 (Court, Harrison).  The Court asked for further information regarding through whom the Real Estate Law provided legal services, and the Parwatikar Defendants explained that Mr. Pratt owned and was the lead attorney for Real Estate Law from 2011 to 2013, that Davis owned and was the lead attorney for Real Estate Law from 2013 to 2016, and that Real Estate Law employed its own attorneys, who performed its legal work.  See Tr. at 60:19-61:6 (Harrison).  The Court asked the Parwatikar Defendants about Mr. Parwatikar's references to clients in the Feb. 14 Email, and the Parwatikar Defendants responded that the clients to which Mr. Parwatikar referred were not Mr. Parwatikar's personal clients, but Real Estate Law's

clients, and that Mr. Parwatikar and Pinnacle Law provided business and human resources consulting services and rental services to Real Estate Law. See Tr. at 61:7-62:7 (Court, Harrison). The Court pressed that Mr. Parwatikar appeared to manage Real Estate Law's activities, but the Parwatikar Defendants explained that, although human resource management and litigation management overlap, Mr. Parwatikar was not involved in Real Estate Law's litigation services. See Tr. at 62:8-63:18 (Court, Harrison).

The Court and the parties turned to the injunctive relief arguments. See Tr. at 63:25-64:6 (Harrison, Court). The Parwatikar Defendants averred that New Mexico has not shown any ongoing actions to enjoin. See Tr. at 64:6-14 (Harrison). New Mexico agreed that no evidence shows that the prohibited activities are ongoing, but stated that it did not intend to waive its injunctive relief requests and that it sought such relief to prevent the Defendants' activities from proceeding in the future. See Tr. at 64:20-65:10 (Anaya-Allen). The Parwatikar Defendants responded that injunctive relief is inappropriate when it is speculative and has no end date. See Tr. at 65:15-21 (Harrison).

Regarding the Marked Exhibits Notice, the Parwatikar Defendants added that they objected to the Marked Exhibits Notice as untimely. See Tr. at 66:1-11 (Harrison). The Court asked if timeliness was the Parwatikar Defendants' sole objection to the Marked Exhibits, see Tr. at 66:12-16 (Court), and the Parwatikar Defendants responded that they had no other objections, see Tr. at 67:1-7 (Harrison). New Mexico repeated that the Marked Exhibits only differ from the MSJ Response's exhibits in that the Marked Exhibits are marked. See Tr. at 67:12-17 (Anaya-Allen). The Court concluded that it likely would not exclude the evidence for being untimely, because it welcomed New Mexico's help in having marked the exhibits. See Tr. at 66:21-23 (Court). The Court informed the parties that it would likely deny the MSJ. See Tr. at 67:23-68:23 (Court).

Mr. Pratt returned at the hearing's end to the collateral estoppel issue and argued that he "cannot be punished twice for the same crime." Tr. at 111:5 (Pratt). See id. at 111:1-10 (Pratt).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. CIV 11-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at

331 (Brennan, J., dissenting)(emphasis in original).[47]  Once the movant meets this burden, rule 56

requires the nonmoving party to designate specific facts showing that there is a genuine issue for

trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)("Liberty Lobby").  Alternatively, the movant may show that the nonmoving party lacks the

evidence to establish its case at trial, and the nonmovant will have the burden of showing that it

can produce sufficient evidence to establish the essential elements of its case.  See Celotex, 477

U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an

essential element of its case); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M.

2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence

that defendants defectively manufactured an oil distributor); 11 James Wm. Moore et al., Moore's

Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).  In American Mechanical

Solutions, LLC v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M.

2016)(Browning, J.), the Court confronted such a situation in which the movant did not offer

evidence disproving the nonmovant's allegations, but, rather, argued, under the second option in

Celotex, that the nonmovant lacked evidence to establish an element of its claim.  See 184

F. Supp. 3d at 1075.  The Court granted summary judgment for the movant, because the

nonmovant -- the plaintiff -- did not offer expert evidence supporting causation or proximate

causation for its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims

---

[47]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court of the United States, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

as New Mexico law requires to establish a prima facie case for those elements.  See 184 F. Supp. 3d at 1075.

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("'However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" (quoting Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d at 1241)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("'[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" quoting Coleman v. Darden, 595 F.2d, 533, 536 (10th Cir. 1979)).  A party may not "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue

Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (citing Vitkus v. Beatrice Co., 11 F.3d at 1539; Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted)(citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968); Dombrowski v. Eastland, 387 U.S. 82, 87 (1967)). Where a rational trier of fact, considering the whole record, cannot find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary

judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus[.] Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "as with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott[ v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets from Thomson v. Salt Lake Cty. omitted).

"The Tenth Circuit, in Rhoads v. Miller, 352 F. App'x 289 [, 291 (10th Cir. 2009)(unpublished),[48]] . . . explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).

---

[48]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion from the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Rhoads v. Miller and United States v. McElhiney, 85 F. App'x 112 (10th Cir. 2003), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

**LAW REGARDING DIVERSITY JURISDICTION AND INTERPRETING STATE LAW**

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity jurisdiction, and when applying state law under federal question jurisdiction, applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[49] If the Court finds only an opinion from the Court of Appeals of New

---

[49]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the

Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")))[.50]  The Court may also rely on Tenth Circuit decisions interpreting New Mexico

_____

earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court applying Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[50]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

law.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30

(D.N.M. 2014)(Browning, J.).[51]  Ultimately, "the Court's task is to predict what the state supreme

---

... We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."(emphasis and title case omitted)).

[51]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to

adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, &

Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state supreme court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is $x$. Its holdings are descriptive and not prescriptive -- interpretive and not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, former United States District Judge for the United States District Court of the Northern District of Illinois, looks to state

procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866. From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language

1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, then-United States Circuit Judge for the Tenth Circuit, limitation in Wankier v. Crown Equip. Corp. of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court.  "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law.  Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

court would do." Wade v. EMCASCO Ins., 483 F.3d at 666. Accord Mosley v. Titus, 762 F. Supp. 2d at 1332.

## LAW REGARDING THE FINALITY OF STATE COURT JUDGMENTS IN FEDERAL COURT

Res judicata and collateral estoppel are common-law doctrines of finality, which serve to relieve parties of the costs and vexation of multiple lawsuits, conserve judicial resources, and prevent inconsistent decisions. See Allen v. McCurry, 449 U.S. 90, 94 (1980). Pursuant to res judicata, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981)(citing Comm'r v. Sunnen, 333 U.S. 591, 597 (1948)). Collateral estoppel precludes re-litigation of a common issue of law or fact which was necessarily decided in a prior court's final judgment. See Allen v. McCurry, 449 U.S. at 94. In determining whether a doctrine of finality applies, a decision from a state court has the same preclusive effect in federal court as the decision would have in a subsequent state court action. See Reed v. McKune, 298 F.3d 946, 949-50 (10th Cir. 2002)(citing 28 U.S.C. § 1738 ("[The] judicial proceedings of any court of any such State . . . shall have the same full faith and credit in every court within the United States . . . as they would by law or usage in the courts of such . . . from which they are taken.")). A district court in the Tenth Circuit applying res judicata or collateral estoppel to a decision from a state court must look to the laws of that state to determine the required elements for either doctrine to preclude a claim or issue brought in federal court. See Reed v. McKune, 298 F.3d at 949 (""In determining whether a state court judgment precludes a subsequent action in federal court, we must . . . giv[e] it the same preclusive effect as would the courts of the state issuing the judgment.'" (quoting Rhodes v. Hannigan, 12 F.3d 989, 991 (10th Cir. 1993))).

Thus, if a state law in state court would preclude re-litigation of a claim or an issue of law or fact, the same claim or issue is precluded in federal court. See <u>Reed v. McKune</u>, 298 F.3d at 949-51 (applying Kansas law to determine whether collateral estoppel precludes an issue of fact or law in a federal court action containing § 1983 claims). <u>Cf.</u> <u>Mayer v. Bernalillo Cty.</u>, No. CIV 18-0666 JB\SCY, 2019 WL 130580, at *36-43 (D.N.M. Jan. 8, 2019)(Browning, J.)(applying New Mexico law to determine the preclusive effects of a New Mexico state court proceeding); <u>Martinez v. Martinez</u>, No. CIV 09-0281 JB/LFG, 2013 WL 3270448, at *28-29 (D.N.M. June 3, 2013)(Browning, J.)(applying New Mexico preclusion law to determine the preclusive effect of a New Mexico divorce); <u>Braverman v. New Mexico</u>, No. CIV 11-0829 JB/WDS, 2012 WL 5378290, at *28-30 (D.N.M. Sept. 26, 2012)(Browning, J.)(applying New Mexico law to determine the preclusive effect of a New Mexico state court judgment).

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." <u>United States v. Christy</u>, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). Rule 801(c) of the Federal Rules of Evidence defines hearsay: "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Courts deem hearsay generally unreliable and untrustworthy. See <u>Chambers v. Mississippi</u>, 410 U.S. 284, 298 (1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability); <u>United States v. Lozado</u>, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible as evidence because it is considered unreliable." (citing <u>Williamson v. United States</u>, 512 U.S. 594, 598 (1994))); <u>United States v. Console</u>, 13 F.3d 641, 656 (3d. Cir. 1993)(stating hearsay is "'inherently untrustworthy'" because of the lack of an oath, presence in court, and cross

examination quoting United States v. Pelullo, 964 F.2d 193, 203 (3rd Cir. 1992))). Testimonial proof is necessarily based upon the human senses, which can be unreliable. See 5 Jack Weinstein & Margaret Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (Joseph McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence"). The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination. See Weinstein's Federal Evidence § 802.02[2][a], at 802-5. Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination, see, e.g., United States v. Console, 13 F.3d at 656; it is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable, see Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7.

"Hearsay within hearsay" is admissible only "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See, e.g., United States v. DeLeon, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting, after concluding that rule 803(8) provides an exception for law enforcement reports, that a hearsay issue remains regarding the statements within the reports); Wood v. Millar, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015)(Brack, J.)(stating that witness statements in police reports, to which rule 803(8) applies, may be admissible under hearsay exclusions other than rule 803(8)); Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 6632524, at *7 (D.N.M. Oct. 31, 2012)(Browning, J.)(excluding medical records, which themselves were inadmissible hearsay, although the statements within the medical records were opposing party statements). A statement that is otherwise hearsay, however, may be admissible for a purpose, such as impeachment, other than to prove the truth of the matter asserted. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used

substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Likewise, "'[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.'" Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001)(quoting Fed. R. Evid. 801 advisory committee's note). Statements in the latter category include verbal acts --

> "statement[s] offered to prove the words themselves because of their legal effect (e.g., the terms of a will)." Black's Law Dictionary (10th ed. 2014). "A contract, for example, is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992). *See also Cagle v. The James St. Grp.*, 400 F. App'x 348, 356 (10th Cir. 2010).

Farley v. Stacy, No. 14-CV-0008-JHP-PJC, 2015 WL 3866836, at *5 (N.D. Okla. June 23, 2015)(Payne, J.), aff'd, 645 F. App'x 684 (10th Cir. 2016)(unpublished).

### 1.   **Rule 801(d)(2).**

An opposing party's statement is not hearsay. See Fed. R. Evid. 801(d)(2). Rule 801(d)(2) specifically excludes from hearsay a statement that

> is offered against an opposing party and:
>
> (A)    was made by the party in an individual or representative capacity;
>
> (B)    is one the party manifested that it adopted or believed to be true;
>
> (C)    was made by a person whom the party authorized to make a statement on the subject;
>
> (D)    was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
>
> (E)    was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

Fed. R. Evid. 801(d)(2). "The admissibility of opposing-party statements 'is not based on reliability; rather, they are admitted as part of the adversary system'; they are admitted, in short, because the party said the words and should be stuck with them, regardless of their accuracy." United States v. Ballou, 59 F. Supp. 3d 1038, 1074 (D.N.M. 2014)(Browning, J.)(quoting Stephen A. Saltzburg et. al, Federal Rules of Evidence Manual § 801.02[b], at 801-13 (2011)). "[T]he Tenth Circuit has stated that proponents of such evidence 'need only show by a preponderance of the evidence that the opposing party had made the statement.'" United States v. Shirley, No. CR 15-1285 JB, 2016 WL 9021832, at *7 (D.N.M. Dec. 21, 2016)(Browning, J.)(citing United States v. Brinson, 772 F.3d 1314, 1320 (10th Cir. 2014)).

"Rule 801(d)(2)(A) does not . . . permit such a statement to be used against anyone other than the party who made the statement, such as codefendants." United States v. DeLeon, 287 F. Supp. 3d 1187, 1256 (D.N.M. 2018)(Browning, J.)(citing United States v. Wolf, 839 F.2d 1387, 1393 & n.4 (10th Cir. 1988); Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual § 801.02[6][c] (11th ed. 2017)). Statements made during closing argument by an attorney qualify as an admission by a party opponent under rule 801(d)(2)(A). See United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1121 & 1121 n.11 (D.N.M. 2012)(Browning, J.)(citing United States v. McElhiney, 85 F. App'x 112, 115 (10th Cir. 2003)(unpublished)). The Court has determined that rule 806 of the Federal Rules of Evidence, which permits attacking hearsay statements with "any evidence that would be admissible for those purposes if the declarant had testified as a witness," Fed. R. Evid. 806, "does not apply to rule 801(d)(2)(A) statements," United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 878121, at *2 n.1 (D.N.M. Feb. 12, 2018)(Browning, J.). "Party

opponents can, however, impeach their own admissions, i.e., rule 801(d)(2)(A) statements, even though rule 806 does not apply. If a party opponent admission is relevant, then anything that impeaches such a statement is also relevant." United States v. DeLeon, 2018 WL 878121, at *2 n.1.

## 2. **Rule 803(3).**

Rule 803(3) permits the introduction of "hearsay . . . , even though the declarant is available as a witness," for a statement of the declarant's "[t]hen existing mental, emotional, or physical condition":

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3). For the statement to qualify under the exception, it "must relate to the declarant's state of mind during" the incident in question. United States v. Netschi, 511 F. App'x 58, 61 (2d Cir. 2013)("'To admit statements of one's state of mind with regard to conduct that occurred . . . earlier as in this case would significantly erode the intended breadth of this hearsay exception.'"(quoting United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991))). This requirement is not to say that the statement must be said at the very moment of the incident, but for intent to be proved, it must be "contemporaneous" to the act. Mut. Life Ins. of N.Y. v. Hillmon, 145 U.S. 285, 295 (1892). To be contemporaneous and therefore admissible under the present-state-of-mind exception, a statement must be "part of a continuous mental process." United States v. Cardascia, 951 F.2d at 488. In addition to the requirements that the statement be contemporaneous to the incident at hand and relevant to the issues of the case, it must also be established that there was no opportunity for the declarant to "'fabricate or to misrepresent his

thoughts.'" United States v. Jackson, 780 F.2d 1305, 1315 (7th Cir. 1986)quoting United States v. Layton, 549 F. Supp. 903, 909 (N.D. Cal. 1982)(Peckham, J.)).  The statements of intent must reveal information or details about the future, as opposed to statements of memory, or statements looking to the past.  See Shepard v. United States, 290 U.S. 96, 104 (1933).  "The most obvious risk of prejudice" from such statements "is that the jury will consider the hearsay statement not as proof of state of mind and the subsequent conduct of the declarant, but rather for the truth of the facts that are related in the statement."  Saltzburg, supra, § 803.02, at 4-803 (11th ed. 2017).

### 3.    **Rule 803(8).**

Rule 803(8) provides a hearsay exception for public records.  See Fed. R. Evid. 803(8).  It excepts from the hearsay prohibition:

> A record or statement of a public office if:
>
> (A)    it sets out:
>
>> (i)    the office's activities;
>>
>> (ii)    a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>>
>> (iii)    in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B)    the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8).  This exception does not "allow the admission of findings by courts."  Herrick v. Garvey, 298 F.3d at 1192.[52]

---

[52]In reaching this conclusion, the Tenth Circuit reasoned:

4. **Rule 807.**

Rule 807, the Residual Exception, provides:

Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

> (1)    the statement has equivalent circumstantial guarantees of trustworthiness;

> (2)    it is offered as evidence of a material fact;

> (3)    it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

> (4)    admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a).  This rule provides further that "the statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it."  Fed. R. Evid. 807(b).[53]  The United States Court of Appeals for the

---

The advisory committee notes to Rule 803(8) also indicate that the intent of the rule's drafters was to allow for the admission of investigations by officials in the executive branch . . . .   In addition, the Federal Rules of Evidence specifically allow for the admission of certain kinds of judgments or their underlying facts as evidence, *see* Fed. R. Evid. 803(22) (previous conviction); R. 803(23) (personal, family, or general history and boundaries), which dissuades us from concluding that Rule 803(8) provides a blanket ground for the admission of prior judgments.  A contrary conclusion by us would effectively eliminate the narrow nature of these hearsay exceptions and render them redundant.

Herrick v. Garvey, 298 F.3d at 1192.  Additionally, the Tenth Circuit noted policy concerns about jurors placing disproportionate weight on judicial findings of fact.  See Herrick v. Garvey, 298 F.3d at 1192.

[53]Rule 807 was added to the Federal Rules of Evidence in 1997, and represents a combination of the virtually identical former rules 803(24) and 804(b)(5).  See 5 Jack B. Weinstein

First Circuit has summarized the policies that the residual hearsay exception serves: (i) "[t]o provide sufficient flexibility to permit the courts to deal with new and unanticipated situations"; (ii) "[t]o preserve the integrity of the specifically enumerated exceptions"; (iii) "[t]o facilitate the basic purpose of the Federal Rules of Evidence: truth ascertainment and fair adjudication of controversies." United States v. Sposito, 106 F.3d 1042, 1048 (1st Cir. 1997)(citing 11 Moore's Federal Practice § 803(24)[7] (2d ed. 1994 & Supp. 1996-97)). These purposes are consistent with the suggestions of many of the leading evidence scholars over the past century and further rule 807's objective to make relevant evidence admissible. See United States v. Moore, 824 F.3d 620, 624 (7th Cir. 2016)("The purpose of Rule 807 is to make sure that reliable, material hearsay evidence is admitted, regardless of whether it fits neatly into one of the exceptions enumerated in the Rules of Evidence.").

Given that rule 807 authorizes the admission of hearsay evidence outside the confines of a precise exception, courts interpret the residual exception to allow, in individual situations, for the admission of evidence of high probative value, but not to create new categorical exceptions. See United States v. Doe, 860 F.2d 488, 491 (1st Cir. 1988)(concluding that the residual exception criteria "involve considerations which are very trial-specific, such as the relative probative value of the hearsay statement and whether admitting the statement will best serve 'the interests of justice'" (quoting Fed. R. Evid. 803(24))). But cf. Garner v. United States, 439 U.S. 936, 939 n.3, (1978)(Stewart, J., dissenting)("It seems to me open to serious doubt whether [the residual exception] was intended to provide case-by-case hearsay exceptions, or rather only to permit expansion of the hearsay exceptions by categories."). The residual hearsay exception is "meant to

---

& Margaret A. Berger, Weinstein's Federal Evidence, § 807.02 at 807-4 (Mark S. Brodin ed., 2d ed. 2018)(citing Advisory Committee Note to Rule 807).

be reserved for exceptional cases," and is "not intended to confer 'a broad license' on trial judges 'to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b).'" Conoco Inc., v. Dep't of Energy, 99 F.3d at 392 (quoting S. Rep. No. 94-199, at 20 (1975)). See United States v. Trujillo, 136 F.3d 1388, 1395-96 (10th Cir. 1998)(stating that, because the residual hearsay exception is intended for "exceptional circumstances," offerors of such evidence bear a "heavy burden" of presenting the trial court with sufficient indicia of trustworthiness). Hence, evidence admitted pursuant to rule 807 must have "circumstantial guarantees of trustworthiness" comparable to those of the rule 803 exceptions.[54] United States v.

---

[54]Categories of information addressed in the rule 803's specific hearsay exceptions "have attributes of trustworthiness not possessed by the general run of hearsay statements that tip the balance in favor of introducing the information" despite its hearsay character. United States v. Fernandez, 892 F.2d 976, 981 (11th Cir. 1989). Moreover, several federal Courts of Appeals have concluded that guarantees of trustworthiness must be equivalent to statements made subject to cross-examination, statements made under a belief of impending death, statements against interest, and statements of personal or family history. See United States v. Banks, 514 F.3d 769, 777-78 (8th Cir. 2008)(observing that one way to approach rule 807 analysis is to compare circumstances of statement at issue to "'the closest hearsay exception'" (quoting 2 Broun, supra, § 324); United States v. Fernandez, 892 F.2d at 981 (considering "those statements that are similar though not identical to hearsay clearly falling under one of the four codified exceptions, if the statements otherwise bear indicia of trustworthiness equivalent to those exceptions"). The trial judge's discretion in this regard is broad. See United States v. Harwood, 998 F.2d 91, 98 (2d Cir. 1993)(concluding that the residual exception applies only in rare cases and that a trial court's decision not to apply it can be reversed only for abuse of discretion); United States v. Mokol, 939 F.2d 436, 438 (7th Cir. 1991)(concluding that the judge has significant discretion in ruling upon admissibility); SEC v. First City Fin. Corp., 890 F.2d 1215, 1225 (D.C. Cir. 1989)(stating that particular deference should be given to trial court's determination, because the exception depends so heavily on judgment of reliability). The United States Court of Appeals for the Second Circuit considers the trustworthiness of hearsay offered under the residual hearsay exception in terms of the extent to which the statement is prone to the four classic hearsay risks -- (i) insincerity, (ii) faulty perception, (iii) faulty memory, and (iv) faulty narration. See Schering Corp. v. Pfizer, Inc., 189 F.3d 218, 232-33 (2d Cir. 1999)(identifying additional class of risk of methodological error for survey evidence); Headley v. Tilghman, 53 F.3d 472, 477 (2d Cir. 1995)(referring to classic hearsay "risks of insincerity, distorted perception, imperfect memory, and ambiguity of utterance").

Harrison, 296 F.3d 994, 1004-07 (10th Cir. 2002)(holding that child sexual abuse victim's statement to Federal Bureau of Investigation agent had circumstantial guarantees of trustworthiness, even though victim recanted her statement, because the statement was consistent with her earlier statements and was specific, and victim was old enough to have the ability to remember the events). See United States v. Trujillo, 136 F.3d at 1395-96; United States v. Tome, 61 F.3d 1446, 1453 (10th Cir. 1995)(concluding that child's statement to caseworker identifying abuser, made a year after attack, lacked guarantees of trustworthiness); United States v. Farley, 992 F.2d 1122, 1126 (10th Cir. 1993). In United States v. Farley, for example, the Tenth Circuit admitted, pursuant to rule 807, a child sexual abuse victim's assault account, as given to victim's mother, even though some statements were made the morning after the assault, because the victim was still suffering pain and distress from the assault, the victim employed childish terminology, and the victim's youth reduced the likelihood that the statements were fabricated. See 992 F.2d at 1126.

In determining the trustworthiness of hearsay offered under the residual exception, the Tenth Circuit considers factors such as: (i) the statement's character; (ii) whether the statement is written or oral; (iii) the parties' relationship; (iv) the declarant's probable motivation in making the statement; and (v) the circumstances under which the statement is made. See United States v. Lawrence, 405 F.3d 888, 902 (10th Cir. 2005)(concluding that statements made to FBI agents by physician at defendant's clinic, including that the physician did not believe he was legally required to be at the clinic to supervise medical work, were not admissible under rule 807, in defendant's

Medicare fraud trial, because statements had no circumstantial guarantees of trustworthiness, statements were taken shortly after FBI executed search warrant on clinic, and physician was the subject of the same investigation that eventually led to charges against defendant); F.T.C. v. Kuykendall, 312 F.3d 1329, 1343 (10th Cir. 2002)(concluding that consumer declarations and complaints had sufficient circumstantial guarantees of trustworthiness to warrant admission under rule 807 in a civil contempt proceeding arising from the defendants' violation of a permanent injunction, because they were made under oath and subject to penalty of perjury).  For admissibility under rule 807, a statement must be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."[55]  Fed. R. Evid. 807(a)(3).  See F.T.C. v. Kuykendall, 312 F.3d at 1343 (concluding that consumer declarations and complaints were trustworthy and most probative evidence available, and therefore admissible under rule 807, provided defendants had adequate notice); United States v. Zamora, 784 F.2d 1025, 1031 (10th Cir. 1986)(concluding that hearsay statements were properly excluded in absence of showing of statement's probative value or any effort to obtain information from other sources). The Tenth Circuit considers a statement "more probative" if the district court determines that the hearsay is relevant and reliable, and that no other evidence, or little other evidence, is available on the same point.  See Marsee v. U.S. Tobacco Co., 866 F.2d 319, 324-25 (10th Cir. 1989)(concluding that reports were not admissible, because much of their contents were already admitted through expert testimony).

---

[55]The "more probative" requirement, however, is not interpreted "with cast iron rigidity." United States v. Harrison, 296 F.3d at 1006-07 (concluding that district court could properly rule that child sexual abuse victim's statement to FBI agent was most probative available evidence with respect to details not disclosed in other statements (quoting Weinstein's Federal Evidence, supra, § 807.3[3][a], at 807-21)).

Rule 807 requires the district court to consider the availability. through reasonable efforts. of other admissible evidence, and courts consider matters such as the importance of the evidence and the proponent's ability to provide it.  See Calderon v. Presidio Valley Farmers Ass'n, 863 F.2d 384, 391 (5th Cir. 1989)(concluding that answers to interrogatories were admissible pursuant to rule 807, because relevant records were lost or destroyed, trial was held several years after violations took place, and witnesses were illiterate); United States v. Shaw, 824 F.2d 601, 610 (8th Cir. 1987)(stating that exceptional circumstances generally exist when child relates abuse details to adult).  Courts must consider the need for the evidence in light of the basic assumption underlying the rule against hearsay -- that statements made directly in the courtroom are more reliable than hearsay; in other words, courts must balance need against trustworthiness.  See United States v. Harrison, 296 F.3d at 1004-07.  Admission of evidence under the residual exception must accord with "the purposes of these rules and the interests of justice."  Fed. R. Evid. 807(a)(4).  See New England Mut. Life Ins. v. Anderson, 888 F.2d 646, 650-51 (10th Cir. 1989)(concluding that district court properly excluded statements reported in newspaper article, because district court found no guarantees of trustworthiness and plaintiff failed to show that admission of the article without opportunity to cross-examine witness would serve interests of justice).

**LAW REGARDING RULE 403 OF THE FEDERAL RULES OF EVIDENCE**

Under rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "'[I]t is only *unfair* prejudice, *substantially* outweighing probative value, which

permits exclusion of relevant matter [under rule 403].'"  United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(emphasis in United States v. Sides, 944 F.2d 1554 (10th Cir. 1991))quoting United States v. Sides, 944 F.2d at 1563).  The Tenth Circuit has admonished district courts that they should be "mindful" that "'exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly.'"  United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(quoting United States v. Tan, 254 F.3d 1204, 1211 (10th Cir. 2001)).

The decision to admit or exclude evidence pursuant to rule 403 is within the district court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the district court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .  This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant.

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.

See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee's note).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." Old Chief v. United States, 519 U.S. at 180-81. In light of rule 404(b)'s prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence." Old Chief v. United States, 519 U.S. at 182. The Supreme Court has advised lower courts to disregard the prosecution's need for "evidentiary depth to tell a continuous story" when the prosecution's evidence consists of the underlying facts of a criminal defendant's prior felony conviction, as in an action for felon in possession. Old Chief v. United States, 519 U.S. at 189-90. In such an action, "[t]he most the jury needs to know is that the conviction admitted by the defendant falls within the class of crimes that Congress thought should bar a convict from possessing a gun, and this point may be made readily in a defendant's admission

and underscored in the court's jury instructions." Old Chief v. United States, 519 U.S. at 190-91. The Court has previously ruled that, under the Supreme Court's decision in Old Chief v. United States, the underlying facts of a defendant's prior conviction should be excluded, even if relevant to the offense. See, e.g., United States v. Williams, No. CR 12-1675 JB, 2012 WL 5476228, at *2 (D.N.M. Nov. 7, 2012)(Browning, J.); United States v. Ashley, No. CR 04-2497 JB, 2006 WL 4109679, at *3 (D.N.M. Aug. 1, 2006)(Browning, J.)("Even if relevant under rule 404(b), given the nature of the crime with which he is charged here and the similarity to these prior crimes, the danger of unfair prejudice outweighs the probative value of specifically identifying the prior crimes."). See also United States v. Wacker, 72 F.3d 1453, 1472 (10th Cir. 1995)("Whereas the fact of a defendant's prior felony conviction is material to a felon in possession charge, the nature and underlying circumstances of a defendant's conviction are not.").

## LAW REGARDING RULE 404(b)

Under rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith. See Fed. R. Evid. 404(b). Rule 404(b) provides:

Other Crimes, Wrongs, or Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

(B) do so before trial -- or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b).  In other words, one cannot present evidence the relevance of which is based

on the forbidden inference: the person did X in the past, therefore he probably has a propensity for

doing X, and therefore he probably did X this time, too.  The rule, however, has a number of

"exceptions" -- purposes for which such evidence will be admissible.  Those purposes include

proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake

or accident.  See Fed. R. Evid. 404(b)(2).  The Supreme Court has enunciated a four-part process

to determine whether evidence is admissible under rule 404(b).  See Huddleston v. United States,

485 U.S. 681, 691-92 (1988).  The Tenth Circuit has consistently applied that test.

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test . . . :
>
>> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(quoting United States v. Roberts, 185

F.3d 1125, 1141 (10th Cir. 1999)).  See United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir.

2002); United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing Huddleston v. United

States, 485 U.S. at 691-92).

Rule 404(b)'s prohibition finds its source in the common-law protection of the criminal

defendant from risking conviction on the basis of evidence of his character.  See United States v.

Dudek, 560 F.2d 1288, 1296 (6th Cir. 1977); 22 Charles Alan Wright & Kenneth Graham, Federal

Practice and Procedure: Evidence § 5239, at 428, 436-37 & 439 (1991).  In United States v.

Phillips, 599 F.2d 134 (6th Cir. 1979), the United States Court of Appeals for the Sixth Circuit

noted, in addressing rule 404(b)'s precepts, that the rule addresses two main policy concerns:

> (1) that the jury may convict a "bad man" who deserves to be punished not because he is guilty of the crime charged but because of his prior or subsequent misdeeds; and (2) that the jury will infer that because the accused committed other crimes he probably committed the crime charged.

United States v. Phillips, 599 F.2d at 136.

When "bad act evidence is both relevant and admissible for a proper purpose, 'the

proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link

of which may be the inference that the defendant has the propensity to commit the crime charged.'"

United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(quoting United States v. Himelwright,

42 F.3d 777, 782 (3d Cir. 1994)). The Tenth Circuit has also stated that district courts must

"identify specifically the permissible purpose for which such evidence is offered and the inferences

to be drawn therefrom." United States v. Youts, 229 F.3d 1312, 1317 (10th Cir.

2000)(Seymour, C.J.)(citing United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir. 1985)). "[A]

broad statement merely invoking or restating Rule 404(b) will not suffice." United States v.

Kendall, 766 F.2d at 1436.

The Tenth Circuit has recognized the probative value of uncharged, unrelated acts to show

motive, intent and knowledge, whether the acts involved previous conduct or conduct subsequent

to the charged offense if the uncharged acts are similar to the charged crime and sufficiently close

in time. See United States v. Olivo, 80 F.3d 1466, 1468-69 (10th Cir. 1996)(finding the district

court did not abuse its discretion when it admitted evidence about an event over one year after a

defendant's arrest); United States v. Bonnett, 877 F.2d 1450, 1461 (10th Cir. 1989)(holding that

evidence about events over a year after the charged conduct was not "too remote in time and

unrelated to the transactions with which [the defendant] was charged"). This similarity may be shown through "physical similarity of the acts or through the 'defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses.'" United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997)(quoting United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978)). See United States v. Bonnett, 877 F.2d at 1461 ("The closeness in time and the similarity in conduct [are] matters left to the trial court, and [its] decision will not be reversed absent a showing of abuse of discretion."). The more similar the act or state of mind, the more relevant the evidence becomes. See United States v. Queen, 132 F.3d at 996. Moreover, when establishing identity, although the uncharged crime must be similar to the charged offense if it is unrelated to the charged offense, it need not be identical. See United States v. Gutierrez, 696 F.2d 753, 755 (10th Cir. 1982). Accord United States v. Ganadonegro, No. CR 09-0312 JB, 2011 WL 3957549, at *1-3 (D.N.M. Aug. 30, 2011)(Browning, J.).

## RELEVANT LAW REGARDING THE MARS RULE

Following the 2008 financial crisis, Congress created the Consumer Financial Protection Bureau ("CFPB") and vested it with authority to enforce several laws previously within the FTC's domain. See Consumer Fin. Prot. Bureau v. Mortgage Law Grp., LLP, 157 F. Supp. 3d 813, 816-17 (W.D. Wis. 2016)(Crabb, J.). Among these laws was the "Omnibus Appropriations Act of 2009, Pub. L. No. 111-8, § 626, 123 Stat. 524 (March 11, 2009), which directed the Federal Trade Commission to issue rules related to mortgage loans." Consumer Fin. Prot. Bureau v. Mortgage Law Grp., LLP, 157 F. Supp. 3d at 817. The FTC enacted the MARS Rule shortly before oversight over the Omnibus Appropriations Act of 2009 transferred to the CFPB, and the CFPB republished the MARS Rule, with the same prohibitions and attorney exemptions extant under the FTC's MARS Rule, at 12 C.F.R. § 1015. See Consumer Fin. Prot. Bureau v. The Mortgage Law Grp.,

LLP, 157 F. Supp. 3d at 817-18; Mortgage Assistance Relief Services, 75 Fed. Reg. 75092 (Dec. 1, 2010); 16 C.F.R. § 322.1 ("The rules formerly at 16 CFR part 322 have been republished by the Consumer Financial Protection Bureau at 12 CFR part 1015, 'Mortgage Assistance Relief Services (Regulation O).'").

In enacting the MARS Rule, the FTC acted on concerns that arose in the 2008 crisis' aftermath about mortgage relief practices and mortgage relief providers. See Mortgage Assistance Relief Services, 75 Fed. Reg. 10707, 10708-13 (March 9, 2010).

> . . . [H]istoric levels of consumer debt, increased unemployment, and a stagnant housing market have contributed to high rates of mortgage loan delinquency and foreclosure. As a result, many consumers struggling to make their mortgage payments are in search of ways to avoid foreclosure. . . . Because loan modifications allow consumers to stay in their homes and reduce their overall debt, this possible solution often has great appeal to consumers. The Commission's law enforcement actions suggest that loan modifications may currently be the most frequently marketed and sold mortgage assistance relief service.

75 Fed. Reg. at 10708-09 (footnotes omitted). The FTC directed the MARS Rule toward misrepresentations and advance-fee schemes involving loan modification services:

> MARS providers often misrepresent the services that they will perform and the results they will obtain for consumers. Indeed, providers frequently fail to perform even the most basic of promised services. As a result, consumers not only lose the thousands of dollars they pay to the providers, but may also lose their homes.
>
> Typically, MARS providers initiate contact with prospective customers through Internet, radio, television, or direct mail advertising. The ads instruct consumers to call a toll-free telephone number or e-mail the company. . . . Providers typically also represent that there is high likelihood, and in some instances a "guarantee," of success. Despite these promises of extremely high success rates, the vast majority of consumers do not receive the promised results.
>
> Even if the services of MARS providers could deliver the promised results, many providers do not provide even the most basic services they claimed they would perform. After collecting their up-front fees, MARS providers often fail to make initial contact with the lender or servicer for months, if at all.

In addition, some MARS providers make the specific claim that they offer legal services, when, in fact, no attorneys are employed at the company or, even if there are, they do little or no legal work for consumers. . . . [A] growing number of attorneys themselves are engaged in deceptive and unfair practices in the marketing and sale of MARS.

75 Fed. Reg. at 10710-12 (footnotes omitted).

## 1. <u>The Advance Fee Prohibition</u>.

Pursuant to the MARS Rule, an entity cannot accept fees in advance for mortgage assistance relief services. <u>See</u> 12 C.F.R. § 1015.5. The regulation states:

It is a violation of this rule for any mortgage assistance relief service provider to:

(a) Request or receive payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief the provider obtained from the consumer's dwelling loan holder or servicer;

12 C.F.R. § 1015.5.

The MARS Rule defines mortgage assistance relief services and mortgage assistance relief provider broadly. <u>See</u> 12 C.F.R.§ 1015.2. The regulation turns the definition of "mortgage assistance relief services" on the service's purported purpose and not on the service's characteristics; the operative phrase in the definition is "is represented, expressly or by implication, to assist or attempt to assist the consumer." 12 C.F.R. § 1015.2. In full, the rule states:

Mortgage Assistance Relief Service means any service, plan, or program, offered or provided to the consumer in exchange for consideration, that is represented, expressly or by implication, to assist or attempt to assist the consumer with any of the following:

(1) Stopping, preventing, or postponing any mortgage or deed of trust foreclosure sale for the consumer's dwelling, any repossession of the consumer's dwelling, or otherwise saving the consumer's dwelling from foreclosure or repossession;

(2)      Negotiating, obtaining, or arranging a modification of any term of a dwelling loan, including a reduction in the amount of interest, principal balance, monthly payments, or fees;

(3)      Obtaining any forbearance or modification in the timing of payments from any dwelling loan holder or servicer on any dwelling loan;

(4)      Negotiating, obtaining, or arranging any extension of the period of time within which the consumer may:

        (i)      Cure his or her default on a dwelling loan,

        (ii)      Reinstate his or her dwelling loan,

        (iii)      Redeem a dwelling, or

        (iv)      Exercise any right to reinstate a dwelling loan or redeem a dwelling;

(5)      Obtaining any waiver of an acceleration clause or balloon payment contained in any promissory note or contract secured by any dwelling; or

(6)      Negotiating, obtaining or arranging:

        (i)      A short sale of a dwelling,

        (ii)      A deed-in-lieu of foreclosure, or

        (iii)      Any other disposition of a dwelling other than a sale to a third party who is not the dwelling loan holder.

12 C.F.R. § 1015.2.  A "mortgage assistance relief service provider" comes within the regulation either by providing or by offering to provide such services.  12 C.F.R. § 1015.2.  For the MARS Rule's purposes, a "mortgage assistance relief service provider" is

any person that provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service. . . . Person means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity, except to the extent that any person is specifically excluded from the Federal Trade Commission's jurisdiction pursuant to 15 U.S.C. 44[56] and 45(a)(2).[57]

12 C.F.R. § 1015.2.

The MARS Rule contains two exemptions for attorney conduct. See 12 C.F.R. § 1015.7.

An attorney is exempt from all MARS Rule prohibitions other than § 1015.5 where the attorney:

---

[56]This provision defines certain entities:

"Corporation" shall be deemed to include any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, which is organized to carry on business for its own profit or that of its members, and has shares of capital or capital stock or certificates of interest, and any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, without shares of capital or capital stock or certificates of interest, except partnerships, which is organized to carry on business for its own profit or that of its members.

. . . .

"Banks" means the types of banks and other financial institutions referred to in section 57a(f)(2) of this title.

"Foreign law enforcement agency" means --

(1)     any agency or judicial authority of a foreign government, including a foreign state, a political subdivision of a foreign state, or a multinational organization constituted by and comprised of foreign states, that is vested with law enforcement or investigative authority in civil, criminal, or administrative matters; and

(2)     any multinational organization, to the extent that it is acting on behalf of an entity described in paragraph (1).

15 U.S.C. § 44.

(1)     Provides mortgage assistance relief services as part of the practice of law;

(2)     Is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located; and

(3)     Complies with state laws and regulations that cover the same type of conduct the rule requires.

12 C.F.R. § 1015.7(a).  An attorney who meets the above requirements "is also exempt from § 1015.5 if the attorney: (1) Deposits any funds received from the consumer prior to performing legal services in a client trust account; and (2) Complies with all state laws and regulations, including licensing regulations, applicable to client trust accounts."  12 C.F.R. § 1015.7(b).[58]

---

[57]This provision states:

The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of Title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

15 U.S.C. § 45(a)(2).

[58]The Honorable Marcia Howard, United States District Judge for the United States District Court for the District of Middle Florida, confronted the issue whether the attorney exemption applies to a law firm.  See F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d 1238, 1279-80, 1284 (M.D. Fla. 2016)(Howard, J.).  The Court concludes that, because 12 C.F.R. § 1015.7(a) requires licensure in the state of practice and law firms cannot be licensed to practice law, the attorney exemption applies to individuals only, and not to law firms.  The Court reasons, however, that, should all mortgage assistance services that the law firm provides or offers be performed by exempt attorneys, the law firm would not be liable for a MARS Rule violation.  Firms can act only through their employees and, if all mortgage assistance relief services their employees perform are exempt from the MARS Rule, the firm will not have committed an action within the MARS Rule's reach.  Moreover, were any other rule to exist, the law firm would be liable for activities that its attorneys could legally perform.  Such a result would discourage law firms from employing attorneys offering mortgage modification assistance relief services and, consequently, attorneys

Mortgage assistance relief services encompass legal, including litigation, services, when the attorneys providing such services do not meet the regulation's attorney exemptions. See 12 C.F.R. § 1015.7; F.T.C. v. Kutzner, No. SA CV 16-00999-BRO (AFMx), 2017 WL 4685286, at *2, *8-9 (C.D. Cal. Sept. 5, 2017)(O'Connell, J.)(recognizing that the MARS Rule applies to attorneys and applying the MARS rule to litigation services); F.T.C. v. A to Z Mktg., Inc., No. SACV 13-00919-DOC (RNBx), 2014 WL 12479617, at *4 (C.D. Cal. Sept. 17, 2014)(Carter, J.)(recognizing that attorneys are exempt from the MARS Rule when they satisfy the MARS Rule's attorney exemptions). Cf. F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d 1238, 1282-83 (M.D. Fla. 2016)(Howard, J.)(concluding that, through the MARS Rule, the CFPB appropriately exercises regulatory authority over "attorneys engaged in the practice of law"). In enacting the MARS Rule, the FTC recognized that the attorney exemptions would cover some, but not all, legal and litigation services, and sought to prohibit certain attorney actions:

> Such a narrowly-tailored exemption seeks to strike a balance that would protect consumers from unfair or deceptive conduct by attorneys who are engaged or otherwise involved in the practice of selling MARS, while at the same time preserve the ability of attorneys to provide bona fide legal services to homeowners.
>
> . . . .
>
> If an attorney is not licensed to practice in the state, there is no reason the proposed Rule should not apply to the attorney's activities to the same extent as any other MARS provider. If an attorney is licensed to practice in a state, the attorney would be exempt under the proposed Rule only if he or she complies with state law, including state bar rules. Several commenters advocated the inclusion of such a requirement to protect consumers from unfair and deceptive conduct of attorneys that would violate state ethics and other rules governing attorneys. For example, a frequent characteristic of MARS attorneys engaged in deception is that they offer

---

from engaging in such services. This situation would defeat the purpose of exempting attorneys performing legal services from the MARS Rule's prohibitions.

services to borrowers outside of the state in which they are licensed.  Under the proposed Rule, such an attorney would not be exempt from the rule.

75 Fed. Reg. at 10724-25.[59]

## 2. <u>The Substantial Assistance or Support Prohibition</u>.

The MARS Rule also prohibits substantially assisting or supporting MARS Rule violations.  <u>See</u> 12 C.F.R.§ 1015.6.  The regulation specifically states: "It is a violation of this rule for a person to provide substantial assistance or support to any mortgage assistance relief service provider when that person knows or consciously avoids knowing that the provider is engaged in any act or practice that violates this rule."  12 C.F.R. § 1015.6.  A substantial assistance violation requires, accordingly, three elements: "(1) an underlying violation of the MARS rule by a MARS provider; (2) substantial assistance or support by a person to that provider; and (3) knowledge or conscious avoidance, on the part of the person, of the underlying violation."  <u>F.T.C. v. Lake</u>, 181 F. Supp. 3d at 699.

"'The threshold for what constitutes substantial assistance is low.'"  <u>F.T.C. v. Lake</u>, 181 F. Supp. 3d at 699 quoting <u>F.T.C. v. Consumer Health Benefits Ass'n</u>, No. 10 Civ. 3551(ILG)(RLM), 2012 WL 1890242, at *6 (E.D.N.Y. May 23, 2012)(Glasser, J.)).  According to the Tenth Circuit, casual or incidental conduct, like cleaning an office, does not satisfy the substantial assistance requirement, but conduct that plays a role in another's scheme may rise to

---

[59]In the Court's view, that the MARS Rule exempts some legal services suggests exactly the opposite of the Parwatikar Defendants' contention.  <u>See</u> Tr. at 21:15-23 (Harrison).  If the FTC intended the MARS Rule not to embrace any litigation activities, the FTC would not have included a narrow exemption for legal services; it would have broadly exempted litigation services.  The FTC did not take this approach and recognizes, instead, that the MARS Rule provides a narrow exemption, which makes all other litigation services potentially mortgage assistance relief services.  <u>See</u> 75 Fed. Reg. at 10724-25.

substantial assistance.  See <u>F.T.C. v. Chapman</u>, 714 F.3d 1211, 1217 (10th Cir. 2013).[60]  <u>See also</u>

<u>F.T.C. v. Lake</u>, 181 F. Supp. 3d at 699-700 (concluding that a defendant substantially assisted

MARS Rule violations where he contracted with another defendant to interview and to advocate

for clients, and concealed that clients' advance fees were not held in trust).  The substantial

assistance need not be central to the scheme, but it must enable the scheme.  <u>Cf.</u> <u>F.T.C. v. HES</u>

<u>Merch. Servs. Co.</u>, No. 6:12-cv-1618-ORL-22KRS, 2016 WL 10880223, at *5 (M.D. Fla. Oct. 26,

2016)(Conway, J.)("The act of [Universal Processing Services of Wisconsin, LLC ("UPS")]

providing [Treasure Your Success ("TYS")] with two merchant accounts[61] was essential to the

success of the scheme, and absent these merchant accounts, the TYS Defendants would have been

unable to process credit card payments; thus, UPS substantially assisted the TYS Defendants.").

The FTC described when enacting the MARS Rule:

> Proposed  § 322.6  [(now  12 C.F.R. § 1015.6)]  is  limited  to  persons
> providing substantial -- i.e., more than casual or incidental -- assistance or support
> to MARS providers.  Activities that might constitute substantial assistance or
> support include the provision of consumer leads, contact lists, advertisements, or

---

[60]The Tenth Circuit in <u>F.T.C. v. Chapman</u> discusses the substantial assistance provision of the FTC's Telemarketing Sales Rule, 16 C.F.R. § 310.1-10.9 ("TSR"), rather than the MARS Rule provision, but the TSR provision's operative language is identical to the MARS Rule provision's wording:

> It is a deceptive telemarketing act or practice and a violation of this Rule for
> a person to provide substantial assistance or support to any seller or telemarketer
> when that person knows or consciously avoids knowing that the seller or
> telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d),
> or § 310.4 of this Rule.

16 C.F.R.§ 310.3(b).

[61]"A merchant account is a type of bank account that allows businesses to accept payments by debit or credit cards.  So a merchant account is an agreement between a retailer, a merchant bank and payment processor for the settlement of credit card and/or debit card transactions."  Susan Ward, <u>How to Get a Merchant Account</u>, The Balance Small Business (June 19, 2019), https://www.thebalancesmb.com/merchant-account-2948421 (last accessed July 1, 2019).

promotional materials. Such activities also might include the support provided by payment processors and other entities providing essential backroom operations.

75 Fed. Reg. at 10723.

Knowledge of the prohibited practice is sufficient to establish the knowing or consciously avoided knowing requirement. See F.T.C. v. Chapman, 714 F.3d at 1217-19. Although the Tenth Circuit has not explicitly defined what knowledge a defendant must have -- knowledge of the prohibited practice, or knowledge of the practice and knowledge that the regulation prohibits the practice -- in F.T.C. v. Chapman, the Tenth Circuit emphasizes, in concluding that the defendant Meggie Chapman satisfied the knowing or consciously avoided knowing element, evidence showing the Chapman's knowledge or avoidance of knowledge of other defendants' misrepresentations, and does not discuss evidence reflecting Chapman's knowledge or avoidance of knowledge of the Telemarketing Sales Rule, 16 C.F.R. § 310.1-10.9 ("TSR"). See F.T.C. v. Chapman, 714 F.3d at 1212, 1217-18. The Tenth Circuit mentions that Kansas Attorney General investigations should have alerted Chapman to concerns of the other defendants' marketing practices, but the Tenth Circuit does not link the investigations to Chapman's knowledge of the TSR. See F.T.C. v. Chapman, 714 F.3d at 1217-18. See also F.T.C. v. Lake, 181 F. Supp. 3d at 701 (describing the defendant's knowledge of prohibited conduct and not discussing the defendant's knowledge of the TSR); F.T.C. v. Global Mktg. Grp., Inc., 594 F. Supp. 2d 1281, 1288 (M.D. Fla. 2008)(Covington, J.)(stating "[the defendant] consciously avoided knowing the telemarketers were engaged in deceptive acts and practices given the extraordinary high return rate and [the defendant's] substantial involvement in the telemarketing scheme," but not discussing the defendant's knowledge of the TSR); F.T.C. v. Capital Choice Consumer Credit, Inc., No. 02-21050 CIV, 2004 WL 5149998, at *42 (S.D. Fla. Feb. 20, 2004)(Ungaro-Benages, J.)(concluding that the

defendants "provided substantial assistance or support" to other defendants "when they knew or consciously avoided knowing" about the other defendants' misrepresentations and advance fees), aff'd, 157 F. App'x 248 (11th Cir. 2005). Cf. United States v. Dish Network LLC, 256 F. Supp. 3d 810, 928-29 (C.D. Ill. 2017)(Myerscough, J.)("The evidence also proves that it is more likely than not that [defendant] Dish [Network LLC] knew about Star Satellite's use of prerecorded calls, or consciously avoided knowing about such use, and kept paying Star Satellite to continue the violations."). But see F.T.C. v. HES Merch. Servs. Co., 2016 WL 10880223, at *5 (describing that the defendants knew of or avoided knowing of another defendant's TSR violation, because they ignored "red flags" about that defendant's activities); F.T.C. v. Lake, 181 F. Supp. 3d at 700 (mentioning both the defendants' knowledge of the prohibited actions and knowledge of the MARS Rule).

### 3. **The Penalties.**

A violation of the MARS Rule

> shall be treated as a violation of a rule prohibiting unfair, deceptive, or abusive acts or practices under the Consumer Financial Protection Act of 2010[, 12 U.S.C. §§ 25b, 1465, 2806, 5109, 5112, 5481, 5491-97, 5511-19, 5531-36, 5551-53, 5561-67, 5581-87, 5601-03; 15 U.S.C. §§ 1691c-2, 1693; 18 U.S.C. § 3301] and a violation of a rule under section 18 of the Federal Trade Commission Act (15 U.S.C. 57a) [("FTCA")] regarding unfair or deceptive acts or practices.

12 U.S.C. § 5538(a)(1). States attorney generals have authority to bring actions seeking penalties and injunctions for MARS Rule violations. See 12 U.S.C. § 5538(b)(1). Section 5565 describes three tiers of penalties applicable to MARS Rule violations:

> (A) First tier

> For any violation of a law, rule, or final order or condition imposed in writing by the Bureau, a civil penalty may not exceed $5,000 for each day during which such violation or failure to pay continues.

(B)     Second tier

Notwithstanding paragraph (A), for any person that recklessly engages in a violation of a Federal consumer financial law, a civil penalty may not exceed $25,000 for each day during which such violation continues.

(C)     Third tier

Notwithstanding subparagraphs (A) and (B), for any person that knowingly violates a Federal consumer financial law, a civil penalty may not exceed $1,000,000 for each day during which such violation continues.

12 U.S.C. § 5565(c)(2). "[T]he common law has generally understood [recklessness] in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Safeco Ins. of Am. v. Burr, 551 U.S. 47, 68-69 (2007)(footnote omitted)(quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994); and citing William Keeton, et al., Prosser and Keeton on Law of Torts § 34, at 213-14 (5th ed. 1984)). See Consumer Fin. Prot. Bureau v. CashCall, Inc., No. CV 15-07522-JFW (RAOx), 2018 WL 485963, at *14 (C.D. Cal. Jan. 19, 2018)(Walter, J.)(citing Consumer Fin. Prot. Bureau v. D & D Mktg., Case No. CV 15-9692 PSG (Ex), CV 16-2724 PSG (Ex), CV 16-2725 PSG (Ex), 2016 WL 8849698, at *12 n.13 (C.D. Cal. Nov. 17, 2016)(Gutierrez, J.)). For a violation to be knowing, the person must have knowledge of the MARS Rule's prohibition, and that his, her, or its action violated the rule. Cf. Consumer Fin. Prot. Bureau v. CashCall, Inc., 2018 WL 485963, at *14 ("[T]he term 'knowing' means 'actual knowledge or knowledge fairly implied . . . on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule.'" (quoting 15 U.S.C. § 45(m)(1)(A); Consumer Fin. Prot. Bureau v. D&D Mktg., 2016 WL 8849698, at *12; United States v. Dish Network, LLC, 667 F. Supp. 2d 952, 961-62 (C.D. Ill. 2009)(Scott, J.)(describing knowing in the FTCA context to require knowledge of the rule's existence and that the defendant's conduct violated the rule)). The Honorable James Selna, United

States District Judge for the United States District Court for the Central District of California, has

described evidence that counsels penalizing a defendant for a reckless or knowing violation of the

law:

> Uncontroverted evidence could establish that Defendants should be penalized in one of these two tiers. (See Henderson Decl. ¶ 4 ("Alfred Clausen and [Cobb] actually ran Siringoringo's loan modification operations through their company, [CCMC]."); Salto Decl. Supp. Appl. Default J. ¶ 10 (describing a meeting that took place in February 2012 in which Siringoringo thought he'd get a slap on the wrist for his illegal conduct), Dkt. No. 71; Burge Decl. Supp. Appl. Default J. ¶ 5, Ex. 1 (describing an email from Siringoringo cc'ing Cobb on May 6, 2011 acknowledging the existence of the FTC rules that eventually became The MARS Rule), Dkt. No. 70.)

Consumer Fin. Prot. Bureau v. Siringoringo, Case No. SACV 14-01155 JVS (AJWx), 2016 WL

102435, at *7 n.4 (C.D. Cal. Jan. 7, 2016)(Selna, J.).  See Consumer Fin. Prot. Bureau v.

Nationwide Biweekly Admin., Inc., No. 15-CV-02106-RS, 2017 WL 3948396, at *13 (N.D. Cal.

Sept. 8, 2017)(Staton, J.)(imposing a penalty at the lowest tier where the defendants used

aggressive sales tactics, but also pursued "training, quality control, and . . . legal counsel, in an

effort to stay on the right side of the line" of the law).

A court has discretion in granting appropriate relief within these tiers.  See

12 U.S.C. § 5565.[62]  When considering the penalty to assess, a court should consider:

(A)      the size of financial resources and good faith of the person charged;

---

[62]This statute provides:

> The court . . . in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law.

12 U.S.C. § 5565.  As discussed supra, the MARS Rule is such a consumer financial law.  See 12 U.S.C. § 5538(a)(1).

(B)      the gravity of the violation or failure to pay;

(C)      the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided;

(D)      the history of previous violations; and

(E)      such other matters as justice may require.

12 U.S.C. § 5565(c)(3).

### 4.      Common Enterprise Liability.

Courts have adopted a common enterprise exception to common-law principles of corporate structure to permit defendants to be jointly and severally liable where the individuals and the entities may have used "corporate structures to circumvent" legal prohibitions.  F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d 799, 808-09 (D.S.D. 2013)(Lange, J.)(citing P.F. Collier & Son Corp. v. F.T.C., 427 F.2d 261, 267 (6th Cir. 1970)).  Cf. F.T.C. v. Kuykendall, 371 F.3d 745, 759 (10th Cir. 2004)(noting that the common enterprise doctrine may have applied had the FTC supplied sufficient evidence for the theory).[63]      "'The general rule is that, absent highly unusual circumstances, the corporate entity will not be disregarded.'"  F.T.C. v. Wyndham Worldwide Corp., No. CIV.A. 13-1887 ES, 2014 WL 2812049, at *4 (D.N.J. June 23, 2014)(Salas, J.)(quoting P.F. Collier & Son Corp., 427 F.2d at 266).  The common enterprise doctrine avoids "'situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with a clear mechanism for avoiding the terms of the order.'"  F.T.C.

---

[63]The common enterprise liability doctrine developed in the FTCA context.  See F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 808-09.  Courts have applied it to the MARS Rule, see F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1269-73; Office of the Attorney Gen. v. Berger Law Grp., P.A., No. 8:14-CV-1825-T-30MAP, 2015 WL 5922933, at *2-3 (M.D. Fla. Oct. 9, 2015)(Moody, J.), and the Court agrees with this application, because MARS Rule violations are an unfair or deceptive act or practices for FTCA purposes, see 12 U.S.C. § 5538(a)(1).

v. Grant Connect, LLC, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011)(Pro, J.)(quoting F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)(Pannell, J.)). "'[T]he common enterprise [inquiry] is not an alter ego analysis. The entities formally may be separate corporations[] but operate as a common enterprise.'" F.T.C. v. Direct Benefits Grp., LLC, No. 6:11-CV-1186-ORL-28, 2013 WL 3771322, at *18 (M.D. Fl. July 18, 2013)(Antoon, J.)(alterations in F.T.C. v. Direct Benefits Grp.)quoting F.T.C. v. Grant Connect, LLC, 827 F. Supp. 2d at 1218). "Under the theory of common enterprise, each entity in a group of interrelated companies can be held jointly and severally liable for the actions of other entities in that group." F.T.C. v. Johnson, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015)(Du, J.)(citing F.T.C. v. Network Servs. Depot, Inc., 617 F.3d 1127, 1142-43 (9th Cir. 2010)).

"When determining whether a common enterprise exists, 'the pattern and frame-work of the whole enterprise must be taken into consideration.'" F.T.C. v. Direct Benefits Grp., LLC, 2013 WL 3771322, at *18 (quoting F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1182). "'If the structure, organization, and pattern of a business venture reveal a common enterprise or a maze of integrated business entities, the FTC Act disregards corporateness.'" F.T.C. v. Direct Benefits Grp., LLC, 2013 WL 3771322, at *18 quoting F.T.C. v. Wash. Data Res., 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012)(Merryday, J.)), aff'd, 704 F.3d 1323 (11th Cir. 2013); F.T.C. v. Johnson, 156 F. Supp. 3d at 1207 ("'Entities constitute a common enterprise when they exhibit either vertical or horizontal commonality -- qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues.'" (quoting F.T.C. v. Network Servs. Depot, Inc., 617 F.3d at 1142-43)). In making this determination,

> courts have looked to factors including "common control; the sharing of office space and officers; whether business is transacted through amaze [sic] of interrelated companies; the commingling of corporate funds and failure to maintain

separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants."

F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 809 (quoting F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1182; and citing F.T.C. v. J.K. Publ'ns, Inc., 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000)(Collins, J.)).  See F.T.C. v. Johnson, 156 F. Supp. 3d at 1207 (listing same factors); F.T.C. v. Wash. Data Res., 856 F. Supp. 2d at 1271 ("A 'common enterprise' operates if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." (citing Del. Watch Co. v. F.T.C., 332 F.2d 745, 746 (2d Cir. 1964); F.T.C. v. Neovi, Inc., 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008)(Sammartino, J.)).  See also F.T.C. v. Direct Benefits Grp., LLC, 2013 WL 3771322, at *18-19 (finding a common enterprise where, "[t]he two individual Defendants were each sole owners and principals of two of the four corporate entities, were close working partners with each other, and were involved with one another's companies," and the companies shared office space, employees, equipment, and worked together to enroll customers in programs); F.T.C. v. LoanPointe, LLC, No. 2:10-CV-225 DAK, 2011 WL 4348304, at *10 (D. Utah Sept. 16, 2011)(Kimball, J.)("Because the Defendants have shared ownership and control, office space and addresses, and employees, they are a common enterprise and are liable for injunctive relief and, jointly and severally, for monetary relief."), aff'd, 525 F. App'x 696 (10th Cir. 2013)(unpublished); F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1269-73 (finding a common enterprise where the owners shared ownership and control over several entities, shared employees, shared offices, commingled funds, shared advertising and used similar attorney client agreements); Commodity Futures Trading Comm'n v. Wall St. Underground, Inc., 281 F. Supp. 2d 1260, 1271-72 (D. Kan. 2003)(Murguia, J.)("Courts have long considered . . . common control to be indicative

of a common enterprise for the purpose of attributing joint and several liability."), modified sub

nom. Commodities Future Trading Comm'n v. Wall St. Underground, Inc., No. CIV.A. 03-2193-

CM, 2004 WL 1900588 (D. Kan. June 24, 2004)(Murguia, J.), aff'd and remanded, 128 F. App'x

726 (10th Cir. 2005)(unpublished); F.T.C. v. Neovi, Inc., 598 F. Supp. 2d at 1116 (deeming a

common enterprise existed where the "Defendants shared office space, employees, payroll funds,

and other expenses . . . [and] also engaged in unified advertising").[64]

---

[64]The Honorable Carlos Murguia, United States District Judge for the United States District Court for the District of Kansas, has noted: "Individuals may also be held to be participants in a common enterprise where the individual and the other members of the enterprise operate as a single economic entity." Commodity Futures Trading Comm'n v. Wall St. Underground, Inc., 281 F. Supp. 2d at 1271-72 (citing Gibson v. F.T.C., 682 F.2d 554, 568 (5th Cir. 1982); Sunshine Art Studios, Inc. v. F. T. C., 481 F.2d 1171, 1175 (1st Cir. 1973)))(unpublished). The Tenth Circuit did not address this statement on appeal. Although the Court can imagine a situation where an individual -- for instance, an individual doing business as an individual and not through a corporate entity -- might act as a member of a common enterprise, the Court notes that, in most instances, the FTCA individual liability analysis, discussed in more detail in the text's following section, controls an individual's liability and courts restrict the common enterprise analysis to corporate entities. See, e.g., F.T.C. v. Pointbreak Media, LLC, _ F. Supp. 3d _ 2019 WL 1650101, at *4-5 (S.D. Fla. 2019)(Altonaga, J.)(describing a common-enterprise theory under which the individuals are liable as principals for the common enterprise's wrongdoing and an individual liability theory, under which the defendants are liable for directly participating in the FTCA violations); F.T.C. v. A to Z Mktg., Inc., 2014 WL 12479617, at *8 (addressing corporate entities under a common enterprise theory and individual defendants under an individual liability theory); F.T.C. v. Wash. Data Res., 856 F. Supp. 2d at 1271-72 (describing corporate entities as part of the common enterprise and addressing individual defendants' liability under the individual liability analysis); F.T.C. v. Grant Connect, LLC, 827 F. Supp. 2d at 1215-18 (addressing the entity defendants and not the individual defendants under a common-enterprise theory); F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1213-14. The individual liability analysis embraces most situations where an individual defendant exercises considerable control over a corporate entity, so such control, even when the control stems from a controlling interest in or ownership of a closely held entity, does not bring the individual into the common enterprise. Cf. F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (stating that, to establish individual liability for an FTCA unfair or deceptive act or practice, the plaintiff must "show the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control them" (citing F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d at 1170); F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1205 (noting a substantial inference of an individual defendant's authority to control unfair and deceptive acts

### 5. **Individual Liability.**

To establish an individual's liability for a corporate entity's practices, a plaintiff must establish three elements. See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1203 (10th Cir. 2005).[65] First, the plaintiff must show that the entity committed a violation. See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1202-03. Second, the plaintiff must "show the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control them." F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997)). Third, the plaintiff "must establish the individual knew or should have known of the entity's" acts. F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Amy Travel Serv., Inc., 875 F.2d 564, 574 (7th Cir. 1989)). Cf. Consumer Fin. Prot. Bureau v. The Mortgage Law Grp., LLP, 196 F. Supp. 3d 920, 944 (W.D. Wis. 2016)(Crabb, J.)(using these factors in the MARS Rule context), amended on reconsideration, No. 14-CV-513-BBC, 2016 WL 9459248 (W.D. Wis. Nov. 23, 2016)(Crabb, J.); F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1285-86 (same).

Where an individual defendant has a controlling interest in a closely held corporate defendant, "a substantial inference exists" that the individual "had the authority to control the deceptive acts and practices." F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1205 (citing Standard Educators, Inc. v. F.T.C., 475 F.2d 401, 403 (D.C. Cir. 1973)). For deceptive acts,

---

and practices when the individual has a controlling interest in a closely held corporate defendant (citing Standard Educators, Inc. v. F.T.C., 475 F.2d 401, 403 (D.C. Cir. 1973)).

[65]In F.T.C. v. Freecom Communications, Inc., the Tenth Circuit addressed the FTCA's 15 U.S.C. § 45 prohibition on "unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(1). See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1197, 1203. The MARS Rule violation is treated as an FTCA unfair or deceptive act or practice. See 12 U.S.C. § 5538(a)(1). The Court concludes, accordingly, that the FTCA caselaw applies to the MARS Rule.

"'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth'" satisfy the knowledge requirement. <u>F.T.C. v. Freecom Commc'ns, Inc.</u>, 401 F.3d at 1207 quoting <u>F.T.C. v. Amy Travel Serv., Inc.</u>, 875 F.2d at 574). Likewise, "'actual knowledge'" of the prohibited action, "'reckless indifference,'" or "'an awareness of a high probability of [the action] along with an intentional avoidance of [knowledge]'" satisfy the requirement for other MARS Rule violations. <u>F.T.C. v. Freecom Commc'ns, Inc.</u>, 401 F.3d at 1207 quoting <u>F.T.C. v. Amy Travel Serv., Inc.</u>, 875 F.2d at 574). <u>Cf. F.T.C. v. E.M.A. Nationwide, Inc.</u>, 767 F.3d 611, 636 (6th Cir. 2014)(citing these requirements as elements for individual MARS violation liability, but not rephrasing them for non-misrepresentation violations); <u>Consumer Fin. Prot. Bureau v. Mortgage Law Grp., LLP</u>, 196 F. Supp. 3d at 944 (applying these requirements as elements for individual MARS violation liability, but not rephrasing them for non-misrepresentation violations), <u>amended on reconsideration</u>, No. 14-CV-513-BBC, 2016 WL 9459248 (W.D. Wis. Nov. 23, 2016)(Crabb, J.); <u>F.T.C. v. Lanier Law, LLC</u>, 194 F. Supp. 3d at 1285-86 (stating these factors as the test to determine individual MARS Rule liability). The inquiry focuses on knowledge of the action and not on knowledge that the specific action was prohibited. <u>Cf. Consumer Fin. Prot. Bureau v. Mortgage Law Grp., LLP</u>, 196 F. Supp. 3d at 944 (treating the inquiry as focused on knowledge of the action and not on whether the action was prohibited). "'A defendant's participation in corporate affairs is probative of knowledge.'" <u>F.T.C. v. Nat'l Urological Grp., Inc.</u>, 645 F. Supp. 2d at 1207 quoting <u>F.T.C. v. Wilcox</u>, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995)(Seltzer, M.J.)), <u>aff'd</u>, 356 F. App'x 358 (11th Cir. 2009).

## <u>RELEVANT LAW REGARDING THE MFCFPA</u>

On May 19, 2010, New Mexico enacted the MFCFP, which provides New Mexico-specific laws governing mortgage foreclosure relief services. <u>See</u> N.M. Stat. Ann. § 47-15-5. Among other things, the MFCFP provides:

> It is a violation of the Mortgage Foreclosure Consultant Fraud Prevention Act for a foreclosure consultant to:
>
> A.      claim, demand, charge, collect or receive any compensation until after the foreclosure consultant has fully performed every service the foreclosure consultant contracted to perform or represented the consultant would perform;
>
> . . . .
>
> G.      include a provision in a foreclosure consulting contract that:
>
>> (1)      attempts or purports to waive an owner's rights under the Mortgage Foreclosure Consultant Fraud Prevention Act;
>>
>> (2)      requires an owner to consent to jurisdiction for litigation or choice of law in a state other than New Mexico;
>>
>> (3)      provides for venue in a county other than the county in which the residence in foreclosure is located; or
>>
>> (4)      imposes any costs or filing fees greater than the fees required to file an action in a district court; or
>
> H.      induce or attempt to induce an owner to enter a contract that does not comply in all respects with the Mortgage Foreclosure Consultant Fraud Prevention Act.

N.M. Stat. Ann. § 47-15-5(A), (G)-(H). The MFCFP preserves to homeowners the right to rescind foreclosure consulting contracts: "In addition to any other right under law to rescind a contract, an owner may rescind a foreclosure consulting contract until midnight of the third business day after the day on which the owner signs a foreclosure consulting contract that complies with the

Mortgage Foreclosure Consultant Fraud Prevention Act." N.M. Stat. Ann. § 47-15-4(A). In addition, the MFCFP prescribes practices, forms, and language for such contracts:

A.  A foreclosure consulting contract shall:

(1)  be provided to the owner for review at least twenty-four hours before being signed by the owner;

(2)  be printed in at least fourteen-point type and written in the same language that was used by the owner in discussions with the foreclosure consultant to describe the consultant's services or to negotiate the contract;

(3)  fully disclose the nature and extent of the foreclosure consulting services to be provided, including any foreclosure reconveyance that may be involved, and the total amount and terms of any compensation to be received by the foreclosure consultant or anyone working in association with the foreclosure consultant;

(4)  disclose the names of any other corporations, businesses or entities on behalf of which the consultant does business or with which the consultant is affiliated or employed;

(5)  separately itemize all costs, fees or expenses and the purpose of the costs, fees or expenses that are charged to the homeowner during the term of the contract;

(6)  be dated and personally signed by the owner and the foreclosure consultant; and

(7)  contain the following notice, which shall be printed in at least fourteen-point boldface type, completed with the name of the foreclosure consultant, and located in immediate proximity to the space reserved for the owner's signature:

"NOTICE REQUIRED BY NEW MEXICO LAW

..........(Name) or anyone working for him or her CANNOT ask you to sign or have you sign any lien, mortgage or deed as part of signing this agreement unless the terms of the transfer are specified in this document and you are given a separate explanation of the nature and extent of the transaction.

...........(Name) or anyone working for him or her CANNOT guarantee you that they will be able to refinance your home or arrange for you to keep your home. Continue making mortgage payments until a refinancing, if applicable, is approved. If a

transfer of the deed or title to your property is involved in any way, you may rescind the transfer any time within 3 days after the date you sign the deed or other document of sale or transfer. See the attached Notice of Rescission form for an explanation of this right. As part of any rescission, you must repay any money spent on your behalf as a result of this agreement within 60 days of receiving commercially reasonable documentation of the payments.

THIS IS AN IMPORTANT LEGAL CONTRACT AND COULD RESULT IN THE LOSS OF YOUR HOME. CONTACT AN ATTORNEY OR COUNSELOR BEFORE SIGNING."

B.      A foreclosure consulting contract shall contain on the first page, in at least fourteen-point type:

> (1)      the name and address of the foreclosure consultant to which the notice of cancellation is to be mailed; and

> (2)      the date the owner signed the contract.

C.      A foreclosure consulting contract shall be accompanied by a completed form in duplicate, captioned "NOTICE OF RESCISSION RIGHTS", which shall:

> (1)      be on a separate sheet of paper attached to the contract;

> (2)      be easily detachable; and

> (3)      contain the following statement printed in at least fifteen-point type:

"NOTICE OF RESCISSION RIGHTS

(Date of Contract)

You may cancel or rescind this contract, without any penalty, at any time until midnight of the third business day after the day on which you sign this contract. If you want to end this contract, mail or deliver a signed and dated copy of this Notice of Rescission, or any other written notice indicating your intent to rescind to (name of foreclosure consultant) at (address of foreclosure consultant, including facsimile and electronic mail).

As part of any rescission, you (the homeowner) must repay any money spent on your behalf as a result of this agreement within 60 days of receiving commercially reasonable documentation of the payments.

THIS IS AN IMPORTANT LEGAL CONTRACT AND COULD RESULT IN THE LOSS OF YOUR HOME.  CONTACT AN ATTORNEY OR COUNSELOR BEFORE SIGNING.

RESCISSION OF CONTRACT FORM

TO: (name of foreclosure consultant)

(address of foreclosure consultant, including facsimile and electronic mail)

I hereby rescind this contract.

..........(Date)

..........(Homeowner's signature)".

D.      The foreclosure consultant shall provide the owner with a signed and dated copy of the foreclosure consulting contract and the attached notice of rescission rights and rescission of contract form immediately upon execution of the contract.

E.      The time during which the owner may rescind the foreclosure consulting contract does not begin to run until the foreclosure consultant has complied with this section and the owner has signed the contract.

N.M. Stat. Ann. § 47-15-3.

The MFCFP defines "foreclosure consultant" broadly.  N.M. Stat. Ann. § 47-15-2(B).  Like the MARS Rule, the definition includes people who offer and who provide services:

"[F]oreclosure consultant":

(1)      means a person[66] who, directly or indirectly, makes a solicitation or offer to an owner to perform services for compensation or who, for compensation,[67] performs a service that the person represents will:

(a)      stop or postpone a foreclosure sale;

---

[66]"'[P]erson' means an individual, a partnership, a corporation, a limited liability company, an association or other group, however organized."  N.M. Stat. Ann. § 47-15-2(E).

[67]"'[C]ompensation' means monetary payment, remuneration or other benefits received, including monetary donations made in conjunction with the performance of services."  N.M. Stat. Ann. § 47-15-2(A).

(b)     obtain any forbearance from a beneficiary or mortgagee;

(c)     assist the owner to exercise the right to reinstatement;

(d)     obtain an extension of the period within which the owner may reinstate the owner's obligation;

(e)     obtain a waiver of an acceleration clause contained in a promissory note, deed of trust or contract secured by a mortgage on a residence in foreclosure or contained in the mortgage;

(f)     assist an owner in foreclosure or loan default to obtain a loan or advance of funds;

(g)     avoid or ameliorate the impairment of an owner's credit resulting from the recording of a notice of default or from a foreclosure sale; or

(h)     otherwise save an owner's residence from foreclosure[.]

N.M. Stat. Ann. § 47-15-2(B)(1).  "'[O]wner' means the record owner of a residence in foreclosure at the time a foreclosure notice of pendency was recorded or a summons and complaint for foreclosure was served."  N.M. Stat. Ann. § 47-15-2(D).  Also like the MARS Rule, the MFCFP emphasizes the purposes for which the services are promised; it regulates those services that a person "represents will" attain mortgage assistance relief results.  N.M. Stat. Ann. § 47-15-2(B)(1).  Unlike the MARS Rule, however, the MFCFP lists forms of services to which the MFCFP applies:

G.     "service" means and includes, but is not limited to, any of the following:

(1)     debt, budget or financial counseling of any type;

(2)     receiving money for the purpose of distributing it to creditors in payment or partial payment of an obligation secured by a lien on a residence in foreclosure;

(3)     contacting creditors on behalf of an owner;

(4)     arranging or attempting to arrange for an extension of the period within which the owner of a residence in foreclosure may cure the owner's default and reinstate the owner's obligation;

(5)     arranging or attempting to arrange for a delay or postponement of the time of sale of the residence in foreclosure;

(6)     advising the filing of any document or assisting in any manner in the preparation of any document for filing with a bankruptcy court; or

(7)     giving advice, explanation or instruction to an owner, which in any manner relates to the cure of a default in or the reinstatement of an obligation secured by a lien on the residence in foreclosure, the full satisfaction of that obligation, or the postponement or avoidance of a sale of a residence in foreclosure, pursuant to a power of sale contained in a mortgage.

N.M. Stat. Ann. § 47-15-2(G).

Given the MFCFP's breadth, the Court predicts that the Supreme Court of New Mexico would understand legal services litigation services to fall within the MFCFP. Nothing in the MFCFP precludes litigation services from those services that the MFCFP regulates. Legal services may involve "contacting creditors on behalf of an owner," "arranging or attempting to arrange for an extension of the period within which the owner of a residence in foreclosure may cure the owner's default and reinstate the owner's obligation," and "arranging or attempting to arrange for a delay or postponement of the time of sale of the residence in foreclosure," and litigation provides one strategy for undertaking these actions. N.M. Stat. Ann. § 47-15-2(G)(3)-(5). The MFCFP contains a limited attorney exemption -- excluding from the definition of foreclosure consultant "a person licensed to practice law in this state when the person renders service in the course of the person's practice as an attorney," N.M. Stat. Ann. § 47-15-2(B)(2)(a) -- and such exemption counsels the MFCFP's application against non-exempt attorneys performing legal services, see N.M. Stat. Ann. § 47-15-2(B)(2)(a). Without such application, the exemption would serve to bar

few attorneys and advance little purpose. Moreover, the Supreme Court of New Mexico would likely consider the MFCFP in light of the similar MARS Rule, and reason that the MFCFP and the MARS Rule reach similar activities. Cf. State ex rel. Schwartz v. Sanchez, 1997-NMSC-021, ¶ 7, 936 P.2d 334, 335 ("[T]wo statutes covering the same subject matter should be harmonized and construed together when possible, in a way that facilitates their operation and the achievement of their goals." (citing Quintana v. Schnedar, 1993-NMSC-033, ¶ 4, 855 P.2d 562, 564-65)). The MARS Rule, as the Court concluded in the preceding section, applies to legal services, including litigation services.

The MFCFP provides that MFCFP violations are deemed to be NMUPA violations. See N.M. Stat. Ann. § 47-15-7(A). The MFCFP permits the award of actual damages, and attorney's fees and costs on a basis cumulative with other remedies. See N.M. Stat. Ann. § 47-15-7(B). Additionally, the MFCFP permits a court to award "exemplary damages up to three times the compensation charged by the foreclosure consultant if the court finds that the foreclosure consultant violated a provision of Section 5 of the Mortgage Foreclosure Consultant Fraud Prevention Act and that the foreclosure consultant's conduct was willful or in bad faith." N.M. Stat. Ann. § 47-15-7(D). "Willful conduct is the intentional doing of an act with knowledge that harm may result." N.M. Civ. UJI 13-1827.[68]

---

[68]The Court draws this definition of willful from the New Mexico Civil Uniform Jury Instructions on punitive damages, and predicts that the Supreme Court of New Mexico would apply this definition to the MFCFP. See N.M. Civ. UJI 13-1827. The N.M. Civ. UJI offers New Mexico's definition for willful in the punitive damages context. Cf. Coffey v. United States, 906 F. Supp. 2d 1114, 1186 n.33 (D.N.M. 2012)(Browning, J.)("The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law." (citing State v. Wilson, 1994-NMSC-009, ¶ 5, 867 P.2d 1175, 1178)). The MFCFP uses the concept of "willful" in such a context; it permits treble damages for defendants' willful scienter. See Hale v. Basin Motor Co.,

# LAW REGARDING THE NMUPA

The NMUPA provides private -- individual and class action -- remedies and civil penalties "for unfair, deceptive, or unconscionable trade practices." Valdez v. Metro. Prop. & Cas. Ins., No. CIV 11-0507 JB/KBM, 2012 WL 1132414, at *19 (D.N.M. March 31, 2012)(Browning, J.)(citing Ouynh Truong v. Allstate Ins, 2010-NMSC-009, ¶ 22, 227 P.3d 73, 80)). See N.M. Stat. Ann. § 57-12-3 ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."); N.M. Stat. Ann. § 57-12-10 (authorizing private suits); N.M. Stat. Ann. § 57-12-11 (authorizing the Attorney General of New Mexico to seek civil penalties). In construing the NMUPA, "courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts." N.M. Stat. Ann. § 57-12-4.

> The term ""unfair or deceptive trade practice"" covers

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person.

N.M. Stat. Ann. § 57-12-2(D)(quotation for emphasis). To succeed on an NMUPA claim of an unfair or deceptive trade practice, the plaintiff most show four elements:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. Ashlock[v. Sunwest Bank of Roswell, N.A.], [1988-NMSC-026, ¶ 4,] . . . 753 P.2d [346,] 347. Second, the false or misleading representation must

---

1990-NMSC-068, ¶ 20, 110 N.M. 314, 320 ("Multiplication of damages pursuant to statutory authority is a form of punitive damages."). The N.M. Civ. UJI provides, therefore, a definition appropriate for "willful" in the MFCFP's context. Cf. Atherton v. Gopin, 2015-NMCA-003, ¶¶ 53-54, 340 P.3d 630, 641-42 (applying the N.M. Civ. UJI 13-1827 definition of willful to the NMUPA's punitive damages provision).

have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." *Id.* Third, the conduct complained of must have occurred in the regular course of the repres, er's trade or commerce. *Id.* Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person." *Id.*

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 12, 811 P.2d 1308, 1311. "Generally speaking, [this NMUPA provision] is designed to provide a remedy against misleading identification and false or deceptive advertising." Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 166 P.3d 1091, 1096.[69] "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services." Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 965 P.2d 332, 338. "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051,

---

[69]Here, the Court must look to how the Supreme Court of New Mexico, rather than the Court of Appeals of New Mexico, would resolve the case. Federal courts sitting in diversity must apply the substantive law of the state that would otherwise have jurisdiction over the claims at issue. See Erie, 304 U.S. at 78. In the absence of an authoritative pronouncement from the highest court, a federal court's task under the Erie doctrine is to predict how the state's highest court would rule if presented with the same case. See Wade v. EMCASCO Ins., 483 F.3d at 666. When making an Erie guess, a federal court should follow intermediate state-court decisions "unless other authority convinces us that the state supreme court would decide otherwise." Koch v. Koch Indus., Inc., 203 F.3d at 1230 (quoting Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir. 1984)). The Court predicts that the Supreme Court of New Mexico would agree with Lohman v. Daimler-Chrysler Corp. and Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, 965 P.2d 332, see infra, that the NMUPA provides a remedy against misleading, false, or deceptive statements associated with advertising and the sale of goods, based on the Court's read of the Supreme Court of New Mexico's opinion in Stevenson v. Louis Dreyfus Corp., stating that the NMUPA is modeled after the Uniform Deceptive Trade Practices Act, which "provides a private remedy to persons likely to suffer pecuniary harm for conduct involving either misleading identification of business or goods or false or deceptive advertising." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 12, 811 P.2d at 1310-11 (citing N.M. Stat. Ann. § 57-12-1). The Court will, accordingly, apply New Mexico law as the Court of Appeals of New Mexico articulated that law in Lohman v. Daimler-Chrysler Corp. and Diversey Corp. v. Chem-Source Corp.

¶ 17, 811 P.2d at 1311-12.  The Court has noted that, "in the right circumstances, it could grant judgment as a matter of law on whether a statement is deceptive or misleading," although "generally the question is a matter of fact."  Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1192-93 (reasoning that the Supreme Court of New Mexico would reach this conclusion).  The Court has also concluded that a communication can mislead even if the representation is not false.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1193-95 (concluding that the Supreme Court of New Mexico would reach this conclusion).

> Unconscionable trade practices include:
>
> act[s] or practice[s] in connection with . . . the extension of credit in the collection of debts that to a person's detriment:
>
> > (1)      take[] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or
> >
> > (2)      result[] in a gross disparity between the value received by a person and the price paid.

N.M. Stat. Ann. § 57-12-2(E).  An unconscionable trade practice, accordingly, can be procedurally unconscionable, per § 57-12-2(E)(1), or substantively unconscionable, per § 57-12-2(E)(2).  See Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 21, 308 P.3d 901, 907 ("The doctrine of contractual unconscionability can be analyzed from both procedural and substantive perspectives.").  The NMUPA's provisions regarding unconscionability "evince[] a legislative recognition that, under certain conditions, the market is truly not free, leaving it for courts to determine when the market is not free, and empowering courts to stop and preclude those who prey on the desperation of others from being rewarded with windfall profits."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 34, 329 P.3d 658, 671.  "Procedural

unconscionability . . . examines the particular factual circumstances surrounding the formation of [a] contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other." Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 23, 308 P.3d at 907-08. Substantive unconscionability, on the other hand, "concerns the legality and fairness of the contract terms themselves," and "focuses on such issues as whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar policy concerns." Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 22, 308 P.3d at 907. Substantive unconscionability arises where a contract is illegal, or where it "is grossly unreasonable and against our public policy under the circumstances," Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 31, 308 P.3d at 909, even if "there is not a statute that specifically limits [such] contract terms," because "[r]uling on substantive unconscionability is an inherent equitable power of the court, and does not require prior legislative action," State ex rel. King v. B&B Inv. Grp., Inc., 2014-NMSC-024, ¶ 33, 329 P.3d at 670.

Under the NMUPA, the Attorney General of New Mexico is entitled to bring an action in New Mexico's name for NMUPA violations. See N.M. Stat. Ann. § 57-12-8(A). In such an action, the Attorney General may "petition the district court for temporary or permanent injunctive relief and restitution." N.M. Stat. Ann. § 57-12-8(B). Special penalties are available against persons who act willfully:

> In any action brought under Section 57-12-8 NMSA 1978, if the court finds that a person is willfully using or has willfully used a method, act or practice declared unlawful by the Unfair Practices Act, the attorney general, upon petition to the court, may recover, on behalf of the state of New Mexico, a civil penalty of not exceeding five thousand dollars ($5,000) per violation.

N.M. Stat. Ann. § 57-12-11.  "Willful conduct is the intentional doing of an act with knowledge that harm may result."  N.M. Civ. UJI 13-1827.[70]

## FEDERAL LAW REGARDING PERMANENT INJUNCTIONS

To attain a permanent injunction under federal law, a plaintiff must demonstrate:

(i) that [the plaintiff] has suffered an irreparable injury; (ii) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (iii) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (iv) that the public interest would not be disserved by a permanent injunction.

eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).  The Tenth Circuit has formulated that test as: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction if issues, will not adversely affect the public interest."  Southwest Stainless, LP v. Sappington, 582 F.3d 1176, 1191 (10th Cir. 2009).  See Klein-Becker USA, LLC v. Englert,

---

[70]The Court expects the Supreme Court of New Mexico to define the NMUPA's "willful" according to the New Mexico Civil Uniform Jury Instructions.  As discussed supra note 69, the Court predicts that the Supreme Court of New Mexico would conclude that the New Mexico Civil Uniform Jury Instructions best defines New Mexico's understanding of "willful" in the punitive damages context.  The Court of Appeals of New Mexico has concluded that the NMUPA's civil penalties are punitive.  See Atherton v. Gopin, 2015-NMCA-003, ¶ 53, 340 P.3d at 641 (citing McLelland v. United Wis. Life Ins., 1999-NMCA-055, ¶ 10, 127 N.M. 303, 980 P.2d 86, 90).  The Court predicts that the Supreme Court of New Mexico would agree with Atherton v. Gopin.  In Hale v. Basin Motor Co., the Supreme Court of New Mexico concluded that multiplying civil penalties based on scienter creates punitive damages.  See 1990-NMSC-068, ¶ 20, 110 N.M. at 320.  The NMUPA does not multiply the otherwise applicable civil penalties for culpable defendants, but it increases the maximum penalty according to scienter.  Multiplying civil penalties differs from increasing maximum civil penalties only in the means of calculating penalties; both provision categories enhance penalties for culpable mental states and are likewise punitive.  The Court concludes, accordingly, that the Supreme Court of New Mexico would look to the New Mexico Civil Uniform Jury Instructions to understand "willful" in the NMUPA provision for enhanced civil penalties.  Cf. Atherton v. Gopin, 2015-NMCA-003, ¶¶ 53-54, 340 P.3d at 641 (reaching the same conclusion as the Court and using the N.M. Civ. UJI 13-1827 definition to define "willful" in the NMUPA).

711 F.3d 1153, 1164 (10th Cir. 2013). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." eBay, Inc. v. MercExchange, LLC, 547 U.S. at 391. See Southwest Stainless, LP v. Sappington, 582 F.3d at 1191 ("'The district court's discretion in this context is necessarily broad and a strong showing of abuse must be made to reverse it.'" quoting F.T.C. v. Accusearch Inc., 570 F.3d 1187, 1201 (10th Cir. 2009)). "An injunction is an 'extraordinary remedy' to prevent future violations, and should be used sparingly." Copar Pumice Co., Inc. v. Morris, No. 07-0079, 2009 WL 5201799, at *15 (D.N.M. October 23, 2009)(Browning, J.)(quoting Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah, 144 F.3d 1513, 1522 (10th Cir. 1997)).

"A district court may find irreparable harm 'based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer.'" Southwest Stainless, LP v. Sappington, 582 F.3d at 1191 (quoting Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990)). In Copar Pumice Co., Inc. v. Morris, for example, the Court denied a permanent injunction, because the plaintiff did not demonstrate that damages could not compensate the Fourth-Amendment to the Constitution of the United States search injury it had suffered. See 2009 WL 5201799, at *15-17. The Court further concluded that the plaintiff had "shown few, if any, damages other than attorney's fees and costs," and, accordingly, the extraordinary remedy sought -- a permanent injunction -- was inappropriate. 2009 WL 5201799, at *16.

Injunctive relief requests are subject to Article III mootness. See WildEarth Guardians v. Public Service Co. of Colorado, 690 F.3d 1174, 1190-91 (10th Cir. 2012); State of N.M. ex rel. N.M. State Highway Dept. v. Goldschmidt, 629 F.2d 665, 668-69 (10th Cir. 1980). A case becomes moot "'when the issues presented are no longer 'live' or the parties lack a legally

cognizable interest in the outcome.'"  Cty. of L.A. v. Davis, 440 U.S. 625, 631 (1979)(quoting

Powell v. McCormack, 395 U.S. 486, 496 (1969)).

> Like Article III standing, mootness is oft-cited as a constitutional limitation
> on federal court jurisdiction. *E.g.*, *Building & Constr. Dep't v. Rockwell Int'l
> Corp.*, 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional mootness doctrine is
> grounded in the Article III requirement that federal courts only decide actual,
> ongoing cases or controversies) . . . .  But although issues of mootness often bear
> resemblance to issues of standing, their conceptual boundaries are not
> coterminous. . . . [T]he Supreme Court has historically recognized what are often
> called 'exceptions' to the general rule against consideration of moot cases, as where
> a plaintiff's status is 'capable of repetition yet evading review,' *S. Pac. Terminal
> Co. v. Interstate Commerce Comm'n*, 219 U.S. 498 (1911), or where a defendant
> has ceased the challenged action but it is likely the defendant will 'return to his old
> ways' -- the latter often referred to as the voluntary cessation exception, *United
> States v. W.T. Grant Co.*, 345 U.S. 498, 515 (1911).

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d 1239, 1242 (10th Cir. 2011).  When

injunctive relief does not redress plaintiffs' particular injuries, the injunctive relief requested is

rendered moot.  See WildEarth Guardians v. Public Service Co., 690 F.3d at 1191 (citing United

States v. Vera-Flores, 496 F.3d 1177, 1180 (10th Cir. 2007)).  Similarly, if the injunction would

have no present-day effect, the injunctive relief request is also rendered moot.  See Utah Animal

Rights Coalition v. Salt Lake City Corp., 371 F.3d 1248, 1257 (10th Cir. 2004)("The alleged

violation took place in 2001, the Olympics have come and gone, and neither temporary restraining

order, preliminary injunction, nor permanent injunction could have any present-day effect.").

Mootness is subject to the voluntary-cessation exception.  See Brown v. Buhman, 822 F.3d

1151, 1166 (10th Cir. 2016).  Under that exception, "'voluntary cessation of challenged conduct

does not ordinarily render a case moot because a dismissal for mootness would permit a resumption

of the challenged conduct as soon as the case is dismissed.'"  Brown v. Buhman, 822 F.3d at 1166

quoting Knox v. Serv. Emps. Int'l Union, Local 1000, 567 U.S. 298, 307 (2010)).  "This rule is

designed to prevent gamesmanship.  If voluntary cessation automatically mooted a case, 'a

defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves his unlawful ends.'" Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)). Nevertheless, a defendant's voluntary cessation may render a case moot, if "the defendant carries 'the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" Brown v. Buhman, 822 F.3d at 1166 (quoting Already, LLC v. Nike, Inc., 568 U.S. at 91). "In assessing the likelihood of recurrence, a court may consider 'all the circumstances,' including the 'bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations.'" F.T.C. v. Accusearch Inc., 570 F.3d at 1201 (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)).

## NEW MEXICO LAW REGARDING INJUNCTIONS

"'An injunction is an equitable remedy,'" State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 28, 329 P.3d at 669 quoting Cafeteria Operators, L.P. v. Coronado-Santa Fe Assocs., L.P., 1998-NMCA-005, ¶ 19, 952 P.2d 435, 442), the granting of which lies within "'the sound discretion of the district court,'" State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 28, 329 P.3d at 669 quoting Moody v. Stribling, 1999-NMCA-094, ¶ 30, 985 P.2d 1210, 1219). Injunctions are, however, "'harsh and drastic remedies,'" Hill v. Cmty. of Damien of Molokai, 1996-NMSC-008, ¶ 51, 911 P.2d 861, 877 quoting Padilla v. Lawrence, 1984-NMCA-064, ¶ 22, 685 P.2d 964, 970), and "are granted to prevent irreparable injury for which there is no adequate and complete remedy at law," City of Las Cruces v. Rio Grande Gas Co., 1967-NMSC-190, ¶ 11, 431 P.2d 492, 494 (citing Asplund v. Hannett, 1926-NMSC-040, 249 P. 1074; La Mesa Cmty. Ditch v. Appelzoeller, 1914-NMSC-033, 140 P. 1051). An injury is irreparable at law where, for

instance, "the imminent harm or conduct is or will be of a continuous nature, the constant recurrence of which renders a remedy at law inadequate, except by a multiplicity of suits." Winrock Enters., Inc. v. House of Fabrics of N.M., Inc., 1978-NMSC-038, ¶ 16, 579 P.2d 787, 790 (citing Kennedy v. Bond, 1969-NMSC-119, ¶ 17, 460 P.2d at 813). "Where injury is threatened, there need be no showing of the precise measured amount of actual harm. A showing of a serious threat of imminent harm is sufficient where such harm will result in irreparable injury." Winrock Enters., Inc. v. House of Fabrics of N.M., Inc., 1978-NMSC-038, ¶ 16, 579 P.2d at 790 (citing Ingram v. Phillips Petroleum Co., 259 F. Supp. 176 (D.N.M. 1966)(Doyle, J.); R.M. Sedrose, Inc. v. Mazmanian, 95 N.E.2d 677 (Mass. 1950)). When granting an injunction, "[t]he court is allowed to, and in some situations should weigh equities and hardships." Hines Corp. v. City of Albuquerque, 1980-NMSC-107, ¶ 13, 621 P.2d 1116, 1118 (citing Gaskin v. Harris, 1971-NMSC-013, 481 P.2d 698; State ex rel. State Tax Comm'n v. First Judicial Dist. Court, 1961-NMSC-157, 366 P.2d 143).

## ANALYSIS

The Court grants the MSJ and the Joinder in part and denies them in part. The Court concludes that New Mexico has shown genuine disputes of material fact whether the Parwatikar Defendants and Mr. Pratt are liable for MARS Rule and MFCFPA violations. Specifically, genuine disputes of material fact exist whether Real Estate Law violated the MARS Rule and the MFCFP; whether Real Estate Law, Balanced Legal, and Pinnacle Law operated a common enterprise; whether Mr. Parwatikar and Mr. Pratt are individually liable for Real Estate Law's alleged MARS Rule and MFCFP violations; whether Mr. Parwatikar and Pinnacle Law substantially assisted the other Defendants' alleged MARS Rule violations; and what penalties the Court should assess should it find the Parwatikar Defendants and Mr. Pratt liable for the MARS

Rule and the MFCFPA violations. New Mexico has not produced, however, sufficient evidence to survive summary judgment on a theory based on Davis' alleged MARS Rule violations; on Balanced Legal and Pinnacle Law's violation of the MARS Rule independent of Real Estate Law, on Mr. Parwatikar's and Mr. Pratt's participation in a common enterprise with Real Estate Law, Balanced Legal, and Pinnacle Law, and on Mr. Pratt's reckless or knowing violation of the MARS Rule, or willful violation of the MFCFP, so the Court grants summary judgment in the Parwatikar Defendants and Mr. Pratt's favor on these theories. The Court also grants the Parwatikar Defendants and Mr. Pratt's request for summary judgment on the NMUPA issues other than the MFCFP claim, as New Mexico has not produced evidence on which a reasonable factfinder could conclude that Real Estate Law knowingly made false or misleading misrepresentations such that New Mexico can establish its unfair or deceptive practices claims, and has not shown sufficient evidence on which a reasonable factfinder could conclude that Real Estate Law engaged in unconscionable practices. The Court also grants the Parwatikar Defendants and Mr. Pratt's request for summary judgment on the injunctive relief issue, because New Mexico has not produced evidence of ongoing, continuous, or recent MARS Rule, MFCFP, or other NMUPA violations to survive summary judgment on its requests for injunctive relief.

I.      **NEW MEXICO HAS SHOWN GENUINE DISPUTES OF MATERIAL FACT WHETHER THE PARWATIKAR DEFENDANTS AND MR. PRATT ARE LIABLE FOR MARS RULE VIOLATIONS.**

The Court concludes that New Mexico has shown genuine disputes of material fact whether the Parwatikar Defendants and Mr. Pratt are liable for violations of the MARS Rule's advance fee prohibition. The Parwatikar Defendants and Mr. Pratt propose as grounds for summary judgment that New Mexico lacks sufficient evidence to establish their MARS Rule violations. See MSJ at 4-5; Joinder at 1. The Court notes, however, that New Mexico can establish Balanced Legal's and

Pinnacle Law's liability by showing that Real Estate Law[71] violated the MARS Rule and that a common enterprise existed between Real Estate Law, Balanced Legal, and Pinnacle Law. See F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 808-09. New Mexico can show Mr. Parwatikar's and Mr. Pratt's individual liabilities by satisfying the FTCA test for individual liability. See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203. New Mexico can also establish liability for Mr. Parwatikar and Pinnacle Law through its alternative theory, that Mr. Parwatikar and Pinnacle Law substantially assisted the other Defendants' MARS Rule violations, which is itself a MARS Rule violation, by satisfying the elements for substantial assistance or support liability.[72] See F.T.C. v. Lake, 181 F. Supp. 3d at 699. The Court concludes that New Mexico has shown genuine disputes of material fact regarding the Parwatikar Defendants' and Mr. Pratt's liability -- through the common enterprise and individual liability theories -- for violations of the MARS Rule's advance fees prohibition, and regarding Mr. Parwatikar's and Pinnacle Law's liability for substantially assisting or supporting the other Defendants' alleged MARS violations.

---

[71]The Court notes that the parties have not produced evidence or made arguments on Davis' alleged MARS Rule violations. The Court grants, accordingly, summary judgment on any theories that the Parwatikar Defendants or Mr. Pratt are liable for MARS violations based on Davis' actions.

[72]Contrary to the Parwatikar Defendants' suggestion, see MSJ at 5, the Court concludes that New Mexico brings against the Parwatikar Defendants a claim of a direct violation of the MARS Rule and a claim of substantial assistance or support. The Complaint alleges that all the Defendants were mortgage assistance relief service providers, see Complaint ¶¶ 80-82, at 18-19, and notes additionally that Mr. Parwatikar and Pinnacle Law substantially assisted or supported Real Estate Law, Davis, and/or Mr. Pratt, see Complaint ¶ 81, at 18-19. Moreover, at the hearing, New Mexico suggested that it sought substantial assistance or support liability should the Court conclude that Mr. Parwatikar was not directly involved in providing mortgage assistance relief services. See Tr. at 14:22-15:2 (Anaya-Allen). The Court addresses, accordingly, the Parwatikar Defendants' direct liability for a MARS Rule violation and their liability for substantial assistance and support.

Preliminarily, the Court cannot say that either the Parwatikar Defendants or Mr. Pratt are exempt from the MARS Rule. An attorney is exempt from the advance fee prohibition if the attorney: (i) provides mortgage assistance relief services as part of the practice of law, see 12 C.F.R. § 1015.7(a)(1); (ii) is licensed in the consumer's state of residence or dwelling, see 12 C.F.R. § 1015.7(a)(2); (iii) complies with state laws regulating mortgage assistance relief services, see 12 C.F.R. § 1015.7(a)(3); (iv) deposits advance fees in client trust accounts, see 12 C.F.R.§ 1015.7(b)(1); and (iv) complies with state laws, including licensing requirements regulating client trust accounts, see 12 C.F.R. § 1015.7(b)(2). New Mexico and the Parwatikar Defendants agree that Mr. Parwatikar is not licensed in New Mexico, so Mr. Parwatikar is not exempt from the advance fee prohibition. See Tr. at 21:24-22:2 (Court, Harrison); id. at 12:15-17 (Anaya-Allen). Although New Mexico states that whether Mr. Pratt is licensed in New Mexico is undisputed, see Tr. at 12:15-17 (Anaya-Allen), Mr. Pratt has not conceded that point, and the Court has not located evidence whether Mr. Pratt is licensed in New Mexico; it has not located evidence that he is or that he is not licensed in the state. The Court cannot, accordingly, determine as a matter of law Mr. Pratt's exemption from the MARS Rule. The Court notes for the parties' planning purposes that, if Mr. Pratt is not licensed in New Mexico, he also is not exempt from the MARS Rule's advance fee prohibition.

The Court also notes that Balanced Legal and Pinnacle Law cannot argue that the attorney exemption applies to them. The Court concludes that the attorney exemption does not apply to law firms. See supra note 64. Cf. F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1279-80, 1284 (addressing arguments that 12 C.F.R. § 1015.7 applies to law firms). Moreover, as Mr. Parwatikar is not exempted from the advance fee prohibition, Balanced Legal and Pinnacle Law cannot argue soundly that the MARS Rule equally does not apply to them.

### A. NEW MEXICO HAS SHOWN A GENUINE DISPUTE OF MATERIAL FACT WHETHER THE PARWATIKAR DEFENDANTS AND MR. PRATT VIOLATED THE ADVANCE FEE PROHIBITION.

The Court concludes that a genuine dispute of material fact exists whether the Parwatikar Defendants and Mr. Pratt are liable for MARS Rule violations. New Mexico has shown a genuine dispute of material fact whether Real Estate Law violated the MARS Rule. Additionally, it has established genuine disputes of material fact whether Real Estate Law, Balanced Legal, and Pinnacle Law engaged in a common enterprise, and whether Mr. Parwatikar and Mr. Pratt are individually liable.

### 1. A Genuine Dispute of Material Fact Exists Whether Real Estate Law Violated the MARS Rule.

First, a genuine dispute of material fact exists whether Real Estate Law was a mortgage assistance relief services provider that violated the MARS Rule's advance fee prohibition. To establish this violation, New Mexico must show that: (i) a Real Estate Law "provide[d], offer[ed] to provide, or arrange[d] for others to provide," mortgage assistance relief services, 12 C.F.R. § 1015.2; see 12 C.F.R § 1015.5; and (ii) that Real Estate Law requested or received consideration; (iii) for those mortgage assistance relief services from a consumer; (iv) before a loan modification agreement was obtained, see 12 C.F.R. § 1015.5. Here, the parties focus their dispute on whether Real Estate Law accepted advance fees for mortgage assistance relief services. See, e.g., MSJ at 5; MSJ Response at 8-13; MSJ Reply at 8; Tr. at 12:19-23 (Anaya-Allen); id. at 13:1-3 (Anaya-Allen). New Mexico avers that Real Estate Law engaged in frivolous litigation to conceal its mortgage assistance relief services and that the central issue is whether the litigation services were, as the Parwatikar Defendants aver, actual litigation services. See Tr. at 13:1-3 (Anaya-Allen); id. at 14:7-18 (Anaya-Allen); id. at 18:15-21 (Harrison). The Court concludes that

a genuine dispute of material fact exists whether Real Estate Law requested its advance fees for mortgage assistance relief services.

The Court notes that considerable evidence shows that Real Estate Law is a mortgage assistance relief service provider. Mortgage assistance relief services include services that are "represented, expressly or by implication, to assist or attempt to assist the consumer with" activities, including "[s]topping, preventing, or postponing" a foreclosure and modifying a loan. 12 C.F.R. § 1015.2(1)-(2). Mr. Parwatikar admits that Real Estate Law provided loan modification services. See Parwatikar Depo. Doc. 145-1 at 82:9-18. Additionally, before transmitting the Attorney-Client Fee Agreement to Madrid, Real Estate Law made representations to Madrid him about helping him resolve his mortgage problems, modify his loans, and stop foreclosure. See Madrid Decl. ¶ 4, at 1.[73] Real Estate Law then send Madrid a packet that included the Attorney-Client Fee Agreement. See Madrid Decl. ¶ 5, at 2. Following Madrid's completion of the Attorney-Client Fee Agreement, Real Estate Law sent Madrid the Information Packet, and, in a letter affixed with Mr. Pratt's name, informed Madrid:

> As for our firm, Real Estate Law Center PC is exclusively dedicated to assisting homeowners in their struggle against lenders. We have a variety of solutions to help those who are upside down in "bad" loans due to lender liability, as well as homeowners in distress.
>
> Rest assured that your case is in excellent hands. Our firm began this mass tort action to provide homeowners with the resources and legal expertise to leverage

---

[73]The Court considers Real Estate Law's representations discussed throughout this Analysis section as non-hearsay. "'If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.'" Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d at 1087 (quoting Fed. R. Evid. 801 advisory committee's note). That Real Estate Law represented that it could stop Madrid's foreclosure or help with loan modification carries legal consequences -- that Real Estate Law made representations making its services mortgage assistance relief services. The Court concludes, accordingly, that it can consider this evidence without violating the hearsay prohibition.

an action against your lender. Your retainer fee, pooled with those of other homeowners in this mass tort action, allows a powerhouse law firm to represent your interests.

Information Packet at 1. In another document in the Information Packet, Real Estate Law explains: "The Real Estate Law Center PC has helped many homeowners in their struggle against predatory banks and their fraudulent mortgage loan tactics. . . . If you are a homeowner facing imminent foreclosure . . . contact our Foreclosure Defense Department . . . immediately." Information Packet at 5 (emphasis omitted). The same Information Packet page contains additional information on responding to collection agencies and bank legal departments, and on loan modifications. See Information Packet at 5. The next Information Packet page addresses communicating with mortgage or foreclosure counselors, banks and lenders, and contacting Real Estate Law about imminent foreclosures. See Information Packet at 6. "Right away, RELC wanted [Madrid] to fill out the loan modification paperwork," and transmitted to him the Germain Email and FDD Package at 1-13, requesting loan modification documents. Madrid Decl. ¶ 16, at 3. Real Estate Law "repeatedly" told Madrid that it could stop his foreclosure. Madrid Decl. ¶ 16, at 3. Madrid received from germain@lenderlawlitigation, at Real Estate Law, Real Estate Law's Foreclosure Defense Department documents "designed to Postpone the sale date." Gill Email at 1. See Madrid Decl. ¶ 16, at 3; Germain Email and FDD Package at 1. In response to Madrid's concerns about foreclosure, Isaiah Gutierrez with Real Estate Law told Madrid to transmit his summons and loan modification documents to Real Estate Law. See Madrid Decl. ¶ 17, at 3. Tutu Gill with Real Estate Law also sent Madrid a copy of the FDD Package. See Madrid Decl. ¶ 18, at 3; Gill Email at 1. Ashley Hana with Real Estate Law told Madrid that "she would get back to [him] on what was happening with the modification," and Gutierrez guaranteed that he would get the loan modification and resolve the foreclosure. Madrid Decl. ¶ 21, at 4; ¶ 24, at 4. Madrid

often sent Real Estate Law paystubs and bank statements to obtain a loan modification.  See

Madrid Decl. ¶ 25, at 4.  Madrid received an email from Keith Anthony, a fraud analyst at Real

Estate Law, which alerted Madrid to fraud issues with his mortgage loan that could provide

information to "forestall foreclosure."  Anthony Email at 1.  See Madrid Decl. ¶ 22, at 4.  Such

representations and activities would suggest a finding that the requirements to qualify as a

mortgage assistance relief provider are met.

Considerable evidence also shows that Real Estate Law requested from Madrid, and that

Madrid paid, advance fees before Madrid received mortgage modification or foreclosure relief.

The Attorney-Client Fee Agreement requests a $5,000.00 advance fee, and Madrid states that he

paid that amount.  See Attorney-Client Fee Agreement ¶ 4, at 1; Madrid Decl. ¶ 15, at 3.  Moreover,

Real Estate Law requested, and Madrid paid, $29.95 in monthly fees.  See Attorney-Client Fee

Agreement ¶ 4, at 2; Madrid Decl. ¶ 8, at 2.  Even had Madrid not paid those amounts, Real Estate

Law's request in the Attorney-Client Fee Agreement for the advance fee would violate the MARS

Rule.  See 12 C.F.R. § 1015.5(a) (making it a violation to "[r]equest or receive" an advance fee).

Contra Tr. at 24:3-5 (Harrison).  Although the Parwatikar Defendants aver that the $5,000.00

retainer was not a concrete requirement, and "any payment could have triggered litigation services

or assignment to an attorney," the Parwatikar Defendants cite no evidence undermining New

Mexico's facts, and any payment for services would result in a receipt of fees.  Tr. at 23:24-24:2

(Harrison).  As Madrid did not receive mortgage assistance relief and lost his home in a

foreclosure, see Madrid Decl. ¶¶ 30-33, at 5, these fees were all requested before he received the

promised relief.  The Court cannot, accordingly, say that there is no evidence that Real Estate Law

requested from Madrid, at least, advance fees.

The Court cannot reach such a conclusion for the other New Mexico consumers. A reasonable factfinder could infer, from the Attorney-Client Fee Agreement, that all Real Estate Law's attorney-client fee agreements contained the $5,000.00 retainer and monthly maintenance fee provisions. Additionally, such factfinder could reason that, because Real Estate Law included these provisions in the agreement that provided for services, Real Estate Law requested all such fees before it obtained for the New Mexico consumers mortgage modification or foreclosure relief.

New Mexico has shown that a genuine dispute of material fact exists whether Real Estate Law requested these fees for mortgage assistance relief services. The Attorney-Client Fee Agreement describes its scope of service as "litigation against their mortgage lender concerning their real estate property." Attorney-Client Fee Agreement ¶ 1, at 1 (emphasis omitted). Although the Attorney-Client Fee Agreement asks for consumers' "initial loan documents, any loan modification correspondence, mortgage note, trust deed and copy of mortgage statement," Attorney-Client Fee Agreement at 1, it does not, on its face, discuss mortgage assistance relief services. The Attorney-Client Fee Agreement contains a contingency fee provision, see Attorney-Client Fee Agreement ¶ 4, at 2, and Mr. Pratt, who wrote the Attorney-Client Fee Agreement and was Real Estate Law's lead attorney, denies performing loan modification services, see Pratt Decl. ¶¶ 1, 3, 19 at 11, 14. A reasonable factfinder could suspect, however, that the $5,000.00 served a purpose other than reimbursement for litigation expenses when the Attorney-Client Fee Agreement also provided for a thirty-percent contingency fee. See Attorney-Client Fee Agreement ¶ 4, at 1-2. Madrid mentions, additionally, receiving no services from Real Estate Law until after he signed the Attorney-Client Fee Agreement, and then, as discussed supra, he explains numerous communications about preventing or forestalling foreclosure and about modifying his mortgage. Real Estate Law's immediate response to Madrid's completion of the Attorney-Client Fee

Agreement was to send the Information Packet with pages addressing foreclosure and loan modification. See Information Packet at 5, 6. Madrid's enrollment in Real Estate Law's litigation services also seems to have followed the signing of this Attorney-Client Fee Agreement. See Madrid Decl. ¶ 19, at 3 (discussing Madrid's lawsuit); Information Packet at 7 (describing the lawsuit process). Based on these facts, despite the Attorney-Client Fee Agreement's language and Mr. Pratt's representations, a reasonable factfinder could conclude that the Attorney-Client Fee Agreement requested the $5,000.00 and the monthly $29.95 for all services Real Estate Law provided, including the mortgage assistance relief services, and/or that the litigation was part of the services represented to stop or forestall foreclosure. A genuine dispute of material fact exists, therefore, whether Real Estate Law requested the advance fee for mortgage assistance relief services, and the Court denies summary judgment on this issue.[74]

2.      **A Genuine Dispute of Material Fact Exists Whether Real Estate Law, Pinnacle Law, and Balanced Legal Group Constituted a Common Enterprise.**

Next, a genuine dispute of material fact exists whether Real Estate Law, Balanced Legal, and Pinnacle Law operated a common enterprise such that Balanced Legal and Pinnacle Law are jointly and severally liable for Real Estate Law's MARS Rule violations.[75] The Parwatikar

---

[74]The Court notes that, if Mr. Pratt is collaterally estopped from relitigating the factual issues in the In re Pratt Decision, the estoppel will not affect the analysis. The MARS Rule gives the Attorney General of New Mexico authority to bring civil actions on behalf of its residents. See 12 U.S.C. § 5538(b)(1). The facts in the In re Pratt Decision about Real Estate Law's specific loan modification activity relate to California and not to New Mexico residents and are, therefore, irrelevant. See In Re Pratt Decision at 4, 9, 12.

[75]No evidence suggests that Balanced Legal or Pinnacle Law alone provided, offered to provide, or arranged to provide mortgage assistance relief services to the New Mexico consumers. The Court concludes that there is no evidence that these entities are liable on their own, separate actions for a MARS Rule violation and grants summary judgment in the Parwatikar Defendants' favor on such a theory.

Defendants do not, in their MSJ, dispute specifically New Mexico's allegations regarding Balanced Legal's or Pinnacle Law's MARS Rule violations, but, at the hearing, they asserted that the MSJ applies to all the Parwatikar Defendants. See MSJ at 4-5; Tr. at 9:23-10:2 (Harrison). To New Mexico's arguments that a common enterprise existed between the Defendants, see MSJ at 13, the Parwatikar Defendants respond that they cannot locate the common enterprise test in the statutes or caselaw, see MSJ at 10; Tr. at 26:18-20 (Harrison). As the Court discusses in the Law Regarding the MARS Rule section, however, this common enterprise test exists in FTCA caselaw, the Court agrees with that caselaw and applies the test here. The Court concludes that a genuine dispute of material fact exists whether the corporate defendants -- Real Estate Law, Balanced Legal, and Pinnacle Law -- engaged in a common enterprise.

For evidence of a common enterprise, the Court looks to "common control; the sharing of office space and officers [and employees]; whether business is transacted through amaze [sic] of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants.'" F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 809 (alteration added)(quoting F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1182; and citing F.T.C. v. J.K. Publ'ns, Inc., 99 F. Supp. 2d at 1201). Considerable evidence connects Balanced Legal to Pinnacle Law. Mr. Parwatikar is the "sole shareholder, President, Chief Operating Officer, and Chief Financial Officer" at Pinnacle Law, Parwatikar First Set Response, Interrogatory No. 1 at 2, and evidence suggests that he had a considerable role in controlling Real Estate Law's activities. According to Susan Murphy, a Real Estate Law employee, Mr. Parwatikar hired her for Real Estate Law, "ran Real Estate Law Center and regularly spoke and communicated with [her] in the role of direct supervisor." Murphy Decl. ¶¶ 3-4, at 1. Mr. Parwatikar instructed Murphy on her start date

at Real Estate Law, see May 9 Email at 1; told Murphy on at least one occasion what work to perform, e.g., to work on a loan modification, see Feb. 13 Email at 1; directed Murphy not to speak with clients about individual cases until the clients retain Real Estate Law for a mass litigation, see Feb. 14 Email at 1; asked Murphy to speak with him before taking an action that contradicted for what the client retained the firm, see Feb. 14 Email at 1; and circulated a summary of an attorney meeting, with instructions for daily policies and litigation practices, see April 5 Email at 1.[76]  These communications reflect Mr. Parwatikar's personal involvement in Real Estate Law and in its litigation activities.  Mr. Parwatikar directed Real Estate Law employee's work and assignments, see Feb. 13 Email at 1; Feb. 14 Email at 1, and various litigation and client interaction policies: "We also came to conclusion on mass cases that the first amended complaint should not be done before service but after any opposition pleading"; "[a]ll individual clients contacted every 3 weeks at least by atty assigned"; "client will be specifically told no interview of client or a complaint filed until initial retainer fully paid"; and "I, Deepak, shall write the verbiage for the initial client contact by atty," April 5 Email at 1.  Mr. Parwatikar's use of "we," "us," and "I" in discussing

---

[76]The Court concludes that the emails discussed in the text are non-hearsay, because they are introduced to show Mr. Parwatikar's relationship to Real Estate Law and not the truths of the matters asserted within the emails.  Murphy's identification of these emails in the Murphy Decl. suffices to identify the emails for what they are.  See Murphy Decl. ¶ 4, at 1-2; Fed. R. Evid. 901(a).  Moreover, the Court concludes that the emails, if not all their contents, are exempted from the hearsay exemption to the extent they are used against Pinnacle Law, because the Court concludes by a preponderance of the evidence that Mr. Parwatikar sent these emails in his position as a Pinnacle Law employee.  See Fed. R. Evid. 801(d)(2)(D); United States v. Shirley, 2016 WL 9021832, at *7 (noting that a court must conclude by a preponderance of the evidence that the party opponent made the statement (citing United States v. Brinson, 772 F.3d at 1320).  Mr. Parwatikar sends the emails from his Pinnacle Law email address and with his Pinnacle Law signature block, suggesting that he makes the statements based on the authority his role with Pinnacle Law grants.  See May 9 Email at 1; Feb. 13 Email at 1; Feb. 13 Email at 1; April 5 Email at 1-2; Parwatikar Depo. 132-1 at 145:3-6 (identifying the email address from which these emails were sent as Mr. Parwatikar's email address).

Real Estate Law issues suggests a close identification with Real Estate Law. See, e.g., Feb. 14 Email at 1 ("It is not your place to offer or ask a client if they want an individual case after they retained us for a mass UNTIL you talk with me first." (capitalization in Feb. 14 Email)); April 5 Email at 1 (see quotations in preceding sentence). See also F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1269-70 (citing communications between defendants about litigation and client issues, and the use of language such as "our" and "we" as evidence of a common enterprise).

Additionally, a reasonable factfinder could conclude that other factors counsel a common enterprise. Pinnacle Law helped incorporate Real Estate Law, see Parwatikar Depo. Doc. 145-1 at 20:19-1, and the two entities shared an office building, see Parwatikar Depo. Doc. 132-1 at 33:6-11; F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1271 (citing shared office building as evidence of a common enterprise). Pinnacle Law is listed on Real Estate Law's telephone list in formatting identical to the formatting identifying Real Estate Law's internal departments. See Telephone List at 1; F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1270 (noting, in concluding that a common enterprise existed, that a document listed contact information for the various defendants in the common enterprise). Pinnacle Law leased employees to and shared employees with Real Estate Law. See Parwatikar Depo. Doc. 132-1 at 43:13-17; Parwatikar Depo. Doc. 145-1 at 19:15-20:2; F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1270 ("With respect to common officers and employees, . . . these entities all have numerous employees in common."). Pinnacle Law also received a large share -- eighty percent -- of Real Estate Law's retainer fees, see Attorney-Client Fee Agreement ¶ 10, at 2-3; Pinnacle Law received $141,500.00 in 2012, $1,029,520.54 in 2013, $746,620.33 in 2014, $787,573.53 in 2015, $368,609.21 in 2016, and $13,125.00 in 2017, see Parwatikar First Set Response, Interrogatory No. 1, at 1-2. Even by the Parwatikar Defendants' account, Mr. Parwatikar admits that his consulting agreement with Real Estate Law capped his

consulting services at eight-percent of Real Estate Law's monthly revenue.  See Parwatikar Depo. Doc. 132-1 at 30:22-24.  A reasonable factfinder could conclude that this imbalance in Pinnacle Law's favor illustrates that Pinnacle Law offered more than consulting services to Real Estate Law, and even that Pinnacle Law, and Mr. Parwatikar within Pinnacle Law, held control over Real Estate Law.  The fee-splitting agreement assigns the purported consulting entity four times the amount of revenue that the law firm purportedly performing the client services retained.

The Parwatikar Defendants depict Mr. Parwatikar's involvement in Real Estate Law as the involvement of a human resource consultant.  See Tr. at 61:7-62:7 (Court, Harrison); id. at 62:8-63:19 (Court, Harrison); id. at 39:8-40:3 (Harrison); id. at 40:23-41:7 (Harrison).  Mr. Parwatikar contends that he initially became involved with Real Estate Law to aid with marketing strategy, see Parwatikar Depo. Doc. 132-1 at 22:2-13, and that he helped with human resources activities, like identifying tools for finding new hires and determining the number of people to hire, see Parwatikar Depo. Doc. 132-1 at 23:25-24:14.  He explains that he did not help Clarambeau with providing legal services or with retaining clients, see Parwatikar Depo. Doc. 132-1 at 254:21-25:4, and states that he -- Mr. Parwatikar -- likewise provided human resource suggestions to Mr. Pratt when he controlled Real Estate Law, see Parwatikar Depo. Doc. 132-1 at 33:12-25. Mr. Parwatikar describes that Pinnacle Law charged Real Estate Law a minimum fee per year, and then fees for each engagement, for rent, for employee leases, and for any contractor services Pinnacle Law used.  See Parwatikar Depo. Doc. 132-1 at 43:5-21.  He denies knowledge of the eighty-percent fee-splitting provision and conjectures that the provision arose because the consulting agreement's cap of his consulting services at eighty percent of Real Estate Law's monthly revenue was transferred into the attorney-client fee agreement.  See Parwatikar Depo. Doc. 132-1 at 30:5-31:17.  Mr. Parwatikar's story does not outweigh as a matter of law the

evidence suggesting a common enterprise. A reasonable factfinder could conclude that Mr. Parwatikar controlled both Real Estate Law and Pinnacle Law, and that the shared office space, telephone number list, employees, and lop-sided fee-splitting provision suggest a common enterprise.

Less evidence connects Balanced Legal to Real Estate Law, but the Court concludes that a genuine issue of material fact exists regarding Balanced Legal's role in a common enterprise with Real Estate Law and Pinnacle Law. The Court cannot determine precisely whether Real Estate Law's and Balanced Legal's operations overlapped. Mr. Parwatikar did business as Balanced Legal from 2008 to 2011, and that entity ceased operation in 2012. See Parwatikar First Set Response, Interrogatory Nos. 1-2, at 1-2. Real Estate Law was founded in 2011. See MSJ Response ¶ 15, at 8 (citing Parwatikar Depo. Doc. 145-1 at 20:19-25:25). Cf. Parwatikar Depo. Doc. 132-1 at 25:21-25. Balanced Legal performed loan modification work, although it did mostly immigration work, see Parwatikar Depo. at 26:22-27:3, and Real Estate Law's documents include Balanced Legal's name as the law firm authorized to act on the client's behalf, see Germain Email and FDD Package at 7, 8. Furthermore, as recited supra, Mr. Parwatikar owned Balanced Legal and Pinnacle Law, and the evidence suggests that he had a large role in Real Estate Law. See Parwatikar First Set Response, Interrogatory No. 1, at 1-2. Based on this evidence, the Court cannot say as a matter of law that Balanced Legal was not part of a common enterprise with Real Estate Law and Pinnacle Law. A genuine dispute of material fact exists whether all the corporate

defendants -- Real Estate Law, Balanced Legal, and Pinnacle Law -- engaged in a common enterprise.[77]

### 3.  Genuine Disputes of Material Fact Exist Regarding Mr. Parwatikar's and Mr. Pratt's Individual Liability.

The Court concludes that genuine disputes of material fact also exist whether Mr. Parwatikar and Mr. Pratt are individually liable.  To establish Mr. Parwatikar's and Mr. Pratt's individual liability, New Mexico must show: (i) that Real Estate Law violated the MARS Rule, see F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1202-03; (ii) that Mr. Parwatikar and Mr. Pratt "participated directly in the business entity's deceptive acts or practices, or had the authority to control them," F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d at 1170); and (iii) that they "knew or should have known of the entity's" acts, F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Amy Travel Serv., Inc., 875 F.2d at 574).  The Court has already concluded that a genuine dispute of material fact arises whether Real Estate Law violated the MARS Rule, and it now concludes that genuine issues of material fact exist whether Mr. Parwatikar and Mr. Pratt directly participated in the MARS Rule violations, and whether they had authority to control the violations.

First, regarding Mr. Parwatikar, a genuine issue of material fact exists regarding his individual liability.  A genuine issue of material fact first exists whether Mr. Parwatikar directly

---

[77]New Mexico has not produced evidence that Mr. Parwatikar operated as a single economic entity either with Balanced Legal or with Pinnacle Law, that Mr. Pratt operated as such an entity with Real Estate, or that either individual operated with such economic unity with the alleged common enterprise.  Other than ownership attributions, the Court sees no evidence of Mr. Parwatikar's or Mr. Pratt's economic relationships with the corporate entities.  Without this evidence, the Court cannot say that a genuine dispute of material fact exists whether Mr. Parwatikar and Mr. Pratt belonged in the common enterprise, and analyzes their liability for direct MARS Rule violations only under an individual liability theory.  The Court grants, accordingly, summary judgment on this issue.

participated in Real Estate Law's MARS Rule violations. The Parwatikar Defendants argue that Mr. Parwatikar never owned Real Estate Law. See MSJ ¶ 1, at 2 (citing Plaintiff's Response to Defendant Parwatikar's First Set of Requests for Admission, Interrogatories, and Requests for Production, Request for Admission Nos. 1-2, at 1-2, filed April 25, 2019 (Doc. 132-2)("New Mexico First Set Response"); New Mexico Second Set Response, Interrogatory No. 3, at 5). Additionally, the Parwatikar Defendants contend that "Mr. Parwatikar never communicated directly with any of the New Mexico consumers described in Plaintiff's Complaint," MSJ ¶ 7-8, at 3-4 (citing New Mexico Second Set Response, Interrogatory No. 10, at 11; New Mexico Second Set Response, Request for Production No. 2, at 15), and that Mr. Parwatikar neither entered an appearance in nor signed the pleadings for litigation on behalf of New Mexico consumers, see MSJ ¶ 10, at 4 (citing New Mexico First Set Response, Request for Admission No. 4, at 3); MSJ Response ¶ 1, at 2. According to Murphy, Mr. Parwatikar "ran Real Estate Law." Murphy Decl. ¶ 4, at 1. A reasonable factfinder could conclude, based on Mr. Parwatikar's involvement in Real Estate Law as the materials discussed supra evidence, and on Mr. Parwatikar's direction to Murphy to work on a loan modification, see Feb. 13 Email at 1, that he participated in organizing Real Estate Law's activities and mortgage assistance relief services.[78] Such a factfinder could reason

---

[78]The Court concludes that the emails discussed supra are non-hearsay, because they are introduced to show Mr. Parwatikar's relationship to Real Estate Law and not the truths of the matters asserted within the emails. Murphy's identification of these emails in the Murphy Decl. suffices to identify the emails for what they are. See Murphy Decl. ¶ 4, at 1-2; Fed. R. Evid. 901(a). Moreover, Mr. Parwatikar's emails, if not all the emails' content, are exempted from the hearsay exemption to the extent they are admitted against Mr. Parwatikar, because the Court concludes by a preponderance of the evidence that Mr. Parwatikar wrote and sent these emails, making the emails statements of a party opponent. See Fed. R. Evid. 801(d)(2)(A). Mr. Parwatikar signed the emails and sent them from his email address. See May 9 Email at 1; Feb. 13 Email at 1; Feb. 13 Email at 1; April 5 Email at 1-2; Parwatikar Depo. 132-1 at 145:3-6 (identifying the email address from which these emails were sent as Mr. Parwatikar's email address).

that, as Mr. Parwatikar evidenced a desire to limit client contact until Real Estate Law received a retainer fee, see April 5 Email at 1 ("[C]lient will be specifically told no interview of client or a complaint filed until initial retainer fully paid."), and opined as to the scope of Real Estate Law's services following a retainer, see Feb. 14 Email at 1,[79] he participated in requesting advance fees. Even if these specific emails refer to non-New Mexico consumers, a reasonable factfinder could infer from the evidence that Mr. Parwatikar played a similar role in relation to New Mexico consumers, cf. 12 U.S.C. § 5538(b)(1) (limiting states attorney generals' ability to bring suit to actions on behalf of the state's residents); Mr. Parwatikar's role at Real Estate Law likely did not change in accordance with which state's residents Real Estate Law represented.

Even if Mr. Parwatikar did not directly participate in the MARS Rule violations, a genuine dispute of material fact exists whether he had authority to control Real Estate Law's activities. As discussed supra, sufficient evidence reflects Mr. Parwatikar's control over Real Estate Law's operations and litigation activities that a reasonable factfinder could infer his authority to control the activities resulting in MARS Rule violations. See F.T.C. v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 13 (1st Cir. 2010)(describing as irrelevant an officer and owner's responsibilities in the entity, because "[t]he question is whether he could have nipped the offending infomercials in the bud"); F.T.C. v. Hornbeam Special Situations, LLC, 308 F. Supp. 3d 1280, 1288 (N.D. Ga.

_____

[79]In the Feb. 14 Email, Mr. Parwatikar writes:

It is not your place to offer or ask a client if they want an individual case after they retained us for a mass UNTIL you talk with me first. You are also not allowed to say ANYTHING to a client that refutes, abutments the terms, or contradicts how or what they retained the firm to do until you talk with me first.

Feb. 14 Email at 1 (capitalization in Feb. 14 Email).

2018)(Batten, J.)("'Authority to control . . . may be established by active involvement in business affairs and the making of corporate policy' and by evidence that 'the individual had some knowledge of the practices.'" (quoting <u>F.T.C. v. IAB Mktg. Assocs., LP</u>, 746 F.3d 1228, 1233 (11th Cir. 2014)); <u>F.T.C. v. Commerce Planet, Inc.</u>, 878 F. Supp. 2d 1048, 1079 (C.D. Cal. 2012)(Carney, J.)(recognizing involvement in business affairs and business policy making as evidence of authority to control (citing <u>F.T.C. v. Amy Travel Serv., Inc.</u>, 875 F.2d at 574)), <u>aff'd in part, vacated in part, remanded</u>, 815 F.3d 593 (9th Cir. 2016), and <u>aff'd in part</u>, 642 F. App'x 680 (9th Cir. 2016). That Mr. Parwatikar did not contract for a role in Real Estate Law's corporate structure does not change the Court's analysis; Mr. Parwatikar could still exercise sufficient control within Real Estate Law to make him individually liable. See <u>F.T.C. v. Lanier Law, LLC</u>, 194 F. Supp. 3d at 1269 (recognizing a defendant's control over entities despite his lacking a "contractual ownership interest" in those entities).[80]

New Mexico's evidence also shows a genuine issue of material fact regarding Mr. Parwatikar's knowledge. Mr. Parwatikar was aware of Real Estate Law's mass tort lawsuits and knew that Real Estate Law provided consumers loan modification services. See Parwatikar Depo. Doc. 145-1 at 79:6-13; <u>id.</u> at 82:9-18; Feb. 13 Email at 1. Although the Parwatikar Defendants aver that Mr. Parwatikar was unaware of the advance fee provisions, they point to no evidence to undercut New Mexico's evidence and reveal that no genuine issue exists. See Tr. at 23:14-15 (Harrison). Mr. Parwatikar's ignorance about the fee splitting provision suggests that he did not draft the attorney-client fee agreement, <u>see</u> Parwatikar Depo. Doc. 132-1 at 44:17-45:18, and Mr. Pratt asserts that he drafted the agreements, <u>see</u> Pratt Decl. ¶ 19, at 14. Evidence suggests,

---

[80]Moreover, if the factfinder concludes that a common enterprise exists, the factfinder would not need to conclude that Mr. Parwatikar exercised control beyond the common enterprise.

however, that, by April 5, 2013, Mr. Parwatikar knew of at least one retainer provision. See April 5 Email at 1 ("[C]lient will be specifically told no interview of client or a complaint filed until initial retainer fully paid."). Even if the April 5 Email does not refer to a retainer request in the same form agreement that Madrid signed, a reasonable factfinder could infer, given Mr. Parwatikar's April 5 Email and Mr. Parwatikar's intimate role with Real Estate Law, that he knew or should have known of other retainer provisions. See F.T.C. v. Grant Connect, LLC, 763 F.3d 1094, 1102 (9th Cir. 2014)(upholding summary judgment on individual liability, because evidence that the defendant "organized the companies, recruited personnel who had been involved in his prior deceptive marketing schemes, and directed . . . activities" was sufficient to establish scienter). Moreover, Minn. v. Balanced Legal & Parwatikar should have put Mr. Parwatikar on notice of prohibitions on advance fees so that he investigated Real Estate Law's practices.[81] Cf. F.T.C. v. Primary Grp., Inc., 713 F. App'x 805, 807-08 (11th Cir. 2017)(concluding that a defendant had the requisite knowledge where she stayed informed of the entities' daily operations, had received prior complaints about her employees' behavior, and had previously fired employees for unethical behavior); F.T.C. v. Grant Connect, LLC, 763 F.3d at 1102 (treating prior trouble with the FTC as evidence supporting knowledge of or indifference to unfair or deceptive practices).

A genuine issue of material fact also exists regarding Mr. Pratt's individual liability. A reasonable factfinder could conclude that Mr. Pratt directly participated in the MARS Rule

---

[81]Should New Mexico have evidence of MARS Rule violations that occurred after In re Pratt and In re Davis, those disciplinary cases additionally should have alerted Mr. Parwatikar to concerns about Real Estate Law's practices. See 2017 In re Davis Stipulation at 6 (stating that Real Estate Law consumers paid advanced fees); 2016 In re Davis Stipulation at 2 (same); In re Pratt Decision at 1 (stating that Pratt owned a law firm that extensively filed meritless lawsuits for advance fees).

violations.  Mr. Pratt denies that he had any involvement with New Mexico customers, see Pratt Decl. ¶ 4, at 2, or that he engaged in loan modification work, see Pratt Decl. ¶ 3, at 2.  Mr. Pratt's name is, however, affixed to the Information Packet, which contains representations about mortgage assistance relief services, and Mr. Pratt signed Madrid's Attorney-Client Fee Agreement on Real Estate Law's behalf.  See Information Packet at 1, 4.[82]  The Letter of Authorization that Madrid signed with the Attorney-Client Fee Agreement gives Mr. Pratt authority to discuss Madrid's mortgage matters.  See Letter of Authorization, filed May 10, 2019 (Doc. 137-5).[83]  Although Madrid is only one New Mexico consumer, Mr. Pratt admits that he drafted all Real Estate Law's attorney-client fee agreements, which contain the retainer provision.  See Pratt Decl. ¶ 19, at 4.  A reasonable factfinder could find, accordingly, that Mr. Pratt directly participated in the MARS Rule violations.

Even if Mr. Pratt did not himself commit MARS violations, a reasonable factfinder could still conclude that he is individually liable.  Mr. Pratt was the lead attorney at Real Estate Law,[84] see Pratt Decl. ¶ 1, at 1, was involved in Real Estate Law's operations, see Parwatikar Depo.

---

[82]The Court concludes that this evidence is admissible as evidence that Mr. Pratt adopted the representations made within the documents.  Evidence of the representations is not evidence of the truths of the matters that the documents assert, but evidence that Mr. Pratt made representations that transformed his activities into mortgage assistance relief services.  See Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d at 1087 ("'If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.'"  (quoting Fed. R. Evid. 801 advisory committee's note)).

[83]The Court notes that the Letter of Authorization is non-hearsay, because it evidences legal rights conveyed on Mr. Pratt and is not used for the truth of the matter asserted.  See Farley v. Stacy, 2015 WL 3866836, at *5.

[84]The Court notes that, should collateral estoppel stop Mr. Pratt from relitigating factual issues from In re Pratt, the Court would adhere to the State Bar of California's conclusion that Mr. Pratt owned Real Estate Law.  See In re Pratt Decision at 3.

Doc. 132-1 at 26:1-13; id. at 31:18-23; id. at 6-11, drafted the Attorney-Client Fee Agreements, see Pratt Decl. ¶ 19, at 14, and a reasonable factfinder could believe, given Mr. Pratt's name in the Information Packet, see Information Packet at 1, 4, that Mr. Pratt was involved with initial client contact. Cf. F.T.C. v. World Media Brokers, 415 F.3d 758, 764 (7th Cir. 2005)(stating that "active participation in the corporate affairs, including assuming duties as a corporate officer," establishes the first individual liability element (citing F.T.C. v. Amy Travel Serv., Inc., 875 F.2d at 574)). Moreover, based on this evidence, the Court cannot conclude as a matter of law that Mr. Pratt did not exercise control within Real Estate Law to direct the MARS rule violations. Cf. F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d at 1170-71 (treating the role of president and the authority to sign business documents as evidence warranting summary judgment regarding the control issue), as amended (April. 11, 1997); F.T.C. v. Partners In Health Care Ass'n, Inc., 189 F. Supp. 3d 1356, 1367-68 (S.D. Fla. 2016)(Scola, J.)(concluding that the role of president and sole officer, and the exercise of day-to-day control of entities alone establishes the first element for individual liability); F.T.C. v. Wash. Data Res., 856 F. Supp. 2d at 1276 (deeming governing sales and financing, controlling operations within an enterprise, employing the entities' employees, and owning and overseeing an entity's activities to establish authority to control). Given Mr. Pratt's role with Real Estate Law and his involvement with the Information Packet, a reasonable factfinder could conclude that Mr. Pratt knew of, or should have known of, the loan modification services and the advance fee provision. See F.T.C. v. Grant Connect, LLC, 763 F.3d at 1102. The Court will not, accordingly, grant summary judgment on the issue either of Mr. Parwatikar's or of Mr. Pratt's individual liability.

**B.    A GENUINE DISPUTE OF MATERIAL FACT EXISTS WHETHER MR. PARWATIKAR AND PINNACLE LAW SUBSTANTIALLY ASSISTED THE OTHER DEFENDANTS' ALLEGED MARS RULE VIOLATIONS.**

A genuine issue of material fact also exists whether Mr. Parwatikar and Pinnacle Law substantially assisted or supported Real Estate Law and/or Mr. Pratt's alleged MARS Rule violations. A substantial assistance violation involves three elements: "(1) an underlying violation of the MARS rule by a MARS provider; (2) substantial assistance or support by a person to that provider; and (3) knowledge or conscious avoidance, on the part of the person, of the underlying violation." F.T.C. v. Lake, 181 F. Supp. 3d at 699. As discussed supra, a genuine dispute of material fact exists regarding the first element -- whether Real Estate Law and/or Mr. Pratt directly violated the MARS Rule. The Court concludes that New Mexico has also shown genuine disputes of material fact on the remaining elements.

Considerable evidence shows that Mr. Parwatikar and Pinnacle Law substantially assisted Real Estate Law and/or Mr. Pratt. The evidence, discussed supra, reflects Mr. Parwatikar's and Pinnacle Law's substantial assistance in organizing Real Estate Law's operations and in, if Mr. Pratt is individually liable for direct MARS Rule violations, assisting Mr. Pratt's activities. Even if Mr. Parwatikar and Pinnacle Law provided Real Estate Law and/or Mr. Pratt only human resource consultant advice, tasks like hiring employees, see Murphy Decl. ¶ 3, at 1, directing employees when to begin work, see May 9 Email at 1, delegating tasks to employees, see Feb. 13 Email at 1; April 5 Email at 1-2, explaining to employees how to perform tasks, see Feb. 14 Email at 1, summarizing attorney meetings, see April 5 Email at 1-2, and opining on policy decisions, see April 5 Email at 1-2, play a large role in a business' operations and enable a business to engage in its activities, see 75 Fed. Reg. at 10723 (describing as substantial assistance "the support

provided by payment processors and other entities providing essential backroom operations"). Contrary to the Parwatikar Defendants' implication, see MSJ at 5, the substantial assistance inquiry focuses on assisting the business and not on assisting the MARS Rule violation, F.T.C. v. Chapman, 714 F.3d at 1216-17 (concluding that providing the product that a telemarketer marketed is substantial assistance); F.T.C. v. HES Merch. Servs. Co., Inc., 2016 WL 10880223, at *5 (concluding that creating two merchant accounts for the defendants was substantial assistance; F.T.C. v. Partners In Health Care Ass'n, Inc., 189 F. Supp. 3d at 1369 (concluding that processing payments, sending materials to customers, and opening merchant accounts for the telemarketers substantially assisted the telemarketers); Minn. ex rel. Hatch v. Fleet Mortg. Corp., 158 F. Supp. 2d 962, 968 (D. Minn. 2001)(Montgomery, J.)(stating that providing telephone numbers and personal information to a telemarketer is substantial assistance).

A genuine dispute of material fact exists regarding Mr. Parwatikar's and Pinnacle Law's scienter. The scienter inquiry involves essentially the same questions as the individual liability's scienter issue. Mr. Parwatikar was aware of Real Estate Law's mass tort lawsuits and knew that the consumers in the mass tort litigation cases were receiving loan modification services. See Parwatikar Depo. Doc. 145-1 at 79:6-13; id. at 82:9-18; Feb. 13 Email at 1. Although Mr. Parwatikar may not have drafted the attorney-client fee agreements, see Parwatikar Depo. Doc. 132-1 at 44:17-45:18; Pratt Decl. ¶ 19, at 14, the Parwatikar Defendants produce no evidence undermining a genuine issue of material fact whether Mr. Parwatikar knew of, or consciously avoided knowing of, the retainer provision, see Tr. at 23:14-15 (Harrison). Mr. Parwatikar knew of at least one retainer provision in April, 2013, see April 5 Email at 1, and his knowledge provides grounds for extrapolating that he knew of the retainer provision before 2013 and that, even if the April 5 Email does not refer to an attorney-client fee agreement identical to those agreements that

New Mexico consumers signed, he knew of other such provisions. Moreover, a reasonable factfinder could reason that, given Mr. Parwatikar's close relationship with Real Estate Law, he knew of Real Estate Law's retainer provisions and that, if he did not know of the provisions, he avoided obtaining that knowledge. Likewise, the factfinder could conclude that Minn. v. Balanced Legal & Parwatikar should have alerted Mr. Parwatikar that requests for advance fees might violate state and federal law such that he should have inquired about Real Estate Law's practices.[85] Cf. F.T.C. v. Chapman, 714 F.3d at 1217-18 (reflecting that knowledge of previous inquiries by state officials should have put the defendant on notice to investigate ongoing violations); F.T.C. v. Lake, 181 F. Supp. 3d at 700 (concluding that knowledge of the MARS Rule, knowledge that many mortgage relief assistance providers collect advance fees, and refusal to work on client files until after receiving payment satisfied the knowledge requirement). Accordingly, the Court cannot say as a matter of law that Mr. Parwatikar and Pinnacle Law did not substantially assist or support Real Estate Law and/or Mr. Pratt.

### C. A GENUINE DISPUTE OF MATERIAL FACT EXISTS REGARDING THE PENALTIES WITH WHICH TO CHARGE THE PARWATIKAR DEFENDANTS AND MR. PRATT, AND WHETHER THE PARWATIKAR DEFENDANTS, BUT NOT MR. PRATT, ACTED RECKLESSLY OR KNOWINGLY.

Genuine disputes of material fact remain regarding two aspects of the penalties question: (i) with what civil penalties to charge the Parwatikar Defendants and Mr. Pratt; and (ii) whether the Parwatikar Defendants acted recklessly or knowingly. Regarding the first dispute, a genuine

---

[85]As discussed supra, should New Mexico have evidence of MARS Rule violations that occurred after In re Pratt and In re Davis, those disciplinary cases additionally should have alerted Mr. Parwatikar to concerns about Real Estate Law's practices. See 2017 In re Davis Stipulation at 6 (stating that Real Estate Law consumers paid advanced fees); 2016 In re Davis Stipulation at 2 (same); In re Pratt Decision at 1 (stating that Pratt owned a law firm that extensively filed meritless lawsuits for advance fees).

issue of material fact exists regarding the extent of the alleged MARS Rule violations.   When

considering the penalty to assess, the Court should consider:

> (A)      the size of financial resources and good faith of the person charged;

> (B)      the gravity of the violation or failure to pay;

> (C)      the severity of the risks to or losses of the consumer, which may take into
> account the number of products or services sold or provided;

> (D)      the history of previous violations; and

> (E)      such other matters as justice may require.

12 U.S.C. § 5565(c)(3).   For this MSJ, the parties have introduced no evidence and made no

arguments related to penalties, and the Court cannot reach a conclusion as a matter of law on the

issue.   The Court cannot, for instance, determine with how many other New Mexico consumers

Real Estate Law had attorney-client fee agreements, of how many such consumers Real Estate

Law requested advance fees, or how much New Mexico consumers paid in these fees.   New

Mexico has introduced evidence of only one New Mexico consumer -- Madrid, who entered the

Attorney-Client Fee Agreement in 2012.   The issues surrounding penalty calculations await,

therefore, trial.

A genuine dispute of material fact also exists whether the Parwatikar Defendants, but not

Mr. Pratt, acted recklessly or knowingly such that the Court should demand higher civil penalties.

To obtain enhanced penalties from a defendant, New Mexico must show that: (i) the defendant

acted recklessly; or (ii) the defendant acted knowingly.   See 12 U.S.C. § 5565(c)(2)(b)-(c).   New

Mexico has produced no evidence that Mr. Pratt acted recklessly or knowingly, so the Court grants

summary judgment on that issue.   A reasonable factfinder could conclude, however, that the

Parwatikar Defendants, if found liable, acted recklessly or knowingly.   Mr. Parwatikar knew of

Real Estate Law's mass tort lawsuits and of its loan modification services, see Parwatikar Depo. Doc. 145-1 at 79:6-13; id. at 82:9-18; Feb. 13 Email at 1, and a reasonable factfinder could also conclude that Mr. Parwatikar knew of or should have known of Real Estate Law's requests for $5,000.00 and for $29.95 in monthly maintenance fees, see Feb. 14 Email at 1; April 5 Email at 1. After Minn. v. Balanced Legal & Parwatikar, the Parwatikar Defendants should have been alert to the MARS Rule restrictions and particularly to those restrictions on advance fees.[86]  A reasonable factfinder could reason that the Parwatikar Defendants recklessly proceeded in their relationship with Real Estate Law or, as New Mexico suggests, knowingly entered the relationship in an attempt to avoid liability for advance fees, see Tr. at 50:7-51:6 (Anaya-Allen), and that the Parwatikar Defendants acted with scienter when they chose to continue working with Real Estate Law.  The Court grants summary judgment on the issue whether Mr. Pratt acted recklessly or knowingly.

## II.    NEW MEXICO HAS SHOWN A GENUINE DISPUTE OF MATERIAL FACT WHETHER THE DEFENDANTS' VIOLATED THE MFCFP.

For reasons similar to those discussed in the preceding MARS Rule section, the Court concludes that a genuine dispute of material fact exists whether the Parwatikar Defendants and Mr. Pratt violated the MFCFP.  The Parwatikar Defendants and Mr. Pratt argue that New Mexico lacks evidence to show their liability for MFCFP violations.  See MSJ at 5-7.  As the NMUPA directs New Mexico courts to look to the FTC for guidance in interpreting the NMUPA, see N.M. Stat. Ann. § 57-12-4, as the MFCFP is a specific form of NMUPA violation, see N.M. Stat. Ann.

---

[86]Should New Mexico have evidence of MARS Rule violations that occurred after In re Pratt and In re Davis, a reasonable factfinder could additionally conclude that those disciplinary cases should have alerted the Parwatikar Defendants to concerns about the propriety of Real Estate Law's activities and Real Estate Law's advance fees.  See In re Pratt Decision at 1; 2017 In re Davis Stipulation at 6; 2016 In re Davis Stipulation at 2.

§ 47-15-7(A), and as the Supreme Court of New Mexico has previously looked to federal statutes similar to New Mexico statutes to interpret the New Mexico law, see Featherstone v. Bureau of Revenue, 1954-NMSC-080, ¶ 6, 273 P.2d 752, 753; Lopez v. Singh, 1949-NMSC-022, ¶ 7, 205 P.2d 492, 493, the Court predicts that the Supreme Court of New Mexico would also look to federal caselaw to interpret MFCFP violations. New Mexico can establish, accordingly, Balanced Legal's and Pinnacle Law's liability by showing that Real Estate Law violated the MARS Rule, and that a common enterprise existed between Real Estate Law, Balanced Legal, and Pinnacle Law, see F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 808-09, and can show Mr. Parwatikar's and Mr. Pratt's individual liabilities by satisfying the FTCA test for individual liability, see F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203. In the Court's view, New Mexico has presented sufficient evidence to establish genuine issues of material fact on these questions.

The Court also concludes preliminarily that the MFCFP's attorney exemption does not apply to the Parwatikar Defendants and likely does not cover Mr. Pratt. The MFCFP exempts from its coverage "a person licensed to practice law in this state when the person renders service in the course of the person's practice as an attorney." N.M. Stat. Ann. § 47-15-2(B)(2)(a). As discussed supra, Mr. Parwatikar is not licensed in New Mexico, so the exemption does not apply to him, see Tr. at 21:24-22:2 (Court, Harrison); id. at 12:15-17 (Anaya-Allen), and the Court lacks the evidence to determine Mr. Pratt's state or states of licensure. Assuming Mr. Pratt is not licensed in New Mexico, the exemption also does not apply to him. The Court predicts that the Supreme Court of New Mexico would look to the MFCFP's plain meaning to determine whether the exemption applies to law firms, see Griego v. Oliver, 2014-NMSC-003, ¶ 21, 316 P.3d 865, 875 ("'Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance.'" quoting N.M. Attorney Gen. v. N.M. Pub.

Regulation Comm'n, 2013-NMSC-042, ¶ 26, 309 P.3d 89, 97)), and that the Supreme Court of New Mexico would conclude that, because the exemption applies only to persons practicing law as "attorney[s]," it does not exempt law firms, to which plain English does not apply the word attorney, N.M. Stat. Ann. § 47-15-2.  In the Court's view, the Supreme Court of New Mexico would conclude that, where a law firm employs an attorney licensed in New Mexico and, consistent with the MFCFP, provides foreclosure consultant services in his or her law practice, the MFCFP also exempts the law firm, because reaching another conclusion would impede the provision, through law firms, of useful legal services to New Mexico citizens.  As Mr. Parwatikar is not licensed within New Mexico, however, the MFCFP exemption would not apply to Balanced Legal and Pinnacle Law.

### A.     A GENUINE DISPUTE OF MATERIAL FACT EXISTS WHETHER REAL ESTATE LAW VIOLATED THE MFCFP.

The Court concludes that a genuine issue of material fact exists whether Real Estate Law violated the MFCFP.  To show the alleged MFCFP violations, New Mexico must establish that Real Estate Law was a "foreclosure consultant" for the MFCFP's purposes, N.M. Stat. Ann. § 47-15-2(B)(1), and that Real Estate Law failed to follow the MFCFP's specific requirements for foreclosure consultants, see N.M. Stat. Ann. § 47-15-3; N.M. Stat. Ann. § 47-15-5(G), or "claim[ed], demand[ed], charge[d], collect[ed] or receive[ed]" compensation before it "fully performed every service the foreclosure consultant contracted to perform or represented the consultant would perform," N.M. Stat. Ann. § 47-15-5(A).  Genuine disputes of material facts remain whether Real Estate Law was a foreclosure consultant and whether Real Estate Law committed MFCFP violations.

First, a genuine dispute of material fact exists whether Real Estate Law was a foreclosure consultant. See N.M. Stat. Ann. § 47-15-2(B)(1). A foreclosure consultant is an individual or entity

> who, directly or indirectly, makes a solicitation or offer to an owner to perform services for compensation or who, for compensation, performs a service that the person represents will:
>
> (a)     stop or postpone a foreclosure sale;
>
> (b)     obtain any forbearance from a beneficiary or mortgagee;
>
> (c)     assist the owner to exercise the right to reinstatement;
>
> (d)     obtain an extension of the period within which the owner may reinstate the owner's obligation;
>
> (e)     obtain a waiver of an acceleration clause contained in a promissory note, deed of trust or contract secured by a mortgage on a residence in foreclosure or contained in the mortgage;
>
> (f)     assist an owner in foreclosure or loan default to obtain a loan or advance of funds;
>
> (g)     avoid or ameliorate the impairment of an owner's credit resulting from the recording of a notice of default or from a foreclosure sale; or
>
> (h)     otherwise save an owner's residence from foreclosure[.]

N.M. Stat. Ann. § 47-15-2(B)(1). New Mexico must show that: (i) Real Estate Law solicited or offered to perform, or performed a service; (ii) that Real Estate Law represented would fulfill one of N.M. Stat. Ann. § 47-15-2(B)(1)'s enumerated functions; and (iii) Real Estate Law requested or received compensation. See N.M. Stat. Ann. § 47-15-2(B)(1). New Mexico's evidence shows that Real Estate Law initially contacted Madrid to offer help with preventing foreclosure and modifying his mortgage, see Madrid Decl. ¶ 4, at 1, and, as discussed supra, that Real Estate Law continued to make representations throughout its relationship with Madrid about performing

services to stop or forestall the foreclosure and to modify his mortgage.  The evidence also reflects that Madrid paid Real Estate Law $5,000.00 as a retainer and $29.95 monthly in maintenance fees.  See Madrid Decl. ¶¶ 8, 11, at 2.  As discussed in detail supra, however, a genuine dispute of material fact exists whether Real Estate Law offered to perform the foreclosure consultant services for these amounts paid or represented to Madrid that he paid these amounts for the foreclosure consultant services, and not for general litigation services.  Accordingly, the Court concludes that a genuine dispute of material fact exists whether Real Estate Law was a foreclosure consultant.

Madrid's Attorney-Client Fee Agreement suggests that, at least pertaining to Madrid, Real Estate Law did not comply with several of the warnings, notices, and disclosures that § 47-15-3 requires.  The Attorney-Client Fee Agreement does not

> (3)     fully disclose the nature and extent of the foreclosure consulting services to be provided, including any foreclosure reconveyance that may be involved, and the total amount and terms of any compensation to be received by the foreclosure consultant or anyone working in association with the foreclosure consultant;
>
> . . . .
>
> (5)     separately itemize all costs, fees or expenses and the purpose of the costs, fees or expenses that are charged to the homeowner during the term of the contract;
>
> (7)     contain the following notice, which shall be printed in at least fourteen-point boldface type, completed with the name of the foreclosure consultant, and located in immediate proximity to the space reserved for the owner's signature:
>
> "NOTICE REQUIRED BY NEW MEXICO LAW
>
> ..........(Name) or anyone working for him or her CANNOT ask you to sign or have you sign any lien, mortgage or deed as part of signing this agreement unless the terms of the transfer are specified in this document and you are given a separate explanation of the nature and extent of the transaction.

...........(Name) or anyone working for him or her CANNOT guarantee you that they will be able to refinance your home or arrange for you to keep your home. Continue making mortgage payments until a refinancing, if applicable, is approved. If a transfer of the deed or title to your property is involved in any way, you may rescind the transfer any time within 3 days after the date you sign the deed or other document of sale or transfer. See the attached Notice of Rescission form for an explanation of this right. As part of any rescission, you must repay any money spent on your behalf as a result of this agreement within 60 days of receiving commercially reasonable documentation of the payments.

THIS IS AN IMPORTANT LEGAL CONTRACT AND COULD RESULT IN THE LOSS OF YOUR HOME. CONTACT AN ATTORNEY OR COUNSELOR BEFORE SIGNING."

N.M. Stat. Ann. § 47-15-3(A). <u>See</u> Attorney-Client Fee Agreement at 1-3. The Attorney-Client

Fee Agreement also does not comply with the requirements that:

B.      A foreclosure consulting contract shall contain on the first page, in at least fourteen-point type:

(1) the name and address of the foreclosure consultant to which the notice of cancellation is to be mailed; and

(2) the date the owner signed the contract.

C.      A foreclosure consulting contract shall be accompanied by a completed form in duplicate, captioned "NOTICE OF RESCISSION RIGHTS", which shall:

(1) be on a separate sheet of paper attached to the contract;

(2) be easily detachable; and

(3) contain the following statement printed in at least fifteen-point type:

"NOTICE OF RESCISSION RIGHTS

(Date of Contract)

You may cancel or rescind this contract, without any penalty, at any time until midnight of the third business day after the day on which you sign this contract. If you want to end this contract, mail or deliver a signed and dated copy of this Notice of Rescission, or any other written notice indicating your intent to rescind to (name of foreclosure consultant) at (address of foreclosure consultant, including facsimile and electronic mail).

As part of any rescission, you (the homeowner) must repay any money spent on your behalf as a result of this agreement within 60 days of receiving commercially reasonable documentation of the payments.

THIS IS AN IMPORTANT LEGAL CONTRACT AND COULD RESULT IN THE LOSS OF YOUR HOME. CONTACT AN ATTORNEY OR COUNSELOR BEFORE SIGNING.

RESCISSION OF CONTRACT FORM

TO: (name of foreclosure consultant)

(address of foreclosure consultant, including facsimile and electronic mail)

I hereby rescind this contract.

..........(Date)

..........(Homeowner's signature)".

N.M. Stat. Ann. § 47-15-3(B)-(C).  See Attorney-Client Fee Agreement at 1-3.  The Attorney-Client Fee Agreement also does not contain the notice of rescission rights and the rescission of contract form that N.M. Stat. Ann. § 47-15-3(D) requires, see N.M. Stat. Ann. § 47-15-3(D); Attorney-Client Fee Agreement at 1-3, and requires that, in the case of a lawsuit arising from Real Estate Law's services, New Mexico consumers consent to jurisdiction outside New Mexico venue outside their venue of residence, see N.M. Stat. Ann. § 47-15-5(G); Attorney-Client Fee Agreement ¶ 12, at 3.

Whether several other MFCFP violations occurred is more unclear.  The Court cannot determine with certainty from the evidence submitted whether the Attorney-Client Fee Agreement and other attorney-client fee agreements were in size-14 font, see N.M. Stat. Ann. § 47-15-3(A)(1); Madrid Decl. ¶ 5, at 2; whether Real Estate Law gave New Mexico consumers the attorney-client fee agreement twenty-four hours before they signed the agreement, see N.M. Stat. Ann. § 47-15-

3(A); Complaint ¶ 91, at 20, or whether all the New Mexico consumers signed attorney-client fee agreements identical to the Attorney-Client Fee Agreement such that each agreement contains MFCFPA violations.  The Court cannot grant, therefore, grant those issues as a matter of law. Moreover, as discussed <u>supra</u>, a genuine dispute of material fact exists whether Real Estate Law required the retainer fee and monthly fees for foreclosure consultant services or for litigation services.  <u>See</u> N.M. Stat. Ann. § 47-15-5(A).  The Court will not, therefore, grant summary judgment on these issues.[87]

### B.    A GENUINE DISPUTE OF MATERIAL FACT EXISTS WHETHER BALANCED LEGAL AND PINNACLE LAW ARE LIABLE ON A COMMON ENTERPRISE THEORY, AND WHETHER MR. PARWATIKAR AND MR. PRATT ARE INDIVIDUALLY LIABLE.

As with the MARS Rule violations, genuine disputes of material fact exist regarding Balanced Legal's and Pinnacle Law's common enterprise liability, and Mr. Parwatikar's and Mr. Pratt's individual liability.[88]   The Court's common enterprise analysis for the MFCFP violations follows its MARS Rule analysis, as does the Court's analysis of Mr. Parwatikar's and

---

[87]As the specific mortgage relief services that the <u>In re Pratt Decision</u> addresses occurred in California, if Mr. Pratt were collaterally estopped from relitigating <u>In re Pratt</u>'s factual issues, the Court's analysis would not change.  The MFCFP limits the Attorney General of New Mexico's authority to events occurring within New Mexico, <u>see</u> N.M. Stat. Ann. § 47-15-8, and the California events are irrelevant.

[88]New Mexico argues that Mr. Parwatikar and Pinnacle Law are liable for MFCFP violations, because they received compensation for Real Estate Law's mortgage assistance relief services.  <u>See</u> MSJ Response at 15.  This theory does not persuade the Court.  New Mexico has produced no evidence that, removed from Real Estate Law, Mr. Parwatikar or Pinnacle Law performed mortgage assistance relief services for New Mexico consumers.  These Defendants' liability must rest on their relationship with Real Estate Law.  As discussed in the text, a genuine dispute of material fact exists whether Pinnacle Law operated a common enterprise with Real Estate Law and whether Mr. Parwatikar is individually liable, and the compensation from Real Estate Law helps create these genuine disputes.

Mr. Pratt's individual liabilities for the attorney-client fee agreements' advance fee provisions. As discussed supra, genuine issues of material fact exist regarding these issues. The Court concludes that genuine issues of material fact also remain regarding Mr. Parwatikar's and Mr. Pratt's individual liability for the other alleged MFCFP violations.

First, a genuine dispute of material fact exists regarding Mr. Parwatikar's individual liability for the other MFCFP violations.[89] As discussed supra, a reasonable factfinder could believe that Mr. Parwatikar directly participated in Real Estate Law's foreclosure consultant services and, given the evidence of Mr. Parwatikar's control within Real Estate Law and his knowledge of at least one retainer provision, see April 5 Email at 1, the factfinder could infer that Mr. Parwatikar directly participated in arranging the attorney-client fee agreements. Furthermore, given this evidence, a reasonable factfinder could conclude at least that Mr. Parwatikar had the authority to control Real Estate Law's operations, including its attorney-client fee agreements, and could extrapolate that Mr. Parwatikar knew of or avoided knowing of the attorney-client fee agreement's contents. The evidence in the record reflects that Mr. Parwatikar knew of Real Estate Law's mass tort lawsuits and of its loan modification services, see Parwatikar Depo. Doc. 145-1 at 79:6-13; id. at 82:9-18; Feb. 13 Email at 1, and, after Minn. v. Balanced Legal & Parwatikar,

---

[89]New Mexico suggests that a question exists regarding Mr. Parwatikar's direct or indirect involvement in Real Estate Law. See Tr. at 34:25-35:5 (Anaya-Allen). The Court suspects that New Mexico draws this language from the MFCFP's language defining a foreclosure consultant as a person "who, directly or indirectly, makes a solicitation or offer to an owner to perform services for compensation or who, for compensation, performs a service." N.M. Stat. Ann. § 47-15-2(B)(1). The Court notes, however, that the "directly or indirectly" language modifies the act of making a solicitation or offer and not the act of performing services or the foreclosure consultant's activities. N.M. Stat. Ann. § 47-15-2(B)(1). As the Court describes above, the Court concludes that the test for Mr. Parwatikar's liability for involvement with Real Estate Law is the FTC individual liability test.

Mr. Parwatikar should have been alerted to mortgage relief services' subjection to detailed regulations. The Court deems, moreover, whether Mr. Parwatikar knew of Real Estate Law's New Mexico clients irrelevant, because the analysis focuses on knowledge of the non-disclosure and not the specific actions' impropriety. Cf. Consumer Fin. Prot. Bureau v. Mortage Law Grp., LLP, 196 F. Supp. 3d at 945 (focusing on knowledge of whether a contract contained a disclosure). Accordingly, a genuine dispute of material fact exists regarding Mr. Parwatikar's individual liability.

The Court also concludes that New Mexico has shown a genuine dispute of material fact whether Mr. Pratt is individually liable. A reasonable factfinder could conclude that Mr. Pratt was a foreclosure consultant who directly violated the MFCFP. See N.M. Stat. Ann. § 47-15-2(B)(stating that "a person who, directly or indirectly, makes a solicitation or offer to an owner to perform services for compensation or who, for compensation performs a service that the person represents will" provide mortgage relief services). First, a reasonable factfinder could reason that Mr. Pratt was a foreclosure consultant serving New Mexico consumers. Mr. Pratt drafted the attorney-client fee agreements. See Pratt Decl. ¶ 19, at 4. Mr. Pratt's name appears on the Information Packet, which contains the Attorney-Client Fee Agreement that Mr. Pratt signed, see Information Packet at 1, 4, and representations regarding mortgage relief services, and the Letter of Authorization gives Mr. Pratt authority to discuss Madrid's mortgage matters, see Letter of Authorization at 1. Madrid was a New Mexico consumer to whom Real Estate Law transmitted the Information Packet. See Madrid Decl. ¶ 1, 14, at 1, 3. Although Mr. Pratt argues that no evidence shows that he communicated with New Mexico residents or that New Mexico residents were in foreclosure, see Joinder ¶¶ 2-3, at 2, the evidence reflects that Mr. Pratt signed the Information Packet's cover letter and the completed Attorney-Client Fee Agreement that Real

Estate Law transmitted to Madrid, see Information Packet at 1, 4, and Madrid, a New Mexico resident, faced foreclosure, see Madrid Decl. ¶ 1, 3, 17, at 1, 3. Second, Mr. Pratt admits that he drafted all attorney-client fee agreements, see Pratt Decl. ¶ 19, at 4, which violate the MFCFP. Third, as discussed supra, a genuine issue of material fact exists whether the payments that Madrid made to Real Estate Law pursuant to the Attorney-Client Fee Agreement were for foreclosure consultant services. Mr. Pratt's position as Real Estate Law's lead attorney, see Pratt Decl. ¶ 1, at 1, raises a genuine issue of material fact whether his compensation from Real Estate Law, likely funded through consumer payments, was compensation for foreclosure consultant services. Even if Mr. Pratt did not himself violate the MFCFP, as discussed supra, in the MARS Rule violation context, a reasonable factfinder could conclude that he had the authority to control Real Estate Law actions and, hence, its MFCFP violations. Last, given Mr. Pratt's role with Real Estate Law, and the evidence about his involvement with the Attorney-Client Fee Agreement and the Information Packet, a reasonable factfinder could conclude that Mr. Pratt knew of, or should have known of, the attorney-client fee agreement's contents. The Court will not, accordingly, grant summary judgment on the Parwatikar Defendants' or on Mr. Pratt's liability for MFCFP violations.

### C. A GENUINE DISPUTE OF MATERIAL FACT EXISTS REGARDING THE PARWATIKAR DEFENDANT'S WILLFULNESS OR BAD FAITH, BUT NOT REGARDING MR. PRATT'S WILLFULNESS OR BAD FAITH.

Like the Court's other conclusions about the MFCFP violations, the Court's conclusions about the issues surrounding the MFCFP penalties mirror its MARS Rule analysis. As the parties have produced no evidence debating the amount of damages owed, the Court will not make such a determination as a matter of law. Moreover, genuine issues of material fact exist regarding the Parwatikar Defendants' willfulness or bad faith, see N.M. Stat. Ann. § 47-15-7(D) (permitting

treble damages for willful or bad faith conduct), because, as discussed supra, a reasonable factfinder could conclude that the Parwatikar Defendants knew of or should have known of the MFCFPA violations and that Minn. v. Balanced Legal & Parwatikar should have put the Parwatikar Defendants on notice that foreclosure consultant agreements may violate state laws.[90] New Mexico has produced no evidence on Mr. Pratt's willfulness or bad faith to create a genuine dispute of material fact on the issue, so the Court grants summary judgment on that issue.

III. **NEW MEXICO HAS NOT SHOWN A GENUINE DISPUTE OF MATERIAL FACT THAT THE PARWATIKAR DEFENDANTS OR MR. PRATT VIOLATED THE NMUPA THROUGH ACTIONS OTHER THAN THE ALLEGED MFCFP VIOLATIONS.**

New Mexico has not shown a genuine dispute of material fact whether the Parwatikar Defendants or Mr. Pratt violated the NMUPA by requiring advance fees and monthly maintenance fees for sham lawsuits; by leading consumers to believe that the Defendants performed valuable legal services when the Defendants filed valueless, sham lawsuits; or by allowing consumers to believe that the Defendants would defend foreclosure lawsuits. See Complaint ¶¶ 102-08, at 22-23. The Parwatikar Defendants and Mr. Pratt argue that New Mexico lacks admissible evidence to show that they violated the NMUPA, see MSJ at 7-8, and the Court agrees. The Court concludes that no genuine dispute of material fact exists regarding Real Estate Law's liability for requiring advance fees for sham lawsuits, leading consumers to believe that it provided valuable services, or misleading New Mexico consumers to believe that it offered foreclosure defense services. The Court grants, accordingly, summary judgment in the Parwatikar Defendants' and Mr. Pratt's favor on these NMUPA claims.

---

[90]If New Mexico has evidence of MFCFP violations after In re Pratt and In re Davis, those disciplinary proceedings evidence additional notice that later should have driven the Parwatikar Defendants to question the propriety, if not the legality, of Real Estate Law's activities.

The Court notes, however, that, as with the MFCFPA violations, the Court predicts that the Supreme Court of New Mexico would look to federal FTC caselaw to determine the Parwatikar Defendants' and Mr. Pratt's liability for these NMUPA violations. The NMUPA specifically directs courts to look to FTC caselaw for guidance in interpreting the NMUPA. See N.M. Stat. Ann. § 57-12-4. See also Featherstone v. Bureau of Revenue, 1954-NMSC-080, ¶ 6, 273 P.2d at 753; Lopez v. Singh, 1949-NMSC-022, ¶ 7, 205 P.2d at 493. The Court concludes that New Mexico could establish the Parwatikar Defendants' and Mr. Pratt's liability for the non-MFCFP NMUPA violations through common-enterprise and individual liability theories. New Mexico shows a genuine dispute of material fact whether Real Estate Law, Balanced Legal, and Pinnacle Law operated a common enterprise, as discussed supra, and genuine disputes of fact exist regarding Mr. Parwatikar's and Mr. Pratt's individual liability.

A. **NO GENUINE DISPUTE OF MATERIAL FACT EXISTS WHETHER REAL ESTATE LAW VIOLATED THE NMUPA THROUGH ACTIONS OTHER THAN THE ALLEGED MFCFPA VIOLATIONS.**

New Mexico has not produced sufficient evidence to survive summary judgment on its three remaining NMUPA violation claims. New Mexico shows no genuine dispute of material fact regarding its two unfair or deceptive practices claims -- that Real Estate Law misled New Mexico consumers regarding the value of its services and regarding whether it provided foreclosure defense. New Mexico also has not produced sufficient evidence to raise such an issue on its unconscionable practice claim -- whether Real Estate took advantage of New Mexico consumers by requiring advance fees for sham lawsuits.

1. **No Genuine Issue of Material Fact Exists Whether Real Estate Law Misrepresented the Value of Its Lawsuits.**

First, no genuine dispute of material fact exists whether Real Estate Law made false statements or representations about its lawsuit's value. Four elements exist for an NMUPA unfair or deceptive practice claim.

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. *Ashlock,* 107 N.M. at 101, 753 P.2d at 347. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." *Id.* Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. *Id.* Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person." *Id.*

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 12, 811 P.2d at 1311. The Court concludes that genuine issues of material fact exist regarding the first element -- the making of false or misleading statements. On first contacting Madrid, Real Estate Law told him that it would help him with his mortgage issues, modify the mortgage, and stop the foreclosure of his home, and Real Estate Law then filed a mass tort case with Madrid as a plaintiff. See Madrid Decl. ¶¶ 4, 26, at 1, 4. In the Information Packet, Real Estate Law identifies itself as a "powerhouse law firm." Information Packet at 1.[91] A reasonable factfinder could conclude that these representations conveyed to Madrid that the mass tort lawsuit would help with his foreclosure and mortgage concerns, but Real Estate Law did not achieve any promised result -- forestalling the foreclosure or modification of the mortgage -- and Madrid lost his home. See Madrid Decl. ¶¶ 29, 30, at 5. Madrid then eventually lost even communication with Real Estate Law, because the telephone

---

[91]The Court deems all these statements admissible, because the Court considers them for the fact that Real Estate Law made the statements, which carries legal significance for the NMUPA violation, and not for the truths of the matters asserted.

number that he had for Real Estate Law ceased to work.  See Madrid Decl. ¶ 34, at 5.  Based on these facts, a reasonable factfinder could infer that Real Estate Law's representations were false or misleading, because they suggested that Real Estate Law and its lawsuits could help obtain loan modifications or forestall foreclosure when Real Estate Law did not, could not, or would not achieve those goals.

New Mexico has not produced, however, evidence establishing a genuine dispute of material fact whether Real Estate Law made these false or misleading statements knowingly as the second element requires.  "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading."  Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17, 811 P.2d at 1311-12.  New Mexico wants to rest its claim on the dismissal of lawsuits such as Alexander v. Wells Fargo Bank, Aghaji v. Bank of America, and Armstrong v. Nationstar, see Alexander v. Wells Fargo Bank Fees Order at 4, 5 (stating that [the allegations] indicate that the Complaint was filed without any concern over whether it was legally or factually plausible,'" and that "'[t]he amount of this sanction is appropriate in light of the frivolous nature of the Complaint, the blatant misjoinder of Plaintiffs, and Plaintiffs' Counsel's voluntary dismissal of the case to avoid an adverse ruling"); Aghaji v. Bank of Am., 202 Cal. Rptr. 3d at 627 (noting that the plaintiffs could not show that they could truthfully allege facts for any plaintiff to state a claim and that the plaintiffs were misjoined); Armstrong v. Nationstar Order at 2 (citing extensively to Aghaji v. Bank of Am. and concluding that the plaintiffs pled the same cause of action as they pled in Aghaji v. Bank of Am., failed to state a claim, and misjoined plaintiffs); the decisions in In re Pratt and In re Davis, see In re Pratt Decision at 1 (stating that Mr. Pratt "assisted in filing meritless lawsuits"); 2017 In re Davis Stipulation at 8 ("None of the

complainants received loan modifications as a result of RELC's litigation and loan modification services."); 2016 In Re Davis Stipulation at 11 (same); and a pattern of frivolous lawsuits, see also MSJ Response at 16.  New Mexico has not, however, produced evidence of misrepresentations other than the statements made to Madrid in 2012, see Madrid Decl. ¶ 3, at 1; and none of these cases or disciplinary proceedings occurred until after that date, see Alexander v. Wells Fargo Bank (dated June 11, 2014); Aghaji et al v. Bank of America (dated 2016); Armstrong v. Nationstar (dated July 14, 2016); In re Pratt Decision at 1 (dated Sept. 18, 2014); 2017 In re Davis Stipulation at 8 (dated April 17, 2017); 2016 In Re Davis Stipulation at 11 (dated July 21, 2016).  New Mexico has shown no evidence of misrepresentations after the dismissals and disciplinary proceedings, and no evidence suggesting Real Estate Law's knowledge of the falsity or misleading nature of the statements it made Madrid on or before 2012.  New Mexico asks too much for a reasonable factfinder to extrapolate from a series of dismissals two years after Real Estate Law's statements to Madrid that Real Estate Law knew those statements to be false or misleading.  The analysis might differ if the Court considered the truths of the matters stated in Alexander v. Wells Fargo Bank, Aghaji v. Bank of America, Armstrong v. Nationstar, In re Pratt Decision, 2017 In re Davis Stipulation, and 2016 In Re Davis Stipulation, such as the lawsuits' frivolous nature and Real Estate Law's pattern of meritless suits, see In re Pratt Decision at 1 (stating that Mr. Pratt "assisted in filing meritless lawsuits").  As discussed supra, notes 17, 22 through 26, and 28, however, such evidence is inadmissible hearsay.  The Court cannot, accordingly, say that New Mexico shows that a genuine dispute of material fact exists on this element, and the Court will grant the Parwatikar Defendants and Mr. Pratt summary judgment on this element.

Third, considerable evidence shows that Real Estate Law made the representations to Madrid during its regular course of trade or commerce as it made them in solicitations, see Madrid

Decl. ¶ 4, at 1, through which it likely gained clients, and in the Information Packet for new clients, see Madrid Decl. ¶ 14, at 3. Fourth, evidence reflects that these were representations that might deceive or mislead a person. While a consumer might not believe all statements in advertisements, Real Estate Law described to Madrid its services and the help it could provide him, see Madrid Decl. ¶ 4, at 1-2, and such basic information is that information on which a consumer relies in deciding to purchase a service. Given that New Mexico cannot, however, establish a genuine issue of material fact regarding the second element for this NMUPA claim, the Court grants summary judgment in the Parwatikar Defendants' and Mr. Pratt's favor.

**2.     No Genuine Issue of Material Fact Exists Whether Real Estate Law Misrepresented that It Performed Foreclosure Defense.**

New Mexico likewise has not shown a genuine issue of material fact regarding Real Estate Law's representations about its foreclosure defense services. First, a reasonable factfinder could conclude that Real Estate Law made false or misleading representations to Madrid. Real Estate Law transmitted to Madrid the FDD Package with a list of financial documents that Real Estate Law required and that stated: "It is extremely important that all items are included; otherwise the processing of your foreclosure defense will be delayed." Germain Email and FDD Package at 2. See Madrid Decl. ¶ 16, 17, at 3; Germain Email and FDD Package at 2; Gill Email at 1. Real Estate Law told Madrid that this FDD Package was "designed to Postpone the sale date." Gill Email at 1. Real Estate Law "repeatedly" informed Madrid that it would resolve the threatened foreclosure, and frequently asked for additional financial documents from him. Madrid Decl. ¶ 16, at 3. See Madrid Decl. ¶¶ 16, 25, at 3-4. Gutierrez told Madrid that Real Estate Law would help with his foreclosure and asked for his summons and his loan modification documents, see Madrid Decl. ¶¶ 17, 24 at 3, 4, and Hanu also promised to look into Madrid's loan modification, see Madrid

Decl. ¶ 21, at 4.  In the Anthony Email, Real Estate Law additionally conveyed that it would use information about fraudulent activity on Madrid's loan to forestall foreclosure.  See Madrid Decl. ¶ 22, at 4; Anthony Email at 1.  A reasonable factfinder could conclude, based on these representations, that Real Estate Law held itself out as capable of, and willing to defend against, foreclosure and foreclosure suits.  As Madrid received no foreclosure defense, did not obtain a loan modification, lost his home, and eventually lost contact with Real Estate Law, a reasonable factfinder could conclude that the statements were false or misleading and that Real Estate Law did not provide such services.  See Madrid Decl. ¶¶ 29, 30, 34, at 5.

New Mexico has produced insufficient evidence, however, from which a reasonable factfinder could conclude that Real Estate Law made the false or misleading representations knowingly.  None of New Mexico's admissible evidence suggests Real Estate Law knew that it did not or could not offer foreclosure defense before making the statements to Madrid.  New Mexico has not even presented arguments in its MSJ Response why Real Estate Law would have knowledge of the representation's falsity.  See MSJ Response at 17.  Although, for instance, the 2017 In re Davis Stipulation and the 2016 In Re Davis Stipulation statement that "[n]one of the complainants received loan modifications as a result of RELC's litigation and loan modification services" suggests that Real Estate Law should have known that it provided no foreclosure defense, as discussed supra note 23, this evidence is inadmissible.  2017 In re Davis Stipulation at 8; 2016 In Re Davis Stipulation at 11.  The Court cannot say, accordingly, that New Mexico has shown that a genuine dispute of material fact exists regarding the second element for this NMUPA claim.

New Mexico has established, nevertheless, sufficient evidence for the third and fourth NMUPA violation elements.  Real Estate Law made the representations to Madrid during its regular course of business, because it made such statements while providing Madrid service and

while answering questions during this service.  See Madrid Decl. ¶¶ 16-22, 24, at 3-4.  The fourth element -- that the representation is that which would deceive or mislead a person -- is also satisfied, because a reasonable person would believe his or her attorneys' statements about their scope of practice and services.  Given that New Mexico cannot survive, however, summary judgment on the second element, the Court grants summary judgment for the Parwatikar Defendants and for Mr. Pratt on this claim.

### 3. No Genuine Issue of Material Fact Exists Whether Real Estate Law Acted Unconscionably in Collecting Advance Fees for Sham Lawsuits.

New Mexico also has not produced sufficient evidence to raise a genuine dispute of material fact about the consciousability of Real Estate Law's practices.  New Mexico argues that Real Estate Law brought sham cases solely to collect retainer fees and so the fees had disproportionately higher value than Real Estate Law's services.  See MSJ Response at 16-17.  Evidence suggests that New Mexico consumers paid Real Estate Law.  Madrid, at least, paid $5,000.00 as a retainer and $29.95 a month to Real Estate Law, see Madrid Decl. ¶ 15, 23, at 3-4, and, although the Parwatikar Defendants dispute that Real Estate Law required all consumers to pay the $5,000.00 retainer fee or the monthly fee, and whether all consumers paid these amounts, the Court cannot determine from the evidence whether their assertions are true, see Tr. at 23:24-24:2 (Harrison).

New Mexico has not, however, produced admissible evidence to raise a genuine dispute of material fact on its sham lawsuit theory.  As discussed supra, notes 17, 22 through 26, and 28, the Court deems inadmissible for the truths of the matters asserted evidence from Alexander v. Wells Fargo Bank, Aghaji v. Bank of America, Armstrong v. Nationstar In re Pratt, and In re Davis.  New Mexico relies on such inadmissible evidence to argue its theory.  See MSJ Response at 16-17.

New Mexico's other evidence alone does not permit a reasonable factfinder to conclude that Real Estate Law's lawsuits were shams; no other evidence addresses the lawsuit's validity. Accordingly, the Court grants the Parwatikar Defendants and Mr. Pratt summary judgment on this issue.

**B.** **NEW MEXICO HAS SHOWN A GENUINE DISPUTE OF MATERIAL FACT WHETHER THE PARWATIKAR DEFENDANTS AND MR. PRATT ARE LIABLE FOR THE ALLEGED NON-MFCFP NMUPA VIOLATIONS.**

If New Mexico established a genuine issue of material fact regarding Real Estate Law's non-MFCFPA NMUPA violations, the Court would permit the issues to proceed to trial, because genuine issues of material fact exist regarding the Parwatikar Defendants' and Mr. Pratt's individual liabilities. As discussed _supra_, a genuine dispute of material fact exists whether Balanced Legal and Pinnacle Law engaged in a common enterprise with Real Estate Law. Moreover, as discussed _supra_, the extent of Mr. Parwatikar's and Mr. Pratt's involvement in and control over Real Estate Law's activities and operations permit a reasonable factfinder to conclude that they at least had the authority to control -- if not that they directly participated in -- Real Estate Law's activities and the NMUPA violations, and that they knew of the misrepresentations -- of Real Estate Law's sales pitch to consumers and of its day-to-day activities representing the consumers -- and of the unconscionable actions -- the requests for retainer fees and the sham lawsuits. As the Court concludes that New Mexico cannot survive summary judgment on Real Estate Law's NMUPA violations, however, this genuine dispute of material fact does not mean that the non-MFCFP NMUPA claims survive summary judgment.[92]

---

[92]The Court notes that no genuine issue of material fact exists either whether the Parwatikar Defendants and Mr. Pratt violated the NMUPA, through other actions than the alleged MFCFP violations, willfully such that the Court should award New Mexico increased penalties against

## IV.     NO GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER NEW MEXICO IS ENTITLED TO INJUNCTIVE RELIEF.

Last, the Court concludes that New Mexico cannot survive summary judgment on its requests for injunctive relief.  New Mexico seeks injunctive relief pursuant to N.M. R. Ann. 1-066, N.M. Stat. Ann. §36-2-28.2(A), N.M. Stat. Ann. § 57-12-8(A), and 12 U.S.C. § 5538(b)(1)(a).   In the Court's view, N.M. R. Ann. 1-066 and N.M. Stat. Ann. § 36-2-28.2(A) are inapplicable here, and New Mexico has not produced sufficient evidence to establish a genuine issue of material fact to enjoin MARS Rule or MFCFPA violations pursuant to, respectively, 12 U.S.C. § 5538(b)(1)(a) and N.M. Stat. Ann. § 57-12-8(A).

The Court first notes that rule 1-066 and N.M. Stat. Ann. § 36-2-28.2 are inapplicable. Rule 1-066 gives New Mexico courts jurisdiction to decide preliminary injunctions, but New Mexico here seeks a permanent injunction.  Cf. N.M. R. Ann. 1-066; Griego v. Oliver, 2014-NMSC-003, ¶ 21, 316 P.3d at 875 ("'Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance.'"  (quoting N.M. Attorney Gen. v. N.M. Pub. Regulation Comm'n, 2013-NMSC-042, ¶ 26, 309 P.3d at 97)).   A preliminary injunction is "[a] temporary injunction issued before or during trial to prevent an irreparable injury from occurring before the court has a chance to decide the case," and, as New Mexico seeks an injunction as a form of relief following trial. "Injunction," Black's Law Dictionary (11th ed. 2019).  A permanent injunction is "[a]n injunction granted after a final hearing on the merits."  "Injunction," supra.  Cf. Borrego v. El Guique Cmty. Ditch Ass'n, 1988-NMSC-

them.  See N.M. Stat. Ann. § 57-12-11 (providing for higher penalties for willful NMUPA violations).  For the same reasons that New Mexico fails to produce admissible evidence of Real Estate Law's scienter for these NMUPA violations, New Mexico also does not show sufficient admissible evidence for the Parwatikar Defendants' or Mr. Pratt's willfulness to permit a reasonable factfinder to conclude that they acted willfully.

081, ¶¶ 8-9, 762 P.2d 256, 258-59 (describing a permanent injunction occurring after a preliminary injunction); Jencks v. Goforth, 1953-NMSC-090, ¶ 3, 261 P.2d 655, 656 ("[P]rayer was made for an order to show cause why a preliminary injunction should not be issued until final hearing could be had on application for a permanent injunction"); N.J. Zinc Co. v. Local 890 of Int'l Union of Mine, Mill & Smelter Workers, 1952-NMSC-062, ¶ 24, 245 P.2d 156, 164 (describing that the plaintiff sought a preliminary and a permanent injunction); Hagerman Irrigation Co. v. McMurry, 1911-NMSC-021, 113 P. 823, 823 ("[A] preliminary injunction, and, after trial, a permanent injunction, were properly issued against the defendant"). Section 36-2-28.2 permits the Attorney General of New Mexico to petition courts for injunctive relief to prevent the unauthorized practice of law. See N.M. Stat. Ann. § 36-2-28.2. New Mexico has not here alleged or shown evidence of any unauthorized practice of law. The Court grants, accordingly, the Parwatikar Defendants and Mr. Pratt's request for summary judgment on the injunctive relief sought pursuant to this rule and this statute.

The other two sources of authority that New Mexico cites apply here to the MARS Rule and the MFCFPA violations. Section 5538 of the United States Code's Title 12 grants states' attorney generals authority to seek injunctions for violations of CFPB laws, like the MARS Rule. See 12 U.S.C. § 5538(a)(1). The statute grounds, accordingly, the Attorney General of New Mexico's authority to seek injunctive relief for MARS Rule violations. Section 57-12-8(B) permits the Attorney General of New Mexico to seek injunctive relief against persons who violate the NMUPA. See N.M. Stat. Ann. § 57-12-8(B). As the MFCFP is a specific unfair or deceptive act for NMUPA purposes, § 57-12-8(B) provides authority to seek to enjoin future MFCFP violations. See N.M. Stat. Ann. § 47-15-7(A).

Although the Court could grant injunctive relief for discontinued activity under federal law, it concludes that, here, New Mexico has not provided the evidence to support a trial on such relief. Under federal law, "[a] 'court's power to grant injunctive relief survives the discontinuance of the illegal conduct.'" F.T.C. v. Accusearch Inc., 570 F.3d at 1201 (quoting United States v. W.T. Grant Co., 345 U.S. at 633). The Court may grant injunctive relief if the parties demonstrate that the activity is likely to recur, and in deciding whether to grant injunctive relief for discontinued conduct, the Court considers "'all the circumstances,' including the 'bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations.'" F.T.C. v. Accusearch Inc., 570 F.3d at 1201 (quoting United States v. W.T. Grant Co., 345 U.S. at 633). The Court concludes that it should not, based on the evidence before it on this MSJ, say that New Mexico has produced the evidence to create a genuine issue of material fact that the Parwatikar Defendants' and Mr. Pratt's activities are likely to recur. New Mexico has presented to the Court admissible evidence of only the MARS Rule violations arising in Madrid's interactions with Real Estate Law. As discussed supra, notes 17, 22 through 26, and 28, the Court does not consider admissible other courts' conclusions regarding Real Estate Law's, Davis', the Parwatikar Defendants', and Mr. Pratt's conduct. Although this evidence's consideration might push Real Estate Law past the summary judgment mark, because it suggests recent and repeated violations, if not likely to recur violations, a reasonable factfinder cannot reach the same conclusion based on the limited admissible evidence in the Murphy Decl., the Madrid Decl., and the attached exhibits, which contain evidence from, at the latest, 2013. This at least six-year-old evidence and isolated evidence of MARS Rule and MFCFP violations cannot support a genuine issue of material fact whether the Parwatikar Defendants' and Mr. Pratt's actions were of such a character that they are likely to recur and necessitate injunction.

The Court reaches the same conclusion regarding the MFCFP violations.[93]  If New Mexico

had offered sufficient evidence to create a genuine issue of material fact whether the Parwatikar

---

[93]The Court applies New Mexico permanent injunction standards here.  Although the Court sits on the New Mexico state law claims in supplemental jurisdiction, "[u]nder the *Erie* doctrine, a federal court exercising supplemental jurisdiction applies state substantive law and federal procedural law."  Tri-Dam v. Yick, No. 1:11-CV-01301 AWI-SMS, 2016 WL 4061348, at *5 (E.D. Cal. July 28, 2016)(Ishii, J.)(citing Erie, 304 U.S. 64 (1938); Mangold v. Cal. Pub. Utils. Comm'n, 67 F.3d 1470, 1478 (9th Cir. 1995)).  Some unclarity persists whether permanent injunctions involve state substantive law such that the court should apply state law standards.  See Waldschmidt v. NVR, Inc., No. CV 18-1372, 2018 WL 6433910, at *11 n.9 (W.D. Pa. Dec. 7, 2018)(Fischer, J.)("The law is less clear when it comes to permanent injunctions.  As other courts have explained, there is 'some uncertainty regarding whether state or federal law applies to the issuance of a permanent injunction in a diversity case that does not implicate an express statutory right to injunctive relief.'" (quoting O'Hara, Jr. v. Premcor Ref. Grp., Inc., No. 09-500 RBK/JS, 2011 WL 337951, at *4 (D. Del. Jan. 28, 2011)(Kugler, J.))).  Cf. Sindi v. El-Moslimany, 896 F.3d 1, 31 n.12 (1st Cir. 2018)(avoiding the question because the state and federal law standards were the same).

Although federal law governs preliminary injunctions, see Flood v. ClearOne Commc'ns, Inc., 618 F.3d 1110, 1117 (10th Cir. 2010)("[F]ederal law governs the procedural questions when a preliminary injunction may issue"); 11A Charles Alan Wright, et al. Federal Practice and Procedure § 2943 (3d ed. 2019)(noting that federal law governs preliminary injunctions), courts have differentiated between preliminary and permanent injunctions. Cf. Capital Tool & Mfg. Co. v. Maschinenfabrik Herkules, 837 F.2d 171, 172 (4th Cir. 1988)("[T]he purpose of a preliminary, as opposed to a final, injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981))).

> A permanent injunction serves a distinct function; "[a] permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate."  *Brocade Communications Systems, Inc. v. A10 Networks, Inc.*, [No. C 10–3428 PSG,] 2013 WL 890126, *3 (N.D. Cal. 2013)[(Grewal, M.J.)](citation and internal quotation marks omitted).  A preliminary injunction's preservation of the status quo cannot be outcome determinative because the party seeking the preliminary injunction "will still have the opportunity to seek a permanent injunction after trial on the merits."  *Kane*[ v. Chobani, Inc.], [Case No.: 12–CV–02425–LHK,] 2013 WL 3776172[,] at *3 [(Koh, J.)].

Tri-Dam v. Yick, 2016 WL 4061348, at *5.

The majority of courts that the Court found to have addressed directly the issue categorizes permanent injunctions as substantive law.  See, e.g., Lord & Taylor, LLC v. White Flint, L.P., 780 F.3d 211, 215 (4th Cir. 2015)(applying state substantive law to a claim for a permanent injunction);

---

Capital Tool & Mfg. Co. v. Maschinenfabrik Herkules, 837 F.2d at 172 ("There is no reason to exclude from *Erie* state substantive law regarding the issuance of final injunctions."); Sys. Operations, Inc. v. Sci. Games Dev. Corp., 555 F.2d 1131, 1143 (3d Cir. 1977)(determining that New Jersey law defines the claim for preliminary injunction); Blackard v. Hercules, Inc., No. 2:12-CV-175-KS-MTP, 2014 WL 3548829, at *5 (S.D. Miss. July 17, 2014)(Starrett, J.)("The Court finds persuasive numerous authorities providing that the grant of a permanent injunction is a substantive matter necessitating the application of state law."); Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship, No. CIV.A. RDB-11-1864, 2013 WL 2903285, at *4 (D. Md. June 13, 2013)(Bennett, J.)("[A] federal court sitting in diversity should apply state substantive law to the issuance of a preliminary injunction"), aff'd, 594 F. App'x 798 (4th Cir. 2014; United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp., No. 07CV2172 AJB, 2012 WL 3861946, at *4 (S.D. Cal. Sept. 5, 2012)(Battagli, J.)("A permanent injunction, as a method to enforce substantive law rights, 'is an integral component of the [underlying] substantive law right.'" (alteration in United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.)(quoting Sullivan v. Vallejo City Unified Sch. Dist., 731 F. Supp. 947, 956 (E.D. Cal. 1990)(Karlton, J.)); Tradesmen Int'l, Inc. v. Black, No. 10-2098, 2011 WL 5330589, at *8 (C.D. Ill. Nov. 7, 2011)(Bernthal, M.J.)("An award of a permanent injunction in a diversity case is governed by the appropriate state's substantive law." (citing Dunkin' Donuts Inc. v. N.A.S.T., Inc., 428 F. Supp. 2d 761, 775 (N.D. Ill. 2005)(Shadur, J.))), aff'd in part sub nom. Tradesman Int'l, Inc. v. Black, 724 F.3d 1004 (7th Cir. 2013); Deer Valley Resort Co. v. Christy Sports, LLC, No. 2:07-CV-904-CW, 2010 WL 1065940, at *4 (D. Utah March 23, 2010)(Waddoups, J.)(classifying permanent injunctions as substantive legal matters); Pearl Invs., LLC v. Standard I/O, Inc., 297 F. Supp. 2d 335, 337 (D. Me. 2004)(Hornby, J.)("When state law defines the underlying substantive right, state law also governs the availability of such equitable remedies as a permanent injunction." (citing 19 Charles A. Wright, et al., Federal Practice and Procedure § 4513, at 214 (1982)); Hanger Prosthetics & Orthotics, Inc. v. Morgan, No. CIV.A.00-0170-CB-S, 2000 WL 1843820, at *1 (S.D. Ala. Oct. 17, 2000)(Butler, J.)("In a diversity case, whether to grant a permanent injunction is governed by state law."). But see Clear-View Techs., Inc. v. Rasnick, No. 13-CV-02744-BLF, 2015 WL 13298075, at *12 (N.D. Cal. Aug. 31, 2015)(Freeman, J.)(stating "[c]hoice of law principals, however, dictate that federal law determines the issuance of a permanent injunction," but citing to a case discussing preliminary injunctions (citing Kane v. Chobani Inc., No. 12-02425-LHK, 2013 WL 3776172, at *3 (N.D. Cal. July 15, 2013)(Koh, J.))).

   On the other hand, federal courts may have some autonomy in their role as courts of equity. Cf. Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 233 (3d Cir. 1941)("The rule of Erie . . . being determinative of substantive rights, there is still preserved to the federal courts a uniform basis for granting equitable remedies in cases in which substantive rights have arisen under state law."). Cf. also GADV, Inc. v. Beaumont Indep. Sch. Dist., No. 1:11-CV-187, 2011 WL 2220242, at *1-2 (E.D. Tex. June 7, 2011)(Clark, J.)(applying federal law to a state permanent injunction issue). Supreme Court dicta suggests federal courts retain some control over equitable remedies, see Guar. Tr. Co. of N.Y. v. York, 326 U.S. 99, 106-07 (1945)("State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts."), but, as Professors Charles A. Wright and Arthur R. Miller note,

much of the [Guaranty Trust Company of New York v. York] opinion is devoted to refuting the notion that federal equity is a separate system. Thus, the Court went on to hold that a federal court in diversity jurisdiction was obliged to apply the state statute of limitations, rather than its own notions concerning the equitable defense of laches.

11A Wright, et al. supra § 2943. Professors Wright and Miller go on to explain:

> On the other hand, in order to give some effect to the first passage quoted from the [Guaranty Trust Company of New York v. York] opinion, which strives to preserve some independence for federal equity, if the state law simply does not provide a specific remedy . . . or generally proscribes a remedy similar to traditional equitable relief, then the federal court properly may grant an injunction because no real conflict is presented.

Wright, et al., supra, § 2943.

The Court agrees with the majority of courts, which deem permanent injunctions substantive issues. The Supreme Court has directed federal courts, in classifying law as substantive or procedural for Erie purposes, to ask: "Would 'application of the [standard] . . . have so important an effect upon the fortunes of one or both of the litigants that failure to [apply] it would [unfairly discriminate against citizens of the forum State, or] be likely to cause a plaintiff to choose the federal court'?" Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427-28 (1996)(footnote omitted)(quoting Hanna v. Plumer, 380 U.S. 460, 468, n.9 (1965)). The Court agrees that, unlike a preliminary injunction, which preserves the status quo until further adjudication on the merits, a permanent injunction determines whether a party has successfully validated legal rights to an equitable remedy. Where federal and state permanent injunction standards differ, application of a stricter standard at one court level would deprive a plaintiff at another level of equitable relief available in another court, and a plaintiff would likely choose a forum that would issue an injunction. New Mexico's permanent injunction standard, for instance, departs from the federal test. New Mexico courts deem injunctions warranted "to prevent irreparable injury for which there is no adequate and complete remedy at law." City of Las Cruces v. Rio Grande Gas Co., 1967-NMSC-190, ¶ 11, 431 P.2d at 494. Federal law prompts plaintiffs to show four elements:

> (i) that [the plaintiff] has suffered an irreparable injury; (ii) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (iii) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (iv) that the public interest would not be disserved by a permanent injunction.

eBay, Inc. v. MercExchange, LLC, 547 U.S. at 391. New Mexico's standard omits the third and fourth inquiries. Although New Mexico courts may consider the equities, see Hines Corp. v. City

Defendants and Mr. Pratt were likely to recommit MFCFP violations, the Court would proceed to grant New Mexico an injunction, because the Court predicts that the Supreme Court of New Mexico would permit the enjoining of such actions. The Supreme Court of New Mexico has recognized recurring conduct as grounds for an injunction: "Where the imminent harm or conduct is or will be of a continuous nature, the constant recurrence of which renders a remedy at law inadequate, except by a multiplicity of suits, then the injury is irreparable at law and relief by injunction is therefore appropriate." Winrock Enters., Inc. v. House of Fabrics of N.M., Inc., 1978-NMSC-038, ¶ 17, 579 P.2d at 790 (citing Kennedy v. Bond, 1969-NMSC-119, ¶ 17, 460 P.2d at 813). Moreover, the Court expects that, when the action to be enjoined is prohibited conduct that is likely to recur and that injures New Mexico citizens, the Supreme Court of New Mexico would conclude that the equities favor an injunction. See Hines Corp. v. City of Albuquerque, 1980-NMSC-107, ¶ 13, 621 P.2d at 1118 (directing courts, in some instances, to balance the equities when granting injunctions). As discussed in the preceding paragraph, however, New Mexico has not shown with sufficient evidence that the Parwatikar Defendants' and Mr. Pratt's MFCFP violations are likely to recur such that a genuine issue of material fact arises. The Court grants summary judgment on New Mexico's request that the Court enjoin future MFCFP violations.[94]

---

of Albuquerque, 1980-NMSC-107, ¶ 13, 621 P.2d at 1118, they have no mandatory obligation to balance the parties' hardships, see eBay, Inc. v. MercExchange, LLC, 547 U.S. at 391. While such facts pose minor differences, they may make New Mexico's test slightly less stringent, and so make more challenging success in a federal forum and motivate choices regarding preferred forums. The Court deems, accordingly, a permanent injunction to raise an issue of substantive law and applies, therefore, New Mexico law.

[94]For the reasons discussed in the text's preceding paragraph, the Court would reach the same conclusion were it to apply the federal permanent injunction standard.

As New Mexico has not shown sufficient evidence to raise a genuine issue of material fact regarding any its NMUPA claims, it has also not produced sufficient evidence that such violations are likely to recur such that injunctive relief is warranted. The Court also grants, therefore, summary judgment on New Mexico's requests that the Court enjoin future non-MFCFP NMUPA violations. The Court concludes that summary judgment is warranted on all New Mexico's requests for injunctive relief. Accordingly, the Court grantsthe MSJ and the Joinder in part denies them in part.

**IT IS ORDERED** that: (i) the Defendant Deepak S. Parwatikar's Motion for Summary Judgment, filed April 25, 2019 (Doc. 132)("MSJ"), is granted in part and denied in part; (ii) the Notice of Joinder of Chad T-W Pratt, Sr. In Motion for Summary Judgment, filed May 3, 2019 (Doc. 135)("Joinder"), is granted in part and denied in part; (iii) the Defendant Parwatikar's Objections to Plaintiff's Untimely Filings and Disclosures, filed May 25, 2019 (Doc. 147)("Marked Exhibits Objections"), are overruled; (iv) the requests of Defendants Deepak S. Parwatikar, Balanced Legal Group, and Pinnacle Law Center, P.C., (collectively, the "Parwatikar Defendants"), and Defendant Chad T. Pratt in the MSJ and the Joinder for summary judgment on Plaintiff State of New Mexico's claims regarding the Mortgage Assistance Relief Services ("MARS") Rule, 12 C.F.R. § 1015, and the New Mexico Mortgage Foreclosure Consultant Fraud Prevention Act, N.M. Stat. Ann. §§ 47-15-1 to -8 ("MFCFP"), are denied; (v) the Parwatikar Defendants' and Mr. Pratt's requests in the MSJ and the Joinder that the Court grant summary judgment on New Mexico's claims regarding New Mexico Unfair Practices Act, §§ 57-12-1 to -26, and injunctive relief are granted;[95] (vi) the Court grants summary judgment on theories

---

[95]This excludes the claim based on MFCFP, although violations of the MFCFP are considered violations of the New Mexico Unfair Practices Act. <u>See</u> N.M. Stat. Ann. § 47-15-7(A).

based on Defendant Erickson Davis' alleged MARS Rule violations; on Balanced Legal and Pinnacle Law's violation of the MARS Rule independent of Defendant Real Estate Law Center, P.C., on Mr. Parwatikar's and Mr. Pratt's participation in a common enterprise with Real Estate Law, Balanced Legal, and Pinnacle Law, and on Mr. Pratt's reckless or knowing violation of the MARS Rule, or willful violation of the MFCFP; and (vii) the Court will consider the exhibits attached to the Plaintiff's Notice of Filing of Marked Exhibits to Response to Motion for Summary Judgment at 1, filed May 24, 2019 (Doc. 145).

_____
UNITED STATES DISTRICT JUDGE

*Counsel and parties:*

Hector H. Balderas
  Attorney General of the State of New Mexico
Lisa Giandomenico
Angelica Anaya-Allen
  Assistant Attorney General of the State of New Mexico
Attorney General of the State of New Mexico's Office
Santa Fe, New Mexico

> *Attorneys for the Plaintiff*

Real Estate Law Center, P.C.
Los Angeles, California

> *Defendant*

Chad Thomas Pratt
Los Angeles, California

> *Defendant pro se*

Paul J. Kennedy
Jessica M. Hernandez
Elizabeth Harrison
Kennedy, Hernandez & Associates, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendants Deepak S. Parwatikar, Pinnacle Law Center, PC , and Balanced Legal Group*

Erikson M. Davis
Newbury Park, California

> *Defendant pro se*