# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO, ex rel.,
HECTOR BALDERAS, Attorney General of
New Mexico,

       Plaintiff,

vs.                                        No. CIV 17-0251 JB\LF

REAL ESTATE LAW CENTER, P.C., a
California professional corporation; ERIKSON
M. DAVIS, an attorney and resident of
California, individually, and dba Real Estate
Law Center, P.C., a California professional
corporation; DEEPAK S. PARWATIKAR, an
attorney and resident of California, individually,
and dba Balanced Legal Group, an unidentified
trade name or entity, dba
www.pinnaclelawcenter.com; CHAD T.
PRATT, an attorney and resident of California,
individually, and formerly dba Real Estate Law
Center, P.C.; the BALANCED LEGAL
GROUP, an unidentified trade name or entity
located in California, and PINNACLE LAW
CENTER, P.C., a California professional
corporation,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the bench trial held on July 8, 2019, to July

11, 2019. The primary issues are: (i) whether the Defendants Real Estate Law Center, P.C.,

Erikson M. Davis, and Chad T. Pratt violated the Mortgage Assistance Relief Services ("MARS")

Rule, 12 C.F.R. § 1015 "Regulation O";[1] (ii) Real Estate Law, Mr. Davis, and Mr. Pratt, violated

---

[1]Defendants Deepak S. Parwatikar, Balance Legal Group, and Pinnacle Law Center, P.C.
(collectively "Settling Defendants") reached a settlement agreement with Plaintiff State of New

the New Mexico Mortgage Foreclosure Consultant Fraud Prevention Act, N.M. Stat. Ann. §§ 47-15-1 to -8 ("MFCFPA"); and (iii) what damages the Defendants owe. The Court concludes that the Defendants violated the MARS Rule and the MFCFPA. The Court awards judgment against Real Estate Law, Mr. Davis, and Mr. Pratt in the following amounts: (i) Real Estate Law: $85,941.20; (ii) Mr. Davis: $34,826.80; and (iii) Mr. Pratt: $36,955.00.

## **FINDINGS OF FACT**

Plaintiff State of New Mexico and Mr. Parwatikar, Balanced Legal, and Pinnacle Law (collectively, the Parwatikar Defendants) have submitted proposed findings of fact. See Plaintiff's Proposed Findings of Fact and Conclusions of Law, filed August 9, 2019 (Doc. 212)("New Mexico's Proposed Findings"); Defendant Parwatikar's Proposed Findings of Fact and Conclusions of Law, filed August 9, 2019 (Doc. 213)("Parwatikar Defs.' Proposed Findings"). Defendant Chad T. Pratt also has submitted his Findings of Fact and Conclusions of Law, filed August 15, 2019 (Doc. 216)("Pratt's Proposed Findings"). The Court notes that Pratt's Proposed Findings include one paragraph asking the Court to disregard individual claimants and do not otherwise include proposed findings of fact. Defendants Real Estate Law Center, P.C. and Erikson M. Davis did not submit proposed findings of fact and conclusions of law. The Court has carefully considered New Mexico's and the Parwatikar Defendants' sets of proposed facts, and Mr. Pratt's objections, and accepts some of those facts, rejects some, and finds some facts that no party brought to its attention. The Court sets forth its findings below.

---

Mexico, which resulted in all "claims [other than the claim that Pinnacle Law Center, P.C. provided substantial assistance and support to Defendant Real Estate Law Center in violation of 12 C.F.R. § 1015.6] alleged against Settling Defendants [were] dismissed with prejudice." Stipulated Consent Judgment for Injunctive and Mandatory Relief with Defendants Deepak Parwatikar, Pinnacle Law Center, and Balanced Legal Group, filed December 26, 2019 (Doc. 232)("Consent Judgment"). Although the Settling Defendants and New Mexico have "resolve[d] all matters," Consent Judgment at 3, the Court still examines Pinnacle Law Center's liability.

1.     **Real Estate Law Operations.**

1.     Mr. Parwatikar is a member of the State Bar of California.  See Transcript of Trial Proceedings at 635:10-12 (Anaya-Allen, Parwatikar)(taken July 10, 2019), filed July 15, 2019 (Doc. 196)("July 10 Tr.").

2.     Mr. Parwatikar is not licensed to practice law in the State of New Mexico.  See July 10 Tr. at 635:13-21 (Anaya-Allen, Parwatikar).

3.     Mr. Pratt is a member of the State Bar of California.  See Memorandum Opinion and Order at 2 n.3, filed July 2, 2019 (Doc. 183).

4.     Mr. Pratt is not licensed to practice law in the State of New Mexico.  See Plaintiff's First Set of Requests for Admission and Second Set of Interrogatories to Defendant Chad T-W Pratt, Request No. 18, at 6 (admitted only as to Real Estate Law, Defendant Mr. Davis, and Mr. Pratt, July 11, 2019, at trial as New Mexico's Ex. 182)("New Mexico's First Set of Requests"); Responses to Requests for Admission from New Mexico by Chad T-W Pratt, Sr., ¶ 18, at 4 (admitted July 11, 2019, at trial as New Mexico's Ex. 184)("Pratt's Responses to Requests").

5.     In 2008, Mr. Pratt described himself to a reporter as a "bottom feeder" and as a "predator," because he based his legal practice on desperate clients.  David Lazarus, "Things are Looking up -- at the Pawn Shop," Los Angeles Times at 4 (March 23, 2008)(admitted July 11, 2019, at Trial as New Mexico's Ex. 243).

6.     Balanced Legal began operating in approximately 2008.  See July 10 Tr. at 637:11-16 (Anaya-Allen, Parwatikar).

7.     Balanced Legal provided immigration law services and loan modification services.  See July 10 Tr. at 637:25-638:3 (Anaya-Allen, Parwatikar); Deposition of Yervand Arzakanyan at

10:16-18 (taken September 21, 2018)(admitted July 11, 2019, at Trial as New Mexico's Ex. 188 ("Arzakanyan Depo.")).

8.     Balanced Legal ceased operations around early 2011, and no longer has employees. See Deposition of Angelina Solomon at 37:8-18 (taken September 20, 2018)(admitted July 11, 2019, at Trial as New Mexico's Ex. 146)("Solomon Depo."). See also Transcript of Trial Proceedings at 803:9-11 (Kennedy, Parwatikar)(taken July 11, 2019), filed July 16, 2019 (Doc. 198)("July 11 Tr.")(stating that Balanced Legal Group did not exist when Madrid was a Real Estate Law client); July 10 Tr. at 735:5-9 (Parwatikar).

9.     As Balanced Legal was a "dba" of Mr. Parwatikar, Mr. Parwatikar subsequently used it as a personal account such that money transferred from Pinnacle Law to Balanced Legal was money paid to Mr. Parwatikar. See July 10 Tr. at 637:11-16 (Anaya-Allen, Parwatikar); July 10 Tr. at 735:5-9 (Parwatikar).

10.     Pinnacle Law is a professional law corporation, and Mr. Parwatikar incorporated it on July 7, 2011, and is its sole shareholder, president, chief operating officer, and chief financial officer. See Defendant Pinnacle Law Center, P.C.'s Answers, Responses, and Objections to Plaintiff's First Set of Interrogatories and Requests for Production, Answer to Interrogatory No. 8, at 6 (undated)(admitted July 10, 2019, at Trial as New Mexico's Ex. 155)("Pinnacle Law Answers"). See also Solomon Depo. at 37:8-18.

11.     In 2011, Mr. Parwatikar and Pinnacle Law also helped Adlore Clarambeau incorporate Real Estate Law, and Mr. Parwatikar acted as an agent for Real Estate Law in that incorporation. See July 10 Tr. at 645:5-15 (Anaya-Allen, Parwatikar).

12.     Yervand Arzakanyan worked for Balanced Legal in marketing for loan modification services, see Arzakanyan Depo. at 10:5-8; id. at 10:16-18; July 10 Tr. at 640:10-11

(Anaya-Allen, Parwatikar), and his signature is on a check to the California Secretary of State on November 4, 2011, for $25.00 for "RELC PC Statement of Information," Check from Real Estate Law Center, P.C. to CA Secretary of State at 351-52 (admitted July 11, 2019, at Trial as New Mexico's Ex. 188); <u>see</u> Arzakanyan Depo. at 104:5-14.[2]

13.     Mr. Clarambeau's email address was adlore@balancedlegalgroup.com.     <u>See</u> Solomon Depo. at 39:4-10; Spreadsheet of Balanced Legal Employees at 177, 179 (admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 146).

14.     Mr. Parwatikar and Pinnacle Law knew that Mr. Clarambeau intended Real Estate Law to provide mortgage relief through lawsuits.  <u>See</u> July 10 Tr. at 646:11-14 (Anaya-Allen, Parwatikar).

15.     Pinnacle Law, with Mr. Parwatikar as its sole shareholder, occupied a position as consultant for Mr. Clarambeau and for Real Estate Law.  <u>See</u> July 10 Tr. at 646:15-24 (Anaya-Allen, Parwatikar); <u>id.</u> at 659:13-15 (Anaya-Allen, Parwatikar); <u>id.</u> at 659:22-660:4 (Anaya-Allen, Parwatikar).

16.     Pinnacle Law also had a bankruptcy and immigration practice.  <u>See</u> Transcript of Trial Proceedings at 46:8-11 (taken July 8, 2019)(Murphy), filed July 12, 2019 (Doc. 194)("July 8 Tr."); <u>id.</u> at 48:2-3 (Murphy); <u>id.</u> at 115:22-24 (Kennedy, Paul); July 10 Tr. at 676:23-677:3 (Anaya-Allen, Parwatikar).

---

[2]New Mexico proposes a finding that Arzakanyan signed the check that the text references. <u>See</u> New Mexico's Proposed Findings ¶ 205, at 27.  The Arzakanyan Depo. reflects that Arzakanyan's signature is on the check, but he asserts that the handwriting is not his handwriting, so the Court adopts the fact that the text reflects.  <u>See</u> Arzakanyan Depo. at 104:14.

17.     Mr. Pratt owned Real Estate Law from September, 2011, to September, 2013.  <u>See</u> Initial Disclosure of Chad T-W Pratt, Sr., ¶ 1, at 2 (dated August 5, 2018)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 178).

18.     Mr. Pratt was the sole shareholder of Real Estate Law during this time.  <u>See</u> Mr. Davis Depo. at 20:16-19.

19.     Pinnacle Law continued providing Real Estate Law consulting services after Mr. Clarambeau left and Mr. Pratt became the owner.  <u>See</u> July 10 Tr. at 662:3-5 (Anaya-Allen, Parwatikar).

20.     Mr. Davis assumed ownership of Real Estate Law from Mr. Pratt on September 26, 2013.   <u>See</u> Organizational Meeting Minutes and Minutes of Special Meeting at 5-8 (undated)(admitted July 11, 2019, at Trial as New Mexico's Ex. 241).

21.     At a Special Meeting, held on September 26, 2013, at 12:00 p.m., Mr. Pratt surrendered his stock and ownership of Real Estate Law, and Mr. Davis was declared the new Chief Executive Officer, Secretary, and Chief Financial Officer, and Real Estate Law's majority and controlling shareholder.  <u>See</u> Organizational Meeting Minutes and Minutes of Special Meeting at 7-8.

22.     Mr. Davis was then Real Estate Law's sole owner and sole corporate member, had a role in overseeing Real Estate Law's operations, and fulfilled all the roles within the corporation. <u>See</u> Mr. Davis Depo. at 19:13-20:2.[3]

---

[3]The Court qualifies the Defendants proposed finding 18.  <u>See</u> Defs.' Proposed Findings ¶ 18, at 7.  The Defendants propose that the Court find that Mr. Davis was "'the attorney in charge of overseeing the entire operation.'"  Mr. Davis Depo. at 19:14.  As the Court concludes that Mr. Parwatikar had a large role in Real Estate Law, while the Court comfortably finds that Mr. Davis had sole control over Real Estate Law as a corporate entity, the Court does not find that Mr. Davis was, in fact, the sole attorney who oversaw Real Estate Law or the boss at Real Estate Law.

23.     Real Estate Law ceased operations around December, 2016, or January, 2017.  See

July 10 Tr. at 665:16-19.

a.      **The General Practices.**

24.     Mr. Parwatikar described to one potential employee during an interview that Real

Estate Law helped people facing foreclosure.  See July 8 Tr. at 85:1-9 (Paul, Anaya-Allen).

25.     Real Estate Law had a foreclosure defense department, a sales department, an

accounting department, and a legal department.  See Arzakanyan Depo. at 14:21-15:4; id. at

15:9-13.

26.     Real Estate Law clients with foreclosure sale dates had red folders, because those

clients were a priority for Real Estate Law to stop the foreclosures.  See Arzakanyan Depo. at

115:25-116:9.

27.     Real Estate Law also had a "boiler room full of salesmen" who dictated the cases

that Real Estate Law accepted.  July 8 Tr. at 32:13 (Murphy).  See July 8 Tr. at 32:13-14 (Murphy).

28.     Real Estate Law engaged in mass tort litigation against mortgage lenders.  See July

10 Tr. at 689:11-15 (Anaya-Allen, Parwatikar).

29.     Real Estate Law employed bar-certified persons to pursue its litigation.  See July

8 Tr. at 21:6 (Murphy)(stating that she is barred); id. at 26:18-22 (Murphy)(stating that she

attended a hearing with Mr. Pratt).

30.     Real Estate Law also provided loan modification services.  See, e.g., July 10 Tr. at

689:16-19 (Anaya-Allen, Parwatikar).

31.     Real Estate Law obtained clients through advertising; the clients would see an

advertisement, call an 800 number, and speak with a salesperson who described Real Estate Law's

services.  See July 8 Tr. at 89:10-13 (Paul).

32. Real Estate Law engaged in compliance calls with its clients. See, e.g., July 8 Tr. at 71:13-21 (Murphy); Arzakanyan Depo. at 50:2-8 (stating that a compliance attorney would speak to clients to "make sure they knew what they were signing up for"); July 8 Tr. at 90:15-23 (Paul)(explaining that he would call Real Estate Law consumers to ensure that they "understood what they were singing up for").

33. The compliance calls' purpose was to protect Mr. Parwatikar. See July 8 Tr. at 71:13-21 (Murphy).

34. After speaking with a Real Estate Law salesperson, the caller would be forwarded to a representative for a compliance call, or an appointment would be scheduled for the compliance call. See July 8 Tr. at 89:14-21 (Paul).

35. During a compliance call, one New Mexico consumer was told to answer the questions "yes" or "no." Audio Recording of Conversation Between Larry Madrid and Joe Goldberg at 2:30-3:00 (taken October 17, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 36)("Madrid Compliance Call").

36. Mr. Parwatikar instructed one employee to call the clients beforehand and convince them to answer in a way that would not serve their best interest. See July 8 Tr. at 31:16-32:1 (Murphy).

37. Real Estate Law then received payments from its clients in advance of services provided. See Arzakanyan Depo. at 52:18-24.

38. Homeowners often paid $5,000.00 as initial payments to Real Estate Law. See Arzakanyan Depo. at 101:10-13.

39. When Mr. Davis owned Real Estate Law, he did not permit the marketing staff to make "cold" telephone calls. Arzakanyan Depo. at 25:3-4. See id. at 25:1-5.

40.     Real Estate Law would, however, look for clients with specific lenders.  See Arzakanyan Depo. at 118:18-20.

41.     Arzakanyan was the sole owner of YAMG, which contracted with the outside marketing group AD Marketing and with which Real Estate Law contracted, see Arzakanyan Depo. at 56:20-57:12, and Arzakanyan assisted in marketing and spreading Real Estate Law's claims that they could help stop foreclosures, see Arzakanyan Depo. at 53:10-18.

42.     Arzakanyan incorporated YAMG in 2008 and YAMG worked in marketing.  See Statement of Information at 353 (dated September 11, 2008)(admitted July 11, 2019, at Trial as New Mexico's Ex. 188); Arzakanyan Depo. at 105:18-23; id. at 106:2-7.

43.     YAMG contracted with and hired different companies to obtain clients for Real Estate Law.  See Arzakanyan Depo. at 118:14-17.

44.     AD Marketing contracted with Consumer Credit Marketing and, from October, 2012, through May, 2013, contracted for direct mail on mortgage prospect and loan modification. See Arzakanyan Depo. at 91:10-15; Invoices from Consumer Credit Marketing to AD Marketing Group at 179 to 201 (dated October 26, 2012, October 31, 2012, November 8, 2012, November 27, 2012, December 5, 2012, January 9, 2013, January 17, 2013, January 24, 2013, January 30, 2013, February 7, 2013, February 13, 2013, February 21,  2013, February 28,  2013, March 8, 2013, March 14, 2013, March 22, 2013, March 29, 2013, April 5, 2013, April 12, 2013, May 3, 2013, May 10, 2013, May 15, 2013)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, as New Mexico's Ex. 188)(billing AD Marketing Group for "turn-key direct mail program for mortgage prospect"); Check from Real Estate Law Center, P.C. to Consumer Credit Marketing at 329-330 (dated October 22, 2012)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, as New Mexico's Ex. 188).

45.     YAMG paid AD Marketing to gather client files for YAMG, which YAMG gave to Real Estate Law.  See Arzakanyan Depo. at 65:18-23.[4]

46.     Real Estate Law would tell AD Marketing, through Arzakanyan and YAMG, about the banks that Real Estate Law was suing.  See Arzakanyan Depo. at 76:4-77:6.

47.     AD Marketing used mailers that included statements like: "Principal Balance Reduction," "Going after your Fraudulent Mortgage Note," "Interest Rate Reduction," "Forgiveness of Past Due Payments," "Foreclosure Defense to Help Postpone Sale Dates and Keep You in Your Home," and did not include MARS Rule general disclosures.[5]  Real Estate Law

---

[4]The Court does not adopt New Mexico's proposed finding of fact "AD Marketing Group was one of the main contractors for Real Estate Law."  New Mexico's Proposed Findings ¶ 187, at 26 (citing Arzakanyan Depo. at 60:5-7).  The statement arises in the context of a conversation about YAMG and Arzakanyan, and does not reflect, in the Court's view, a comment on Real Estate Law's contractors as much as a comment on YAMG's contractors.

[5]The MARS Rule requires that mortgage assistance relief service providers include specific disclosures in general commercial communications:

(a)     Disclosures in All General Commercial Communications -- Failing to place the following statements in every general commercial communication for any mortgage assistance relief service:

(1)     "(Name of company) is not associated with the government, and our service is not approved by the government or your lender."

(2)     In cases where the mortgage assistance relief service provider has represented, expressly or by implication, that consumers will receive any service or result set forth in paragraphs (2) through (6) of the definition of Mortgage Assistance Relief Service in § 1015.2, "Even if you accept this offer and use our service, your lender may not agree to change your loan."

(3)     The disclosures required by this paragraph must be made in a clear and prominent manner, and --

(i)     In textual communications the disclosures must appear together and be preceded by the heading

Mailers at 212, 215, 217, 219, 221, 223, 224, 227, 229, 233, 235, 237, 238, 240, 243, 245, 247, 249, 251, 253 (admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11 2019, as New Mexico's Ex. 188); Arzakanyan Depo. at 64:8; id. at 64:10-14; id. at 65:18-23; id. at 66:8-9.

48.     Arzakanyan and YAMG did not review Real Estate Law mailers to see if the mailers complied with state or federal law.  See Arzakanyan Depo. at 65:18-66:10.

**b.     The Employees.**

49.     Arzakanyan worked for Real Estate Law from 2011 until it closed, see Arzakanyan Depo. at 10:1-2 and worked for Balanced Legal before working for Real Estate Law, see Arzakanyan Depo. at 10:5-6.

---

"IMPORTANT NOTICE," which must be in bold face font that is two point-type larger than the font size of the required disclosures; and

(ii)     In communications disseminated orally or through audible means, wholly or in part, the audio component of the required disclosures must be preceded by the statement "Before using this service, consider the following information."

. . . .

(c) Disclosures in All General Commercial Communications, Consumer-Specific Commercial Communications, and Other Communications -- In cases where the mortgage assistance relief service provider has represented, expressly or by implication, in connection with the advertising, marketing, promotion, offering for sale, sale, or performance of any mortgage assistance relief service, that the consumer should temporarily or permanently discontinue payments, in whole or in part, on a dwelling loan, failing to disclose, clearly and prominently, and in close proximity to any such representation that "If you stop paying your mortgage, you could lose your home and damage your credit rating."

12 C.F.R. § 1015.4.  The Court hereinafter will refer to these disclosures as MARS Rule general disclosures.  In noting in the Findings of Fact that a communication does not include the MARS Rule general disclosures, the Court concludes, as a factual matter, that the communication does not contain the above-quoted disclosure language and is not yet reaching a conclusion of law.

50.     Mr. Parwatikar referred Arzakanyan to Real Estate Law when Balanced Legal stopped taking clients.  See Arzakanyan Depo. at 11:18-12:1; id. at 9:23-10:6.

51.     Arzakanyan was the general office manager for Real Estate Law.  See Arzakanyan Depo. at 14:21-15:4.

52.     Arzakanyan worked under Mr. Clarambeau, Mr. Pratt, and Mr. Davis at Real Estate Law.  See Arzakanyan Depo. at 15:17-23.

53.     Arzakanyan worked for Pinnacle Law and Real Estate Law during the same time, and received $8,250.00 from Pinnacle Law between October and December, 2011, in checks that Mr. Parwatikar signed.  See July 10 Tr. at 719:15-721:14; Checks from Pinnacle Law Center, PC to Yervand Arzakanyan at 504-07 (dated October 20, 2011, November 18, 2011, December 9, 2011, December 24, 2011)(admitted July 10, 2019, at Trial as New Mexico's Ex. 234)("Pinnacle Law to Arzakanyan Checks").

54.     Ms. Solomon processed a payment from Real Estate Law to Arzakanyan on March 14, 2013, in the amount of $1,379.01.  See Solomon Depo. at 67:9-15; Check from Real Estate Law Center, P.C. to Yervand Arzakanyan at 197-98 (dated March 14, 2013)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 146).

55.     Solomon also processed a payment from Real Estate Law to Arzakanyan on March 15, 2013, for $4,570.00.  See Solomon Depo at 68:17-24; Check from Real Estate Law Center, P.C. to Yervand Arzakanyan at 199-200 (dated March 15, 2013)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 146).

56.     Sam Branco worked for Balanced Legal, Pinnacle Law, and Real Estate Law.  See July 10 Tr. at 640:6-9 (Anaya-Allen, Parwatikar); id. at 653:7-9 (Anaya-Allen, Parwatikar); id. at 652:21-653:3 (Anaya-Allen, Parwatikar).

57.     Mr. Parwatikar recommended that Real Estate Law hire Branco.  See July 10 Tr. at 687:14-16 (Anaya-Allen, Parwatikar).

58.     Branco worked for Pinnacle Law doing administrative work, and for Balanced Legal, and for Real Estate Law performing loan modification work, and led Real Estate Law's Foreclosure Defense Department ("FDD").  See Solomon Depo. at 17:11-16; id. at 17:20-18:6; July 10 Tr. at 653:18-23 (Anaya-Allen, Parwatikar); id. at 654:4-6 (Anaya-Allen, Parwatikar); Arzakanyan Depo. at 23:11-18; id. at 23:20-21.

59.     Branco supervised the FDD staff, including intakers, underwriters, and processors. See Arzakanyan Depo. at 23:25-24:5.

60.     Branco communicated with New Mexico consumer Linda Ward using the email address sam@balancedlegalgroup.com and provided her with financial documents for assistance with foreclosure defense.  See July 8 Tr. at 169:10-25 (Anaya-Allen, Ward); Email from Linda Ward to Sam Branco at 1 (sent March 7, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 30).

61.     Mr. Parwatikar and Pinnacle Law leased Branco to Real Estate Law so that Branco could have health insurance through Pinnacle Law.  See Anthem BlueCross Documents, at Parwatikar 000203-000211 (undated)(admitted July 10, 2019, at Trial as New Mexico's Ex. 233); July 10 Tr. at 655:5-12 (Anaya-Allen, Parwatikar); id. at 657:3-11 (Anaya-Allen, Parwatikar).[6]

62.     Pinnacle Law paid Branco, and Mr. Parwatikar signed checks to Branco from January, 2012, through December, 2013.  See July 10 Tr. at 731:9-732:16 (Anaya-Allen,

---

[6]The Court does not separately adopt New Mexico's proposed finding that "Pinnacle and Parwatikar did not provide health insurance records for Sam Branco during RELC's effective existence between August, 2011 and December, 2016," New Mexico's Proposed Findings ¶ 21, at 4, because it overlaps with the statement that the Court adopts in the text.

Parwatikar); Checks from Pinnacle Law Center, PC to Sam Branco at 630-77 (dated January 16, 2012, January 31, 2012, February 15, 2012, February 29, 2012, March 15, 2012, April 2, 2012, April 16, 2012, April 30, 2012, May 15, 2012, May 31, 2012, June 15, 2012, July 2, 2012, July 16, 2012, July 31, 2012, August 15, 2012, August 30, 2012, September 17, 2012, October 1, 2012, October 15, 2012, October 31, 2012, November 15, 2012, November 29, 2012, December 17, 2012, January 2, 2013, January 15, 2013, January 31, 2013, February 14, 2013, February 28, 2013, March 14, 2013, April 1, 2013, April 15, 2013, April 30, 2013, May 15, 2013, May 31, 2013, June 17, 2013, July 1, 2013, July 15, 2013, July 31, 2013, August 15, 2013, September 16, 2013, September 27, 2013, October 15, 2013, October 29, 2013, November 15, 2013, December 2, 2013, December 16, 2013, December 31, 2013, and January 15, 2014)(admitted July 10, 2019, at Trial as New Mexico's Ex. 237)("Pinnacle Law to Branco Checks").

63.     Pinnacle Law issued Branco a check on October 1, 2012, for $1,914.79, because Branco worked for Pinnacle Law by handling administrative tasks. See Solomon Depo. at 94:12-19; Check from Pinnacle Law Center, PC to Sam Branco at 235 (dated October 1, 2012)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt on July 11, 2019, at Trial as New Mexico's Ex. 146).

64.     Real Estate Law also paid Branco an "FDD December 2013 bonus" in a check that Arzakanyan signed on December 31, 2013.   July 10 Tr. at 732:18-733:6 (Anaya-Allen, Parwatikar); Check from Pinnacle Law Center, PC to Sam Branco, at 678 (dated December 31, 2018)(admitted July 10, 2019, at Trial as New Mexico's Ex. 238)("Dec. 31, 2018 Check from Pinnacle Law Center, PC to Sam Branco").

65.     Pinnacle Law issued Branco a Form 1099 for 2017.  See July 4 Tr. at 768:15-17 (Anaya-Allen, Parwatikar); 1099 from Pinnacle Law Center PC to Sam Branco (dated 2017)(admitted July 10, 2019, at Trial as New Mexico's Ex. 175).

66.     Angelina Solomon worked for Balanced Legal, for Pinnacle Law, and for Real Estate Law.  See July 10 Tr. at 640:12-15 (Anaya-Allen, Parwatikar); id. at 658:22-659:8 (Anaya-Allen, Parwatikar); id. at 658:11-13 (Anaya-Allen, Parwatikar); July 8 Tr. at 50:17-51:6 (Anaya-Allen, Parwatikar).

67.     Solomon worked for Pinnacle Law for seven years and, before that, worked for Balanced Legal for five to six years.  See Solomon Depo. at 8:9-14.

68.     Solomon began working for Real Estate Law after Mr. Parwatikar asked if Solomon was interested in doing so and if she had time to do Real Estate Law's daily booking.  See Solomon Depo. at 42:1-4.

69.     Solomon handled bookkeeping for Balanced Legal, Pinnacle Law, and Real Estate Law.  See Solomon Depo. at 10:17-19; id. at 10:25-11:7.

70.     Solomon worked with Arzakanyan at Balanced Legal and at Real Estate Law.  See Solomon Depo. at 16:14-25.

71.     Solomon received a check for $41.12 from Real Estate Law dated November 30, 2012.  See Solomon Depo. at 79:16-19; Check from Real Estate Law Center, P.C. to Angeline Solomon at 217-18 (dated November 30, 2012)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 146).

72.     Solomon received a check, which Mr. Pratt signed, from Real Estate Law dated March 14, 2013, for $1,580.61.  See Check from Real Estate Law Center, P.C., to Angeline

Solomon at 221 (dated March 14, 2013)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 146); Solomon Depo. at 81:5-9.

73.      Mr. Davis received a check from Real Estate Law for $1,491.01 dated July 1, 2013. <u>See</u> Check from Real Estate Law Center, P.C. to Erikson Davis at 232 (dated July 1, 2013)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt on July 11, 2019, at Trial as New Mexico's Ex. 146).

74.      Real Estate Law's 2013 telephone list includes entries for Pinnacle Law Center employees Deepak Parwatikar and Paige Knickerbocker.  <u>See</u> July 11 Tr. at 764:2-15 (Anaya-Allen, Parwatikar); Real Estate Law, P.C., Contact List at 26 (dated 2013)(admitted July 10, 2019, at Trial as New Mexico's Exhibit 240).

75.      Another of Real Estate Law's telephone lists included entries for Pinnacle Law Center, Parwatikar, Solomon, and Knickerbocker.  <u>See</u> July 11 Tr. at 825:12-827:19 (Anaya-Allen, Parwatikar, Court, Kennedy); Real Estate Law Center, P.C., Contact List at 9-10 (undated)(admitted July 11, 2019, at Trial as New Mexico's Ex. 243).

76.      Mr. Clarambeau, Arzakanyan, and Branco are on a list of employees that includes Balanced Legal and Real Estate Law staff, and Mr. Clarambeau, Arzakanyan, and Branco have emails ending in balancedlegalgroup.com.  <u>See</u> Solomon Depo. at 34:2-6; <u>id.</u> at 35:24-36:2; <u>id.</u> at 36:13-14; <u>id.</u> at 38:7-16; <u>id.</u> at 39:4-10; Spreadsheet of Balanced Legal Employees at 177-80 (undated)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt on July 11, 2019, at Trial as New Mexico's Ex. 146).

77.      Mr. Parwatikar assigned Pinnacle Law attorneys to Real Estate Law cases.  <u>See</u> July 8 Tr. at 39:12-23 (Anaya-Allen, Murphy); April 19 Email at 1.

78.     Knickerbocker, for instance, a Pinnacle Law employee, handled Real Estate Law cases: "Paige is not to be assigned litigation materials unless approval from me obtained in advance."  April 4 Email at 2.  See July 10 Tr. at 700:20-701:2 (Anaya-Allen, Parwatikar).

### c.     The Money Pinnacle Law Received.

79.     Pinnacle Law invoice Real Estate Law.  See, e.g., July 11 Tr. at 797:6-18 (Kennedy, Parwatikar); Pinnacle Law Center, P.C., to Real Estate Law Center, P.C., Invoices at 1 (dated September 29, 2011, October 28, 2011, November 30, 2011, December 30, 2011, January 31, 2012, February 29, 201, March 30, 2012, April 27, 2012, May 13, 2012, June 29, 2012, July 31, 2012, August 31, 2012, September 28, 2012, October 31, 2012, November 30, 2012, December 31, 2012, January 30, 2013, February 28, 2013, March 29, 2013, April 29, 2013, May 30, 2013, June 28, 2013, July 31, 2013, August 30, 2013, September 30, 2013, October 31, 2013, November 29, 2013, and December 31, 2013)(admitted July 10, 2019, at Trial as New Mexico's Ex. 171)("Pinnacle Law to Real Estate Law Invoices").[7]

80.     Pinnacle Law invoiced Real Estate Law for $200,000.00 for engagement fees and $100,000.00 for consulting fees in 2011.  See Pinnacle Law to Real Estate Law Invoices at 1-5.

---

[7]The Court does not adopt the Parwatikar Defendants' proposed findings that the evidence shows that Pinnacle Law did not receive a portion of Real Estate Law's attorneys' fees or its statement that the Pinnacle Law to Real Estate Law Invoices do not reflect an apportionment of client retainer fees to Pinnacle Law.  See Defendants Proposed Findings ¶¶ 32, 33, at 10-11.  As the Court does not know how much Real Estate Law received in retainer fees each year, the Court cannot comfortably say that the invoices do not reflect roughly eighty percent of the retainer fees that Real Estate Law received or eighty percent of Real Estate Law's revenue, and, because, as the text, infra, reflects, the invoices do not align with the amount that Real Estate Law paid Pinnacle Law, the Court cannot comfortably conclude that the money exchanged between Real Estate Law and Pinnacle Law does not reflect an eighty percent/ twenty percent division of revenue.

81.     Pinnacle Law invoiced, for instance, Real Estate Law for September, 2011, for an engagement fee of $50,000.00 and a consulting fee of $25,000.00.  See July 10 Tr. at 667:23-668:2 (Anaya-Allen, Parwatikar); Pinnacle Law to Real Estate Law Invoices at 1.

82.     Real Estate Law paid Pinnacle Law $141,500.00 in 2012.  See July 10 Tr. at 664:23-25 (Anaya-Allen, Parwatikar).

83.     Pinnacle Law invoiced Real Estate Law for $295,000.00 for engagement fees, $300,000.00 in consulting fees, and $202,500.00 in additional hourly fees for 2012.  See Pinnacle Law to Real Estate Law Invoices at 6-16.

84.     In 2012, Pinnacle Law invoiced Real Estate Law for $797,500.00, and reported receiving $141,500.00 from Real Estate Law, and Pinnacle Law's federal tax returns show gross receipts of $480,534.00.[8]  See Pinnacle Law to Real Estate Law Invoices at 6-16; July 10 Tr. at 677:8-11 (Anaya-Allen, Parwatikar); Pinnacle Law Tax Documents at 6 (transmission of copies to Pinnacle Law dated March 6, 2018, September 15, 2016, and undated)(admitted July 10, 2019, at Trial as New Mexico's Ex. 172).

85.     On its 2012 tax return, Pinnacle Law deducted $34,223.00 for promotion.  See July 10 Tr. at 753:10-16 (Anaya-Allen, Parwatikar); 2012 Pinnacle Law Tax Documents at 13.

86.     Real Estate Law paid Pinnacle Law $1,029,520.54 in 2013.  See July 10 Tr. at 665:1-3 (Anaya-Allen, Parwatikar).

---

[8]New Mexico describes a federal tax return report of $480,000.00 in gross receipts.  See New Mexico's Proposed Findings ¶ 60, at 8.  The record reflects, however, a report on the federal tax return of $480,534.00, so the Court adopts the latter number in its Findings of Fact.  See Pinnacle Law Tax Documents at 6.

87.     Pinnacle Law invoiced Real Estate Law for $485,000.00 for engagement fees, $300,000.00 in consulting fees, and $215,250.00 in additional hourly fees for 2013. See Pinnacle Law to Real Estate Law Invoices at 17-28.

88.     In 2013, Pinnacle invoiced Real Estate Law $1,000,250.00 and reported receiving $1,029,520.00 from Real Estate Law, and its federal tax return show total gross receipts of $1,081,349.00. See Pinnacle Law to Real Estate Law Invoices at 17-28; Pinnacle Law Tax Documents at 33; July 10 Tr. at 678:11-20 (Anaya-Allen, Parwatikar).

89.     On its 2013 tax return, Pinnacle Law deducted $263,454.00 for marketing and $39,804.00 for promotion. See July 10 Tr. at 754:17-25(Anaya-Allen, Parwatikar); Pinnacle Law Tax Documents at 40.

90.     Real Estate Law paid Pinnacle Law $746,720.33 in 2014. See July 10 Tr. at 665:5-6 (Anaya-Allen, Parwatikar).

91.     Pinnacle Law did not provide New Mexico with any invoices to Real Estate Law for the period after December, 2013. See July 10 Tr. at 673:18-21 (Anaya-Allen, Parwatikar).

92.     In 2014, Pinnacle Law received from Real Estate Law $746,720.33, and Pinnacle Law's tax returns show gross receipts of $858,152.00. See Pinnacle Law Tax Documents at 62; July 10 Tr. at 680:25-681:3 (Anaya-Allen, Parwatikar).

93.     In 2014, Pinnacle Law had $187,800.00 in deductions for marketing and promotion. See July 11 Tr. at 764:22-765:12 (Anaya-Allen, Parwatikar); Pinnacle Law Tax Documents at 62, 68.

94.     Real Estate Law paid Pinnacle Law $787,573.53 in 2015. See July 10 Tr. at 665:7-9 (Anaya-Allen, Parwatikar).

95. In 2015, Pinnacle Law received $787,573.53 from Real Estate Law, and Pinnacle Law's federal tax return shows gross receipts of $702,250.00. See Pinnacle Law Tax Documents at 87; July 10 Tr. at 681:13-682:4 (Anaya-Allen, Parwatikar).

96. On Pinnacle Law's 2015 tax return, Pinnacle Law had a deduction for marketing of $72,500.00 and for promotion of $37,500.00. See July 10 Tr. at 748:18-749:17 (Anaya-Allen, Parwatikar); Pinnacle Law Tax Documents at 93.

97. Real Estate Law paid Pinnacle Law $368,609.21 in 2016. See July 10 Tr. at 665:10-12 (Anaya-Allen, Parwatikar).

98. In 2016, Pinnacle Law received $368,609.21 from Real Estate Law, and Pinnacle Law's federal tax return for 2016 shows gross receipts of $452,516.00. See Pinnacle Law Tax Documents at 111; July 10 Tr. at 682:18-683:2 (Anaya-Allen, Parwatikar).

99. Real Estate Law paid Pinnacle Law $13,125.00 in 2017. See July 10 Tr. at 665:20-22 (Anaya-Allen, Parwatikar).

100. Pinnacle Law had gross receipts of $452,516.00 in 2016 and had deductions for marketing totaling $44,446.00. See July 10 Tr. at 765:13-23 (Anaya-Allen, Parwatikar); Pinnacle Law Tax Documents at 111, 120.

101. Pinnacle Law had $679,727.00 in tax deductions for marketing and promotion expenses from 2012 to 2016. See July 11 Tr. at 778:1-14 (Kennedy, Parwatikar); July 10 Tr. at 748:18-20 (Anaya-Allen, Parwatikar); id. at 749:8-17 (Anaya-Allen, Parwatikar); id. at 753:1016 (Anaya-Allen, Parwatikar); id. at 754:17-25 (Anaya-Allen, Parwatikar); July 11 Tr. at 765:8-12, 19-23 (Anaya-Allen, Parwatikar).

102. Pinnacle Law received $3,087,048.61 in total from Real Estate Law from 2012 through 2016.

### d.    **The Payment Practices.**

103.    When issuing invoices and writing checks, Solomon would prepare invoices for Pinnacle Law and give the invoice to Mr. Parwatikar, and Mr. Parwatikar would give the invoice to Mr. Davis or to Mr. Pratt, who would tell Solomon to pay the invoice on Real Estate Law's behalf. See Solomon Depo. at 103:14-104:1; id. at 108:2-5.

104.    Solomon tried, but could not, reconcile the Pinnacle Law invoices and the Real Estate Law payments to Pinnacle Law. See Solomon Depo. at 109:23-110:9.

105.    Mr. Davis would sometimes instruct Solomon to pay Pinnacle Law without an invoice. See Solomon Depo. at 108:8-20.

106.    Real Estate Law would make payments to contractors without invoices or tracking, see Solomon Depo. at 27:3-7; id. at 27:17-18; id. at 28:21-24, and Real Estate Law would likewise make payments outside payroll, based on Mr. Davis' reports, and, for instance, paid Branco in December, 2015, $880.00, see Solomon Depo. at 28:3-12; US Bank Documents at 160 (undated)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt on July 11, 2019, at Trial as New Mexico's Ex. 146).

107.    Mr. Parwatikar would also at times remind Arzakanyan to write him a check from Real Estate Law. See Arzakanyan Depo. at 88:2-11.

108.    Real Estate Law regularly made payments to Pinnacle Law through checks that Arzakanyan signed, and that Pinnacle Law received and negotiated, including on: October 5, 2011, for $9,695.00; October 12, 2011, for $12,000.00; October 20, 2011, for $9,000.00; October 31, 2011, for $5,000.00; November 7, 2011, for $6,000.00; November 14, 2011, for $10,000.00;

November 18, 2011, for $5,000.00[9]; November 30, 2011, for $7,000.00; December 9, 2011, for $12,000.00; January 9, 2012, for $7,500.00; January 16, 2012, for $6,000.00; January 30, 2012, for $7,500.00; February 9, 2012, for $8,000.00; February 13, 2012, for $10,000.00; February 16, 2012, for $7,000.00; February 21, 2012, for $3,000.00; March 9, 2012, for $6,755.00; March 13, 2012, for $10,000.00; March 21, 2012, for $2,000.00; March 23, 2012, for $7,500.00; March 27, 2012, for $4,000.00; April 9, 2012, for $15,000.00; April 18, 2012, for $5,000.00[10]; April 29, 2012, for $17,000.00; May 1, 2012, for $12,000.00; May 13, 2012, for $12,000.00; May 31, 2012, for $10,000.00; June 13, 2012, for $10,000.00; June 15, 2012, for $3,000.00; October 1, 2013, for $2,000.00; November 4, 2013, for $2,000.00; December 3, 2013, for $2,000.00. See July 10 Tr. at 725:19-730:19 (Anaya-Allen, Parwatikar); Real Estate Law to Pinnacle Law Checks at 546-72, 610-12 (dated December 11, 2013, October 5, 2011, October 12, 2011, October 20, 2011, October 31, 2011, November 7, 2011, November 14, 2011, November 18, 2011, November 30, 2011, December 9, 2011, January 9, 2012, January 16, 1012, January 30, 2012, February 9, 2012, February 23, 2012, February 16, 2012, February 21, 2012, March 9, 2012, March 13, 2012, March 21, 2012, March 23, 2012, March 27, 2012, April 9, 2012, April 18, 2012, April 23, 2012, May 1, 2012, May 13, 2012, May 31, 2012, June 13, 2012, June 15, 2012, June 28, 2012, July 12, 2012, July 16, 2012, July 26, 2012, August 8, 2012, August 14, 2012, August 27, 2012, September 6, 2012, September 24, 2012, October 1, 2012, October 3, 2012, October 15, 2012, October 31, 2012, November 8, 2012, November 14, 2012, November 30, 2012, December 13, 2012, December 17,

---

[9]New Mexico's Proposed Findings states $7,000.00, but the record reflects $5,000.00. See Real Estate Law to Pinnacle Law Checks at 552.

[10]This check includes a memorandum line that states: "Independent Contractor Service: Foreclosure defense Sam Branco/Jesselia Tintin." Real Estate Law to Pinnacle Law Checks at 569.

2012, December 28, 2012, January 15, 2013, February 1, 2013, February 15, 2013, March 22, 2013, March 26, 2013, April 1, 2013, April 30, 2013, June 24, 2013, July 31, 2013, August 14, 2013, August 30, 2013, October 1, 2013, November 4, 2013, and December 3, 2013)(admitted July 10, 2019, at Trial as New Mexico's Ex. 236). See also Arzakanyan Depo. at 101:4-8 (discussing January 30, 2012, check); Check from Real Estate Law Center, P.C. to Pinnacle Law Center P.C. at 345-46 (dated January 30, 2012)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt on July 11, 2019, as New Mexico's Ex. 188); Arzakanyan Depo. at 102:23-103:5 (discussing February 9, 2012, check); Check from Real Estate Law Center, P.C. to Pinnacle Law Center P.C. at 347-48 (dated February 9, 2012)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt on July 11 2019, as New Mexico's Ex. 188); Arzakanyan Depo. at 103:19-104:4 (discussing February 16, 2012, check); Check from Real Estate Law Center, P.C. to Pinnacle Law Center P.C. at 349-50 (dated February 9, 2012)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt on July 11, 2019, as New Mexico's Ex. 188).

109.     Between October, 2011, and June, 2012, Arzakanyan wrote on Real Estate Law's behalf twenty-nine checks to Pinnacle Law that totalled $240,950.000. See Exhibits to Deposition of Deepak S. Parwatikar (taken May 9, 2018), Checks from Real Estate Law Center, P.C. to Pinnacle Law Center at 546-612.

110.     On February 23, 2012, for instance, Real Estate Law paid Pinnacle Law $10,000.00 via a check that Arzakanyan signed, see Arzakanyan Depo. at 87:15-17; Check from Real Estate Law to Pinnacle Law Center at 319-20 (dated February 23, 2012)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt on July 11 2019, as New Mexico's Ex. 188), and on February 5, 2013, Arzakanyan handwrote a check to Pinnacle Law on behalf of Real Estate Law for $10,000.00, see Arzakanyan Depo. at 100:3-6; Check from Real Estate Law Center, P.C. to

Pinnacle Law Center P.C. at 341-42 (dated February 5, 2013)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt on July 11, 2019, as New Mexico's Ex. 188).

111.    Real Estate Law provided Pinnacle Law a check for $4,000.00 on September 24, 2012.  <u>See</u> Solomon Depo. at 102:8-103:2; Check from Real Estate Law Center, P.C. to Pinnacle Law Center P.C. at 243 (dated September 24, 2012)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 146).

112.    Starting May 31, 2012, Mr. Pratt started signing checks to Pinnacle Law, and these checks include: May 31, 2012, for $10,000.00; June 13, 2012, for $10,000.00; June 15, 2012, for $3,000.00; June 28, 2012, for $10,000.00; July 12, 2012, for $10,000.00; July 16, 2012, for $4,000.00; July 26, 2012, for $4,000.00; August 8, 2012, for $10,000.00; August 14, 2012, for $7,000.00; August 27, 2012, for $10,000.00; September 6, 2012, for $10,000.00; September 24, 2012, for $4,000.00; October 1, 2012, for $14,000.00; October 3, 2012, for $2,000.00; October 3, 2012, for $2,000.00; October 15, 2012, for $5,000.00; October 31, 2012, for $18,000.00; November 8, 2012, for $2,000.00; November 8, 2012, for $8,000.00; November 14, 2012, for $15,000.00; November 30, 2012, for $15,000.00; December 13, 2012, for $5,000.00; December 17, 2012, for $13,000.00; December 17, 2012, for $2,000.00; December 28, 2012, for $18,000.00; January 15, 2013, for $12,500; February 1, 2013, for $5,000.00; February 15, 2013, for $10,000.00; March 22, 2013, for $20,000.00; March 26, 2013, for $2,000.00; April 1, 2013, for $2,000.00; April 30, 2013, for $1,000.00; June 24, 2013, for $2,000.00; June 24, 2013, for $1,000.00; July 31, 2013, for $2,000.00; August 14, 2013, for $1,995; August 30, 2013, for $2,000.00   <u>See</u> July 10 Tr. at 730:20-731:3 (Anaya-Allen, Parwatikar); Real Estate Law to Pinnacle Law Checks at 573-609.

113.     Pinnacle Law also issued Balanced Legal checks in September through December, 2011. See July 10 Tr. at 733:16-736:1 (Anaya-Allen, Parwatikar); Exhibits to Deposition of Deepak S. Parwatikar (taken May 9, 2018), Checks from Pinnacle Law Center, PC to Balanced Legal Group at 679-85 (dated September 30, 2011, October 4, 2011, October 6, 2011, October 11, 2011, October 14, 2011, October 17, 2011, and December 21, 2011)(admitted July 10, 2019, at Trial as New Mexico's Ex. 239)("Pinnacle Law to Balanced Legal Checks").

114.     After Real Estate Law settled a case with the Brysons, see July 11 Tr. at 766:8-15 (Anaya-Allen, Parwatikar), both Solomon and YAMG made payments on Real Estate Law's behalf, see July 11 Tr. at 766:21-767:6 (Anaya-Allen, Parwatikar); Solomon Depo. at 49:2-19; Arzakanyan Depo. at 94:22-95:5.

115.     Solomon made, for instance, payments on the Bryson settlement using a Pinnacle Law Center envelope and postage account in May, 2017. See July 11 Tr. at 766:21-767:6 (Anaya-Allen, Parwatikar); Solomon Depo. at 48:18-49:11; Mr. Davis, and Mr. Pratt, Checks from Angelina T. Solomon to Law Offices of Walker & Mann LLP Atty Client Trust Acct at 187-190 (dated May 12, 2017, April 14, 2017, March 14, 2017, and February 13, 2017)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 146).

116.     Mr. Davis would deposit funds in Solomon's bank account and send her a text message about the deposit, and she would purchase the cashier's checks for the settlement payments. See Solomon Depo. at 50:1-51:6; id. at 51:13-52:10.

117.     Solomon would mail the payments from Pinnacle Law's office. See Solomon Depo. at 57:8-11.

118.     Solomon made three settlement payments for Mr. Davis to the Law Offices of Walker & Mann in amounts of $1,944.45 on May 12, 2017; $1,944.45 on April 14, 2017; and

$2,500.00 on March 14, 2017.  See Solomon Depo. at 48:23-49:4, Cashier's Checks Purchased by Angelina T. Solomon to Law Offices of Walker & Mann LLP Atty Client Trust Acct at 187-89 (dated May 12, 2017, April 14, 2017, March 14, 2017)(admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, as New Mexico's Ex. 146).

119.     Mr. Parwatikar knew of the settlement and of Solomon's payments.  See July 11 Tr. at 766:8-15 (Anaya-Allen, Parwatikar); Solomon Depo. at 63:6-12 (reflecting that Mr. Parwatikar asked Solomon about the payments).[11]

120.     YAMG purchased a cashier's check in the amount of $5,000.00 payable to the Law Office of Walker & Mann LLP for Real Estate Law on February 13, 2017, on Mr. Davis' behalf. See Arzakanyan Depo. at 94:22-95:5; Cashier's Check Purchased by YAMG at 338 (dated February 13, 2017)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, as New Mexico's Ex. 188).

121.     YAMG purchased the cashier's check on Mr. Davis' behalf.  See Arzakanyan Depo. at 94:22-95:5; Cashier's Check Purchased by YAMG at 338.

    **e.      The Workplace.**

122.     Real Estate Law was located in Costa Mesa, California, when it was incorporated. See July 10 Tr. at 645:21-24 (Anaya-Allen, Parwatikar).

---

[11]The New Mexico's Proposed Findings state: "Solomon neglected to check bank records in response to the production subpoena."  New Mexico's Proposed Findings ¶ 227, at 29.  The Court concludes that the Solomon Depo. more accurately reflects that Solomon did not check her bank records, and so the Court adopts a version of the New Mexico's Proposed Findings, but not the exact New Mexico's Proposed Findings, but the Court concludes that this fact addresses Solomon's credibility and not the facts that underlie the allegations.

123.    Real Estate Law then moved to Pasadena, California, and was located in Pasadena and in Pinnacle Law's building when Mr. Pratt owned it.  See Arzakanyan Depo. at 18:9-10; July 11 Tr. at 786:8-13 (Kennedy, Parwatikar).

124.    Real Estate Law shared office space with Pinnacle Law.  See July 10 Tr. at 662:19-663:4 (Anaya-Allen, Parwatikar); July 8 Tr. at 45:4-13 (Murphy).

125.    Real Estate Law used office space in Suite 1100, the same as Pinnacle Law's suite, and in Suite 1320, another suite, at 695 S. Vermont Ave., Los Angeles, California, where Pinnacle Law was located from 2012 to 2016.  See Solomon Depo. at 72:24-73:7; id. at 113:9-18; id. at 113:23-114:3; July 11 Tr. at 786:8-22 (Kennedy, Parwatikar); Sublease of Office Space at 1 (dated November 1, 2011)(admitted July 11, 2019, at Trial as the Parwatikar Defendant's Ex. A).

126.    Real Estate Law and Pinnacle Law used different computer systems.  See Solomon Depo. at 12:4-15.

127.    Pinnacle Law's and Real Estate Law's suite had a suite number and had no law firm name at the suite entrance.  See July 8 Tr. at 24:23-25:4 (Murphy).

128.    Real Estate Law's attorneys were licensed only in California.  See, e.g., Attorney-Client Fee Agreement ¶ 2, at 1 (executed August 9, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 20)("Ward Attorney-Client Fee Agreement"); Attorney-Client Fee Agreement ¶ 2, at 1 (executed October 16, 2012, October 28, 2012)(admitted July 8, 2019, at Trial as New Mexico's Exhibit 37)("Madrid Attorney-Client Fee Agreement").

129.    Balanced Legal used Captaloans -- a data management system[12] -- for its client database, and Real Estate Law used the same system for the same purpose. <u>See</u> July 10 Tr. at 691:3-15 (Anaya-Allen, Parwatikar); Solomon Depo. at 31:24-32:8.

130.    Pinnacle Law replaced its computer system in 2018. <u>See</u> July 11 Tr. at 770:13-771:3 (Anaya-Allen, Parwatikar).

**f.    <u>The Workplace Roles of Mr. Davis and Mr. Pratt</u>.**

131.    Mr. Pratt operated Real Estate Law before Mr. Davis. <u>See</u> Arzakanyan Depo. at 15:19; <u>id.</u> at 92:24-93:3.[13]

132.    Mr. Pratt alone gave Solomon instructions about payments while he ran Real Estate Law. <u>See</u> Solomon Depo. at 71:17-20.[14]

133.    Solomon received instructions from Mr. Pratt and from Mr. Davis when she worked with them in Real Estate Law. <u>See</u> Solomon Depo. at 68:16-22.

134.    Mr. Davis was the sole shareholder after he became sole owner, and no one else has held corporate positions of power within Real Estate Law. <u>See</u> Mr. Davis Depo. at 20:8-11.[15]

---

[12]Captaloans is a client database software that contains records of client information. <u>See</u> July 10 Tr. at 691:22-692:13 (Anaya-Allen, Parwatikar).

[13]The Court does not adopt the Parwatikar Defendants' proposed finding that Mr. Pratt "ran" Real Estate Law before Mr. Davis. Arzakanyan Depo. at 15:19. <u>See</u> Parwatikar Defs.' Proposed Findings ¶ ¶ 19, at 7-8. As discussed, <u>infra</u>, the Court concludes that Mr. Parwatikar had a significant role in running Real Estate Law.

[14]The Court does not adopt the Parwatikar Defendants' proposed finding that "no one else had authority to authorize payments," because Solomon's statements do not mention authority but rather the facts of who gave her such instructions. Parwatikar Defs.' Proposed Findings ¶19, at 8; Solomon Depo. at 71:17-20.

[15]The Court qualifies the Defendants' proposed finding that, "[d]uring the period in which [Mr. Davis] was RELC's sole owner, 'no one else [was] a stock holder with [him], or a shareholder with [him], or [] held any positions of power,'" Defs.' Proposed Findings ¶ 18, at 7 (quoting Mr.

135.    Mr. Davis was the senior lawyer at Real Estate Law, and he supervised the junior lawyers.  <u>See</u> Mr. Davis Depo. at 56:20-57:3.

136.    Mr. Davis was the signatory on Real Estate Law's client trust account, and payments required his approval.  <u>See</u> Mr. Davis Depo. at 35:6-13.

137.    Mr. Davis signed retainer agreements during his time as Real Estate Law's owner and a principal of the firm, and no one else at Real Estate Law was authorized to sign such agreements.  <u>See</u> Deposition of Erikson Davis at 7:22-8:1 (taken October 24, 2016)(admitted July 11, 2019, at Trial as the Parwatikar Defendants' Ex. G); <u>id.</u> at 13:19-23.

138.    Mr. Davis worked with Arzakanyan and Solomon when clients wanted to cancel services and/or to obtain refunds.  <u>See</u> Arzakanyan Depo. at 26:19-23; Solomon Depo. at 33:16-17.

139.    Mr. Davis provided Arzakanyan information on Real Estate Law's services.  <u>See</u> Arzakanyan Depo. at 54:22-55:3.

140.    Real Estate Law had a bank account with US Bank, and Mr. Davis was usually paid $11,925.00 per month.  <u>See</u> Solomon Depo. at 23:10-11; <u>id.</u> at 25:14-15; <u>id.</u> at 26:1-12; US Bank Documents at 158 (admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 146).

---

Davis Depo. at 20:8-11), because Mr. Davis made the statement in response to a question about corporate members and owners, and not to a question about practical power, <u>see</u> Mr. Davis Depo. at 20:3-4.

### g. Mr. Parwatikar's Workplace Role.

141. Mr. Parwatikar had effective control of and ran Real Estate Law. See July 8 Tr. at 26:3-4 (Murphy); July 8 Tr. at 93:15-19 (Anaya-Allen, Paul); id. at 96:2-10 (Paul); id. at 101:18-19 (Anaya-Allen, Paul).[16]

142. Mr. Parwatikar was at the Real Estate Law and the Pinnacle Law office every day. See July 8 Tr. at 25:14-16 (Murphy); id. at 96:7-8 (Paul).

143. Mr. Parwatikar wanted the Real Estate Law staff to act as if he were not involved in running Real Estate Law, see July 8 Tr. at 57:22-233 (Murphy), such that, for instance, Mr. Pratt was the "public face of" Real Estate Law, July 8 Tr. at 94:2 (Paul).

144. Mr. Parwatikar interviewed, however, Mr. Pratt when he was going to take over ownership of Real Estate Law. See July 10 Tr. at 674:7-10 (Anaya-Allen, Parwatikar).

145. Mr. Parwatikar participated in Mr. Davis' hiring interview as an attorney. See July 11 Tr. at 822:18-823:3 (Anaya-Allen, Parwatikar).

146. "Mr. Davis was hired because he was already -- . . . when he came on as an attorney . . . . But not as the owner." July 11 Tr. at 62:21-23 (Parwatikar).

_____

[16]The Court concludes that this fact held true under Mr. Davis and under Mr. Pratt. Mr. Parwatikar's role in Mr. Davis' hiring and his consulting role with Mr. Davis and with Mr. Pratt suggests that Mr. Parwatikar played a continuing role in Real Estate Law's activities. The Court also considers suspicious that Mr. Parwatikar produced a consulting agreement between Real Estate Law and Pinnacle Law only for the time period after the State Bar of California disciplined Mr. Pratt. The Court, as discussed in its Findings of Fact, does not deem credible Mr. Parwatikar's statement that he had such an agreement with Mr. Pratt. The timing of the consulting agreement with Mr. Davis suggests that Mr. Parwatikar attempted to write his way out of liability for Real Estate Law's actions and bolsters the Court's conclusion that Mr. Parwatikar exercised control within Real Estate Law. The Court also does not adopt, therefore, the Parwatikar Defendants' proposed finding that Mr. Parwatikar was not in charge of Real Estate Law staff. See Parwatikar Defs.' Proposed Findings ¶ 20, at 8.

147. Mr. Parwatikar had, therefore, a role in Mr. Davis' appointment to Real Estate Law's ownership. See July 11 Tr. at 62:21-23 (Parwatikar).

148. Before the transition between Mr. Davis and Mr. Pratt, Mr. Parwatikar told Solomon that Mr. Pratt would leave and that Mr. Davis would take over Real Estate Law. See Solomon Depo. at 89:24-90:2.

149. Parwatikar, on Pinnacle Law's behalf, entered a consulting agreement with Real Estate Law and Mr. Davis on September 26, 2013. See July 10 Tr. at 674:23-675:5 (Anaya-Allen, Parwatikar); Consulting Agreement at 1-4 (executed September 26, 2013)(admitted July 10, 2019, at Trial as New Mexico's Ex. 170 and admitted July 11, 2019, at Trial as Parwatikar's, Balanced Legal's, and Pinnacle Law's Ex. B); July 11 Tr. at 820:25-821:4 (Anaya-Allen, Parwatikar).

150. Real Estate Law and Pinnacle Law's Consulting Agreement provides for a monthly fee of $25,000.00 plus $1,500.00 per hour for hours over 40 hours a month and includes a provision that the total monthly fees not exceed eighty percent of Real Estate Law's monthly revenues. See July 10 Tr. at 675:6-18 (Anaya-Allen, Parwatikar); Consulting Agreement at 2.

151. Mr. Parwatikar did not have a consulting agreement with Mr. Pratt.[17]

152. Pinnacle Law provided Real Estate Law, under both Mr. Davis and Mr. Pratt, consulting services on human resources, including hiring, staffing, advertising, and interviewing job candidates, see July 10 Tr. at 663:11-20 (Anaya-Allen, Parwatikar); id. at 685:12-686:3

---

[17]The Court does not adopt the Defendants' proposed fact that the evidence shows that Pinnacle Law had a consulting agreement with Mr. Pratt. See Defendants' Proposed Findings ¶ 32, at 10-11. Mr. Parwatikar stated that he had a consulting agreement with Mr. Pratt. See July 11 Tr. at 796:4-7 (Parwatikar). The Court does not, however, deem Mr. Parwatikar's statement credible. Had Mr. Parwatikar had a consulting agreement with Mr. Pratt, he would have produced it. Mr. Parwatikar produced the sublease between Real Estate Law and Pinnacle Law, see July 11 Tr. at 793:19-14 (Kennedy, Parwatikar), and a consulting agreement, like the sublease, would bolster Mr. Parwatikar's story that he had no role in Real Estate Law.

(Anaya-Allen, Parwatikar), and on marketing, and advised Mr. Pratt and Mr. Davis about outreach strategies, see July 10 Tr. at 683:14-684:11 (Anaya-Allen, Parwatikar). See also July 10 Tr. at 686:4-17 (Anaya-Allen, Parwatikar); id. at 686:18-687:6 (Anaya-Allen, Parwatikar); id. at 739:12-19 (Anaya-Allen, Parwatikar).

153.    Mr. Parwatikar did not perform marketing for Real Estate Law, but consulted with Real Estate Law's owners. See July 11 Tr. at 781:18-23 (Kennedy, Parwatikar).

154.    Pinnacle Law and Mr. Parwatikar were not directly involved in referring clients to Real Estate Law. See July 11 Tr. at 802:10-13 (Kennedy, Parwatikar).[18]

155.    Mr. Parwatikar worked "hand in hand" with Real Estate Law, July 11 Tr. at 781:25 (Parwatikar); id. at 782:3 (Parwatikar). See id. at 782:1-4 (Parwatikar), and met daily with Mr. Pratt and Mr. Davis, id. at 791:23-25 (Parwatikar).

156.    "Anything that could advance the business because the more business got advanced, the more [Mr. Parwatikar] could charge consulting fees and make money." July 11 Tr. at 686:14-17 (Parwatikar).

157.    Pinnacle Law did not pay for marketing or promotional programs. See July 10 Tr. at 696:1-4 (Anaya-Allen, Parwatikar); July 11 Tr. at 773:23-25 (Anaya-Allen, Parwatikar).[19]

---

[18]The Court does not adopt the Defendants' broader statement that "Pinnacle and Mr. Parwatikar had no involvement in referring clients to RELC." Parwatikar Defs.' Proposed Findings ¶ 30, at 10. The record reflects that Mr. Parwatikar and Pinnacle Law were not involved in referring clients to Real Estate Law such that they were involved in marketing calls or advertisements, or that consumers would have mentioned Mr. Parwatikar's name, but, given the Court's conclusions about Mr. Parwatikar's role at Real Estate Law, the Court will not find that Mr. Parwatikar had no involvement in the process by which consumers eventually contacted Real Estate Law. See July 11 Tr. at 801:23-804:13 (Parwatikar, Kennedy).

[19]The Court does not adopt the Defendants' proposed finding: "Pinnacle Law Center did not pay for any of RELC's marketing or promotion." Parwatikar Defs.' Proposed Findings ¶ 29, at 10. The Court incorporates the finding in the text, because the record reflects that Pinnacle Law

158.     Mr. Parwatikar also did not immediately control Real Estate Law's accounts or money.  See July 11 Tr. at 811:7-12 (Kennedy, Parwatikar); Mr. Davis Depo. at 34:6-13; Solomon Depo. at 33:16-17.[20]

159.     Mr. Parwatikar interviewed, for instance, potential candidates for Real Estate Law with Mr. Pratt.  See July 10 Tr. at 663:17-20 (Parwatikar).

160.     Mr. Parwatikar interviewed Susan Murphy with Mr. Clarambeau for a job at Real Estate Law.  See July 10 Tr. at 697:15-17 (Anaya-Allen, Parwatikar); July 8 Tr. at 22:1-2 (Murphy).

161.     Mr. Pratt and Mr. Parwatikar interviewed Ms. Murphy when Real Estate Law hired her.  See July 8 Tr. at 22:4-7 (Murphy).

162.     Mr. Parwatikar spoke on the telephone to and corresponded with Ms. Murphy about her hiring and start dates.  See July 8 Tr. at 23:17-22 (Anaya-Allen, Murphy).

163.     Mr. Parwatikar participated in interviewing Michael Paul for a job at Real Estate Law.  See July 10 Tr. at 700:3-8 (Anaya-Allen, Parwatikar); Email from Deepak Parwatikar to Susan Murphy at 1 (sent February 20, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 4)("Feb. 20 Email"); July 8 Tr. at 85:1-9 (Paul, Anaya-Allen).

---

does not pay for marketing, although Mr. Parwatikar had done marketing for Balanced Legal and consulted with Real Estate Law.  See July 11 Tr. at 773:18-25 (Anaya-Allen, Parwatikar).  In the Court's view, the record does not reflect that Pinnacle Law did not pay for Real Estate Law's marketing or promotion, so much as it reflects that Pinnacle Law paid for no marketing or promotion.

[20]The Court qualifies the Parwatikar Defendants' proposed finding that Mr. Parwatikar "did not control any of RELC's funds," because, as the Court's Findings of Fact reflect, the Court concludes that Mr. Parwatikar had some effective control within Real Estate Law.  Parwatikar Defs.' Proposed Findings ¶ 20, at 8.

164.    Mr. Parwatikar was Ms. Murphy's boss at Real Estate Law; he assigned files on which she should work, brought files to her desk, directed her on the case the client had, and told her how to dress.  See July 8 Tr. at 25:17-26:4 (Parwatikar, Murphy); Email from Deepak Parwatikar to Susan Murphy at 1 (sent February 14, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 3)("Feb. 14 Email"); Feb. 20 Email at 1; Email from Deepak Parwatikar to Susan Murphy at 1-2 (sent February 25, 2013)(admitted July 8, 2019, at Trial as New Mexico's Trial Exhibit 5); April 5 Email at 1-2; Email from Deepak Parwatikar to Susan Murphy at 1 (sent April 19, 2013)(admitted July 8, 2019, at Trial as New Mexico's Exhibit 7.

165.    Mr. Parwatikar was Mr. Paul's boss at Real Estate Law.  See July 8 Tr. at 96:2-10 (Paul); id. at 101:9-17 (Paul); Email from Deepak Parwatikar to Michael Paul at 1 (sent December 14, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 15).

166.    Mr. Parwatikar regularly supervised Ms. Murphy's work and gave her instructions on cases, including settlement.  See July 8 Tr. at 28:17-29:3 (Anaya-Allen, Murphy); Email from Deepak Parwatikar to Susan Murphy at 1 (sent February 13, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 2)("Feb. 13 Email"); April 5 Email at 1-2.

167.    Mr. Parwatikar emailed Ms. Murphy an instruction about working with opposing counsel on a loan modification.  See July 10 Tr. at 697:23-698:2 (Anaya-Allen, Parwatikar); Feb. 13 Email at 1.

168.    Mr. Parwatikar emailed Ms. Murphy directing her on communicating with clients and telling her to consult with him before recommending legal action other than a mass joinder case to a Real Estate Law client.  See Feb. 14 Email at 3; July 10 Tr. at 698:3-14 (Anaya-Allen, Parwatikar); July 8 Tr. at 30:9-24 (Murphy, Anaya-Allen).

169.    Real Estate Law staff sent weekly case updates on Real Estate Law clients to Mr. Parwatikar's email, deepak@pinnaclelawcenter.com, and Ms. Murphy was supposed to send such weekly Real Estate Law case updates to Mr. Parwatikar.  See July 8 Tr. at 36:5-6 (Murphy); id. at 36:9-19 (Murphy); Feb. 20 Email at 1; Feb. 25 Email at 1-2.

170.    Mr. Parwatikar sent Real Estate Law staff, including Ms. Murphy, an email thanking them for keeping up with weekly case updates and asking that they copy "Christine" on future such emails.   Feb. 20 Email at 1.   See July 10 Tr. at 698:22-699:14 (Anaya-Allen, Parwatikar).

171.    Mr. Parwatikar sent an email to Real Estate Law staff, including Ms. Murphy and Mr. Paul, on April 4, 2013, in which he summarized an attorney meeting that the Real Estate Law staff held and summarized several directives that reflect his role in managing Real Estate Law:

> All individual clients contacted every 3 weeks at least by atty assigned.
>
> Cutoffs established for HSBC mass for Tala and CITI mass Marilyn. Deadlines for clients to be included on initial complaint is April 18. I am not sure if drop dead filing date. Can we make that April 30?  Please advise(.)
>
> . . . . I, Deepak, shall write the verbiage for the initial client contact by attorney.
>
> Chad will be writing OCWEN and then potentially handing it off to another atty.  We also came to conclusion on mass cases that the first amended complaint should not be done before service but after any opposition pleading.
>
> Christine, Yervand, John and myself will meet to discuss the policy for an individual file after a salesperson hands it downstairs.

Email from Deepak Parwatikar to Real Estate Law Employees at 1-2 (sent April 4, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 6)("April 4 Email").  See July 10 Tr. at 700:20-704:3 (Anaya-Allen, Parwatikar).

172.    Mr. Parwatikar ran weekly staff meetings, which Mr. Pratt attended irregularly, see July 8 Tr. at 31:2-3 (Murphy); id. at 38:12-39:1 (Murphy); id. at 94:6-10 (Paul); id. at 95:1-5 (Paul), at which the participants discussed case statuses and caseloads, made and received work assignments, see July 8 Tr. at 38:16-39:1 (Anaya-Allen, Murphy), and met with Real Estate Law's department heads, see Arzakanyan Depo. at 113:24-114:17.[21]

173.    Mr. Parwatikar avers that he told Real Estate Law to remove a provision from the attorney-client fee agreements that mentioned Pinnacle Law when he became aware that clients who saw the provision believed that Pinnacle Law was involved with Real Estate Law.  See July 10 Tr. at 666:14-667:9 (Anaya-Allen, Parwatikar).

174.    At a May 22, 2013, meeting, Real Estate Law employees discussed "4 Step Sale Delay Strategy," "Adding Clients to Mass Tort Cases," and scheduling attorney calls to clients "within 3 weeks of final payment deposit date."  FDD Streamlining Notes, at 359 (undated)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, as New Mexico's Ex. 188).  See FDD Streamlining Notes, at 359-60; Arzakanyan Depo. at 114:1-7.

175.    Real Estate Law employees knew little about Pinnacle Law's operations.  See July 8 Tr. at 115:22-24 (Kennedy, Paul); Arzakanyan Depo. at 27:19-20.[22]

---

[21]The New Mexico's Proposed Findings state that Mr. Parwatikar ran meetings for Real Estate Law department heads.  See New Mexico's Proposed Findings ¶ 207, at 27.  The Arzakanyan Depo. reflects that Mr. Parwatikar did not always run the Real Estate Law department head meetings, so the Court alters the findings' language, which, in the New Mexico's Proposed Findings, suggests that Mr. Parwatikar always ran such meetings.

[22]The Court does not adopt Real Estate Law's proposed fact that the Real Estate Law attorneys did not interact with Pinnacle's clients, because the Court does not see evidence for that assertion in the record.  See Parwatikar Defs.' Proposed Findings ¶ 31, at 10.

h. **Mr. Parwatikar's Knowledge.**

176.  Mr. Parwatikar knew that Real Estate Law engaged in mass tort litigation and became aware of the practice when they began using it.  See July 10 Tr. at 689:11-15 (Anaya-Allen, Parwatikar).

177.  Mr. Parwatikar and Pinnacle Law knew that Mr. Davis continued to practice mass tort litigation at Real Estate Law.  See July 10 Tr. at 739:20-22 (Anaya-Allen, Parwatikar).

178.  Mr. Parwatikar knew that Real Estate Law provided loan modification services. See July 10 Tr. at 689:16-19 (Anaya-Allen, Parwatikar).

179.  Mr. Parwatikar and Pinnacle Law knew that, when Mr. Davis owned Real Estate Law, Real Estate Law continued to provide mortgage modification services through its FDD.  See July 10 Tr. at 739:23-740:6 (Anaya-Allen, Parwatikar).

180.  Mr. Parwatikar did not research mass joinder lawsuits.  See July 11 Tr. at 817:17-24 (Anaya-Allen, Parwatikar).

181.  Mr. Parwatikar deferred to Mr. Pratt's and Mr. Davis' expertise as litigators.  See July 11 Tr. at 817:19-24 (Parwatikar); id. at 793:5-15 (Kennedy, Parwatikar).

182.  Mr. Pratt and Mr. Davis told Mr. Parwatikar that the mass joinder lawsuits were a good litigation strategy, and he relied on their statements.  See July 11 Tr. at 816:24-817:6 (Anaya-Allen, Parwatikar).

183.  During a discussion with Mr. Pratt of mass tort lawsuits, Mr. Parwatikar told Mr. Pratt that he would market the strategy if Mr. Pratt thought that the strategy was legal.  See July 11 Tr. at 810:15-811:2 (Kennedy, Parwatikar).

184.  Mr. Parwatikar knew which banks Real Estate Law was suing.  See Arzakanyan Depo. at 77:7-10.

185.     Mr. Parwatikar knew of the advance fees that Real Estate Law charged and how it required that the clients pay the advance fees, and he emphasized in an April 4, 2013, email that Real Estate Law clients must pay in advance:

> From now on all individual files will be assigned to an atty once SOME payment has cleared. Client will be alerted by atty that research on the case will be done as well as an atty introduction. However client will be specifically told no interview of client or a complaint filed until initial retainer fully paid.

April 4 Email at 1. <u>See</u> July 10 Tr. at 702:21-703:2 (Anaya-Allen, Parwatikar).

### i.     <u>The Litigation.</u>

186.     The FDD had success keeping homeowners' homes, but Real Estate Law did not succeed in court with any of its lawsuits; Arzakanyan would not say that the mass tort lawsuits helped homeowners.[23]  <u>See</u> Arzakanyan Depo. at 54:2-8; <u>id.</u> at 63:9-16.[24]

187.     Real Estate Law and the courts regularly dismissed Real Estate Law's litigation. <u>See, e.g.</u>, <u>Conrad v. JP Morgan Chase & Co.</u>, Case No. CV-2015-0006295, Notice of Dismissal of Coordinated Case at 1-3, County of San Joaquin, Superior Court of California (dated October 13,

---

[23]The New Mexico's Proposed Findings suggest that Arzakanyan could not say whether the mass tort lawsuits helped homeowners, but the Court cannot conclude based on the Arzakanyan Depo. whether Arzakanyan simply did not address the mass tort lawsuits or whether he could not comment on them.  <u>See</u> New Mexico's Proposed Findings ¶ 185, at 25.

[24]According to Ms. Murphy, Real Estate Law used the lawsuits as part of a scam to take people's money.  <u>See</u> July 8 Tr. at 42:16-42:16 (Anaya-Allen, Murphy).  New Mexico asserts as a proposed fact that the mass joinder cases were scams.  <u>See</u> New Mexico's Proposed Findings ¶ 39, at 18.  The Court concludes that the evidence shows that Ms. Murphy believed that the mass joinders were scams, but the evidence does not show that the mass joinders were actually scams.  <u>See</u> July 8 Tr. at 42:16-42:16 (Anaya-Allen, Murphy).  To someone who has lost money, the enterprise that took their money may well be a scam.  Such an eventuality may result from fraud, but it may also result from sheer incompetence.  The repeated dismissals of Real Estate Law's lawsuits certainly alerted the Defendants that the lawsuits were not succeeding.  New Mexico has not, however, carried its burden to prove that the lawsuits were part of a sham, <u>i.e.</u>, that the Defendants acted fraudulently or that the Defendants were simply incompetent.  The Court cannot, accordingly, say that the lawsuits are a sham.

2017)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 196); Conrad v. JP Morgan Chase & Co., Case No. CV-2015-0006295, Request for Dismissal at 4-7, County of San Joaquin, Superior Court of California (dated September 27, 2016)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 196); White v. Ocwen Fin. Corp., Case No. CV-2015-0006295, Request for Dismissal at 1-4, County of San Joaquin, Superior Court of California (dated December 28, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 197); Barlow v. JP Morgan Chase & Co., Case No. 1-15-cv-28300, Request for Dismissal at 1-5, County of Santa Clara, Superior Court of California (dated August 9, 2016)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 198); Barker v. Select Portfolio Servicing, Case No. RG15781772, Request for Dismissal and Dismissal at 1-4, County of Alameda, Superior Court of California (dated June 30, 2016)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 199).

188. Ms. Murphy accompanied Mr. Pratt to a demurrer hearing on the second amended complaint for a mass joinder named Ramos v. Bank of America soon after she started working at Real Estate Law in 2012. See July 8 Tr. at 26:10-22 (Anaya-Allen, Murphy).

189. Mr. Pratt knew that Ramos v. Bank of America would be dismissed. See July 8 Tr. at 34:9-14 (Anaya-Allen, Murphy).[25]

---

[25]The Court does not adopt New Mexico's proposed finding that Mr. Pratt "had knowledge of the legal insufficiencies of the mass joinder model of litigation used by RELC in mid-2012 when he accompanied attorney Susan Murphy to a hearing for dismissal of *Ramos v. Bank of America*." New Mexico's Proposed Findings ¶ 602, at 77. Nothing in the record reflects that the hearing addressed the general mass tort model rather than the issues that arose in Ramos v. Bank of America.

190. At the hearing, the court was prepared to dismiss the <u>Ramos v. Bank of America</u> mass joinder with prejudice on all causes but allowed Real Estate Law, by Ms. Murphy, to file a third amended complaint to save the case. <u>See</u> July 8 Tr. at 26:16-27:8 (Murphy, Anaya-Allen).

191. Murphy prepared and filed a third amended complaint for <u>Ramos v. Bank of America</u>, but the court granted the demurrer, sustained it on all causes, and dismissed the case. <u>See</u> July 8 Tr. at 27:16-22 (Anaya-Allen, Murphy).

192. Real Estate Law and Mr. Davis filed voluntary dismissals in several cases in the Superior Court of California, County of Los Angeles: (i) <u>Anderson v. Wells Fargo Bank N.A.</u>, <u>see</u> <u>Anderson v. Wells Fargo Bank N.A.</u>, BC52599, Request for Dismissal at 4, County of Los Angeles, Superior Court of California, Request for Dismissal (dated March 20, 2014)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194); (ii) <u>Jackson v. Specialized Loan Servicing</u>, <u>see</u> <u>Jackson v. Specialized Loan Servicing</u>, BC541287, Request for Dismissal, at 46-49, County of Los Angeles, Superior Court of California (dated April 10, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194); (iii) <u>Allen et al v. Ocwen Fin.</u>, <u>see</u> <u>Allen et al v. Ocwen Fin.</u>, BC555168, Request for Dismissal, at 50-53, County of Los Angeles, Superior Court of California, (dated May 19, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194), (iv) <u>Black v. Select Portfolio Servicing</u>, <u>see</u> <u>Black v. Select Portfolio Servicing</u>, BC540511, Request for Dismissal, at 54-57 County of Los Angeles, Superior Court of California (dated May 19, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194); (v) <u>Brown v. Citibank USA, N.A.</u>, <u>see</u> Court Filings Ex. 194, <u>Brown v. Citibank USA, N.A.</u>, BC550916, Request for Dismissal, at 58-61, County of Los Angeles, Superior Court of California (dated May 19,

2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194); and (vi) Ball v. JP Morgan Chase & Co., see Ball v. JPMorgan Chase & Co., BC540510, Request for Dismissal, at 62-65, County of Los Angeles, Superior Court of California (May 27, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194).[26]

193.    The Superior Court of California, County of Los Angeles dismissed the following cases: (i) Aghaji v. Bank of America and related cases, see Aghaji v. Bank of Am., BC498852, and related cases BC498852, BC498850, BC498978, BC521834 [consolidated with BC521835], BC522150, BC522158, BC522315, BC525203, BC531302, BC531535, BC531639, BC531713, BC531836, GC050583, BC538607, BC541862, BC545528, at 12-17, Judgment County of Los Angeles, Superior Court of California (dated December 4, 2014)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194)[27]; (ii) Anderson v. Nationstar Mortgage, LLC,[28] see Anderson v. Nationstar Mortg., LLC, BC539499, Judgment in

---

[26]New Mexico consumer Julian Mondragon was a plaintiff in Ball v. JPMorgan Chase & Co. See Mondragon Emails at 8, 63, 71 (admitted July 9, 2019, at Trial as New Mexico's Ex. 106).

[27]The Court takes judicial notice that the California Court of Appeals affirmed the Superior Court of California, County of Los Angeles' decision not to permit Real Estate Law to amend its complaint and concluded that the plaintiffs were misjoined, but Real Estate Law did not appeal the ruling sustaining the demurrers. See Aghaji v. Bank of Am., N.A., 202 Cal. Rptr. 3d 619, 625, 627-28 (Cal. Ct. App. 2016). The Court does not adopt New Mexico's Proposed Finding that the California Court of Appeals upheld Aghaji v. Bank of America's dismissal, because the Court does not see evidence of the California Court of Appeals decision in the record. See New Mexico's Proposed Findings ¶ 602, at 77.

[28]New Mexico consumer June Valdez was a plaintiff in the Anderson case. See Anderson v. Nationstar Mortg., LLC, BC539499, Judgment in Favor of Nationstar Mortgage LLC in Anderson v. Nationstar Mortgage LLC, BC539499, at 18, Superior Court of California, County of Los Angeles (dated February 23, 2015)(admitted July 11, 2019, at Trial as New Mexico's Ex. 194).

Favor of Nationstar Mortgage LLC in *Anderson v. Nationstar Mortgage LLC*, BC539499, at 18-21, County of Los Angeles, Superior Court of California (dated February 23, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194); (iii) <u>Aguayo et al v. Bank of America</u>, <u>see</u> <u>Aguayo et al v. Bank of Am.</u>, BC498852 (lead case), BC522158 (related case), Judgment of Dismissal in the *Matter of Aguayo, et al. v. Bank of America, N.A., et al.* (BC522158), at 22-27, County of Los Angeles, Superior Court of California, (dated March 13, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194); (iv) <u>Holmes et al v. Bank of America</u>, <u>see</u> <u>Holmes et al v. Bank of Am.</u>, BC498852 (lead case), BC531535 (related case), Judgment of Dismissal in the Matter of *Holmes, et al. v. Bank of America, N.A., et al.* (BC531535), at 28-33, County of Los Angeles, Superior Court of California, (dated March 13, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194); (v) <u>Penn et al v. Bank of America</u>, <u>see</u> <u>Penn v. Bank of Am.</u>, BC531639, BC498852 (lead case), BC531639 (related case), Judgment of Dismissal in the Matter of *Penn, et al. v. Bank of America, N.A., et al.* (BC531639), at 34-39, County of Los Angeles, Superior Court of California (dated March 13, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194); and (vi) <u>Simons v. Bank of America.</u>, <u>see</u> <u>Simons v. Bank of Am.</u>, BC531836, Judgment of Dismissal in the Matter *Simons, et al. v. Bank of America, N.A., et al.* (BC531639), at 40-45, County of Los Angeles, Superior Court of California, (dated March 13, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194).

194. Real Estate Law and Mr. Davis filed voluntary dismissals in the following cases in the Superior Court of California, County of San Diego: (i) <u>Miller v. Wells Fargo Bank</u>, <u>see</u> <u>Miller</u>

v. Wells Fargo Bank, Case No. 37-2014-00010936, Request for Dismissal, at 1-4, County of San Diego, Superior Court of California (dated June 24, 2014)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 194); (ii) Clark v. Wells Fargo Bank, see Clark v. Wells Fargo Bank, Case No. 37-2014-00011572, Request for Dismissal, at 5-8, County of San Diego, Superior Court of California (dated June 24, 2014)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 195), and (iii) Mills v. Wells Fargo Bank N.A., see Mills v. Wells Fargo Bank N.A., Case No. 37-2014-00015941, Request for Dismissal, at 9-12, County of San Diego, Superior Court of California (dated June 30, 2014)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 195).

195.    The County of San Diego, Superior Court of California, dismissed: (i) Arce v. Specialized Loan Servicing, LLC,[29] see Arce v. Specialized Loan Servicing, LLC, Case No. 37-2015-00013692, Judgment of Dismissal with Prejudice 13-17, County of San Diego, Superior Court of California (dated March 3, 2016)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 195); (ii) Kennedy v. Bank of America,[30] see Kennedy v. Bank of Am., Case No. 37-2015-00013692, Order of Dismissal, at 26-30, County of San Diego, Superior Court of California (dated May 6, 2016)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 195); (iii) Gardner v.

---

[29]New Mexico consumer Brian Woods was a plaintiff in Arce v. Specialized Loan Servicing, LLC.  See Arce v. Specialized Loan Servicing, LLC, County of San Diego, Superior Court of California, Case No. 37-2015-00013692, Judgment of Dismissal with Prejudice (dated March 3, 2016) at 13.

[30]New Mexico consumer Roberta Marcelli was a plaintiff in the Kennedy case.  See Court Filings Ex. 195, Kennedy v. Bank of Am., County of San Diego, Superior Court of California, Case No. 37-2015-00013692, Order of Dismissal (dated May 6, 2016), at 26.

Bank of America, see Gardner v. Bank of Am., Case No. 37-2014-00013183, Notice of Entry of Judgment at 41-50, County of San Diego, Superior Court of California (filed June 3, 2016)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 195); and (iv) Barnes v. Select Portfolio Servicing, Inc., see Barnes v. Select Portfolio Servicing, Inc., Case No. 37-2015-00013374, Order of Judgment and Dismissal, at 51-71, County of San Diego, Superior Court of California (dated June 3, 2016)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 195).

196.    The Superior Court of California, San Joaquin County dismissed Conrad v. JP Morgan Chase & Co. See Conrad v. JP Morgan Chase & Co., Notice of Dismissal of Coordinated Case and Request for Dismissal at 1-3.

197.    On September 27, 2016, Real Estate Law and Mr. Davis also filed a Request for Dismissal in the Conrad case. See Conrad v. JP Morgan Chase & Co., Request for Dismissal at 4-7.

198.    Real Estate Law and Mr. Davis requested dismissal of White v. Ocwen Financial Corporation, and dismissal was entered on December 28, 2015. See White v. Ocwen Fin. Corp., Request for Dismissal at 1-4.

199.    Real Estate Law and Mr. Davis filed a Request for Dismissal in Barlow v. JP Morgan Chase & Co. and dismissal was entered on December 28, 2015.[31] See Barlow v. JPMorgan Chase & Co., Request for Dismissal at 1-5.

200.    On August 22, 2013, Real Estate Law and Mr. Pratt voluntarily dismissed Acevedo v. JP Morgan Chase Bank. See Acevedo v. JP Morgan Chase Bank, N.A., 2:13-CV-05278-R-

---

[31]New Mexico consumer Julian Mondragon was a plaintiff in Barlow v. JP Morgan Chase & Co. See Barlow v. JPMorgan Chase & Co., Request for Dismissal at 3; Mondragon Emails at 67, 69.

(JCx), Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c) at 254 (filed in C.D. Cal. August 22, 2013)(C.D. Cal. Doc. 10)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11 2019, as New Mexico's Ex. 188).

### j. The Workplace Conflict.

201. Mr. Parwatikar asked Ms. Murphy and Mr. Paul to perform tasks at Real Estate Law that Ms. Murphy and Mr. Paul did not think were right. See July 8 Tr. at 31:11-13 (Murphy); Email from Deepak Parwatikar to Michael Paul at 1-2 (sent April 17, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 16); Email from Paul to Drew Borthwick at 4 (sent April 15, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 16).

202. Ms. Murphy wanted to help clients and to be a good attorney, and she had experienced conflict with Mr. Parwatikar, because she did not agree with Real Estate Law's operations. See July 8 Tr. at 32:5-12 (Murphy); id. at 32:18-20 (Murphy); id. at 32:22-33:2 (Anaya-Allen, Murphy); id. at 33:10-17 (Anaya-Allen, Murphy).

203. At a staff meeting, for instance, Ms. Murphy suggested that Real Estate Law's intake process focus on identifying clients with common actions, but her suggestion was against Real Estate Law's practices, because Real Estate Law's model was to join a client in the mass tort against the client's lender, i.e., if the client's lender was Bank of America, the client would join the mass tort against Bank of America. See July 8 Tr. at 43:5-14 (Murphy).

204. Ms. Murphy saved emails when the emails contradicted what she was told, and the Feb. 13, 2013, Email, see Feb. 13 Email at 1, shows that Mr. Parwatikar was involved with Real Estate Law although he did not want employees to act as if he were involved, see July 8 Tr. at 57:17-58:1 (Anaya-Allen, Murphy).

205.     Real Estate Law terminated Murphy's employment, and Mr. Davis escorted her from Real Estate Law's building.  See July 8 Tr. at 40:6-12 (Anaya-Allen, Murphy).

206.     Mr. Parwatikar told Ms. Murphy that the salesmen called her a "deal-crusher or deal-killer," that she was not a "good girl," and that no one liked her.  July 8 Tr. at 41:2-42:4 (Murphy).

207.     Ms. Murphy testified in the State Bar of California disciplinary proceedings against Mr. Pratt.  See July 8 Tr. at 42:5-12 (Anaya-Allen, Murphy).

208.     Mr. Paul had a conflict with Mr. Parwatikar, because Mr. Paul did not want to sign a letter that Mr. Parwatikar wanted him to sign on Real Estate Law's behalf, because Mr. Paul had not written the letter.  See Email from Deepak Parwatikar to Michael Paul at 1-2; Email from Paul to Drew Borthwick at 4; July 8 Tr. at 99:18-101:8 (Anaya-Allen, Paul).

209.     Mr. Paul left Real Estate Law because Real Estate Law was not acting ethically; it was collecting advance fees, not delivering the services that it promised, not allowing clients to speak with attorneys, and refusing to refund fees, and used the compliance calls as a justification.  See July 8 Tr. at 106:5-15 (Paul); id. at 107:18-21 (Paul).

210.     The Attorney General of California issued a press release about a lawsuit against a law firm like Real Estate Law, and Mr. Paul thought that Real Estate Law did similar work.  See July 8 Tr. at 117:2-10 (Anaya-Allen, Paul).

211.     Mr. Paul made several complaints about Real Estate Law; he contacted the Attorney General, the city attorney,[32] and wrote Mr. Pratt and Mr. Parwatikar directly on June 20, 2013.

---

[32]The July 8 Tr. does not clarify which Attorney General and which city attorney to whom Mr. Paul referred the matter.  The Court assumes that it refers to the Attorney General of California and deems it likely that Mr. Paul referred the complaints to the Los Angeles city attorney, as Real Estate Law's offices were in Los Angeles.

See Email from Michael Paul to Chad Pratt, CC Deepak Parwatikar at 1-2 (sent June 20, 2013)(admitted for non-hearsay purposes July 8, 2019, at Trial as New Mexico's Ex. 18)("June 20 Email"); July 8 Tr. at 106:18-107:6 (Paul).

212.     Mr. Paul wrote a complaint to the State Bar of California in which he expressed the same concerns that he had expressed to Mr. Pratt and Mr. Parwatikar.  See July 8 Tr. at 112:8-19 (Paul).

213.     The day that Mr. Paul left Real Estate Law, Mr. Parwatikar called him into his office about the June 20, 2013, email, and Mr. Paul expressed his concerns with clients paying $3,000.00 or $5,000.00 upfront, and being unable to speak to their attorneys.  See July 8 Tr. at 108:10-16 (Paul).

214.     Mr. Paul informed Mr. Pratt and Mr. Parwatikar that the mass tort cases were not successful and were dismissed, that Real Estate Law required upfront payments, and that clients could not speak to their attorneys.  See July 8 Tr. at 117:18-20 (Anaya-Allen, Paul); id. at 119:15-120:18 (Anaya-Allen, Paul); June 20 Email at 1-2.

215.     Mr. Parwatikar did not express concern about the issues that Mr. Paul raised when they met.  See July 8 Tr. at 108:16-23 (Paul).

216.     The State Bar of California held a proceeding against Mr. Pratt, and Ms. Murphy testified about Mr. Pratt, his interactions with Real Estate Law, and his limited responsibilities at Real Estate Law.  See July 8 Tr. at 42:5-12 (Anaya-Allen, Murphy).

### k. **The Discipline.**

217.     Balanced Legal Group provided loan modification services to consumers in Minnesota. <u>See</u> July 10 Tr. at 638:4-6 (Anaya-Allen, Parwatikar), <u>id.</u> at 649:13-15(Anaya-Allen, Parwatikar).

218.     On November 24, 2010, the State of Minnesota sued Mr. Parwatikar and Balanced Legal for violating Minnesota's law on foreclosure consultants, stated that "states around the country, including Minnesota, have enacted laws to prohibit [foreclosure consultants] from charging fees in advance of their delivery of services," and alleged that Balanced Legal did not provide multiple consumer protection notices that Minnesota Law requires. <u>Minn. v. Balanced Legal Group</u>, No. 27-CV-10-27052, Complaint ¶ 8, (filed in County of Hennepin, Fourth Judicial District, State of Minnesota, January 6, 2012)(admitted, for notice and not the truth of the matters asserted, July 10, 2019, at Trial as New Mexico's Ex. 193). <u>See</u> July 10 Tr. at 638:23-639:6; <u>Minn. v. Balanced Legal Group</u>, Complaint at ¶¶ 8-17. <u>See</u> <u>also</u> Solomon Depo. at 79:1-7.

219.     Arzakanyan served the Answer and signed the Affidavit of Service on Balanced Legal's and Mr. Parwatikar's behalf in <u>Minnesota v. Balanced Legal Group</u>. <u>See</u> <u>Minn. v. Balanced Legal Group</u>, No. 27-CV-10-27052, Affidavit of Service at 503 (County of Hennepin, Fourth Judicial District, State of Minnesota, dated December 21, 2010)(admitted July 10, 2019, at Trial as New Mexico's Ex. 235)("<u>Minn. v. Balanced Legal Group</u>, Affidavit of Service"); July 10 Tr. at 724:5-15 (Anaya-Allen, Parwatikar).

220.     Balanced Legal Group and Mr. Parwatikar entered a Consent Judgment with Minnesota on December 15, 2011. <u>See</u> July 10 Tr. at 643:19-21 (Court); <u>Minn. v. Balanced Legal Group</u>, No. 27-CV-10-27052, Consent Judgment, at 1-7 (County of Hennepin, Fourth Judicial

District, State of Minnesota, January 6, 2012)(admitted, for notice and not for the truth of the matters asserted, July 10, 2019, at Trial as New Mexico's Ex. 193).

221.    The Consent Judgment provides for eighteen consecutive monthly payments of $625.00 beginning on February 15, 2012.  <u>See</u> Consent Judgment at 5.

222.    Solomon received a payment of $625.00 from Pinnacle Law dated April 12, 2012, with the memo "State of MN."  Check from Pinnacle Law Center, PC to Angelina Solomon at 216 (dated April 12, 2012)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 146).  <u>See</u> Solomon Depo. at 78:7-19.

223.    The State Bar of California suspended Mr. Pratt, and Mr. Parwatikar knew that the State Bar of California had suspended Mr. Pratt.  <u>See</u> July 10 Tr. at 674:19-22 (Anaya-Allen, Parwatikar).

224.    The State Bar of California disciplined Mr. Pratt and Mr. Davis for activities related to Real Estate Law.  <u>See</u> July 11 Tr. at 813:4-6 (Anaya-Allen, Parwatikar).

225.    The Organization Meeting Minutes that Mr. Pratt and Mr. Davis signed when Mr. Davis took over Real Estate Law reflect that Pratt had informed Mr. Davis of:

1.      Existing complaints from regulatory bodies, including the State Bar of California

2.      Any potential complaints from regulatory bodies, including the State Bar of California

3.      Complaint to the State Bar filed by a previous compliance attorney, Michael Paul

4.      Violations of State Bar of California's Rules of Professional Conduct

5.      Existing lawsuits filed against the corporation, including those filed in small claims court

6.      Any potential lawsuits against the corporation

7. Existing and potential refund requests from clients

Organizational Meeting Minutes and Minutes of Special Meeting at 5-6. See July 11 Tr. at 822:5-7 (Anaya-Allen, Parwatikar).

226. The Honorable Manuel Real, then- United States District Judge for the United States District Court for the Central District of California, sanctioned Real Estate Law on June 11, 2014, awarding $126,400.00 for the "frivolous nature of the Complaint, the blatant misjoinder of Plaintiffs, and Plaintiff's counsel's voluntary dismissal of the case to avoid an adverse ruling." Alexander v. Wells Fargo Bank, Case No. 2:14-cv-01303-R-CW, Order Granting in Part and Denying in Part Wells Fargo's Motion for Attorneys' Fees at 3-7 (filed in C.D.C., June 11, 2014) (admitted July 11, 2019, at Trial as New Mexico's Ex. 160).

227. Real Estate Law was ordered to pay Wells Fargo Bank ("Wells Fargo") $227,251.00. See Arzakanyan Depo. at 73:2-6. See also Arzakanyan Depo. at 72:22-24 (reflecting that Wells Fargo Bank received a judgment of $126,524.80 against Real Estate Law[33]); Solomon Depo. at 120:24-121:8 (reflecting that Mr. Davis instructed Solomon to wire transfer a very large amount of money to Wells Fargo for a court-ordered sanctioned).

228. Mr. Parwatikar was aware that a California federal court sanctioned Real Estate Law and Mr. Davis with a substantial financial sanction. See July 10 Tr. at 740:7-18 (Anaya-Allen, Parwatikar).

229. The State of Connecticut Department of Banking entered a Consent Order with Real Estate Law, issuing a March 2, 2015, Temporary Order to Cease and Desist, Order to Make

---

[33]The Court notes that the $126,524.80 is the $126,400.00 with interest. See Alexander v. Wells Fargo Bank, United States District Court for the Central District of California, Case No. 2:14-cv-01303-R-CW, Writ of Execution, filed in the United States District Court for the Central District of California July 29, 2014, at 261 (C.D. Cal. 2:14-cv-01303-R-CW, Doc. 41) (admitted as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11 2019, as New Mexico's Ex. 188).

Restitution, Notice of Intent to Issue Order to Cease and Desist Notice of Intent to Impose Civil Penalty and Notice of Right to Hearing against Real Estate Law. See In the Matter of: Real Estate Law Center, P.C., Consent Order at 1-2, State of Connecticut Department of Banking (dated May 19, 2015)(admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 160)("Consent Order").

230.    The Connecticut Department of Banking charged Real Estate Law with offering to engage in debt negotiation without obtaining a required license, and Mr. Davis entered the Consent Order on Real Estate Law's behalf and agreed to pay restitution and to stop offering debt negotiation services in Connecticut. See Consent Order at 1-2.

231.    The Supreme Court of California filed an order on August 22, 2017, disbarring Mr. Davis and ordering him to pay restitution. See In re Erikson McDonnell Mr. Davis, Case No. 16-O-13378, Order at 1-2 (filed in the Supreme Court of California, August 22, 2017)(admitted only as to Real Estate Law and Mr. Davis July 11, 2019, at Trial as New Mexico's Ex. 191).

232.    Mr. Davis entered the In the Matter of: Erikson McDonnell Mr. Davis, Case No. 16-O-13378, Stipulation re: Facts, Conclusions of Law and Disposition and Order Approving, Order of Involuntary Inactive Enrollment, Disbarment (filed in State Bar Ct. Cal. April 17, 2017)(admitted only as to Real Estate Law and Mr. Davis July 11, 2019, at Trial as New Mexico's Ex. 191)("Mr. Davis Stipulation"). See Mr. Davis Stipulation at 3-18.

233.    Mr. Davis admits that: (i) between September 26, 2013, and January 5, 2017, he owned Real Estate Law Center, see Mr. Davis Stipulation at 8; (ii)

> RELC (i) obtained clients through advertising using mail, television, and the internet; (ii) utilized non-attorney staff to meet with prospective clients; (iii) attempted to assist its clients in obtaining loan modifications by challenging the practices of their lenders and/or service providers; and (iv) used mass joinder lawsuits and individual lawsuits in an attempt to achieve loan modification goals;

Mr. Davis Stipulation at 8; (iii) "[t]he RELC fee agreements required the complainants to pay RELC an advanced fee," Mr. Davis Stipulation at 8; (iv) Real Estate Law filed mass joinder lawsuits with the "ultimate purpose of attempting to obtain a modification of [consumers'] respective home loans," Mr. Davis Stipulation at 9; and (v) Real Estate Law did not provide a written statement that California law requires, see Mr. Davis Stipulation at 10.

234. The State Bar Court of California entered Conclusions of Law, to which Mr. Davis agreed, and which include that: (i) by "failing to adequately supervise non-attorney staff, which inadequate supervision allowed the non-attorney staff . . . to represent to the complainants that RELC would represent them in litigation . . . for an advanced fee, [Mr. Davis] repeatedly failed to perform competently in willful violation of Rules of Professional Conduct";

(ii) by "[c]ollecting fees . . . for RELC's loan modification services before RELC had fully performed each and every service," Mr. Davis willfully violated California law; and (iii) by "breach[ing] his fiduciary duty to the complainants," Mr. Davis "committed acts of moral turpitude in willful violation" of California Law.  Mr. Davis Stipulation at 11.

235. The State Bar Court of California found several aggravated circumstances, to which Mr. Davis agreed, including: (i) a prior record of discipline for collecting between October, 2013, and September, 2015, advanced fees for legal services, including for the filing of lawsuits against home lenders for the purposes of obtaining loan modifications; (ii) multiple acts of wrongdoing, including collecting $173,760.89 in advance fees from nineteen former clients in approximately a three-year period; (iii) dishonesty and overreaching for including language in the fee agreements which states that the advance fees are a "true retainer" and non-refundable to ensure that Real Estate Law worked "exclusively" on the consumers' matters; and (iv) significant harm to clients

by exploiting their financial difficulties and not providing refunds. Mr. Davis Stipulation at 12.
See id. at 11-12.

236.    The State Bar Court of California recommended that the Supreme Court of California discipline Mr. Davis. See Mr. Davis Stipulation at 17.

### 2.    The New Mexico Consumers.

237.    Mr. Pratt wrote the attorney-client fee agreements that Real Estate Law used during his time at Real Estate Law. See Notice of Motion, Motion to Dismiss for Improper Venue and/or In the Alternative Transfer to Los Angeles; Declaration of Pratt ¶ 19, at 14 (filed March 14, 2019)(Doc. 113).

238.    Real Estate Law used different attorney-client fee agreements during the time period at issue. Compare Ward Attorney-Client Fee Agreement at 1-3, with Mondragon Attorney-Client Fee Agreement at 1-3 (executed January 7, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 107)("Mondragon Attorney-Client Fee Agreement").

239.    The attorney-client fee agreements follow, however, the same general pattern. Compare Ward Attorney-Client Fee Agreement at 1-3, with Mondragon Attorney-Client Fee Agreement at 1-3.

240.    The Court discusses below sixteen individuals who owned and occupied property in New Mexico during the time period at issue.[34]

---

[34]The Court will not disregard all "individual claimants" as Mr. Pratt requests. See Pratt's Proposed Findings at 1. The Court concluded in its Memorandum Opinion and Order, filed July 11, 2019 (Doc. 193)("MIL MOO"), that exclusion of evidence of the New Mexico consumers is not appropriate. See MIL MOO at 43-49. The Court does not here reach a different conclusion. Additionally, Mr. Pratt's complaints about New Mexico's representation of the New Mexico consumers do not persuade the Court. New Mexico does not represent the New Mexico consumers. New Mexico brings this suit on its own behalf, as the MARS Rule and the MFCFPA permit. See 12 U.S.C. § 5538(b)(1); N.M. Stat. Ann. §§ 47-15-7(A), (E), 57-12-8(A).

a.    **Linda Ward**.

241.    Ward owns and occupies, as a principal place of residence, a home at 1016 Desert

Willow Court, Bernalillo, New Mexico, and has for twelve years.  See July 8 Tr. at 127:2-8

(Anaya-Allen, Ward).[35]

242.    Ward had trouble making her mortgage payments after a fall in the real estate

market and a loss of income.  See July 8 Tr. at 127:9-17 (Anaya-Allen, Ward).

243.    Ward attempted to refinance but was unsuccessful.  See July 8 Tr. at 127:18-22

(Anaya-Allen, Ward).

244.    Ward learned about Real Estate Law through marketing materials that she received

about a lawsuit against Bank of America.  See July 8 Tr. at 127:25-128:8 (Anaya-Allen, Ward).

245.    Ward decided to visit Los Angeles and meet with Brian Suder in Real Estate Law's

Litigation Compliance.  See July 8 Tr. at 130:7-14 (Anaya-Allen, Ward); id. at 130:22-25 (Ward).

246.    Ward wanted to meet the Real Estate Law attorneys, but she could not do so.  See

July 8 Tr. at 132:7-13 (Anaya-Allen, Ward).[36]

---

[35]The Court concludes that, more likely than not, when Ward testifies to owning a home for the past twelve years, she means that she owned and occupied that home.  In the Court's experience, the word "home" more often than not refers to a building in which one lives.  Ward testified to being a retired realtor, to having attended two years of college and to having owned one home.  See July 8 Tr. at 126:17-127:3 (Anaya-Allen, Ward).  Given these facts, the Court decides that more likely than not Ward's testimony refers to a home that she occupied and continues to occupy.  The Court does not, therefore, adopt the Defendants' proposed findings ¶¶ 5-6, at 2-3, as they apply to Ward.  The Court notes additionally that it does not adopt verbatim the Defendants' Proposed Findings ¶¶ 5-6, at 2-3.  The Court will address these proposed findings regarding the New Mexico consumers' occupancies of their property and current residences as the Court discusses each New Mexico consumer.

[36]New Mexico's Proposed Findings state that Ward wanted to meet with the attorneys and see their offices.  See New Mexico's Proposed Findings ¶ 256, at 34.  The Court does not see evidence of Ward wanting to see their offices, so the Court excludes this portion from its Findings of Fact.

247.    Ward signed an Attorney-Client Fee Agreement with Real Estate Law Center on August 9, 2012, which provides for a non-refundable one-time retainer fee of $5,000.00, monthly fees of $29.95, and that Pinnacle Law Center would receive eighty percent of the fees.  See Ward Attorney-Client Fee Agreement ¶¶ 4, 10, at 1-3.

248.    The Ward Attorney-Client Fee Agreement also provides that Real Estate Law will receive a thirty-percent contingency fee.  See Ward Attorney-Client Fee Agreement ¶ 4, at 2.

249.    The Ward Attorney-Client Fee Agreement states: "Client is hiring RELC to represent client in LITIGATION AGAINST THEIR MORTGAGE LENDER CONCERNING THEIR REAL ESTATE PROPERTY."  Ward Attorney-Client Fee Agreement ¶ 2, at 1 (bold omitted).[37]

250.    The Ward Attorney-Client Fee Agreement provides that, although the client resides outside California, all litigation will be filed in California county or federal courts, and that Real Estate Law's attorneys are California-licensed.  See Ward Attorney-Client Fee Agreement ¶ 2, at 1.

---

[37]The Defendants propose the factual finding: "Although RELC utilized different Attorney-Client Fee Agreements over time -- first, an agreement authored by Defendant Pratt, and at least one different agreement beginning in 2013 -- the agreements generally describe the scope of RELC's service as 'litigation against [the clients'] mortgage lender[s] concerning their real estate property.'"  Parwatikar Defs.' Proposed Findings ¶ 16, at 6 (quoting e.g. Ward Retainer Agreement, Ex. 20).  The Defendants also propose the factual finding: "The attorney-client fee agreements between RELC and the consumers did not offer to assist with mortgage relief or stop any foreclosures; they were limited to representation in litigation against mortgage lenders for fraudulent or predatory practices."  Parwatikar Defs.' Proposed Findings ¶ 9, at 4.  Rather than incorporate these findings as applicable to all New Mexico consumers, the Court divides these findings among the New Mexico consumers and their relevant attorney-client fee agreements.  The attorney-client fee agreements do not all reflect that the litigation was for fraudulent or predatory practices, and the Court, instead of adopting the language of the Defendants' second proposed finding quoted above, quotes the respective attorney-client fee agreements' language.

251.    The Ward Attorney-Client Fee Agreements provides for two-tenths of the retainer fee for Real Estate Law and the remainder to go to Pinnacle Law, and states: "Client is not retaining PLC nor is PLC a litigation firm.  PLC is only involved in referring clients to RELC."  Ward Attorney-Client Fee Agreement ¶ 10, at 3.

252.    The Ward Attorney-Client Fee Agreement provides: "The agreement shall be governed in accordance with the laws of the State of California.  Venue shall be Los Angeles County."  Ward Attorney-Client Fee Agreement ¶ 12, at 3.

253.    The Ward Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that Ward signed the Ward Attorney-Client Fee Agreement.  See Ward Attorney-Client Fee Agreement at 1.

254.    Real Estate Law did not provide required notices to Ward, including the Notice Required by New Mexico Law, the Notice of Rescission Rights, and the Rescission of Contract Form.[38]  See July 8 Tr. at 136:3-16 (Anaya-Allen, Ward); Ward Attorney-Client Fee Agreement at 1-3.

255.    Ward paid the $5,000.00 retainer fee and the monthly maintenance fees for a year.  See July 8 Tr. at 134:8-12 (Anaya-Allen, Ward); id. at 156:14-16 (Anaya-Allen, Ward).[39]

---

[38]As the MFCPFA requires that the Notice Required by New Mexico Law be placed in proximity to "the space reserved for the owner's signature," the Court concludes that, where the attorney-client fee agreements do not include that notice by the place for the owner's signature, Real Estate Law did not provide the notice.  N.M. Stat. Ann. § 47-15-3(A)(7).  As the MFCFPA requires that the Notice of Rescission Rights and the Rescission of Contract Form be attached to the contract, the Court concludes by a preponderance of the evidence that, where the attorney-client fee agreements do not include a Notice of Rescission Rights and a Rescission of Contract Form, Real Estate Law did not provide those items.  See N.M. Stat. Ann. § 47-15-3(C).

[39]The Court removes the word "over" from New Mexico's Proposed Findings, because Ward states that she paid the amount for a year.  New Mexico's Proposed Findings ¶ 263, at 35; July 8 Tr. at 156:14-16 (Anaya-Allen, Ward).  The Court also does not adopt Mr. Pratt's proposed

256.    Ward paid Real Estate Law a total of $5,359.40.

257.    At this time, Ward's property was not in foreclosure.  Cf. July 8 Tr. at 164:2-10 (Kennedy, Ward)(explaining that Ward received a foreclosure notice after retaining Real Estate Law).

258.    Ward understood that Real Estate Law was suing Bank of America and Real Estate Law communicated to her that she was a participant in the lawsuit.  See July 8 Tr. at 128:4-8 (Anaya-Allen, Ward); id. at 141:25:142:4 (Anaya-Allen, Ward).[40]

259.    Bank of America confirmed with Ward that Mr. Pratt was authorized to discuss her mortgage with them.  See July 8 Tr. at 134:19-135:5 (Anaya-Allen, Ward).

260.    Ward expected litigation services from Real Estate Law and did not know that they would contact her bank on her behalf.  See July 8 Tr. at 135:6-20 (Anaya-Allen, Ward); Letter from Bank of America to Linda S. Ward at 1 (dated October 1, 2012)(admitted July 8, 2018, at Trial as New Mexico's Ex. 21)("Ward Oct. 1 Letter")(stating that Mr. Pratt is authorized to act as a third party on Ward's home loan account).

---

finding that no evidence shows that Ward paid Real Estate Law.  See Pratt's Proposed Findings ¶ 11, at 3.  The Court considers credible Ward's assertion that she paid Real Estate Law.

[40]The Court does not adopt verbatim the Defendants' proposed finding that consumers "retained RELC to file lawsuits against their mortgage lenders for predatory practices and other violations" "[a]s described in the attorney-client fee agreements."  Parwatikar Defs.' Proposed Findings ¶ 10, at 5.  The Court recounts for each New Mexico consumer the language that the attorney-client fee agreement contains regarding the retainers' purposes.  Moreover, as discussed through the Findings of Fact and the Conclusions of Law, the Court concludes that the New Mexico consumers understood that Real Estate Law filed lawsuits against their lenders, but that they also understood that Real Estate Law would achieve other loan modification and foreclosure assistance goals.

261.     In May 2012, Ward returned financial documents to sam@balancedlegalgroup.com for help with foreclosure defense.  See Email from Linda Ward to Sam Branco  at 1 (sent March 7, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 30)("Ward FDD March 7 Email").

262.     On September 27, 2012, Real Estate Law told Ward to complete an FDD package and to submit the package and notices of default or sale that she had received form her lender.  See Email from Real Estate Law to Linda Ward  at 2 (sent September 27, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 22)("Ward Sept. 27 Email").

263.     Ward recognized the FDD package to contain loan modification materials, because she previously applied to Bank of America for a loan modification.  See July 8 Tr. at 137:18-22 (Anaya-Allen, Ward).

264.     Real Estate Law automatically sent Ward loan modification documents -- an FDD package -- although she did not hire Real Estate Law for loan modification assistance.  See July 8 Tr. at 136:17-137:22 (Anaya-Allen, Ward); id. at 138:19-23 (Ward); id. at 139:10-13 (Anaya-Allen, Ward); Ward Sept. 27 Email at 2.

265.     In November, 2012, Real Estate Law sent Ward information about Armstrong v. Bank of America, a mass joinder lawsuit in which Real Estate Law named her as a plaintiff and asked Ward to return a verification.  See Email from Gerardo Lopez to Linda Ward at 1-2 (sent November 12, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 24)("Ward Nov. 12 Email").

266.     Real Estate Law sent Ward a copy of the Armstrong v. Bank of America complaint. See July 8 Tr. at 140:22-24 (Ward).[41]

---

[41]The Parwatikar Defendants propose a finding that "the client received updates on the progress of their cases."  Parwatikar Defs.' Proposed Findings ¶ 21, at 8.  The Court agrees with

267.     Real Estate Law filed <u>Armstrong v. Bank of America</u>, and Ward signed a verification for the lawsuit, but never learned of the lawsuit's outcome.  <u>See</u> July 8 Tr. at 151:9-152:9 (Anaya-Allen, Ward); <u>id.</u> at 152:10-18 (Anaya-Allen, Ward); Ward Nov. 12 Email at 1-2; Email from Linda Ward to Gerardo Lopez  at 3 (sent November 12, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 24); Email from Erma Rodriguez to Linda Ward  at 1 (sent August 7, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 32).

268.     Real Estate Law promised that it would help Ward with her foreclosure, and, in January 2013, she sent Real Estate Law her foreclosure notice.  <u>See</u> July 8 Tr. at 143:15-22 (Ward, Anaya-Allen); <u>id.</u> at 167:22-23 (Ward); <u>id.</u> at 169:21-25 (Anaya-Allen, Ward); Email from Linda Ward to Real Estate Law at 2 (sent January 15, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 26).

269.     Real Estate Law directed Ward to obtain local counsel in New Mexico to help with the foreclosure proceedings, <u>see</u> July 8 Tr. at 143:23-144:15 (Anaya-Allen, Ward); Email from Real Estate Law to Linda Ward  at 3 (sent January 15, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 26)("Ward Foreclosure Jan. 15 Email"),[42] but offered that it could help "negotiate Payment stabilization" and complete an FDD package to postpone the sale, <u>see</u> Ward Foreclosure Jan. 15 Email at 3; Email from Tutu Gill to Linda Ward at 1-2 (sent January 15, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 27)("Ward FDD Jan. 15 Email").

---

this statement, but the Court chooses to incorporate the statement into its recounting of each New Mexico consumer's experiences.

[42]The Court does not adopt verbatim the Parwatikar Defendants' proposed findings: "RELC employees encouraged clients to seek local counsel if they had received a foreclosure complaint.  Several of the witnesses testified that they did have local counsel."  Parwatikar Defs.' Proposed Findings ¶ 25, at 9.  The Court incorporates, rather, the factual basis for the proposed finding throughout its discussion of the New Mexico consumers.

270. Real Estate Law repeatedly sent Ward FDD packages, and, in January 2013, sent her another FDD package to complete. See July 8 Tr. at 138:19-23 (Ward); id. at 150:1-5 (Anaya-Allen, Ward); id. at 147:17-148:2 (Anaya-Allen, Ward); Ward FDD March 7 Email at 1.

271. Ashley Hanu, at Real Estate Law, provided Ward advice on proceeding in the local court in New Mexico and indicated that Ward should file a response with information about the pending litigation against Bank of America. See Email from Ashley Hanu to Linda Ward at 1 (sent January 16, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 28)("Ward Advice Jan. 16 Email").

272. Ward was a plaintiff in Aghaji v. Bank of America. See Email from Ward to Ashley Hanu at 1 (sent April 3, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 31); Email from Ashley Hanu to Linda Ward at 2 (sent April 4, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 31)("Ward Apr. 4 Email"); Email from Erma Rodriguez to Linda Ward at 1-2 (sent August 7, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 32)("Ward Aug. 7 Email"); Email from Linda Ward to Erma Rodriguez at 2 (sent October 1, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 32)("Ward Oct. 1 Email"); Email from Real Estate Law to Linda Ward at 1-2 (sent June 16, 2014)(admitted July 8, 2019, at Trial as New Mexico's Ex. 33 ("Ward Aghaji Update Email"); July 8 Tr. at 152:10-153:2 (Anaya-Allen, Ward); id. at 153:10-154:11 (Anaya-Allen, Ward).

273. In October, 2013, Real Estate Law filed an amended complaint in Aghaji and asked Ward to provide a signed certification to Real Estate Law to file. See Ward Aug. 7 Email at 2; Ward Oct. 1 Email at 2.

274. On October 17, 2014, Real Estate Law informed Ward that an October 9, 2014, hearing in Aghaji v. Bank of America resulted in a ruling that the claims are invalid and asked her

for an additional $50.00 per month for an appeal.  <u>See</u> Ward <u>Aghaji</u> Update Email at 1-2; Email

from Tutu Gill to Linda Ward  at 1-2 (sent October 17, 2014)(admitted July 8, 2019, at Trial as

New Mexico's Ex. 34)("Ward Oct. 17 Email"); July 8 Tr. at 155:1-156:8 (Ward).

274.    Ward hired a New Mexico attorney to save her home.  <u>See</u> July 8 Tr. at 157:19-25

(Anaya-Allen, Ward); <u>id.</u> at 164:23-165:23 (Ward, Kennedy).

276.    Real Estate Law provided Ward no assistance with her mortgage issues.  <u>See</u> July

8 Tr. at 157:16-18 (Anaya-Allen, Ward).

277.    Ward ultimately saved her home through the assistance of another attorney to which

Real Estate Law referred her.  <u>See</u> July 8 Tr. at 157:19-25 (Anaya-Allen, Ward).

278.    Email correspondence that Ward received from Real Estate Law on September 27,

2012, October 15, 2012, November 8, 2012, November 12, 2012, January 15, 2013, April 4, 2013,

June 16, 2014, and October 17, 2014, did not contain MARS Rule disclosures or any disclaimer.[43]

---

[43]The MARS Rule requires specific disclosures in consumer-specific communications:

(b)    Disclosures in All Consumer-Specific Commercial Communications -- Failing to disclose the following information in every consumer-specific commercial communication for any mortgage assistance relief service:

(1)    "You may stop doing business with us at any time.  You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer].  If you reject the offer, you do not have to pay us.  If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services."  For the purposes of this paragraph (b)(1), the amount "you will have to pay" shall consist of the total amount the consumer must pay to purchase, receive, and use all of the mortgage assistance relief services that are the subject of the sales offer, including, but not limited to, all fees and charges.

(2)    "(Name of company) is not associated with the government, and our service is not approved by the government or your lender."

See Ward Sept. 27 Email at 2; Email from Real Estate Law to Linda Ward at 7 (sent October 15, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 22); Email from Real Estate Law to

---

(3)    In cases where the mortgage assistance relief service provider has represented, expressly or by implication, that consumers will receive any service or result set forth in paragraphs (2) through (6) of the definition of Mortgage Assistance Relief Service in § 1015.2, "Even if you accept this offer and use our service, your lender may not agree to change your loan."

(4)    The disclosures required by this paragraph must be made in a clear and prominent manner, and --

    (i)    In textual communications the disclosures must appear together and be preceded by the heading "IMPORTANT NOTICE," which must be in bold face font that is two point-type larger than the font size of the required disclosures; and

    (ii)    In communications disseminated orally or through audible means, wholly or in part, the audio component of the required disclosures must be preceded by the statement "Before using this service, consider the following information" and, in telephone communications, must be made at the beginning of the call.

(c)    Disclosures in All General Commercial Communications, Consumer-Specific Commercial Communications, and Other Communications -- In cases where the mortgage assistance relief service provider has represented, expressly or by implication, in connection with the advertising, marketing, promotion, offering for sale, sale, or performance of any mortgage assistance relief service, that the consumer should temporarily or permanently discontinue payments, in whole or in part, on a dwelling loan, failing to disclose, clearly and prominently, and in close proximity to any such representation that "If you stop paying your mortgage, you could lose your home and damage your credit rating."

12 C.F.R. § 1015.4.  The Court will hereinafter refer to these disclosures as specific MARS Rule disclosures.  In noting in the Findings of Fact that a communication does not include the specific MARS Rule disclosures, the Court is concluding as a factual matter that the communication does not contain the above-quoted disclosure language and is not reaching a conclusion of law.

Linda Ward at 2 (sent November 8, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 23); Email from Real Estate Law to Linda Ward at 3 (sent November 12, 2012); Ward Apr. 4 Email at 2; Ward Aghaji Update Email at 1-2; Ward Oct. 17 Email at 1-2.

279.    On November 12, 2012, the email that Ward received as part of the Bank of America Plaintiffs had a disclaimer, but not a specific MARS Rule disclosure:

> Please be aware that filing a Mass Tort Complaint against your lender in and of itself will not stop the foreclosure process or prevent a trustee sale of your property.  Also, if your property has been sold due to the foreclosure process, and/or you have a pending Unlawful Detainer, and/or a Notice to Vacate, Mass Tort Litigation may not prevent legal action against you.

Ward Nov. 12 Email at 2.[44]

280.    Emails from January 14, 2013, January 15, 2013, January 16, 2013, August 7, 2013, and October 1, 2013, contain the same disclosure.  See Email from Ashley Hanu to Linda Ward at 1 (sent January 14, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 26); Ward FDD Jan. 15 Email; Ward Advice Jan. 16 Email at 1-2; Ward Aug. 7 Email at 1-2; Email from Erma Rodriguez to Linda Ward at 1 (sent October 1, 2013).

### b.      Larry Madrid and Mary Lou Madrid.

281.    L. Madrid and his wife, M. Madrid, lived in, as a principal place of residence, a home at 8807 Menaul Boulevard, NE in Albuquerque until approximately 2013.  See July 8 Tr. at 173:5-14 (Anaya-Allen, L. Madrid); id. at 194:6-7 (L. Madrid).

282.    The current residence of L. Madrid and M. Madrid is unclear.

---

[44]The Court does not adopt the Parwatikar Defendants' proposed finding "RELC did not guarantee any results from their litigation against mortgage lenders, informing clients that filing a complaint 'will not stop the foreclosure process.'"  Parwatikar Defs.' Proposed Findings ¶ 24, at 9.  The Court incorporates Real Estate Law's statement throughout its discussions of the New Mexico consumers and of the emails that contain the quoted disclosure.

283.    L. Madrid and M. Madrid had difficulty paying their monthly mortgage after M. Madrid lost her job.  See July 8 Tr. at 173:18-21 (Anaya-Allen, L. Madrid); id. at 207:10-11 (Giandomenico, M. Madrid); id. at 207:23-25 (Giandomenico, M. Madrid).

284.    L. Madrid and M. Madrid tried unsuccessfully to modify their loan on their own with JP Morgan Chase & Co. (" JP Morgan Chase").  July 8 Tr. at 173:24-174:4 (L. Madrid).

285.    Real Estate Law contacted the Madrids and told them that it could help get their mortgage on track and reduce their monthly payments.  See July 8 Tr. at 174:13-15 (Anaya-Allen, L. Madrid).

286.    In October, 2012, L. Madrid completed the PreApproval Intake Form for Real Estate Law and explained the problems that he had with his home mortgage.  See PreApproval Intake Form at 1-2 (undated)(admitted July 8, 2019, at Trial as New Mexico's Ex. 35)("Madrid Real Estate Law Application").

287.    At this time, L. Madrid and M. Madrid's home was not in foreclosure.  See July 8 Tr. at 191:19-25 (Anaya-Allen, Madrid)(reflecting that L. Madrid conveyed foreclosure documents to Real Estate Law).

288.    Real Estate Law conducted a compliance call on October 18, 2012, and told L. Madrid to answer only "yes" or "no."  Madrid Compliance Call at 2:30-3:00.

289.    Real Estate Law also told L. Madrid that it did not guarantee that the lawsuit would delay or stop a foreclosure, and that, if a foreclosure sale date was scheduled, Real Estate Law could not get an order from the judge or an agreement from the lender to stop the sale from going through, and that L. Madrid would need to take legal action outside the lawsuit to stop the foreclosure.  See Madrid Compliance Call at 7:20-8:02.

290. During the compliance call, L. Madrid expressed his understanding that Real Estate Law would help him with a loan modification. See Madrid Compliance Call at 2:00-2:30,

291. Real Estate Law also told Madrid that it would help him stop JP Morgan Chase from taking his home with the FDD. See Madrid Compliance Call at 5:00-6:30.

292. L. Madrid expected Real Estate Law to contact his bank, to redo his mortgage, and to lower his monthly payments, and that he would not lose his home. See July 8 Tr. at 185:11-15 (L. Madrid); id. at 195:13-24 (Kennedy, L. Madrid); id. at 209:4-8 (L. Madrid); Letter of Authorization at 4 (dated October 16, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 41).

293. L. Madrid and Real Estate Law entered into an Attorney-Client Fee Agreement, which L. Madrid signed on October 16, 2012, and which provides for a nonrefundable one-time retainer fee of $5,000.00 and a monthly fee of $29.95. See July 8 Tr. at 176:25-177:13 (Anaya-Allen, L. Madrid); Madrid Attorney-Client Fee Agreement ¶ 4, at 1-2; id. at 3.

294. The Madrid Attorney-Client Fee Agreement also provides that Real Estate Law will receive a thirty-percent contingency fee. See Madrid Attorney-Client Fee Agreement ¶ 4, at 2.

295. The Madrid Attorney-Client Fee Agreement states that Real Estate Law would represent L. Madrid in "LITIGATION AGAINST THEIR MORTGAGE LENDER CONCERNING THEIR REAL ESTATE PROPERTY." Madrid Attorney-Client Fee Agreement, ¶ 2, at 1.

296. The Madrid Attorney-Client Fee Agreement provides that Real Estate Law maintains only attorneys admitted to the State Bar of California and that they only practice in California. See Madrid Attorney-Client Fee Agreement ¶ 2, at 1.

297.     The Madrid Attorney-Client Fee Agreement provides that Pinnacle Law will receive eighty percent of the retainer fee.  See Madrid Attorney-Client Fee Agreement ¶ 10, at 2-3.

298.     The Madrid Attorney-Client Fee Agreement states: "PLC is a separate law firm not related to RELC.  Client is not retaining PLC."  Madrid Attorney-Client Fee Agreement ¶ 10, at 3.

299.     The Madrid Attorney-Client Fee Agreement provides: "The agreement shall be governed in accordance with the laws of the State of California.  Venue shall be Los Angeles County."  Madrid Attorney-Client Fee Agreement ¶ 12, at 3.

300.     Mr. Pratt signed the Madrid Attorney-Client Fee Agreement on October 29, 2012. See July 8 Tr. at 177:24-178:6 (Anaya-Allen, Madrid); Madrid Attorney-Client Fee Agreement at 3.

301.     The Madrid Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that L. Madrid signed the Madrid Attorney-Client Fee Agreement.  See Madrid Attorney-Client Fee Agreement at 1.

302.     Real Estate Law did not provide L. Madrid a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract Form.  See July 8 Tr. at 178:25-15 (Anaya-Allen, L. Madrid); id. at 179:23-180:2 (Anaya-Allen, L. Madrid); Madrid Attorney-Client Fee Agreement at 1-3.

303.     L. Madrid and M. Madrid paid Real Estate Law $5,000.00 in five monthly payments starting the month that they signed with Real Estate Law.  See E-Check Scheduled

Payment Authorization Form at 1-2 (dated December 17, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 41); July 8 Tr. at 181:15-20 (L. Madrid); id. at 210:1-4 (M. Madrid).[45]

304.    L. Madrid and M. Madrid also paid $29.95 per month to Real Estate Law for around seven or eight months.  See July 8 Tr. at 189:22-190:5 (Anaya-Allen, L. Madrid); id. at 210:5-211:18 (Giandomenico, M. Madrid); E-Check Payment Authorization for Monthly Maintenance Fee at 3 (dated February 19, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 41); Letter of Authorization at 4; Email from    by Telephone to Larry Madrid at 1 (sent May 16, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 47); Madrid Bank of Albuquerque Records, at 6 (undated)(admitted July 8, 2019, at Trial as New Mexico's Ex. 51).

305.    L. Madrid and M. Madrid paid Real Estate Law a total of $5,209.65 to $5,239.60. Parwatikar Defs.' Proposed Findings ¶ 14, at 5.

306.    Real Estate Law returned the executed Madrid Attorney-Client Fee Agreement to L. Madrid with a package of documents that included a letter from Mr. Pratt, a statement "Together, We are a Team," "Do's and Don'ts," and "A Brief Outline of a Lawsuit," none of which included specific MARS Rule disclosures, or any disclosure about what happens if a homeowner stops paying a mortgage or about New Mexico law.  See Madrid Real Estate Law Welcome Documents at 1-4 (undated)(admitted July 8, 2019, at Trial as New Mexico's Ex. 38).

307.    In the Letter from Pratt, Mr. Pratt states that Real Estate Law is a "powerhouse law firm" and that Mr. Pratt has had "numerous victories against lenders."  Real Estate Law Welcome Documents at 1.

---

[45]The Court does not adopt Mr. Pratt's proposed finding that no evidence shows that L. Madrid and M. Madrid paid Real Estate Law.  See Pratt's Proposed Findings ¶ 4, at 3.  The Court considers credible L. Madrid's assertion that he paid Real Estate Law.

308.     The "Together, We are a Team" document explains that the FDD uses many strategies to postpone sale dates, directs homeowners to send communications from the lenders' legal department "immediately" to the FDD.  Real Estate Law Welcome Documents at 2.

309.     The "Do's and Don'ts" document instructs the homeowner to pay his or her mortgage if he or she can afford it, tells the homeowner not to provide his or her lender with financial information without contacting Real Estate Law, and asks that the homeowner not telephone Real Estate Law unless for emergencies, like an immediate foreclosure.  Real Estate Law Welcome Documents at 3.

310.     Real Estate Law told L. Madrid that it would help him reduce his monthly mortgage payments.  See July 8 Tr. at 105:11-15 (L. Madrid); id. at 174:13-17 (Anaya-Allen, L. Madrid); Email from Keith Anthony to Larry Madrid at 1 (sent May 15, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 50)("Madrid May 15 Email").

311.     The FDD package includes two mortgage authorization forms that authorize Balanced Legal Group to act on L. Madrid's behalf to resolve his mortgage problems.  See Madrid FDD Email and Package at 6, 7 (sent November 6, 2012)(admitted at Trial July 8, 2019, as New Mexico's Ex. 42).

312.     The mortgage authorization forms state: "This form will serve to acknowledge that the captioned mortgagor has authorized our firm, Balanced Legal Group to act in their behalf to resolve their mortgage problems."  Madrid FDD Email and Package at 6, 7

313.     L. Madrid and M. Madrid learned that Real Estate Law was not negotiating a loan modification on their behalf when M. Madrid called JP Morgan Chase and JP Morgan Chase told her that no loan modification application was in process.  See July 8 Tr. at 212:2-214:9 (Giandomenico, M. Madrid).

314.    L. Madrid sent his foreclosure complaint to Real Estate Law and expected help with his foreclosure matter.  See July 8 Tr. at 191:19-192:2 (Anaya-Allen, Madrid).

315.    Real Estate Law filed a mass tort lawsuit against JP Morgan Chase, but never told L. Madrid the case's outcome.  See July 8 Tr. at 186:13-187:2 (Anaya-Allen, L. Madrid); id. at 193:25-194:3 (Anaya-Allen, L. Madrid).

316.    On August 27, 2012, Branco, using the email sam@balancedlegalgroup.com, sent L. Madrid an FDD package and explained that L. Madrid had access to the FDD to postpone his sale date.  See Email from Sam Branco to Larry Madrid at 1-2 (sent August 27, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 39)("Madrid Aug. 27 Email").

317.    Real Estate Law voluntarily dismissed the "Chase Mass Tort suit" and wrote L. Madrid: "Currently, we have dismissed the case and are awaiting to refile.  It is our intention to gain the most favorable outcome for our clients; therefore we are seeking to have this matter assigned to an overseeing judge who we believe will render a more favorable judgment for all litigants."  Email from Ashley Hanu to Larry Madrid  at 1 (sent January 17, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 44)("Madrid Jan. 17 Email").  See July 8 Tr. at 187:3-12 (Anaya-Allen, L. Madrid).

318.    Real Estate Law voluntarily dismissed a lawsuit on August 17, 2012, and wrote Madrid: "We have dismissed the case and are awaiting to refile."  Madrid Jan. 17 Email at 1; July 8 Tr. at 107:11-12 (Madrid).  See id. at 187:3-12 (Anaya-Allen, Madrid).

319.    L. Madrid was a plaintiff in Acevedo v. JP Morgan Chase Bank, N.A., which Mr. Pratt voluntarily dismissed in August, 2013.  See July 8 Tr. at 203:6-17 (Kennedy, L. Madrid); Acevedo v. JP Morgan Chase Bank, N.A., Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c) at 254; Arzakanyan Depo. at 70:4-6.

320. On November 6, 2012, Real Estate Law sent L. Madrid an FDD Package and asked him to print the attachment, complete it, and return it within ten days, or otherwise the processing of his foreclosure defense would be delayed. See Madrid FDD Email and Package at 1-2.

321. In May, 2013, L. Madrid received an email from Real Estate Law in which it stated that it believed that it could use fraudulent activity and illegal lending on his home mortgage to get a lower payment and "forestall foreclosure." Madrid May 15 Email at 1.

322. Real Estate Law requested that L. Madrid and M. Madrid send his foreclosure summons, and discussed with him the provision of its loan modification services, see Madrid Notes re Summons Conversation at 1 (dated July 8, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 49), but L. Madrid and M. Madrid did not get a loan modification or help with their foreclosure. See July 8 Tr. at 191:19-192:7 (Anaya-Allen, L. Madrid); id. at 194:6-12 (L. Madrid).

323. L. Madrid and M. Madrid moved from the house on Menaul and into a rental. See July 8 Tr. at 217:7-218:22 (Giandomenico, M. Madrid).

324. In written communications with L. Madrid or enclosures with those communications, Mr. Pratt did not include the disclosures that the MARS Rule requires. See Real Estate Law Welcome Documents at 1-4.

325. L. Madrid's compliance call did not include the required MARS Rule disclosures. See Madrid Compliance Call at 00:00-11:36.

326. At least two emails from Real Estate Law to L. Madrid contained no disclosures or disclaimers. See Madrid Jan. 17 Email at 1; Email from Ashley Hanu to Larry Madrid (sent January 24, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 46).

327. Several other correspondences did not contain the specific MARS Rule disclosures. See Madrid Aug. 27 Email; FDD Email and Package at 1; Email from Tutu Gill to Larry Madrid

at 1-2 (sent November 26, 2012)(admitted July 8, 2019, at Trial as New Mexico's Ex. 43); Madrid May 15 Email at 1.

c.    **<u>Martha Leary</u>.**

328.    New Mexico consumer Martha Leary owned and occupied, as a principal place of residence, a home at 6496 Freemont Hills Loop NE, Rio Rancho, New Mexico, 87144. <u>See</u> July 9 Tr. at 230:8-18 (Anaya-Allen, Leary)(reflecting that Leary had to move from her home).[46]

329.    Leary's current residence is unclear.

330.    Leary had trouble making her mortgage payments when the payments increased by $200.00 per month. <u>See</u> Transcript of Trial Proceedings at 230:19-231:1 (Anaya-Allen, Leary)(taken July 9, 2019), filed July 12, 2019 (Doc. 195)("July 9 Tr.").

331.    Leary tried unsuccessfully to resolve her payment problems directly with her lender via a mediator. <u>See</u> July 9 Tr. at 231:4-8 (Leary).

332.    Leary attempted a loan modification alone three times and, on November, 7, 2012, went to court, where she received ninety days to become current on her loan. <u>See</u> Pre-Qualification Questionnaire at 2 (dated December 7, 2012)(admitted July 9, 2019, as New Mexico's Ex. 54).

333.    Leary saw an advertisement for Real Estate Law on television, after which she contacted Real Estate Law, and Real Estate Law told her that it could help with the foreclosure. <u>See</u> July 9 Tr. at 231:8-10 (Leary).

---

[46]The Court concludes that more likely than not Leary occupied this home as her dwelling or primary place of residence. Leary testified to having to move out from the home, to an eleventh-grade education background, and to having owned one home. <u>See</u> July 9 Tr. at 229:25-230:18 (Anaya-Allen, Leary). Given these facts, the Court considers more likely than not that Leary occupied this home as her primary residence. As the Court reaches this finding, the Court does not adopt the Parwatikar Defendants' proposed finding: "The Plaintiff offered no evidence that at least 11 of the 15 consumers occupied the properties they described owning as dwellings or as their principal places of residence." Parwatikar Defs.' Proposed Findings ¶ 6, at 2.

334. Leary signed an Attorney-Client Agreement with Real Estate Law on December 10, 2012, and the agreement provided that Real Estate Law would prepare a complaint with either the Office of the Controller of Currency, the Federal Deposit Insurance Corporation, the Federal Reserve Board, or the National Credit Union Administration. See Attorney-Client Retainer Agreement at 1 (executed December 13, 2012)(admitted July 9, 2019, as New Mexico's Ex. 52)("Leary Attorney-Client Retainer Agreement").

335. At this time, Leary was not in foreclosure. See July 9 Tr. at 247:16-19 (Kennedy, Leary).

336. The Leary Attorney-Client Retainer Agreement provides for a fee of $3,000 and states: "Client is not entitled to a refund of any amount." Leary Attorney-Client Retainer Agreement at 1.

337. The Leary Attorney-Client Retainer Agreement does not provide for a contingency fee. See Leary Attorney-Client Retainer Agreement at 1-2.

338. The Leary Attorney-Client Retainer Agreement provides that the complaint will seek remedies for one or more of: fraud, negligent lending, breach of good faith and fair dealing, breach of fiduciary duty, securitization issues, mortgage electronic registration systems issues. See Leary Attorney-Client Retainer Agreement at 1.

339. The Leary Attorney-Client Retainer Agreement states: "RELC CAN RETAIN CLIENTS FROM ANY STATE BECAUSE IT IS SEEKING RELIEF TO A FEDERAL ENTITY UNDER A FEDERAL PROCESS." Leary Attorney-Client Retainer Agreement at 2.

340. The Leary Attorney-Client Retainer Agreement provides for a division of fees between Real Estate Law and Pinnacle Law, and that Pinnacle Law will receive eighty percent of the fee. See Leary Attorney-Client Retainer Agreement at 2.

341.     The Leary Attorney-Client Retainer Agreement states: "PLC is a separate law firm not related to RELC.  Client is not retaining PLC."  Leary Attorney-Client Retainer Agreement at 2.

342.     The Leary Attorney-Client Retainer Agreement states "Client also agrees that the laws of the State of California shall govern this agreement and that any disputes arising from this agreement must be adjudicated in California" or contain a Notice Required by New Mexico Law or a Notice of Rescission Rights or Rescission of Rights Form.  Leary Attorney-Client Retainer Agreement at 2.  See id. at 1-2.

343.     Mr. Pratt is the designated signatory for Real Estate Law on the Leary Attorney-Client Retainer Agreement.  See Leary Attorney Client Retainer Agreement at 2.

344.     The Leary Attorney-Client Retainer Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that Leary signed the Leary Attorney-Client Fee Agreement.  See Leary Attorney-Client Retainer Agreement at 1.

345.     Leary paid Real Estate Law $3,000.00, which she borrowed from her sister.  See July 9 Tr. at 233:7-10 (Anaya-Allen, Leary); id. at 238:1-2 (Anaya-Allen, Leary).[47]

346.     Leary paid Real Estate Law a total of $3,000.00.

347.     On December 17, 2012, Leary paid the advance fee to Real Estate Law via an E-Check Scheduled Payment Authorization Form that authorized a debit withdrawal for the $3,000.00.  See Scheduled Payment Authorization Form at 2 (admitted July 9, 2019, at Trial as New Mexico's Ex. 93).

---

[47]The Court also does not adopt Mr. Pratt's proposed finding that no evidence shows that Leary paid Real Estate Law.  See Pratt's Proposed Findings ¶ 6, at 3.  The Court considers credible Leary's assertion that she paid Real Estate Law.

348. Leary hired Real Estate Law to stop the foreclosure on her home, and she did not understand what a federal regulatory complaint was. See July 9 Tr. at 232:1-10 (Anaya-Allen, Leary); id. at 238:12-23 (Anaya-Allen, Leary).

349. When Leary notified Real Estate Law of a notice of default from her bank, she received a "foreclosure defense package" described "as designed to postpone a sale date." Email from Ashley Hanu to Martha Leary at 1 (sent January 2, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 57)("Leary Jan. 2 Email").[48] See July 9 Tr. at 242:16-243:6 (Anaya-Allen, Leary).

350. No evidence reflects that Real Estate Law submitted the federal regulatory complaint, and the January 24, 2013, email states that it is a draft. See Email from Tala Resai to Martha Leary at 1 (sent January 24, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 55)("Leary Jan. 24 Email").

351. After a month, Real Estate Law communicated via email to Leary that it could not assist her. See July 9 Tr. at 243:7-12 (Anaya-Allen, Leary); id. at 244:18-24 (Leary); id. at 249:7-13 (Leary).

352. Leary's home was foreclosed, and she moved. See July 9 Tr. at 230:17-18 (Anaya-Allen, Leary).

353. The January 2, 2013, and January 24, 2013, emails from Real Estate Law contained a disclaimer stating:

---

[48]The Court removes from the New Mexico's Proposed Findings the language: "Although the Leary Attorney-Client Agreement states that Real Estate Law would provide services only for a federal regulatory complaint," because the portions of the record that the New Mexico's Proposed Findings cite to support its proposed finding do not support such language and the Court's previous findings reflect the same conclusion as the quoted language. See New Mexico's Proposed Findings ¶ 335, at 43.

Please be aware that filing a Mass Tort Complaint against your lender in and of itself will not stop the foreclosure process or prevent a trustee sale of your property. Also, if your property has been sold due to the foreclosure process, and/or you have a pending Unlawful Detainer, and/or a Notice to Vacate, Mass Tort Litigation may not prevent legal action against you .

Email from Tala Resai to Martha Leary at 1 (sent January 24, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 55); Leary Jan. 2 Email at 1.

### d. Mike M. Maness.

354. New Mexico consumer Mike M. Maness owned and occupied, as a principal place of residence, a home at 9200 Lagrima de Orao Road, Northeast, Albuquerque, New Mexico, 87111 for twelve years. See July 9 Tr. at 254:1-8 (Anaya-Allen, M. Maness); July 9 Tr. at 280:15-18 (Anaya-Allen, M. Maness)(reflecting that M. Maness no longer lives in the home and has moved out).[49]

355. M. Maness' current residence is unclear.

356. M. Maness called Real Estate Law after he saw a television advertisement for Real Estate Law. See July 9 Tr. at 254:19-25 (Anaya-Allen, M. Maness).

357. M. Maness was having trouble making his mortgage payments and hoped to get a fixed rate mortgage. See July 9 Tr. at 254:9-18 (Anaya-Allen, M. Maness).

358. Real Estate Law told M. Maness that it could provide him with foreclosure defense, and get him a fixed-rate mortgage, ninety-something percent loan to value, and possibly punitive damages. See July 9 Tr. at 255:8-13 (Anaya-Allen, M. Maness).

---

[49]The Court does not adopt the Parwatikar Defs.' Proposed Finding ¶ 6, at 2. The evidence reflects that M. Maness occupied his home, and the Court deems more likely than not that M. Maness occupied the home as his only residence. See July 9 Tr. at 253:19-25 (Anaya-Allen, M. Maness)(reflecting that M. Maness was an electronic fabricator for Sandia National Labs and had an associate's degree in electronics).

359.     In a December 8, 2012, email from a Real Estate Law employee about scheduling

a time to speak on the telephone, Real Estate Law told M. Maness:

> During this conversation we will be discussing Litigation and the following
> expected results,
>
> 1)     95% LTV ($166,250);
>
> 2)     Eliminate 2nd mortgage lien;
>
> 3)     Principal (sic) Balance Reduction ($39,000);
>
> 4)     4.75% Interest rate down to 2.5% interest rate;
>
> 5)     30 year fixed term;
>
> 6)     payment down to $657 monthly;
>
> 7)     principal (sic) and interest loan;
>
> 8)     monetary damages / Cash settlement (upwards of $50,000);
>
> 9)     foreclosure protection.

Email from Rick Silva to Mike M. Maness at 4 (sent December 8, 2012)("M. Maness Silva Dec.

8 Email")(admitted July 9, 2019, at Trial as New Mexico's Ex. 58).

360.     On December 11, 2012, M. Maness completed documents for Real Estate Law

including a letter of authorization for Mr. Pratt to contact his lender.  See Authorization Letter at

3 (dated December 11, 2012)(admitted July 9, 2019, at Trial as New Mexico's Ex. 59).

361.     On December 11, 2012, M. Maness executed the Attorney-Client Fee Agreement,

on which Mr. Pratt was Real Estate Law's designated signatory.  See Attorney-Client Fee

Agreement at 3 (dated December 11, 2012)(admitted July 9, 2016, at Trial as New Mexico's Ex.

60)("M. Maness Attorney-Client Fee Agreement).

362.     The M. Maness Attorney-Client Fee Agreement provides that M. Maness hires Real

Estate Law to represent him in "LITGATION AGAINST [his] MORTGAGE LENDER

CONCERNING [his] REAL ESTATE PROPERTY." M. Maness Attorney-Client Fee Agreement ¶ 2, at 1 (bold omitted).

363. The M. Maness Attorney-Client Fee Agreement provides for a nonrefundable one-time retainer fee of $5,000.00 and a monthly maintenance fee of $29.95. <u>See</u> M. Maness Attorney-Client Fee Agreement ¶ 4, at 1-2.

364. The M. Maness Attorney-Client Fee Agreement provides that Real Estate Law will receive a contingency fee of thirty percent. <u>See</u> M. Maness Attorney-Client Fee Agreement ¶ 4, at 2.

365. The M. Maness Attorney-Client Fee Agreement states that Real Estate Law has attorneys only admitted to the State Bar of California and will pursue litigation in California. <u>See</u> M. Maness Attorney-Client Fee Agreement ¶ 2, at 1.

366. The M. Maness Attorney-Client Fee Agreement provides that Real Estate Law would receive twenty percent of the retainer fee and that Pinnacle Law would receive the remaining eighty percent. <u>See</u> M. Maness Attorney-Client Fee Agreement ¶ 10, at 2-3; July 9 Tr. at 262:23-25 (M. Maness).

367. The M. Maness Attorney-Client Fee Agreement states that "PLC is a separate law firm not related to RELC. Client is not retaining PLC." M. Maness Attorney-Client Fee Agreement ¶ 10, at 3.

368. The M. Maness Attorney-Client Fee Agreement states: "The agreement shall be governed in accordance with the laws of the State of California. Venue shall be Los Angeles County." M. Maness Attorney-Client Fee Agreement ¶ 12, at 3.

369. The M. Maness Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that M. Maness signed the Leary Attorney-Client Fee Agreement. See M. Maness Attorney-Client Fee Agreement at 1.

370. Real Estate Law did not provide M. Maness a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract Form. See July 9 Tr. at 258:15-259:2 (Anaya-Allen, M. Maness); M. Maness Attorney-Client Fee Agreement at 1-3.

371. M. Maness paid Real Estate Law $5,000.00. See July 9 Tr. at 259:10-14 (Anaya-Allen, M. Maness); E-Check Scheduled Payment Authorization Form at 2 (admitted July 9, 2019, at Trial as New Mexico's Ex. 61).[50]

372. M. Maness paid Real Estate Law $29.95 per month via debit authorization. See July 9 Tr. at 259:15-18 (Anaya-Allen, M. Maness); E-Check Payment Authorization for Monthly Maintenance Fee at 3 (dated December 13, 2012)(admitted July 9, 2019, at Trial as New Mexico's Ex. 61).

373. M. Maness had a compliance call with Mr. Paul on December 14, 2012, during which Mr. Paul instructed him to provide yes or no responses, advised him that he was not entitled to a refund or credit after executing the retainer agreement and completing the compliance call, and provided no MARS Rule disclosures. See Audio Recording of Compliance Call at 0:40-0:50 (admitted July 8, 2019, at Trial as New Mexico's Ex. 11)("M. Maness Compliance Call"); id. at 5:00-5:16; id. at 0:00-6:06.

374. Real Estate Law also told M. Maness that it did not guarantee that the lawsuit would not delay or stop a foreclosure, and that, if a foreclosure sale date was scheduled, Real Estate Law

---

[50]The Court also does not adopt Mr. Pratt's proposed finding that no evidence shows that M. Maness paid Real Estate Law. See Pratt's Proposed Findings ¶ 6, at 3. The Court considers credible M. Maness' assertion that he paid Real Estate Law.

could not get a restraining order from the judge or an agreement from the lender to stop the sale through the lawsuit, and that M. Maness would need to take legal action outside the lawsuit to stop the foreclosure. See M. Maness Compliance Call at 3:15-3:52.

375.     On February 4, 2013, M. Maness received an email from Real Estate Law that stated: "If you receive anything with a (foreclosure) sale date on it, please send it to us immediately so we can issue you an FDD package and begin work on your foreclosure defense."  Email from Ashley Hanu to Mike M. Maness at 2 (sent February 4, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 62)("M. Maness Feb. 4 Email").

376.     On April 30, 2013, Real Estate Law requested that M. Maness send the foreclosure package that he received, and M. Maness agreed to send the package by overnight mail on May 1, 2013.  See July 9 Tr. at 265:24-266:21 (Anaya-Allen, M. Maness); id. at 267:16-268:1 (Anaya-Allen, M. Maness); M. Maness Apr. 30 Email at 1; Email from Elba Chavez to Mike M. Maness at 1 (sent April 30, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 64)("M. Maness Apr. 30, 1:05 p.m. Email"); Email from Mike M. Maness to Elba Chavez at 1-2 (sent May 2, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 65).

377.     On May 2, 2013, Real Estate Law received the M. Maness' foreclosure package and emailed him that he would need to hire an attorney in his state to help with the lawsuit and stated: "Our lawsuit is against your lender, we are trying to reduce your principle balance, and reduce your interest rate, as well as try [sic]to repair any credit that might have been damaged by your mortgage loan, and even possibly recover monetary damages."  Email from Elba Chavez to Mike M. Maness at 3 (sent May 2, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 65)("M. Maness May 2, 4:34 p.m. Email").

378.     M. Maness responded to Real Estate Law: "I had no idea that this was something you could not stop until this litigation is settled.  I was told by RELC that if forclosure [sic] paperwork was to be filed, that RELC could put a temporary stop to it."  Email from Mike M. Maness to Elba Chavez at 5 (sent May 2, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 65)("M. Maness May 2, 11:01 a.m. Email").

379.     M. Maness' correspondent at Real Estate Law replied: "I completely understand your disappointment regarding my email."  Email from Elba Chavez to Mike M. Maness at 5 (sent May 3, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 65).

380.     On May 3, 2013, Real Estate Law sent M. Maness an FDD package and stated: "This is designed to assist you [to] postpone any sale dates you may have as well as negotiate payment stabilization."  Email from Elba Chavez to Mike M. Maness at 1 (sent May 3, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 66)("M. Maness May 3 Email").  See July 9 Tr. at 267:3-19 (Anaya-Allen, M. Maness).

381.     In an email sent June 20, 2013, Real Estate Law reiterated that the FDD package would assist M. Maness in postponing sale dates and negotiating payment stabilization.  See Email from Elba Chavez to Mike M. Maness at 1 (sent June 20, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 67)("M. Maness June 20 Email").

382.     On October 31, 2013, Real Estate Law sent M. Maness a copy of the Anderson v. Wells Fargo Bank N.A. complaint and asked him, as a plaintiff, to sign a verification.  See Email from Erma Rodriguez to Mike M. Maness at 1 (sent October 31, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 68)("M. Maness Oct. 31 Email").

383.     On November 1, 2013, Real Estate Law told M. Maness that it filed Anderson v. Wells Fargo Bank N.A. on October 23, 2013, and that the case number was BC525299.  See Email

from Real Estate Law to Mike M. Maness at 2 (sent November 1, 2013)(admitted July 9, 2019, at

Trial as New Mexico's Ex. 68)("M. Maness Nov. 1 Email").

384.    M. Maness checked the court website and saw his name listed for the case.  See

July 9 Tr. at 270:21-271:2 (Anaya-Allen, M. Maness).

385.    On February 24, 2014, Real Estate Law emailed M. Maness and explained

regarding Anderson v. Wells Fargo Bank N.A.:

> We regret to report that one judge -- Judge Duffy-Lewis -- has dismissed two cases
> that we had ongoing against Wells Fargo. . . . Judge Duffy-Lewis ruled that
> 'joinder' of multiple plaintiffs into one lawsuit was not permitted for our claims
> under the relevant 'joinder' statute . . . .  [W]e could try to file the same complaints
> in a different court jurisdiction and see if we have better luck there.

Email from Archi Cordova to Mike M. Maness at 1 (sent February 24, 2014)(admitted July 9,

2019, at Trial as New Mexico's Ex. 69 )("M. Maness Feb. 24 Email").  See July 9 Tr. at 271:9-17

(Anaya-Allen, M. Maness).

386.    Real Estate Law and Mr. Davis voluntarily dismissed Anderson v. Wells Fargo

Bank N.A. on March 20, 2014.  See Anderson v. Wells Fargo Bank N.A., Request for Dismissal,

at 4-7.

387.    In March, 2014, M. Maness asked Real Estate Law for a letter reflecting that Real

Estate Law was representing him in a mass tort action against Wells Fargo to provide the Wells

Fargo attorneys in his foreclosure, and Real Estate Law transmitted a letter of representation to

Wells Fargo's attorneys on April 4, 2014.  See July 9 Tr. at 271:24-274:12 (Anaya-Allen, M.

Maness); Facsimile Transmission from Mike M. Maness to Elba Chavez at 1 (dated March 26,

2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 70); Email from Gill Tutu to Michelle

Chavez at 3 (sent April 4, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 71); Email

from Gill Tutu to Mike M. Maness at 6 (sent April 4, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 71)("M. Maness April 4, 1:08 p.m. Email").

388.    On April 2, 2014, Real Estate Law emailed M. Maness discussing a protocol regarding contacting lenders, which states, "[y]ou as clients should not be contacting the Bank directly for any reason at all," and, "[t]his protocol must be adhered to at all times."  Email from Tutu Gill to Mike M. Maness at 5 (sent April 2, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 70)("M. Maness Apr. 2 Email").

389.    On April 17, 2014, Real Estate Law sent M. Maness an email explaining that Real Estate Law included him in Miller v. Wells Fargo Bank, N.A. -- a new lawsuit against Wells Fargo. See July 9 Tr. at 274:14-25 (Anaya-Allen, M. Maness); Email from Real Estate Law to Mike M. Maness at 1 (sent April 17, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 72)("M. Maness April 17 Email").

390.    Real Estate Law and Mr. Davis voluntarily dismissed Miller v. Wells Fargo Bank, N.A. on June 24, 2014.  See July 9 Tr. at 277:7-9 (Anaya-Allen, M. Maness); Miller v. Wells Fargo Bank, N.A., Request for Dismissal, at 1-4.

391.    In July, 2014, Real Estate Law asked M. Maness to complete a Foreclosure Defense Package, and Real Estate Law made the following statements: (i) "[i]ncluded as part of Litigation Process you have access to Foreclosure Defense Department to assist in delaying your foreclosure sale date"; (ii) "[t]hese items are needed for us to process this postponement for the upcoming SALE DATE or foreclosure"; (iii) "Real Estate Law Center P.C. (RELC) provides a complimentary Foreclosure Defense service to all of our clients if there is a scheduled sale date or if a notice of default has been served and the client is at least 6 months in arrears"; (iv) "[t]he results of this service are not guaranteed however RELC will work diligently with you to help

postpone the property foreclosure sale date and/or negotiate a stable mortgage payment while you are in litigation"; (v) "[y]our case will then be assigned to a Foreclosure Defense Specialist who will assist you throughout your foreclosure process."; and (vi) "[y]our FDD Processing Specialist will inform you of all your options if the lender refuses to postpone the sale date. These options could be Bankruptcy, Short Sale, or Deed in Lieu. Your FDD Processing Specialist will discuss this with you in detail if necessary." Email from FDD Intake to Mike M. Maness at 3-4 (sent July 20, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73).

392. M. Maness did not pay separately for the FDD services. See July 9 Tr. at 276:25-277:1 (Anaya-Allen, M. Maness).[51]

393. In a September 30, 2014, email from Real Estate Law, which Mr. Davis signed, to M. Maness, Mr. Davis wrote: "As you know we have been in litigation against Wells Fargo for many months and more recently we have been in negotiation with Wells Fargo to try and settle these actions. . . . Potential relief may be in the form of interest rate and/or principal [sic] reduction." Email from Real Estate Law to Mike M. Maness at 11 (dated September 30, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73).

---

[51]The Court does not adopt the Parwatikar Defendants' proposed finding that "[i]n addition to its litigation services against lenders, for which it received compensation, RELC offered additional mortgage assistance relief services without charge." Parwatikar Defs.' Proposed Findings ¶ 23, at 8-9. The Court incorporates the Parwatikar Defendants' factual evidence for this statement throughout the Court's discussion of the New Mexico consumers. The Court disagrees with the Parwatikar Defendants' language, because, in the Court's view, as the Court's Findings of Fact and Conclusions of Law reflect the New Mexico consumers paid Real Estate Law for all its services that is both for litigation and for FDD services.

394.     Real Estate Law and Mr. Davis dismissed <u>Anderson v. Wells Fargo Bank N.A.</u> and <u>Miller v. Wells Fargo Bank, N.A.</u> in March and June, 2013,[52] <u>see</u> <u>Anderson v. Wells Fargo Bank N.A.</u>, at 4; <u>Miller v. Wells Fargo Bank, N.A.</u>, Request for Dismissal at 1, so the September, 2014, email is inaccurate.

395.     Real Estate Law and Mr. Davis continued negotiating with Wells Fargo and attempted to settle M. Maness' case on December 1, 2014, <u>see</u> Email from Real Estate Law to Mike M. Maness at 5-6  (sent December 1, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 5; and January 9, 2015, Ex. 75 at 7)("M. Maness Dec. 1 Email"); Email from Real Estate Law to Mike M. Maness at 7-8  (sent January 9, 2015)(admitted July 9, 2019, at Trial as New Mexico's Ex. 5; and January 9, 2015, Ex. 75 at 7)("M. Maness Jan. 9 Email"), after they had dismissed the litigation.

396.     On October 17, 2014, Real Estate Law informed M. Maness that it could not continue with mass tort litigation and that future litigation would have to be on an individual basis. <u>See</u> Email from Real Estate Law to Mike M. Maness at 1 (sent October 17, 2014, 11:33 a.m.)(admitted July 9, 2019, at Trial as New Mexico's Ex. 74)("M. Maness Oct. 17, 11:33 a.m. Email").

397.     M. Maness hired another law firm to help him with his foreclosure, although he did not work long with the attorneys.  <u>See</u> July 9 Tr. at 292:1-293:22 (Kennedy, M. Maness); <u>id.</u> at 297:8-13 (M. Maness).

---

[52]The Court changes New Mexico's proposed finding from stating that Real Estate Law dismissed <u>Anderson v. Wells Fargo Bank N.A.</u> and <u>Miller v. Wells Fargo Bank, N.A.</u> in March and April, 2013, to Real Estate Law dismissed the cases in March and June, because the latter statement reflects accurately the record.  <u>See</u> New Mexico's Proposed Findings ¶ 374, at 49.

398.     Real Estate Law did not help M. Maness, and he lost his home.  <u>See</u> July 9 Tr. at

279:23-25 (M. Maness); <u>id.</u> at 280:13-18 (M. Maness).

399.     M. Maness filed a complaint with the New Mexico Office of the Attorney General

and received a refund of $5,000.00.  <u>See</u> July 9 Tr. at 279:15-18 (Anaya-Allen, M. Maness); <u>id.</u> at

280:11-12 (Anaya-Allen, M. Maness); Consumer Complaint at 1 (dated February 12,

2016)(admitted July 9, 2019, as New Mexico's Ex. 76).

400.     M. Maness paid Real Estate Law $5,000.00, received a $5,000.00, refund and paid

Real Estate Law the $29.95 monthly maintenance fees from December 11, 2012, <u>see</u> Attorney-

Client Fee Agreement at 3, to at least January 9, 2015, <u>see</u> M. Maness Jan. 9 Email, for a balance

of $718.80, <u>see</u> E-Check Payment Authorization for Monthly Maintenance Fee at 3.

401.     Some emails that M. Maness received contained the disclosure:

> Please be aware that filing a Mass Tort Complaint against your lender in and of
> itself will not stop the foreclosure process or prevent a trustee sale of your property.
> Also, if your property has been sold due to the foreclosure process, and/or you have
> a pending Unlawful Detainer, and/or a Notice to Vacate, Mass Tort Litigation may
> not prevent legal action against you.

Email from Elba Chavez to Make M. Maness at 1 (sent April 30, 2013, 12:03 p.m.)(admitted July

9, 2019, at Trial as New Mexico's Ex. 63 )("M. Maness Apr. 30, 12:03 p.m. Email"); Email from

Tutu Gill to Mike M. Maness at 6 (sent April 2, 2014)(admitted July 9, 2019, at Trial as New

Mexico's Ex. 70); M. Maness Feb. 4 Email at 2; M. Maness Apr. 30, 12:03 p.m. Email at 1; M.

Maness Apr. 30 1:05 p.m. Email at 1; Email from Elba Chavez to Mike M. Maness at 3 (sent April

30, 2013, 5:15 p.m.)(admitted July 9, 2019, at Trial as New Mexico's Ex. 64); Email from Elba

Chavez to Mike M. Maness at 4 (sent April 30, 2013, 12:05 p.m.)(admitted July 9, 2019, at Trial

as New Mexico's Ex. 64); Email from Elba Chavez to Mike M. Maness at 5 (sent April 30, 2013,

5:33 p.m.)(admitted July 9, 2019, at Trial as New Mexico's Ex. 64); Email from Elba Chavez to

Mike M. Maness at 6   (sent May 2, 2013, 3:34 p.m.)(admitted July 9, 2019, at Trial as New Mexico's Ex. 64); M. Maness May 3 Email at 1; M. Maness May 6 Email at 6; M. Maness June 20 Email at 1; M. Maness Oct. 31 Email at 1; M. Maness Feb. 24 Email at 1; M. Maness Apr. 2 Email at 5; M. Maness April 4, 12:38 p.m. Email at 1; M. Maness April 4, 1:08 p.m. Email at 6; Email from Edgar Franco to Mike M. Maness at 1 (sent June 20, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73); Email from Maria Flores to Mike M. Maness at 3-5 (sent July 20, 2104)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73); Email from Maria Flores to Mike M. Maness at 7-8 (sent August 1, 2014); Email from Maria Flores to Mike M. Maness at 9-10 (sent August 6, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73); Email from Ana Nunez to Mike M. Maness at 13-14   (sent October 2, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73); Email from Ana Nunez to Mike M. Maness at 1-2 (sent October 29, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73); Email from Ana Nunez to Mike M. Maness at 3-4 (sent November 4, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73).

402.    Several emails that M. Maness received contained no disclaimers or disclosures related to loan modification services.  See, e.g., Email from Rick Silva to Mike M. Maness at 1-2 (sent December 8, 2012)(admitted July 9, 2019, at Trial as New Mexico's Ex. 58); Email from Real Estate Law to Mike M. Maness at 3 (sent December 8, 2012)(admitted July 9, 2019, at Trial as New Mexico's Ex. 58); M. Maness Silva Dec. 8 Email at 4-5; Email from Ashley Hanu to Mike M. Maness at 1 (sent January 21, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 62); Email from Real Estate Law to Mike M. Maness at 2 (sent November 1, 2013); M. Maness April 17 Email at 1; Email from Maria Flores to Mike M. Maness at 6 (sent July 28, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73); Email from Real Estate Law to Mike M. Maness at

11-12 (sent September 30, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 73); Email from Real Estate Law to Mike M. Maness at 1-2 (sent October 17, 2014); M. Maness Oct. 17, 11:33 Email at 1; Email from Real Estate Law to Mike M. Maness at 1-2 (sent October 17, 2014, 10:12 a.m.)(admitted July 9, 2019, at Trial as New Mexico's Ex. 74); M. Maness Dec. 1 Email at 5-6; M. Maness Jan. 9 Email at 7-8;

    e.    **Valerie Trujillo.**

403.    V. Trujillo owns and occupies, as a principal place of residence, a home at 3 Private Drive 1510, Espanola, New Mexico and has owned the home for thirty-three years. See July 9 Tr. at 303:9-304:1 (Giandomenico, V. Trujillo).[53]

404.    V. Trujillo struggled to pay her mortgage loan while she was going through her divorce. See July 9 Tr. at 304:2-8 (Giandomenico, V. Trujillo).

405.    V. Trujillo called Real Estate Law, which told her that it would stop the foreclosure and obtain a loan modification. See July 9 Tr. at 305:10-20 (Anaya-Allen, V. Trujillo). See also Email from Garrett Sean to Valerie Trujillo at 2 (sent January 15, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 78)("V. Trujillo Jan. 15 Email"); Email from Maria Flores to Valerie Trujillo at 1 (sent May 22, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 84)("V. Trujillo May 22 Email"); Emails from Araceli Robles to Valerie Trujillo at 1, 3 (sent at May 29, 2014, 3:28 p.m. and 3:50 p.m.)(admitted July 9, 2019, at Trial as New Mexico's Ex. 86)("V. Trujillo May 29 Emails").

---

[53]The Court concludes by a preponderance of the evidence that V. Trujillo owns and occupies this home and does not adopt the Parwatikar Defs.' Proposed Findings ¶¶ 5-6, at 2-3. V. Trujillo has a twelfth-grade education and testified to owning one home for thirty-three years, see July 9 Tr. at 303:9-304:1 (Giandomenico, V. Trujillo), and that her parents got a loan to help her stop the foreclosure sale, see July 9 Tr. at 323:3-21 (Giandomenico, V. Trujillo). This evidence suggests a high likelihood that V. Trujillo has resided in the home that she owns and that her parents took the extreme measure of obtaining a loan to save the home in which V. Trujillo resides.

406.     On January 15, 2013, Real Estate Law sent V. Trujillo an email in which it stated that Real Estate Law feels its cases have "extreme merit" and may produce:

- **Interest Rate Reduced to at 2.5% and fixed for a 30 year term (as stated on the stipulated judgment)**

- **Principle Reduction to 95% of Loan to Value (as stated on the stipulated judgment)**

    **Monetary Damages for homeowners (as stated on the stipulated judgment)**

- **Wiping Out Mortgage Lates off of the credit reports.**

Email from Garrett Sean to Valerie Trujillo at 2 (sent January 15, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 78)(emphasis in Email from Garrett Sean to Valerie Trujillo).

407.     V. Trujillo relied on Real Estate Law's statements in the Jan. 15 Email when she chose to hire Real Estate Law.  <u>See</u> July 9 Tr. at 310:23-25 (Giandomenico, V. Trujillo).

408.     On January 15, 2013, V. Trujillo had a compliance call with Mr. Paul, in which Mr. Paul instructed her to answer questions "yes" or "no," <u>see</u> Audio Recording of Compliance Call at 0:28-0:42 (dated January 15, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 9)("V. Trujillo Compliance Call"), and told her "you are not entitled to a refund or a credit after the execution of the retainer agreement or the completion of the compliance call, even if your name has not yet been added to the caption of a complaint," and did not provide any MARS Rule disclosures, <u>see</u> V. Trujillo Compliance Call at 4:14-4:25.

409.     Real Estate Law also told V. Trujillo that it did not guarantee that the lawsuit would not delay or stop a foreclosure, and that, if a foreclosure sale date was scheduled, Real Estate Law could not get a restraining order from the judge or an agreement from the lender to stop the sale through the lawsuit, and V. Trujillo would need to take legal action outside the lawsuit to stop the foreclosure.  <u>See</u> V. Trujillo Compliance Call at 2:52-3:17.

410. The V. Trujillo compliance call did not include specific MARS Rule disclosures. See V. Trujillo Compliance Call at 0:00-5:19.

411. V. Trujillo entered into an attorney-client fee agreement around January 15, 2013, and, in the agreement, Mr. Pratt is identified as Real Estate Law's signatory. See Attorney-Client Fee Agreement at 2 (undated)(admitted July 9, 2019, as New Mexico's Ex. 77)("V. Trujillo Attorney-Client Fee Agreement").

412. The V. Trujillo Attorney-Client Fee Agreement provides for a $5,000.00 non-refundable, one-time retainer fee and a $29.95 monthly maintenance fee. See V. Trujillo Attorney-Client Fee Agreement ¶ 4, at 1-2.

413. The V. Trujillo Attorney-Client Fee Agreement also provides that Real Estate Law will receive a thirty-percent contingency fee. See V. Trujillo Attorney-Client Fee Agreement ¶ 4, at 2.

414. The V. Trujillo Attorney-Client Fee Agreement provides that V. Trujillo hires Real Estate Law to represent her in "LITGATION AGAINST [her] MORTGAGE LENDER CONCERNING [her] REAL ESTATE PROPERTY." V. Trujillo Attorney-Client Fee Agreement ¶ 2, at 1 (bold omitted)(capitalization in original).

415. The V. Trujillo Attorney-Client Fee Agreement indicates that Real Estate Law's attorneys were admitted only to the State Bar of California and that Real Estate Law will pursue litigation in California. See V. Trujillo Attorney-Client Fee Agreement ¶ 2, at 1.

416. The V. Trujillo Attorney-Client Fee Agreement provides that Pinnacle Law will receive eighty percent of the retainer fee. See July 9 Tr. at 309:2-13 (Giandomenico, V. Trujillo); V. Trujillo Attorney-Client Fee Agreement ¶ 10, at 2-3.

417. The V. Trujillo Attorney-Client Fee Agreement states: "PLC is a separate law firm not related to RELC. Client is not retaining PLC." V. Trujillo Attorney-Client Fee Agreement ¶ 10, at 3.

418. The V. Trujillo Attorney-Client Fee Agreement states: "The agreement shall be governed in accordance with the laws of the State of California. Venue shall be Los Angeles County." V. Trujillo Attorney-Client Fee Agreement ¶ 12, at 3.

419. The V. Trujillo Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that V. Trujillo signed the V. Trujillo Attorney-Client Fee Agreement. See V. Trujillo Attorney-Client Fee Agreement at 1.

420. V. Trujillo did not receive a Notice Regarding New Mexico Law. See July 9 Tr. at 406:10-14 (Giandomenico, V. Trujillo).

421. V. Trujillo also did not receive a Notice of Rescission Rights with a Rescission of Contract Form. See V. Trujillo Attorney-Client Fee Agreement at 1-3.[54]

422. V. Trujillo was charged an advance fee. See July 9 Tr. at 313:9-11 (Giandomenico, V. Trujillo).[55]

---

[54]V. Trujillo testified that she received a Notice of Rescission Rights, see July 9 Tr. at 306:15-23 (Giandomenico, V. Trujillo); id. at 312:12-18 (Giandomenico, V. Trujillo), but the Court does not deem this statement credible. In the Court's view, V. Trujillo does not intentionally misstate the evidence, but she completed the V. Trujillo Attorney-Client Fee Agreement over six years ago, in 2013, see FOF ¶ 411, at X. The V. Trujillo Attorney-Client Fee Agreement does not contain a Notice of Rescission Rights with a Rescission of Contract Form, and the Court concludes that the V. Trujillo Attorney-Client Fee Agreement and not V. Trujillo's memory of events over six years ago more accurately reflects what Real Estate Law provided V. Trujillo.

[55]The Court also does not adopt Mr. Pratt's proposed finding that no evidence shows that V. Trujillo paid Real Estate Law. See Pratt's Proposed Findings ¶ 10, at 3. The Court considers credible V. Trujillo's assertion that she paid Real Estate Law.

423. V. Trujillo paid Real Estate Law $29.94 per month for approximately eighteen months. See July 9 Tr. at 307:12-22 (Giandomenico, V. Trujillo); V. Trujillo Attorney-Client Fee Agreement ¶ 4, at 1-2.

424. V. Trujillo paid Real Estate Law a total of $5,539.10.

425. On April 8, 2014, V. Trujillo received a decree of foreclosure and a notice of sale, which was scheduled for June 18, 2014. See Wells Fargo Bank, NA, v. Trujillo, Case No. D-117-CV-2012-00502, Default Judgment, Decree of Foreclosure, and Appointment of Special Master at 1-5, County of Rio Arriba, First Judicial District, State of New Mexico (filed April 8, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 79)("V. Trujillo Foreclosure Decree"); Wells Fargo Bank, NA, v. Trujillo, County of Rio Arriba, First Judicial District, State of New Mexico, Case No. D-117-CV-2012-00502, Notice of Sale at 1-3 (undated)(admitted July 9, 2019, at Trial as New Mexico's Ex. 87).

426. On May 12, 2014, Real Estate Law asked V. Trujillo to complete an FDD package to help with delaying her foreclosure sale date. See Email from Maria Flores to Valerie Trujillo at 1-3 (sent May 12, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 80)("V. Trujillo May 12 Email").

427. The V. Trujillo May 12 Email describes the FDD as a "complimentary" service that Real Estate Law provides when a scheduled sale date arises. V. Trujillo May 12 Email at 1-3.

428. The V. Trujillo May 12 Email and the Emails from Maria Flores to Valerie Trujillo at 1 (sent May 13, 2014, 4:40 p.m. and 7:19 p.m.)(admitted July 9, 2019, at Trial as New Mexico's Ex. 81)("V. Trujillo May 13 Emails"), refer to "Case # BC534397," V. Trujillo May 12 Email at 1; V. Trujillo May 13 Emails at 1.

429.    The Los Angeles County Superior Court closed <u>Murphy v. Wells Fargo Bank, N.A.</u>, on May 27, 2014, because of inactivity.  <u>See</u> <u>Murphy v. Wells Fargo Bank, N.A.</u>, BC434397, No Appearances, at 8-9 County of Los Angeles, Superior Court of California, dated May 27, 2014 (admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019 as New Mexico's Ex. 194).

430.    V. Trujillo did not understand the mass tort litigation and thought that Real Estate Law would help get her back on track with her mortgage payments.  <u>See</u> July 9 Tr. at 316:14-20 (Giandomenico, V. Trujillo).

431.    Real Estate Law sent V. Trujillo a FDD package to complete, and V. Trujillo repeatedly sent Real Estate Law financial documents that it requested to complete a loan modification application.  <u>See</u> July 9 Tr. at 314:17-315:23 (Giandomenico, V. Trujillo); <u>id.</u> at 322:2-14 (Giandomenico, Trujillo); V. Trujillo May 12 Email at 1; V. Trujillo May 29 Emails at 1, 3.

432.    Real Estate Law filed a complaint in <u>Mills v. Wells Fargo Bank N.A.</u>, in which it listed V. Trujillo as a plaintiff.  <u>See</u> July 9 Tr. at 317:18-319:7 (Giandomenico, V. Trujillo); <u>id.</u> at 317:14-319:4 (Giandomenico, V. Trujillo); <u>id.</u> at 324:22-325:12 (Giandomenico, V. Trujillo); <u>Mills v. Wells Fargo Bank N.A.</u>, Additional Parties Attachment at 1 (admitted July 9, 2019, at Trial as New Mexico's Ex. 82); <u>Mills v. Wells Fargo Bank N.A.</u>, Case No. 37-2014-00015941-CU-FR-CTL, Complaint for Damages at 1-40 (County of San Diego, Superior Court of California, admitted July 9, 2019, at Trial as New Mexico's Ex. 83); Emails from Araceli Robles to Valerie Trujillo at 1, 3 (sent 10:14 a.m. June 19, 2014, 5:35 p.m. June 25, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 88)("V. Trujillo Robles June 2014 Emails").

433.    Real Estate Law and Mr. Davis voluntarily dismissed Mills on June 30, 2014.  See Mills v. Wells Fargo Bank N.A., Request for Dismissal at 9-12.

434.    The FDD contacted V. Trujillo through email about an FDD package.  See V. Trujillo May 22 Email at 1; Email from Same Branco to Valerie Trujillo at 1-3 (sent May 23, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 85)("V. Trujillo May 23 Email"); V. Trujillo May 29 Emails at 1-5.

435.    Real Estate Law sent V. Trujillo an email about a permanent loan modification that her lender sent her on October 16, 2014.  See Email from Araceli Robles to Valerie Trujillo at 1-2 (sent October 23, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 89)("V. Trujillo Oct. 23, 2014 Email"); Letter from Madilyn Aller to Valerie Trujillo and Attached Loan Modification Agreement at 1-11 (dated October 16, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 90).

436.    V. Trujillo borrowed money from her parents to pay Wells Fargo and to stop the foreclosure.  See July 9 Tr. at 322:17-323:25 (Giandomenico, V. Trujillo).

437.    Several emails that Real Estate Law sent V. Trujillo included disclaimers, but not general or specific MARS Rule disclosures.  See, e.g., V. Trujillo May 12 Email at 3; V. Trujillo May 22 Email at 2; V. Trujillo May 23 Email at 3; V. Trujillo May 29 Emails at 1, 3; V. Trujillo Trial Loan Modification Emails at 3-5; V. Trujillo Oct. 23, 2014 Email at 1-2; V. Trujillo Robles June 2014 Emails, at 1, 3.

438.    Several emails that Real Estate Law sent V. Trujillo included no disclaimers or disclosures related to loan modifications.  See, e.g., V. Trujillo Jan. 15 Email at 1-2; V. Trujillo May 13 Emails at 1.

f.    **Lloyd Trujillo.**

439.    New Mexico consumer L. Trujillo owned and occupied, as a principal place of residence, a home at 35 Arroyo Seco Circle, Espanola.  See July 9 Tr. at 353:4-21 (Anaya-Allen, L. Trujillo).[56]

440.    L. Trujillo's current residence is unclear.

441.    L. Trujillo began having problems making his mortgage payments because of a loss in his income.  See July 9 Tr. at 354:3-15 (Anaya-Allen, L. Trujillo).

442.    L. Trujillo tried without success to modify his loan himself through Bank of America.  See July 9 Tr. at 356:6-11 (L. Trujillo).

443.    L. Trujillo saw a television advertisement about Real Estate Law, called them when he was in California, and was told to call them back when he had returned to New Mexico.  See July 9 Tr. at 356:13-14 (L. Trujillo); id. at 356:23-357:2 (L. Trujillo).

444.    L. Trujillo received a compliance call from Mr. Paul on January 18, 2013, and Mr. Paul told Trujillo to answer the questions "yes" or" no," Audio Recording of Compliance Call at 0:28-0:38 (dated January 18, 2013)(admitted July 8, 2019, at Trial as New Mexico's Ex. 10)("L. Trujillo Compliance Call"), that Mr. Pratt was the lead attorney for the mass action against Trujillo's lender, see L. Trujillo Compliance Call at 1:24-1:33, and that L. Trujillo was not entitled to a refund, see L. Trujillo Compliance Call at 4:14-4:25.

---

[56]The Court does not adopt the Parwatikar Defs.' Proposed Findings ¶ 6, at 2-3.  L. Trujillo stated that he no longer lives at the home, which suggests that L. Trujillo once lived at the home.  See July 9 Tr. at 353:13-15 (Anaya-Allen, L. Trujillo).  L. Trujillo has one year of college education, is a transit professional, has owned one home during his life, and purchased that home from his parents.  See July 9 Tr. at 352:25-353:21 (Anaya-Allen, L. Trujillo).  Given these facts, the Court concludes that, more likely than not, L. Trujillo occupied the home as his primary residence.

445.     Real Estate Law also told L. Trujillo that it does not guarantee that the lawsuit would not delay or stop a foreclosure and that, if a foreclosure sale date is scheduled, Real Estate Law could not get a restraining order from the judge or an agreement from the lender to stop the sale through the lawsuit, L. Trujillo would need to take legal action outside the lawsuit to stop the foreclosure.  See L. Trujillo Compliance Call at 2:50-3:18.

446.     Mr. Paul did not provide L. Trujillo specific MARS Rule disclosures.  See L. Trujillo Compliance Call at 0:00-5:42.

447.     L. Trujillo paid Real Estate Law an advance fee of $6,000.00 in five monthly payments from January 2013 to May 2013.  See July 9 Tr. at 358:12-359:5 (Anaya-Allen, L. Trujillo).[57]

448.     L. Trujillo paid $29.95 per month to Real Estate Law for six or seven months.  See July 9 Tr. at 360:7-15 (Anaya-Allen, L. Trujillo).

449.     L. Trujillo paid Real Estate Law a total of $6,179.70 to $6,209.65.

450.     L. Trujillo called and asked to speak with an attorney working on his case, but Real Estate Law would put him off, saying that the attorney was busy, in court, or unavailable.  See July 9 Tr. at 359:9-14 (Anaya-Allen, L. Trujillo).

451.     L. Trujillo understood that Real Estate Law would get him a loan modification and would work with Bank of America to save his home.  See July 9 Tr. at 364:18-365:4 (Anaya-Allen, L. Trujillo).

452.     Real Estate Law named L. Trujillo in a lawsuit against Bank of America.  See July 9 Tr. at 360:16-363:8 (Anaya-Allen, L. Trujillo).

---

[57]The Court does not adopt Mr. Pratt's proposed finding that no evidence shows that L. Trujillo paid Real Estate Law.  See Pratt's Proposed Findings ¶ 9, at 3.  The Court considers credible L. Trujillo's assertion that he paid Real Estate Law.

453.    L. Trujillo received an email from Real Estate Law to that effect.  See July 9. Tr. at 360:19-20 (L. Trujillo).

454.    When the mass joinder against Bank of America was dismissed, Real Estate Law asked L. Trujillo for additional money for an appeal and advised him that he would need to sign a release if he did not want an appeal and wanted to obtain other legal representation.  See July 9 Tr. at 363:9-16 (Anaya-Allen, L. Trujillo); id. at 370:19-12 (Anaya-Allen, L. Trujillo).

455.    L. Trujillo did not receive his refund or an offer for a refund when he signed the release that Real Estate Law requested.  See July 9 Tr. at 371:13-17 (Anaya-Allen, L. Trujillo).

456.    L. Trujillo had an attorney from Santa Fe work on his foreclosure, before he contacted Real Estate Law.  See July 9 Tr. at 366:4-367:9 (Kennedy, L. Trujillo).

457.    L. Trujillo lost his home in a foreclosure action, and Real Estate Law's lawsuit did not help him.  See July 9 Tr. at 363:9-16 (Anaya-Allen, L. Trujillo); id. at 363-24-364:4 (Anaya-Allen, L. Trujillo).

g.    **Arlena Dickerson.**

458.    New Mexico consumer Dickerson owns and occupies, as a principal place of residence, a home at 352 Espejo Street, NE, Albuquerque.  See July 9 Tr. at 373:19-374:2 (Anaya-Allen, Dickerson).[58]

459.    Dickerson had trouble making her mortgage payments, because her husband went to Washington, D.C., to care for his parents.  See July 9 Tr. at 374:10-15 (Dickerson).

_____

[58]The Court does not adopt the Parwatikar Defs. Proposed Findings ¶ 6, at 2-3.  Dickerson was first an office supervisor for a telephone company and then worked various jobs.  See July 9 Tr. at 373:15-18 (Dickerson).  She has owned one home for about forty-three years and has, during that time, remodeled the house.  See July 9 Tr. at 386:13-15 (Kennedy); id. at 388:14-15 (Kennedy).  In the Court's view, these facts suggest that Dickerson has owned one home in which she has lived and remodeled for her lifestyle.

460.     Dickerson attempted unsuccessfully to modify her loan with her lender.  See July 9 Tr. at 374:19-22 (Dickerson).

461.     Dickerson called Real Estate Law after seeing a television commercial advertising loan modifications, and Real Estate Law told her that it could save her home and modify her mortgage to a lower rate.  See July 9 Tr. at 374:22-375:10 (Dickerson, Anaya-Allen).

462.     Dickerson told the Real Estate Law representative that she could pay them or that she could pay the mortgage, but not both, and the representative replied that, if she paid Real Estate Law, it could save her home and reduce her payments.  See July 9 Tr. at 375:10-16 (Dickerson).

463.     On May 7, 2013, Dickerson signed an application with Real Estate Law.  See Real Estate Law Application at 1-3 (admitted July 9, 2019, at Trial as New Mexico's Ex. 91)("Dickerson Real Estate Law Application").

464.     At the time, Dickerson's property was not in foreclosure.  See July 9 Tr. at 391:13-16 (Kennedy, Dickerson).

465.     Dickerson was behind on her mortgage payments when she applied for Real Estate Law's services.  See Dickerson Real Estate Law Application at 2.

466.     Dickerson signed an Attorney-Client Fee Agreement with Real Estate Law on May 10, 2013, and the agreement provides for a $5,000.00 retainer fee and a monthly fee of $59.95, and that Real Estate Law would receive twenty percent of the retainer fee and that Pinnacle Law would receive the remaining amount.  See Attorney-Client Fee Agreement ¶¶ 4, 5, 11, at 1-3 (admitted July 9, 2019, at Trial as New Mexico's Ex. 92)("Dickerson Attorney-Client Fee Agreement").

467.     The Dickerson Attorney-Client Fee Agreements provides that the retainer fee is a non-refundable retainer fee that is fully earned on receipt.  See Dickerson Attorney-Client Fee Agreement ¶ 4, at 1.

468.     The Dickerson Attorney-Client Fee Agreement provides that Real Estate Law will receive a thirty-percent contingency fee.  See Dickerson Attorney-Client Fee Agreement ¶ 4, at 1

469.     The Dickerson Attorney-Client Fee Agreement provides that Dickerson hires Real Estate Law to "maintain a lawsuit AGAINST [her] MORTGAGE LENDER CONCERNING [her] REAL ESTATE PROPERTY."   Dickerson Attorney-Client Fee Agreement ¶ 2, at 1 (bold omitted)(capitalization in original).

470.     The Dickerson Attorney-Clint Fee Agreement states that Real Estate Law's attorneys are admitted only to the State Bar of California and that Real Estate Law pursues actions in California.  See Dickerson Attorney-Client Fee Agreement ¶ 2, at 1.

471.     The Dickerson Attorney-Client Fee Agreement states: "PLC is a separate law firm not related to RELC.  Client is not retaining PLC."  Dickerson Attorney-Client Fee Agreement ¶ 11, at 3.

472.     The Dickerson Attorney-Client Fee Agreement provides: "The agreement shall be governed in accordance with the laws of the State of California.  Venue shall be Los Angeles County."  Dickerson Attorney-Client Fee Agreement ¶ 13, at 3.

473.     The Dickerson Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that Dickerson signed the Dickerson Attorney-Client Fee Agreement.  See Dickerson Attorney-Client Fee Agreement at 1.

474.     Mr. Pratt is the designated signatory on the Dickerson Attorney-Client Fee Agreement.  See Dickerson Attorney-Client Fee Agreement at 3.

475. Real Estate Law did not provide to Dickerson a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract Form.  See July 9 Tr. at 380:6-18 (Anaya-Allen, Dickerson); Dickerson Attorney-Client Fee Agreement at 1-3.

476. Dickerson paid the $5,000.00 retainer fee in $1,000.00-per-month increments and $59.95 maintenance fees each month.  See July 9 Tr. at 378:6-16 (Dickerson, Anaya-Allen); E-Scheduled Payment Authorization Form at 3; E-Check Payment Authorization for Monthly Maintenance Fee at 4 (admitted July 9, 2019, at Trial as New Mexico's Ex. 93).

477. Dickerson paid Real Estate Law a total of at least $5,299.75 -- the $1,000.00 per month for five months, see Real Estate Law Introduction Documents, E-Scheduled Payment Authorization Form at 3, and the $59.95 monthly maintenance fee for at least those five months, see E-Check Payment Authorization for Monthly Maintenance Fee at 4.

478. Real Estate Law included Dickerson in a lawsuit after she hired it.  See July 9 Tr. at 383:1-17 (Anaya-Allen, Dickerson).

479. Dickerson called Real Estate Law when Dickerson received notice of a foreclosure lawsuit against her, and Real Estate Law told her that it could not guarantee that it would file the mass tort litigation before her home was foreclosed but suggested that the suit might save her home.  See July 9 Tr. at 380:25-381:6 (Dickerson).

480. Dickerson asked the Real Estate Law representative what good the mass tort litigation would do her if she no longer had a home, and Real Estate Law did not respond.  See July 9 Tr. at 380:25-381:16 (Dickerson).

481. Real Estate Law did not tell Dickerson the outcome of the lawsuit against Wells Fargo that it filed on her behalf.  See July 9 Tr. at 381:20-25 (Dickerson); id. at 383:18-22 (Anaya-Allen, Dickerson).

482.    Dickerson obtained a loan modification on her own, saved her house, but owed more on her loan because she had been paying Real Estate Law.  See July 9 Tr. at 382:3-21 (Dickerson, Anaya-Allen).

      **h.**    **Rachel Silva.**

483.    New Mexico consumer Silva lives at 2616 Mountain Gate Lane, SW, Albuquerque, 87121, and owned and occupied, as a principal place of residence, 1210 Stinson Street, SW, Albuquerque, 87121.  See July 9 Tr. at 397:8-398:10 (Anaya-Allen, Silva); id. at 408:3 (Silva).

484.    Silva had trouble making her mortgage payments when her payment increased.  See July 9 Tr. at 399:1-5 (Silva).

485.    Silva contacted Real Estate Law after her son gave her Real Estate Law's information, and she chose to start the process of obtaining Real Estate Law's assistance.  See July 9 Tr. at 400:3-13 (Anaya-Allen, Silva).

486.    Silva completed several documents for Real Estate Law, including a foreclosure defense checklist, and she faxed Real Estate Law the documents on November 18, 2013.  See July 9 Tr. at 399:11-401:10 (Anaya-Allen, Silva).

487.    On September 10, 2013, Silva entered an Attorney-Client Fee Agreement with Real Estate Law, and Mr. Pratt executed the agreement on September 24, 2013.  See Attorney-Client Fee Agreement at 3 (admitted July 9, 2019, at trial as New Mexico's Ex. 101)("Silva Attorney-Client Fee Agreement").

488.    The Silva Attorney-Client Fee Agreement provided for a $5,000.00 fee that is a non-refundable one-time retainer fee earned on receipt.  See Silva Attorney-Client Fee Agreement ¶¶ 4-5, at 1-2.

489.     The Silva Attorney-Client Fee Agreement also provides that Real Estate Law will charge a thirty-percent contingency fee.  See Silva Attorney-Client Fee Agreement ¶ 4, at 1.

490.     The Silva Attorney-Client Fee Agreement provides for a $59.95 monthly maintenance fee.  See Silva Attorney-Client Fee Agreement ¶ 5, at 2.

491.     The Silva Attorney-Client Fee Agreement provides that Silva hires Real Estate Law to "maintain a lawsuit AGAINST [her] MORTGAGE LENDER CONCERNING [her] REAL ESTATE PROPERTY."  Silva Attorney-Client Fee Agreement ¶ 2, at 1 (bold omitted)(capitalization in original).

492.     The Silva Attorney-Client Fee Agreement indicates that Real Estate Law's attorneys are admitted only to the California Bar and that Real Estate Law pursues actions in California.  See Silva Attorney-Client Fee Agreement ¶ 2, at 1.

493.     The Silva Attorney-Client Fee Agreement provides for a division of fees between Real Estate Law, which will receive twenty percent of the retainer fee, and Pinnacle Law, which will receive eighty percent of the retainer fee.  See Silva Attorney-Client Fee Agreement ¶ 11, at 4.

494.     The Silva Attorney-Client Fee Agreement states that "PLC is a separate law firm not related to RELC.  Client is not retaining PLC."  Silva Attorney-Client Fee Agreement ¶ 11, at 4.

495.     The Silva Attorney-Client Fee Agreement also states: "The agreement shall be governed in accordance with the laws of the State of California.  Venue shall be Los Angeles County."  Silva Attorney-Client Fee Agreement ¶ 13, at 3.

496.     The Silva Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that Silva signed the Silva Attorney-Client

Fee Agreement, and does not include a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract Form.  See Silva Attorney-Client Fee Agreement at 1-3.

497.  Silva paid Real Estate Law around $6,000.00 in total, including the $5,000.00 retainer and the monthly maintenance fees.  See July 9 Tr. at 404:18-405:3 (Silva); id. at 409:15-410:9 (Kennedy, Silva).[59]

498.  Silva paid $59.95 a month to Real Estate Law for a year.  See July 9 Tr. at 404:19-405:11 (Silva); id. at 406:4-9 (Anaya-Allen, Silva); Silva Attorney-Client Fee Agreement ¶ 5, at 2.

499.  Silva paid Real Estate Law a total of $5,719.40.

500.  Silva received a package from Mr. Pratt in which Mr. Pratt congratulated Silva on joining a mass tort action against her lender and in which Mr. Pratt made statements including: "I have . . . numerous victories against lenders"; "[m]y staff has numerous years of experience with mortgage and real estate law"; "[r]est assured that your case is in excellent hands"; and "[y]our retainer fee, pooled with those of other homeowners in this mass tort action, allows a powerhouse law firm to represent your interests."  Silva Welcome Packet at 1 (admitted July 9, 2019, at Trial as New Mexico's Ex. 100).

501.  The Silva Welcome Package includes a document entitled "Together, We are a Team" that discusses the FDD and states "FDD will utilize a number of strategies to postpone the date" of foreclosure, and a document entitled "Do's and Don'ts" that advises Silva to send correspondence with her lender to Real Estate Law and not to provide her lender with financial

---

[59]The Court also does not adopt Mr. Pratt's proposed finding that no evidence shows that Silva paid Real Estate Law.  See Pratt's Proposed Findings ¶ 7, at 3.  The Court considers credible Silva's assertion that she paid Real Estate Law.

information without first contacting Real Estate Law.  Silva Welcome Packet at 3.  <u>See</u> Silva Welcome Packet at 4.

502.    The "Together, We are a Team" document also states: "If you are a homeowner facing imminent foreclosure (a sales date within 45 days), contact our Foreclosure Defense department, or FDD, immediately.  FDD will utilize a number of strategies to postpone the date." Silva Welcome Packet at 4.

503.    Real Estate Law sent Silva a foreclosure defense checklist that includes the statement: "I appreciate you and look forward to a successful loan modification."  Silva FDD Package at 3 (admitted July 9, 2019, at Trial as New Mexico's Ex. 99).

504.    The foreclosure defense checklist also states: "It is extremely important that all items are included; otherwise the processing of your foreclosure defense will be delayed."  Silva FDD Package at 3.

505.    When Silva spoke with Real Estate Law on the telephone, Real Estate Law reassured her that they would resolve her situation and that she would save her home.  <u>See</u> July 9 Tr. at 407:8-14 (Anaya-Allen, Silva).

506.    Silva completed the Silva FDD Package.  <u>See</u> July 9 Tr. at 399:15-25 (Anaya-Allen, Silva); <u>id.</u> at 400:11-402:23 (Silva, Anaya-Allen); Silva FDD Package at 1-12.

507.    Silva ended up going into foreclosure, Real Estate Law did not prevent the foreclosure on Silva's home, and she lost her home and moved out.  <u>See</u> July 9 Tr. at 407:20-408:8 (Anaya-Allen, Silva).

508.    The letter and the enclosures in the Silva Welcome Packet and the Silva FDD Package include no specific MARS Rule disclosures or MFCFPA disclosures.  <u>See</u> Silva Welcome Packet at 1-4.

i. **Matthew Jaramillo.**

509.   Jaramillo lives at and owns, as a principal place of residence, 1039 Bosque Loop, Bernalillo, New Mexico 87004, and has occupied that residence for three-quarters of his life.  See July 9 Tr. at 411:22-412:3 (Anaya-Allen, Jaramillo).

510.   A few years ago, Jaramillo struggled to make payments on his home mortgage payment for that house.  See July 9 Tr. at 412:4-10 (Anaya-Allen, Jaramillo).

511.   Jaramillo learned of Real Estate Law through a television advertisement offering to help obtain a loan modification.  See July 9 Tr. at 412:17-23 (Anaya-Allen, Jaramillo).[60]

512.   Jaramillo called Real Estate Law, and it told him that it would help him obtain foreclosure protection, but that it wanted a fee.  See July 9 Tr. at 412:24-413:10 (Anaya-Allen, Jaramillo).

513.   At that time, Jaramillo was not in foreclosure.  See July 9 Tr. at 433:11-18 (Anaya-Allen, Jarmaillo); id. at 435:2-13 (Anaya-Allen, Jaramillo).

514.   Jaramillo had a compliance call with Jonathon Lopez of Real Estate Law.  See Audio Recording of Compliance Call at 0:00-3:54 (dated December 16, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 102)("Jaramillo Compliance Call").

515.   Real Estate Law also told Jaramillo that it did not guarantee that the lawsuit would not delay or stop a foreclosure, and that, if a foreclosure sale date is scheduled, and Real Estate Law can not get a restraining order from the judge or an agreement from the lender to stop the sale

---

[60]The Court does not include in its finding the second part of New Mexico's proposed finding ¶ 460, at 60, "Matthew Jaramillo called RELC and they told him they would try to get him a modification of his loan," because the Court includes the evidence of Jaramillo calling Real Estate Law in the next finding and because the record reflects that, during the call, Real Estate Law told Jaramillo that they would help him obtain some foreclosure protection.  July 9 Tr. at 413:6-10 (Jaramillo).

through the lawsuit, Jaramillo will need to take legal action outside the lawsuit to stop the foreclosure.  See Jaramillo Compliance Call at 2:27-2:48.

516.    In the compliance call, Jaramillo and Real Estate Law discussed:

Lopez:        Do you understand that as long as you have signed the retainer agreement, made payment and completed this compliance call, you are represented by RELC even if your name does not appear on the caption of a complaint?

Jaramillo:    Yes.

Lopez:        Perfect.

Jaramillo Compliance Call at 3:15-3:29.

517.    The compliance call continued:

Lopez:        Do you understand that you are not entitled to a refund or credit after the execution of the retainer agreement and completion of the compliance call even if your name has not been added to the caption of a complaint?

Jaramillo:    Yes

Lopez:        Perfect.  Thank you very much, Mr. Jaramillo for answering all my questions and I will email, mail you a copy of your executed retainer agreement.

Jaramillo Compliance Call at 3:30-3:47.

518.    Real Estate Law did not include specific MARS Rule disclosures in the compliance call.  See Jaramillo Compliance Call at 0:00-3:54.

519.    Jaramillo executed an attorney-client fee agreement with Real Estate Law on December 6, 2013.   See Attorney-Client Fee Agreement at 3 (executed December 16, 2013)(admitted July 9, 2019, at Trial as New Mexico's Ex. 104)("Jaramillo Attorney-Client Fee Agreement").

520. The Jaramillo Attorney-Client Fee Agreement provides for a $4,995.00 non-refundable, one-time retainer fee and a monthly maintenance fee of $59.95. See Jaramillo Attorney-Client Fee Agreement ¶¶ 4, 5, at 1-2.

521. The Jaramillo Attorney-Client Fee Agreement also provides that Real Estate Law will charge a thirty-percent contingency fee. See Jaramillo Attorney-Client Fee Agreement ¶ 4, at 1.

522. The Jaramillo Attorney-Client Fee Agreement provides that Jaramillo hires Real Estate Law to "maintain a lawsuit AGAINST [her] MORTGAGE LENDER CONCERNING [her] REAL ESTATE PROPERTY." Jaramillo Attorney-Client Fee Agreement ¶ 2, at 1 (bold omitted).

523. The Jaramillo Attorney-Client Fee Agreement indicates that Real Estate Law employs only employees admitted to California and will litigate actions in California. See Jaramillo Attorney-Client Fee Agreement ¶ 2, at 1.

524. The Jaramillo Attorney-Client Fee Agreement provides: "The agreement shall be governed in accordance with the laws of the State of California. Venue shall be Los Angeles County." Jaramillo Attorney-Client Fee Agreement ¶ 12, at 4.

525. The Jaramillo Attorney-Client Fee Agreement does not contain a provision about Pinnacle Law. See Jaramillo Attorney-Client Fee Agreement at 1-3.

526. The Jaramillo Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that Jaramillo signed the Jaramillo Attorney-Client Fee Agreement, or a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract Form. See Jaramillo Attorney-Client Fee Agreement at 1-3.

527. Mr. Davis executed the Jaramillo Attorney-Client Fee Agreement for Real Estate Law on January 2, 2014. See Jaramillo Attorney-Client Fee Agreement at 3.

528.     Jaramillo was to pay Real Estate Law three installments of $1,000.00 and two additional payments, of around $900.00 and $995.00.  See July 9 Tr. at 415:6-10 (Anaya-Allen, Jaramillo); Retainer Fee Payment Authorizations Form at 3 (admitted July 9, 2019, at Trial as New Mexico's Ex. 103).

529.     Real Estate Law had Jaramillo pay a monthly maintenance fee of $59.95 a month. See July 9 Tr. at 416:24-417:4 (Anaya-Allen, Jaramillo); Maintenance Fee Payment Authorizations Form at 4 (admitted July 9, 2019, at Trial as New Mexico's Ex. 103).

530.     Jaramillo's daughter helped him with forms and paperwork for Real Estate Law, and Jaramillo signed the Jaramillo Application Package pages.[61]  See July 9 Tr. at 420:21-430:10 (Anaya-Allen, Jaramillo).

531.     Jaramillo asked for a refund, because he did not believe that Real Estate Law was helping him, but Real Estate Law did not provide a refund.  See July 9 Tr. at 419:9-21 (Jaramillo, Anaya-Allen).

532.     Real Estate Law denied Jaramillo a refund and stated:

> When you signed the Attorney-Client Fee Agreement on December 16, 2013, you understood that "NO REFUND OR CREDIT will be owed since the actual time and effort spent on the file that could have been spent on other files would be lost".  Furthermore, during the compliance call you completed on December 16, 2013, when asked if you understood that you are not entitled to a refund or credit after the execution of the retainer agreement and completion of the compliance call, you replied "yes.""
>
> On March 25, 2014, you were added to the Mass Tort lawsuit against Bank of America.  Case #BC540511.

---

[61]Jaramillo does not recognize "his" signature on the Jaramillo Application Package or remember electronically signing the document.  See July 9 Tr. at 414:7-15 (Anaya-Allen, Jaramillo).

Letter from Real Estate Law to Matthew Jaramillo at 1 (dated April 3, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 105).

533.     Jaramillo then stopped making Real Estate Law the scheduled retainer fee payments after three payments, because Real Estate Law had not contacted him or informed him what was happening.  See July 9 Tr. at 416:9-18 (Anaya-Allen, Jaramillo).

534.     Jaramillo paid Real Estate Law a total of $3,179.85 in the retainer fee and the monthly maintenance fees.  See Monthly Maintenance Fee Payment Authorizations Form at 4.

535.     Jaramillo then, in 2014, sued his mortgage company, Select Portfolio Servicing, and settled the suit when the company gave him a loan modification.  See July 9 Tr. at 433:11-18 (Anaya-Allen, Jaramillo); id. at 435:2-13 (Anaya-Allen, Jaramillo).

### j.     Julian Mondragon.

536.     Mondragon owns and previously lived, as a principal place of residence, in a home at 839 Wynview Court, NW, Albuquerque, and now lives in Scottsdale, Arizona.  See July 9 Tr. at 437:3-438:3 (Anaya-Allen, Mondragon).[62]

537.     Mondragon had trouble with his home payments after his work hours and income were reduced.  See July 9 Tr. at 438:4-9 (Anaya-Allen, Mondragon).

538.     Mondragon learned of Real Estate Law through a television advertisement and then called Real Estate Law.  See July 9 Tr. at 438:18-23 (Anaya-Allen, Mondragon).[63]

---

[62]The Court concludes that, during the events with Real Estate Law, Mondragon more likely than not occupied the Wynview Court address, because the Facsimile Transmission from Julian Mondragon to Maria Flores (undated) at 2, the Mondragon Application Package, Retainer Fee Payment Authorization Form at 5 (admitted July 9, 2019, at Trial as New Mexico's Ex. 110), and the Mondragon Application Package, Monthly Maintenance Fee Payment Authorizations Form at 5, lists the Wynview Court address as the mailing and/or bank account holder address.

[63]The Court does not adopt New Mexico's proposed language: "Julian Mondragon saw a

539.    Real Estate Law told Mondragon that they would sue JP Morgan Chase to get Mondragon up to $40,000.00 against his payments and that they would obtain for him a loan modification.    See July 9 Tr. at 438:14-22 (Anaya-Allen, Mondragon); id. at 441:17-442:7 (Mondragon, Anaya-Allen).

540.    Mondragon signed an attorney-client fee agreement with Real Estate Law on January 7, 2014.  See Mondragon Attorney-Client Fee Agreement at 3.[64]

541.    At this time, a foreclosure suit had not been filed against Mondragon's house.  See July 9 Tr. at 471:3-5 (Kennedy, Mondragon).

542.    The Mondragon Attorney-Client Fee Agreement provides for a $4,995.00 retainer fee and a monthly maintenance fee of $59.95.  See Mondragon Attorney-Client Fee Agreement at ¶¶ 4, 5, at 1-2.

543.    The Mondragon Attorney-Client Fee Agreement also provides that Real Estate Law will receive a thirty-percent contingency fee.  See Mondragon Attorney-Client Fee Agreement at ¶ 4, at 1.

544.    The Mondragon Attorney-Client Fee Agreement provides for a non-refundable retainer fee that is "fully earned upon receipt."  Mondragon Attorney-Client Fee Agreement ¶ 4, at 1.

---

television commercial about loan modifications that prompted him to call RELC," Plfts.' Proposed Findings ¶ 478, at 62, because the record reflects that Mondragon saw a television commercial for Real Estate Law and not that the commercial discussed loan modifications, see July 8 Tr. at 438:18-23 (Anaya-Allen, Mondragon).

[64]The Court does not adopt New Mexico's proposed finding that Mr. Davis executed the Mondragon Attorney-Client Fee Agreement, because the Court does not see evidence of such an execution in the record.  See New Mexico's Proposed Findings ¶ 480, at 62.

545.    The Mondragon Attorney-Client Fee Agreement provides that Mondragon hires Real Estate Law to "maintain a lawsuit AGAINST [her] MORTGAGE LENDER CONCERNING [her] REAL ESTATE PROPERTY."  Mondragon Attorney-Client Fee Agreement ¶ 2, at 1 (bold omitted).

546.    The Mondragon Attorney-Client Fee Agreement reflects that Real Estate Law has only attorneys that are admitted to the California bar and that Real Estate Law will litigate and represent Mondragon in California courts.  See Mondragon Attorney-Client Fee Agreement ¶ 2, at 1.

547.    The Mondragon Attorney-Client Fee Agreement provides:  "The agreement shall be governed in accordance with the laws of the State of California.  Venue shall be Los Angeles County."  Mondragon Attorney-Client Fee Agreement ¶ 12, at 3.

548.    The Mondragon Attorney-Client Fee Agreement does not discuss Pinnacle Law.  See Mondragon Attorney-Client Fee Agreement at 1-3.

549.    The Mondragon Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that Mondragon signed the Mondragon Attorney-Client Fee Agreement, a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract Form.  See Mondragon Attorney-Client Fee Agreement at 1-3.

550.    Mondragon paid Real Estate Law $4,995.00.  See Retainer Fee Payment Authorization Form at 5 (admitted July 9, 2019, at Trial as New Mexico's Ex. 110); July 9 Tr. at 441:1-6 (Anaya-Allen, Mondragon).

551.    Mondragon made monthly payments to Real Estate Law of $59.95 as direct withdrawals from his account for over one year.  See July 9 Tr. at 444:21-445:2 (Anaya-Allen,

Mondragon); id. at 459:25-460:4 (Anaya-Allen, Mondragon); Monthly Maintenance Fee Payment Authorizations Form at 5 (dated January 7, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 110); Mondragon Emails at 29-32 (admitted July 9, 2019, at Trial as New Mexico's Ex. 106); Email from Real Estate Law to Julian Mondragon at 1 (sent October 7, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 121).

552. Mondragon paid Real Estate Law a total of $5,714.40.

553. Real Estate Law recorded a compliance call with Mondragon, in which Real Estate Law told Mondragon that, after he executed the retainer agreement and completed the compliance call, Real Estate Law would represent him and that he would not receive a refund or credit. See Audio Recording of Compliance Call at 3:24-3:32 (dated January 8, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 108)("Mondragon Compliance Call").

554. Real Estate Law also told Mondragon that it does not guarantee that the lawsuit would not delay or stop a foreclosure; if a foreclosure sale date is scheduled, Real Estate Law can not get a restraining order from the judge or an agreement from the lender to stop the sale through the lawsuit; and that Mondragon would need to take legal action outside the lawsuit to stop the foreclosure. See Mondragon Compliance Call at 2:10-2:43.

555. Mondragon's compliance call did not include specific MARS Rule disclosures. See Mondragon Compliance Call at 0:00-3:53.

556. Mondragon understood that Real Estate Law would help him obtain a loan modification, and he sent Real Estate Law documents for a loan modification application. See July 9 Tr. at 441:14-17 (Anaya-Allen, Mondragon); id. at 442:25-443:6 (Anaya-Allen, Mondragon); id. at 449:7-19 (Anaya-Allen, Mondragon); id. at 451:24-452:21 (Anaya-Allen, Mondragon); id. at 454:15-22 (Anaya-Allen, Mondragon); id. at 455:5-20 (Anaya-Allen,

Mondragon); Email from Monica Davis to Julian Mondragon at 1 (sent February 8, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 114)(stating that Real Estate Law will convey to Mondragon "a checklist of documents needed in order to provide you with optimal results"); Email from Sam Branco to Julian Mondragon at 1 (sent April 7, 2016)(admitted July 9, 2019, at Trial as New Mexico's Ex. 117)(explaining the FDD); Facsimile Transmission from Julian Mondragon to Maria Flores at 1-4 (undated)(admitted July 9, 2019, at Trial as New Mexico's Ex. 109)(conveying information about a change of creditor); Email from Maria Flores to Julian Mondragon (sent March 19, 2014)(admitted at Trial July 9, 2019, as New Mexico's Ex. 120)(confirming receipt of financial documents and explaining that an "underwriting specialist" will submit Mondragon's file to his lender); Email from Araceli Robles to Julian Mondragon at 1-2 (sent June 2, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 119)(advising that Mondragon's servicer is reviewing Mondragon's file and requires no further documentation).

557.    Real Estate Law emailed Mondragon on June 26, 2014, explaining that his lender had approved a trial loan modification, but he did not receive documents for a trial loan modification or get such a modification.  See July 9 Tr. at 475:24-476:1 (Anaya-Allen, Mondragon); Email from Elba Chavez to Julian Mondragon at 1 (sent June 26, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 118).

558.    Real Estate Law told Mondragon that he was part of their "Mass Tort Litigation Program," and that he was a plaintiff in Ball v. v. JP Morgan Chase & Co., filed March 25, 2014. July 9 Tr. at 457:2-3 (Mondragon).  See Email from Lauren Roysten to Julian Mondragon at 1-2 (sent April 7, 2016)(admitted July 9, 2019, at Trial as New Mexico's Ex. 112)("Mondragon Roysten April 7 Email"); Email from Edna Cano to Julian Mondragon at 1  (sent April 7, 2016)(admitted July 9, 2019, at Trial as New Mexico's Ex. 113)("Mondragon Cano April 7

Email"); Email from Real Estate Law to Julian Mondragon at 1-2 (sent September 12, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 115)("Mondragon Sept. 12 Email").

559.    Real Estate Law sent Mondragon an email on April 17, 2015, in which Mr. Davis explained that Real Estate Law had had a hearing on the dismissal of four mass tort cases, including Ball v. v. JP Morgan Chase & Co.  See Email from Real Estate Law to Julian Mondragon at 1-2 (sent April 17, 2015)(admitted July 9, 2019, at Trial as New Mexico's Ex. 123)("Mondragon April 17 Email").

560.    A month later, on May 27, 2015, Real Estate Law and Mr. Davis voluntarily dismissed Ball v. JP Morgan Chase & Co.  See Ball v. JP Morgan Chase & Co. at 62-65.

561.    The named defendants in Real Estate Law's Chase cases challenged the cases' legal validity.  See Email from Real Estate Law to Julian Mondragon at 1-2 (sent October 6, 2014)(admitted July 9, 2019, at Trial as New Mexico's Ex. 116); Mondragon April 17 Email at 1-2.

562.    Real Estate Law and Mr. Davis filed a Request for Dismissal in Barker v. Select Portfolio Servicing, and, on June 30, 2015, the case was dismissed.  See Barker v. Select Portfolio Servicing, Request for Dismissal and Dismissal at 1-4.

563.    The County of Los Angeles, Superior Court of California stayed Alex v. JPMorgan Chase & Co., Ball v. JPMorgan Chase & Co., Beech v. JPMorgan Chase & Co., and Bogan v. JPMorgan Chase & Co., for all non-California plaintiffs, including New Mexico consumer Mondragon, pending filing in a more appropriate venue, and Real Estate Law assured Mondragon in an email dated November 21, 2014, which Mr. Davis signed via e-signature, that the ruling is "by no means a defeat for us or a 'loss'" for him:

> All (this) means is that we now have to determine where to re-file your claims in
> order to be given the best possible chance for success the next time around.  This

will either mean re-filing in another California jurisdiction, or teaming up with a law firm in another state to be able to file your litigation outside of California.

Please understand that your case is not "over," and it certainly has not been dismissed!  It is merely "on hold" for the time being, while we decide what the next step should be.

Mondragon Email at 63-64; Email from Real Estate Law PC to Julian Mondragon (sent April 7, 2015) at 1-2 (admitted July 9, 2019, at Trial as New Mexico's Ex. 122)("Mondragon April 7, 2015 Email").[65]

564.    Real Estate Law did not appeal the dismissals in <u>Alex v. JPMorgan Chase & Co.</u>, <u>Ball v. JPMorgan Chase & Co.</u>, <u>Beech v. JPMorgan Chase & Co.</u>, or <u>Bogan v. JPMorgan Chase & Co.</u>, but refiled the cases as <u>Conrad v. JP Morgan Chase & Co.</u>, Case No. 39-2015-00327265 in the County of San Joaquin, Superior Court of California.  <u>See</u> Email from Real Estate Law Center PC to Julian Mondragon at 1 (sent July 15, 2015)(admitted July 9, 2019, at Trial as New Mexico's Ex. 124).

565.    Real Estate Law's actions did not stop the filing of a foreclosure action against Mondragon, which occurred April, 2016.  <u>See</u> July 9 Tr. at 471:3-7 (Kennedy, Mondragon).

566.    Real Estate Law never told Mondragon the outcome of <u>Ball v. JPMorgan Chase & Co.</u>  <u>See</u> July 9 Tr. at 459:14-19 (Anaya-Allen, Mondragon).

567.    Mondragon received a loan modification in 2017 that saved his home from foreclosure.  <u>See</u> July 9 Tr. at 472:3-6 (Kennedy, Mondragon); <u>id.</u> at 473:9-13 (Kennedy, Mondragon).

568.    Mondragon received the loan modification, because his mortgage was sold.  <u>See</u> July 9 Tr. at 474:15-22 (Anaya-Allen, Mondragon).

---

[65]The Court notes, for the reader's edification, that the pages cited in the Mondragon Emails and the Mondragon April 7, 2015 Email are the same document.

569.    Real Estate Law's lawsuit did not assist Mondragon.  See July 9 Tr. at 460:16-18 (Anaya-Allen, Mondragon).

570.    Mondragon received several emails that contained no disclaimers or disclosures related to loan modification or to foreclosure.  See, e.g., Mondragon Emails at 1, 2-3, 4, 6-7, 8-9, 37-38, 43-44, 45, 50, 59, 63-64, 67, 69, 71-72, 75-76, 80.

571.    Those emails that Mondragon received that contain a relevant disclaimer state:

> Please be aware that filing a Mass Tort Complaint against your lender in and of itself will not stop the foreclosure process or prevent a trustee sale of your property. Also, if your property has been sold due to the foreclosure process and/or you have a pending Unlawful Detainer, and/or a Notice to Vacate, Mass Tort Litigation may not prevent legal action against you.

E.g., Mondragon Emails at 47, 49, 53, 58, 61, 74, 78.

### k.    **Mark Humble.**

572.    Humble lives at and owns, as a principal place of residence, 10312 Apache Avenue in Albuquerque, and has lived there for sixteen years. See July 9 Tr. at 477:16-22 (Anaya-Allen, Humble).

573.    Humble had trouble with his mortgage to CitiMortgage on this home, and his foreclosure action is ongoing, and has delayed the filing of bankruptcy.  See July 9 Tr. at 477:21-478:16 (Anaya-Allen, Humble); id. at 480:24-481:4 (Anaya-Allen, Humble); id. at 482:3-483:6 (Kennedy, Humble).

574.    Humble paid Real Estate Law $1,000.00.  See July 9 Tr. at 479:1-3 (Anaya-Allen, Humble).

575.    Humble asked Real Estate Law for a refund, because he did not want to be in a mass tort lawsuit but wanted individual litigation.  See July 9 Tr. at 479:4-19 (Anaya-Allen, Humble).

576. Humble received $100.00 returned from Real Estate Law, but not the additional $900.00. See July 9 Tr. at 480:9-17 (Anaya-Allen, Humble).

577. Humble paid Real Estate Law $1,000.00 and received a refund of $100.00, for a balance of $900.00.

578. Humble started working with a New Mexico attorney to address his financial concerns in 2016. See July 9 Tr. at 483:7-9 (Kennedy, Humble).

**l.      June Valdez and Jose Valdez.**

579. June Valdez owned homes at 1522 Alaska Avenue, 1801 College Avenue, 1824 Lamar Circle, and 1826 Lamar Circle in Almagordo, New Mexico. See July 9 Tr. at 500:6-14 (Anaya-Allen, June Valdez).

580. June Valdez currently lives at 1826 Lamar Circle. See July 9 Tr. at 529:6-7 (June Valdez).

581. June Valdez occupied, as a principal place of residence, 1801 College Avenue. See July 10 Tr. at 516:24-517:11 (reflecting that June Valdez discussed options with Real Estate Law about 1801 College Avenue, but that Real Estate Law conveyed that it could not help with 1824 Lamar, because it was not owner-occupied).

582. June Valdez resides in New Mexico. See July 10 Tr. at 499:25-500:3 (Anaya-Allen, June Valdez).[66]

583. June Valdez discovered Real Estate Law while doing an internet search to discover ways to save her home. See July 10 Tr. at 500:15-24 (Anaya-Allen, June Valdez).

---

[66]The Court concludes that, because June Valdez works as a "supervisory management analyst working for the U.S. Army at White Sands Missile Range," she more likely than not resides in New Mexico. July 10 Tr. at 499:25-500:3 (Anaya-Allen, June Valdez).

584. June Valdez contacted Real Estate Law, and it informed her that Real Estate Law could help her, that the banks were engaged in fraudulent practices, that June Valdez could join the lawsuits, and that Real Estate Law included foreclosure defense services with her joining. See July 10 Tr. at 501:6-24 (Anaya-Allen, June Valdez).

585. June Valdez signed two Attorney-Client Fee Agreements on January 15, 2014, for two different properties -- the 1801 College Avenue property and the 1824 Lamar Circle property. See Attorney-Client Fee Agreements at 1-6 (admitted July 10, 2019, at Trial as New Mexico's Ex. 125)("June Valdez Attorney-Client Fee Agreements"); July 10 Tr. at 516:24-517:11 (June Valdez).

586. The June Valdez Attorney-Client Fee Agreements provide that June Valdez hires Real Estate Law to "maintain a lawsuit AGAINST [her] MORTGAGE LENDER CONCERNING [her] REAL ESTATE PROPERTY." June Valdez Attorney-Client Fee Agreements ¶ 2, at 1, 4 (bold omitted).

587. The June Valdez Attorney-Client Fee Agreements provide for a $2,500.00 non-refundable, one-time retainer fee for the 1801 College Avenue property and a $5,000.00 non-refundable, one-time retainer, and that both retainer fees are "fully earned upon receipt." June Valdez Attorney-Client Fee Agreements ¶ 4, at 1, 4.

588. The June Valdez Attorney-Client Fee Agreements also provide for a $59.95 monthly maintenance fee. See June Valdez Attorney-Client Fee Agreements ¶ 5, at 2, 5.

589. The June Valdez Attorney-Client Fee Agreements also provide that Real Estate Law will receive a thirty-percent contingency fee. See June Valdez Attorney-Client Fee Agreements ¶ 4, at 1, 4.

590. The June Valdez Attorney-Client Fee Agreements reflect that Real Estate Law has only attorneys admitted to the State Bar of California and will file litigation in California. See June Valdez Attorney-Client Fee Agreements ¶ 2, at 1, 4.

591. The June Valdez Attorney-Client Fee Agreements do not mention Pinnacle Law. See June Valdez Attorney-Client Fee Agreements at 1-6.

592. The June Valdez Attorney-Client Fee Agreements provide: "The agreement shall be governed in accordance with the laws of the State of California. Venue shall be Los Angeles County." June Valdez Attorney-Client Fee Agreements ¶ 12, at 3, 6.

593. Mr. Davis is the signatory for Real Estate Law on the June Valdez Attorney-Client Fee Agreements, and Mr. Davis executed the June Valdez Attorney-Client Fee Agreements on January 30, 2014. See June Valdez Attorney-Client Fee Agreements at 3, 6.

594. The June Valdez Attorney-Client Fee Agreements do not contain in at least fourteen-point font Real Estate Law's name and address, or the date that June Valdez signed the June Valdez Attorney-Client Fee Agreements. See June Valdez Attorney-Client Fee Agreements at 1, 4.

595. June Valdez paid Real Estate Law fees of $2,500.00 for the College Property and $5,000.00 for the 1824 Lamar Circle property. See July 10 Tr. at 502:2-12 (June Valdez); Email from Hamilton Dunn to June Valdez at 2 (sent January 16, 2014)(admitted July 10, 2019, at Trial as New Mexico's Ex. 128)("Valdez Jan. 16 Email").

596. June Valdez made the $7,500.00 payment in an initial deposit of $1,250.00 and eight remaining biweekly payments of $781.25. See Valdez Jan. 16 Email at 2.

597. June Valdez paid Real Estate Law $59.95 in monthly maintenance fees for the properties once a month when she paid the eight biweekly deposits of $781.25 and paid the $59.95

once a month after she finished paying the biweekly amounts. See July 10 Tr. at 505:17-21 (Anaya-Allen, June Valdez); id. at 506:11-20 (Anaya-Allen, June Valdez); id. at 527:23-528:3 (Anaya-Allen, June Valdez); Valdez Jan. 16 Email at 2.

598. Real Estate Law did not provide June Valdez a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract Form. See July 10 Tr. at 509:22-510:9 (Anaya-Allen, June Valdez); June Valdez Attorney-Client Fee Agreements at 1-6.

599. Real Estate Law recorded a compliance call with June Valdez in which June Valdez inquired whether Real Estate Law would require paperwork to stop a foreclosure, and Real Estate Law agreed to do what it could to stop a foreclosure, see Audio Recording of Compliance Call at 2:14-2:44 (undated)(admitted July 10, 2019, at Trial as New Mexico's Ex. 126)("June Valdez Compliance Call"); Real Estate Law conveyed that June Valdez would not be entitled to a refund after signing the Valdez Attorney-Client Fee Agreements and completing the compliance call, see June Valdez Compliance Call at 4:05-4:14; and Real Estate Law did not provide specific or general MARS Rule disclosures in the compliance call, see June Valdez Compliance Call at 0:00-6:03.

600. Real Estate Law also told June Valdez that it did not guarantee that the lawsuit would not delay or stop a foreclosure, and that, if a foreclosure sale date was scheduled, Real Estate Law could not get a restraining order from the judge or an agreement from the lender to stop the sale through the lawsuit, and that June Valdez would need to take legal action outside the lawsuit to stop the foreclosure. See June Valdez Compliance Call at 2:04-3:07.

601. June Valdez communicated with Real Estate Law on behalf of her father -- Jose Valdez -- because he was struggling with his mortgage payments, and because June Valdez believed that Real Estate Law could help him. See July 10 Tr. at 503:1-13 (Anaya-Allen, June Valdez).

602.    Jose Valdez lives at and owns 805 Magnolia Street, Alamogordo, 88310, and June Valdez communicated with Real Estate Law about that property.  See July 10 Tr. at 502:23-503:13 (Anaya-Allen, June Valdez).

603.    Jose Valdez paid Real Estate Law $5,000.00 to enroll with its program.  See July 10 Tr. at 526:11-25 (Anaya-Allen, June Valdez).

604.    Jose Valdez paid Real Estate Law a total of $5,000.00.

605.    Real Estate Law told June Valdez that she and Jose Valdez were included in a mass tort lawsuit.  See July 10 Tr. at 513:3-10 (Anaya-Allen, June Valdez).

606.    In a May 15, 2015, email to June Valdez, Real Estate Law references Miller v. Wells Fargo Bank, N.A., Case No. 37-2014-00010936, and states that Real Estate Law will not appeal Miller v. Wells Fargo Bank, N.A., but that June Valdez may work with the FDD.  See Email from Edna Cano to June Valdez at 1-3 (sent May 15, 2015)(admitted July 10, 2019, at Trial as New Mexico's Ex. 132)("June Valdez May 15 Email").

607.    Real Estate Law and Mr. Davis voluntarily dismissed Miller v. Wells Fargo Bank, N.A. on June 24, 2014.  See Miller v. Wells Fargo Bank, N.A., Request for Dismissal, at 1.

608.    June Valdez did not speak to anyone at Real Estate Law about the lawsuits, because she mostly talked to people from the FDD.  See July 10 Tr. at 513:16-514:3 (June Valdez).

609.    Real Estate Law told June Valdez that it could not help her with the 1824 Lamar Circle property, because it was not owner-occupied, and, for the 1801 College Avenue property, Real Estate Law told June Valdez that her only option was $3,000.00 for a deed in lieu of foreclosure, and so Real Estate Law did not stop foreclosures on Valdez' properties.  See July 10 Tr. at 516:24-517:11 (Valdez); id. at 527:6-8 (Valdez); Email from Adriana Rodriguez to June

Valdez at 1 (sent May 18, 2015)(admitted July 10, 2019, at Trial as New Mexico's Ex. 131)("Valdez May 18 Email"); June Valdez May 15 Email at 1-3.

610.    June Valdez emailed Mr. Davis for help stopping the foreclosure on the 1824 Lamar Circle property, but he never responded to her. See July 10 Tr. at 518:21-519:4 (Anaya-Allen, June Valdez); id. at 519:11-18 (Anaya-Allen, June Valdez); Email from June Valdez to Erikson Davis at 1 (sent October 21, 2015)(admitted July 10, 2019, at Trial as New Mexico's Ex. 133)("Valdez Oct. 21 Email").

611.    June Valdez joined an appeal against Wells Fargo with no results, and Real Estate Law never told June Valdez that an investment property was not eligible for relief from Wells Fargo. See July 10 Tr. at 514:21-515:11 (Valdez, Anaya-Allen); June Valdez May 15 Email at 1-3.

612.    June Valdez did not pay an additional fee for the appeal. See July 10 Tr. at 527:17-22 (Anaya-Allen, June Valdez).

613.    Real Estate Law told June Valdez that a bankruptcy was a way to stop the foreclosure process. See July 10 Tr. at 523:13-525:5 (Anaya-Allen, June Valdez); Email from Sam Branco to June Valdez at 3-6 (sent October 28, 2015)(admitted July 10, 2019, at Trial as New Mexico's Ex. 127)("June Valdez Oct. 28 Email").[67]

---

[67]The Court does not adopt New Mexico's proposed fact that "a non-attorney" at Real Estate Law conveyed this information to June Valdez, because the record reflects that Valdez spoke with someone in the FDD, but nothing in the record reflects that people in the FDD were not lawyers. New Mexico's Proposed Findings ¶ 529, at 68. See July 10 Tr. at 523:13-525:5 (Anaya-Allen, June Valdez).

614.    Real Estate Law referred Valdez to an FDD class for which she paid $300.00, but she could pay $15.00 for the class in New Mexico.  <u>See</u> July 10 Tr. at 522:23-523:4 (June Valdez); Valdez Oct. 28 Email at 3-6.

615.    June Valdez obtained a loan modification for Jose Valdez, by working with his lender, so he did not lose his home.  <u>See</u> July 10 Tr. at 525:17-526:4 (June Valdez, Anaya-Allen).

616.    Real Estate Law told Valdez that the FDD services were included with the litigation services.  <u>See</u> July 10 Tr. at 501:18-24 (Valdez).[68]

617.    June Valdez paid Real Estate Law a total of $8,758.95.  <u>See</u> June Valdez Attorney-Client Fee Agreements at 3, 6 (dated January 15, 2014); Valdez Oct. 21 Email  at 2 (dated October 21, 2015).

618.    The June Oct. 28 Email contained the disclaimer:

> Please be aware that filing a Mass Tort Complaint against your lender in and of itself will not stop the foreclosure process or prevent a trustee sale of your property. Also, if your property has been sold due to the foreclosure process, and/or you have a pending Unlawful Detainer, and/or a Notice to Vacate, Mass Tort Litigation may not prevent legal action against you.

June Valdez Oct. 28 Email at 6.

619.    Several of the emails that Real Estate Law sent June Valdez contained no disclaimers regarding loan modifications or foreclosures.  <u>See</u>, <u>e.g.</u>, Valdez Jan. 16 Email at 2; Email from Hamilton Dunn to June Valdez at 3 (sent January 16, 2014)(admitted July 10, 2019, at Trial as New Mexico's Ex. 128); Email from Hamilton Dunn to June Valdez at 5 (sent January 15, 2015)(admitted July 10, 2019, at Trial as New Mexico's Ex. 128); Email from Hamilton Dunn

---

[68]The Court does not adopt the Defendants' proposed finding that consumers could reject and rejected the FDD services.  In the Court's view, the evidence suggests that Real Estate Law connected people to the FDD service despite an interest in litigation, as, for instance, Valdez testifies that she spoke mainly with the FDD, although she was interested in litigation.  <u>See</u> July 10 Tr. at 513:16-514:3 (Valdez).

to June Valdez at 3-4 (sent March 3, 2014)(admitted July 10, 2019 at Trial as New Mexico's Ex. 129); Valdez May 18 Email at 1.

      **m.**      **Brian Woods.**

620. Brian Woods has owned and lived in, as a principal place of residence, a home at 8 Mariano Road, in Eldorado, Santa Fe, for over twenty years. See July 10 Tr. at 552:16-18 (Anaya-Allen, Woods).

621. Woods began having problems on his mortgage when the home's value decreased. See July 10 Tr. at 552:19-553:14 (Anaya-Allen, Woods).

622. Real Estate Law contacted Woods by telephone when he was looking to restructure the first mortgage on his home. See July 10 Tr. at 554:25-555:5 (Anaya-Allen, Woods); id. at 555:9-12 (Anaya-Allen, Woods).

623. Woods contacted Real Estate Law again when he discovered that his second mortgage had a balloon payment due to talk about options. See July 10 Tr. at 555:5-8 (Woods).

624. Real Estate Law told Woods that it could help him by including him in litigation against SLS,[69] and that the likely outcome would be to remove the second mortgage. See July 10 Tr. at 555:13-22 (Anaya-Allen, Woods); id. at 560:17-561:6 (Anaya-Allen, Woods).

625. Real Estate Law told Woods that it specialized in helping people with foreclosure situations. See July 10 Tr. at 556:2-9 (Anaya-Allen, Woods).

626. Woods researched Real Estate Law on the internet and discovered negative reviews, which he discussed with Real Estate Law, and Real Estate Law told him that the reviewer

---

[69]Woods believes that SLS stands for "Secure Loan Services." July 10 Tr. at 553:17-19 (Woods).

had a history of representing false information and recommended that Woods check other ratings and sources. See July 10 Tr. at 556:19-557:4 (Woods).

627.     Woods entered into an agreement with Real Estate Law on February 19, 2014. See July 10 Tr. at 557:9-11 (Anaya-Allen, Woods); Attorney-Client Fee Agreement at 1-3 (admitted July 10, 2019, at Trial as New Mexico's Ex. 212)("Woods Attorney-Client Fee Agreement")

628.     Woods "had a little time to think" before entering the agreement. July 10 Tr. at 92:7 (Woods).[70] See id. at 92:7-10 (Woods).

629.     Woods' home was not in foreclosure at the time, and it never went into foreclosure. See July 10 Tr. at 88:18-25 (Kennedy, Woods).

630.     The Woods Attorney-Client Fee Agreement provides for a "a NON REFUNDABLE one time retainer fee of $4,995," and a monthly maintenance fee of $59.95. Woods Attorney-Client Fee Agreement ¶¶ 4-5, at 1-2 (capitalization in original).

631.     The Woods Attorney-Client Fee Agreement also provides for a thirty-percent contingency fee. See Woods Attorney-Client Fee Agreement ¶ 4, at 1.

632.     The Woods Attorney-Client Fee Agreement states that Woods hires Real Estate Law to "maintain a lawsuit AGAINST [his] MORTGAGE LENDER CONCERNING [his] REAL ESTATE PROPERTY." Woods Attorney-Client Fee Agreement ¶ 2, at 1 (capitalization in original).

---

[70]The Court does not adopt the Parwatikar Defs.' Proposed Findings ¶ 12, at 5, which proposes that the consumers had time to think about the attorney-client fee agreements. The Court does not see such evidence for the other consumers, so it does not adopt the finding as to all consumers.

633.    The Woods Attorney-Client Fee Agreement reflects that Real Estate Law had only attorneys who were admitted to the State Bar of California and would pursue litigation in California.  See Woods Attorney-Client Fee Agreement ¶ 2, at 1.

634.    The Woods Attorney-Client Fee Agreement does not mention Pinnacle Law.  See Woods Attorney-Client Fee Agreement at 1-3.

635.    The Woods Attorney-Client Fee Agreement provides: "The agreement shall be governed in accordance with the laws of the State of California.  Venue shall be Los Angeles County."  Woods Attorney-Client Fee Agreement ¶ 12, at 3.

636.    The Woods Attorney-Client Fee Agreement designates Mr. Davis as the signatory. See Woods Attorney-Client Fee Agreement at 3.

637.    The Woods Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that Woods signed the Woods Attorney-Client Fee Agreement.  See Woods Attorney-Client Fee Agreement at 1.

638.    Real Estate Law did not provide Woods a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract form.  See July 10 Tr. at 565:20-566:7 (Anaya-Allen, Woods); Woods Attorney-Client Fee Agreement at 1-3.

639.    Woods paid Real Estate Law two payments of $2,495.00 for a total of $4,995.00. See July 10 Tr. at 557:22-558:1 (Woods); id. at 566:15-19 (Woods, Anaya-Allen).

640.    Woods also paid Real Estate Law $59.95 per month from 2014 through 2016.  See July 10 Tr. at 570:4-18 (Kennedy, Woods).

641.    Woods eventually received a loan modification with Real Estate Law's help, but Woods did not realize that the modification was negatively amortized, and Real Estate Law did not explain that aspect of the modification to him.  See July 10 Tr. at 575:4-18 (Kennedy, Woods).

642.     Woods attempted to contact Mr. Davis directly, but did not receive a response through email, or was told that Mr. Davis was unavailable or that another Real Estate Law would forward his questions to Mr. Davis.  See July 10 Tr. at 566:20-567:3 (Anaya-Allen, Ward).

643.     Mr. Davis filed Arce v. Specialized Loan Servicing, LLC on November 30, 2015. See Arce v. Specialized Loan Servicing, LLC, Judgment of Dismissal with Prejudice, at 13.

644.     After the County of San Diego, Superior Court of California dismissed Arce v. Specialized Loan Servicing, LLC, Real Estate Law asked Woods to sign onto an appeal and to pay an additional $50.00 a month.  See July 10 Tr. at 563:2-6 (Woods).

645.     Woods did not join the appeal and ended his monthly payments.  See July 10 Tr. at 563:7-9 (Anaya-Allen, Woods).

646.     After Woods stopped making the payments, Real Estate Law asked him to sign "a waiver of giving them full license to not worry about me as an unhappy customer."  July 10 Tr. at 563:14-15 (Woods).  See id. at 563:9-15 (Woods).

647.     Woods remembers that he was added to a lawsuit, but that the name and the case number changed after the judge dismissed it; the Jackson v. Specialized Loan Servicing, became Arce v. Specialized Loan Servicing, LLC.  See July 10 Tr. at 559:13-560:14 (Woods); id. at 565:10-12 (Woods); id. at 567:4-10 (Anaya-Allen, Woods).

648.     Woods learned that Jackson v. Specialized Loan Servicing was dismissed, because the plaintiffs had too many differences, i.e., some were in foreclosure, some were in California, some were outside California, and Real Estate Law informed Woods that it was unhappy with the court's ruling and would find a "better venue" for the case.  July 10 Tr. at 562:4-16 (Woods); id. at 571:24-572:5 (Woods); id. at 572:13-16 (Woods); id. at 583:3-19 (Anaya-Allen,

Woods)(reflecting that Real Estate Law explained what happened to the case in an email that Mr. Davis signed).

649.	Woods received a loan modification through Real Estate Law.  See July 10 Tr. at 575:6-18 (Woods).

650.	Woods paid Real Estate Law a total of $6,433.80.

**n.	David Starrett.**

651.	Starrett owned and occupied, as a principal place of residence, a home, located at 1025 Ivy Drive in Roswell, New Mexico, for twelve years. See July 10 Tr. at 585:24-586:8; id. at 596:4-14 (Anaya-Allen, Starrett)(stating that he occupied the 1025 Ivy Drive home until he sold it).

652.	Starrett resides in New Mexico.  See July 10 Tr. at 587:21-23 (Starrett).[71]

653.	Starrett started having problems with his mortgage payments, and the bank began its foreclosure in January, 2012.  See July 10 Tr. at 586:11-20 (Anaya-Allen, Starrett); id. at 598:10-12 (Kennedy, Starrett).

654.	Starrett heard a commercial on the radio for a company that would help lower monthly payments or interest rates, and so he called the company -- Real Estate Law.  See July 10 Tr. at 586:21-587:4 (Anaya-Allen, Starrett).

655.	Real Estate Law told Starrett that it could lower his payments and possibly the interest rate.  See July 10 Tr. at 587:7-9 (Starrett).

656.	Real Estate Law told Starrett that he could stop making his mortgage payments and just pay Real Estate Law.  See July 10 Tr. at 587:12-16 (Starrett); id. at 591:22-592:1 (Starrett,

---

[71]Starrett testified that he worked for Crude Oil Logistics Transportation in Artesia, New Mexico, and the Court concludes that more likely than not he continues to reside in New Mexico. See July 10 Tr. at 587:21-23 (Starrett).

Anaya-Allen).

657. On March 30, 2014, Starrett signed an attorney-client fee agreement with Real Estate Law that provided for an upfront payment of $5,500.00 and for monthly fees of $59.95  See Attorney-Client Fee Agreement at ¶ 4, at 1-2 (admitted July 10, 2019, at Trial as New Mexico's Ex. 137)("Starrett Attorney-Client Fee Agreement"); July 10 Tr. at 587:23-588:20 (Anaya-Allen, Starrett).

658. The Starrett Attorney-Client Fee Agreement provides that the retainer fee is "NON REFUNDBALE" and "fully earned upon receipt."  Starrett Attorney-Client Fee Agreement ¶ 4, at 1 (capitalization in original).

659. The Starrett Attorney-Client Fee Agreement also provides that Real Estate Law will receive a thirty-percent contingency fee.  See Starrett Attorney-Client Fee Agreement ¶ 4, at 2.

660. The Starrett Attorney-Client Fee Agreement provides that Real Estate Law will "file and maintain a lawsuIT AGAINST HIS/HER MORTGAGE LENDER AND/OR SERVICER CONCERNING THEIR REAL ESTATE PROPERTY."  Starrett Attorney-Client Fee Agreement ¶ 2, at 1 (capitalization in original).

661. The Starrett Attorney-Client Fee Agreement also reflects that Real Estate Law has attorneys only admitted to the State Bar of California and will pursue litigation in California.  See Starrett Attorney-Client Fee Agreement ¶ 2, at 1.

662. The Starrett Attorney-Client Fee Agreement does not mention Pinnacle Law.  See Starrett Attorney-Client Fee Agreement at 1-3.

663. The Starrett Attorney-Client Fee Agreement states: "The Agreement shall be governed in accordance with the laws of the State of California and any disputes arising from this Agreement must be adjudicated in Los Angeles, California."  Starrett Attorney-Client Fee

Agreement ¶ 13, at 3.

664.    The Starrett Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address, or the date that Starrett signed the Starrett Attorney-Client Fee Agreement, a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract Form. See Starrett Attorney-Client Fee Agreement at 1-3.

665.    Real Estate Law negotiated a settlement for Starrett, but Starrett's house payment went up and he sold the house before entering bankruptcy. See July 10 Tr. at 592:3-17 (Starrett, Anaya-Allen); id. at 593:20-24 (Anaya-Allen, Starrett).

666.    Starrett worked with an attorney on the bankruptcy, and sold the house based on advice about avoiding having the house listed as an asset in the bankruptcy and so as not to have a foreclosure on him. See July 10 Tr. at 597:2-8; id. at 597:18-21 (Kennedy, Starrett); id. at 601:10-13 (Starrett).[72]

667.    Starrett paid Real Estate Law the $5,500.00 for which the Starrett Attorney-Client Fee Agreement called. See July 10 Tr. at 589:10-14 (Anaya-Allen, Starrett).

668.    Starrett did not pay a monthly fee. See July 10 Tr. at 588:12-16 (Anaya-Allen, Starrett).

669.    Starrett paid Real Estate Law a total of $5,500.00

---

[72]The Court adopts the Parwatikar Defs.' Proposed Findings ¶ 8, at 4, as applied to Starrett, because the Court deems credible that, while Starrett worked with an attorney on a bankruptcy who advised him to sell the house, Starrett also wanted to avoid the foreclosure.

o.  **Roberta Marcelli.**

670.   Marcelli owned and occupied, as a principal place of residence, a home on 1112 California, SE, Albuquerque, 87108, although she no longer lives there.  See July 10 Tr. at 603:15-19 (Marcelli).[73]

671.   Marcelli was looking to lower her monthly payments after she became disabled.  See July 10 Tr. at 603:23-25 (Marcelli).

672.   Real Estate Law sent Marcelli a mailing, and Marcelli contacted Real Estate Law.  See July 10 Tr. at 603:25-604:8 (Marcelli, Anaya-Allen).

673.   When Marcelli signed up with Real Estate Law, she was concerned about paying their fees and her mortgage, and Real Estate Law suggested that she not pay the mortgage and just pay them.  See July 10 Tr. at 604:11-22 (Marcelli).

674.   Real Estate Law told Marcelli that it would sue the bank that held her loan and that her payments would be decreased so that she could pay her mortgage with her disability checks.  See July 10 Tr. at 604:19-22 (Marcelli); id. at 606:6-8 (Marcelli).

675.   Marcelli signed an attorney-client fee agreement with Real Estate Law on September 16, 2014.  See July 10 Tr. at 605:10-606:1 (Anaya-Allen, Marcelli); Attorney-Client Fee Agreement at 3 (admitted July 10, 2019, at Trial as New Mexico's Ex. 142)("Marcelli Attorney-Client Fee Agreement").

---

[73]The Court does not adopt the Parwatikar Defs.' Proposd Findings ¶ 6, at 2-3.  Marcelli testified that she does not now live in the 1112 California home, which suggests that she previously lived in the home.  See July 10 Tr. at 603:20-21 (Marcelli).  Marcelli testified to having owned one home, has close to an associate degree, and is currently a part-time Wal-Mart cashier.  See July 10 Tr. at 603:8-16 (Anaya-Allen, Marcelli).  The Court deems, based on these facts, that Marcelli highly likely occupied the one home that she owned.

676.     The Marcelli Attorney-Client Fee Agreement provides for a "NON-REFUNDABLE, one-time retainer fee of $5000.00" and a monthly maintenance fee of $59.95.  Marcelli Attorney-Client Fee Agreement ¶ 4, at 1-2 (capitalization in original).

677.     The Marcelli Attorney-Client Fee Agreement also provides that Real Estate Law will receive a thirty-percent contingency fee.  See Marcelli Attorney-Client Fee Agreement ¶ 4, at 2 (capitalization in the original).

678.     The Marcelli Attorney-Client Fee Agreement provides that Marcelli hires Real Estate Law "to file and maintain a lawsuit AGAINST HIS/HER MORTGAGE LENDER AND/OR SERVICER CONCERNING THEIR REAL ESTATE PROPERTY."  Marcelli Attorney-Client Fee Agreement ¶ 2, at 1.

679.     The Marcelli Attorney-Client Fee Agreement reflects that Real Estate Law has attorneys only admitted to the State Bar of California and that it will file litigation in California.  Marcelli Attorney-Client Fee Agreement ¶ 2, at 1.

680.     The Marcelli Attorney-Client Fee Agreements states: "The Agreement shall be governed in accordance with the laws of the State of California and any disputes arising from this Agreement must be adjudicated in Los Angeles, California."  See Marcelli Attorney-Client Fee Agreement ¶ 13, at 3.

681.     The Marcelli Attorney-Client Fee Agreement does not mention Pinnacle Law.  See Marcelli Attorney-Client Fee Agreement at 1-3.

682.     The Marcelli Attorney-Client Fee Agreement designates Mr. Davis as Real Estate Law's signatory.  See Marcelli Attorney-Client Fee Agreement at 3.

683.     The Marcelli Attorney-Client Fee Agreement does not contain in at least fourteen-point font Real Estate Law's name and address; the date that Marcelli signed the Marcelli

Attorney-Client Fee Agreement; or a Notice Required by New Mexico Law, a Notice of Rescission Rights, or a Rescission of Contract Form.  See Marcelli Attorney-Client Fee Agreement at 1-3.

684.     Marcelli paid Real Estate Law $5,000.00 in advance fees.  See July 10 Tr. at 608:2-3 (Marcelli); id. at 609:7-18 (Anaya-Allen, Marcelli); Marcelli Attorney-Client Fee Agreement ¶ 4, at 1.

685.     Marcelli paid Real Estate Law $59.95 per month for five months.  See July 10 Tr. at 609:20-610:6 (Anaya-Allen, Marcelli); Monthly Maintenance Fee Payment Authorization Form at 2 (admitted July 10, 2019, at Trial as New Mexico's Ex. 143).

686.     Marcelli paid Real Estate Law a total of $5,239.80 to $5,299.75.

687.     Marcelli's foreclosure action was filed in September, 2014, after she signed with Real Estate Law, see July 10 Tr. at 622:19-25 (Kennedy, Marcelli), and Marcelli responded to Real Estate Law's requests for information, because she was going into foreclosure and was scared, see July 10 Tr. at 613:6-11 (Marcelli); Email from Roberta Marcelli to Lawrence at 1-3 (sent September 16, 2014)(admitted July 10, 2019, at Trial as New Mexico's Ex. 144).

688.     Marcelli contacted Real Estate Law for help when she received a foreclosure, and Real Estate Law requested a copy of the foreclosure.  See July 10 Tr. at 613:12-19 (Anaya-Allen, Marcelli).

689.     Real Estate Law filed suit against Bank of America with Marcelli as a plaintiff.  See Email from Real Estate Law to Marcelli at 1 (sent August 24, 2015)(admitted July 10, 2019, at Trial as New Mexico's Ex. 145); Kennedy v. Bank of Am. N.A., Order of Dismissal at 26; Kennedy v. Bank of Am., N.A., Notice of Entry of Judgment at 31.

690.     On May 31, 2016, an Order of Dismissal with prejudice was entered in Kennedy v. Bank of America, N.A., in which Marcelli is listed as a plaintiff, see Kennedy v. Bank of Am.,

N.A., Order of Dismissal at 26, and, on June 3, 2016, the <u>Kennedy v. Bank of America, N.A.,</u> Notice of Entry of Judgment was filed, <u>see</u> <u>Kennedy v. Bank of Am., N.A.,</u> Notice of Entry of Judgment at 31-40.

691.    Both documents note Real Estate Law and Mr. Davis as counsel for the plaintiffs. <u>See</u> <u>Kennedy v. Bank of Am., N.A.,</u> Order of Dismissal at 29; <u>Kennedy v. Bank of Am., N.A.,</u> Notice of Entry of Judgment at 38, 39.

692.    Real Estate Law told Marcelli that they won all their other lawsuits against Bank of America, but Marcelli did not learn what happened to her case.  <u>See</u> July 10 Tr. at 616:13-617:3 (Anaya-Allen, Marcelli).

693.    Marcelli eventually went to cash for keys event -- she agreed to leave her property "in good, clean order" and would receive $3,500.00 in return.  July 10 Tr. at 622:6-7.  <u>See</u> <u>id.</u> at 617:5-11 (Marcelli).

694.    Real Estate Law provided no accounting of the retainer fee that Marcelli paid it. <u>See</u> July 9 Tr. at 627:25-628:4 (Anaya-Allen, Marcelli).

695.    Marcelli eventually retained a separate, local attorney other than Real Estate Law. <u>See</u> July 9 Tr. at 623:19-25 (Kennedy, Marcelli).

696.    Marcelli obtained local assistance with her foreclosure proceeding through a community center event and through the United South Broadway Center.  <u>See</u> July 9 Tr. at 617:9-11 (Marcelli); <u>id.</u> at 627:16-24 (Anaya-Allen, Marcelli); <u>id.</u> at 624-25 (Kennedy, Marcelli).

697.    Marcell did not pay for the local attorney's assistance as she had a low-income status.  <u>See</u> July 9 Tr. at 627:16-24 (Anaya-Allen, Marcelli).

698.     Marcelli paid Real Estate Law to get her loan payments lowered, but they did not

help her, and she lost her home.  See July 9 Tr. at 603:3-604:8 (Anaya-Allen, Marcelli); id. at

617:16-21 (Anaya-Allen, Marcelli); id. at 624:24-25 (Kennedy, Marcelli).

**3.     Mr. Pratt's Actions.**

699.     Attorney-client fee agreements in addition to those of the New Mexico consumers

that the Court discusses above contain a signature line for Mr. Pratt.  See Attorney-Client Fee

Agreement at 10 (admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at

Trial as New Mexico's Ex. 182)("Alexander Attorney-Client Fee Agreement"); Attorney-Client

Fee Agreement at 13 (admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019,

at Trial as New Mexico's Ex. 182)("Cedeno Attorney-Client Fee Agreement"); C. Maness

Attorney-Client Fee Agreement at 34 (admitted only as to Real Estate Law, Mr. Davis, and

Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 182)("C. Maness Attorney-Client Fee

Agreement").  See Plaintiff's First Set of Requests for Admission and Second Set of Interrogatories

to Defendant Chad T-W Pratt, Request for Admission No. 5, at 2 (admitted only as to Real Estate

Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 182); Further

Responses to Requests for Admission from new mexico by Chad T-W Pratt, Sr. ¶ 5, at 2 (admitted

only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex.

180)("Pratt's Further Responses").[74]  See also Dickerson Attorney-Client Fee Agreement at 3;

Madrid Attorney-Client Fee Agreement at 3; M. Maness Attorney-Client Fee Agreement at 3; V.

---

[74]The Court agrees with Mr. Pratt's proposed findings that no evidence reflects that
Alexander, Cedeno, C. Maness, or Vicki Sullivan paid Real Estate Law.  See Pratt's Proposed
Findings ¶¶ 1-2, 5, 8, at 2-3.

Trujillo Attorney-Client Fee Agreement at 3; Lloyd Trujillo Attorney-Client Fee Agreement at 3; Ward Attorney-Client Fee Agreement at 3; Silva Attorney-Client Fee Agreement at 3.[75]

700.    Attorney-client fee agreements that Mr. Pratt prepared in addition to those of the New Mexico consumers that the Court discusses above provide that the attorney's fees are non-refundable, are one-time retainer fees, and are "fully earned upon receipt," and that the consumers' cases "will only be reviewed and prepared but NOT FILED UNTIL THE ENTIRE RETAINER FEE IS PAID."  Alexander Attorney-Client Fee Agreement ¶ 4, at 8; Cedeno Attorney-Client Fee Agreement ¶ 4, at 11; C. Maness Attorney-Client Fee Agreement ¶ 4, at 32. See New Mexico's First Requests, Request for Admission No. 7, at 4; Pratt's Further Responses ¶ 7, at 2.  See also Dickerson Attorney-Client Fee Agreement ¶ 4, at 1; Madrid Attorney-Client Fee Agreement ¶ 4, at 1; M. Maness Attorney-Client Fee Agreement ¶ 4, at 1; V. Trujillo Attorney-Client Fee Agreement ¶ 4, at 1; Lloyd Trujillo Attorney-Client Fee Agreement ¶ 4, at 1; Ward Attorney-Client Fee Agreement ¶ 4, at 1; Silva Attorney-Client Fee Agreement ¶ 4, at 1.

701.    The Vicki Sullivan Attorney Client Retainer Agreement provides for a flat fee of $3,000.00 and that Vicki Sullivan is "not entitled to a refund of any amount."  Vicki Sullivan Attorney-Client Fee Agreement at 38.  See New Mexico's First Requests, Request for Admission No. 7, at 4; Pratt's Further Responses, ¶ 7, at 2.

702.    Attorney-client fee agreements that Mr. Pratt prepared in addition to those of the New Mexico consumers that the Court discusses above provide that Real Estate Law will receive

---

[75]The Court does not adopt New Mexico's proposed finding that "only Creighton Maness, Rachel Silva and Vicki Sullivan's [attorney-client fee agreements] were signed," New Mexico's Proposed Findings ¶ 598, at 76, because, while only those attorney-client fee agreements among the Exhibits to New Mexico's First Requests are signed, the Court cannot verify whether Mr. Pratt signed only those attorney-client fee agreements or whether he signed additional attorney-client fee agreements, and New Mexico included only or had in its possession to include only those signed agreements in the Exhibits to New Mexico's First Requests.

two-tenths of the retainer fee and that Pinnacle Law will receive the remaining percentage. See Alexander Attorney-Client Fee Agreement ¶ 4, at 9-10; Cedeno Attorney-Client Fee Agreement ¶ 10, at 12-13; C. Maness Attorney-Client Fee Agreement ¶ 10, at 33-34. See New Mexico's First Requests, Request for Admission No. 4, at 3; Pratt's Further Responses ¶ 4, at 2. See also Dickerson Attorney-Client Fee Agreement ¶ 10, at 2-3; Madrid Attorney-Client Fee Agreement ¶ 10, at 2-3; M. Maness Attorney-Client Fee Agreement ¶ 10, at 2-3; V. Trujillo Attorney-Client Fee Agreement ¶ 10, at 2-3; Lloyd Trujillo Attorney-Client Fee Agreement ¶ 10, at 2-3; Ward Attorney-Client Fee Agreement ¶ 10, at 2-3; Silva Attorney-Client Fee Agreement ¶ 10, at 2-3.

703.    The attorney-client fee agreements with Mr. Pratt's signatory line request a total of $57,000.00 in retainer fees, with a request of $5,000.00 from Alexander, $5,000.00 from Cedeno, $5,000.00 from Dickerson, $5,000.00 from Madrid, $5,000.00 from M. Maness, $3,000.00 from Leary, $5,000.00 from C. Maness, $5,000.00 from Silva, $3,000.00 from Sullivan, $6,000.00 from L. Trujillo, $5,000.00 from V. Trujillo, and $5,000.00 from Ward. See Alexander Attorney-Client Fee Agreement ¶ 4, at 8; Cedeno Attorney-Client Fee Agreement ¶ 4, at 11; C. Maness Attorney-Client Fee Agreement ¶ 4, at 32; Dickerson Attorney-Client Fee Agreement ¶ 4, at 1; Madrid Attorney-Client Fee Agreement ¶ 4, at 1; M. Maness Attorney-Client Fee Agreement ¶ 4, at 1; V. Trujillo Attorney-Client Fee Agreement ¶ 4, at 1; Lloyd Trujillo Attorney-Client Fee Agreement ¶ 4, at 1; Ward Attorney-Client Fee Agreement ¶ 4, at 1; Silva Attorney-Client Fee Agreement ¶ 4, at 1; Vicki Sullivan Attorney-Client Fee Agreement at 38 (admitted only as to Real Estate Law, Mr. Davis, and Mr. Pratt July 11, 2019, at Trial as New Mexico's Ex. 182); Leary Attorney-Client Retainer Agreement at 1-2. See also New Mexico's First Requests, Request for Admission No. 5, at 2; Pratt's Further Responses ¶ 5, at 2.

704.     Mr. Pratt filed six mass tort lawsuits that, variously, included New Mexico consumers L. Madrid, Alexander, M. Maness, C. Maness, Marcelli, L. Trujillo, and Silva.  See New Mexico's First Requests, Request for Admission No. 11, at 4-5; Pratt's Further Responses ¶ 11, at 2.

705.     These lawsuits include <u>Acevedo v. JP Morgan Chase Bank</u>, which included Madrid; <u>Aguayo v. Bank of America, N.A.</u>, which included Alexander; <u>Attygala v. Wells Fargo Bank</u>, County of Los Angeles, Superior Court of California, BC490700, and Central District of California 2:12-cv-10075-MMM-PLA, which included M. Maness; <u>Holmes v. Bank of America, N.A.</u>, which included C. Maness and Marcelli; <u>Simons v. Bank of America, N.A.</u>, which included L. Trujillo; and <u>Penn v. Bank of America, N.A.</u>, which included Silva.  See New Mexico's First Requests, Request for Admission No. 11, at 4-5; Pratt's Further Responses ¶ 11, at 2.

**4.     Mr. Parwatikar's Resources.**

706.     Mr. Parwatikar owns a condominium in Los Angeles, on which he currently owes a little over $520,000.00 on the mortgage loan.  See July 11 Tr. at 634:1-22 (Anaya-Allen, Parwatikar).

707.     Mr. Parwatikar owns a 1987 Mercedes 560 that he has had for over twenty years and no other vehicles.  See July 11 Tr. at 776:2-7 (Kennedy, Parwatikar).

708.     Mr. Parwatikar filed for bankruptcy in approximately 2010.  See July 11 Tr. at 776:12-13 (Kennedy, Parwatikar).

709.     Mr. Parwatikar has $14,000.00 in his bank account.  See July 11 Tr. at 814:9-11 (Anaya-Allen, Parwatikar).

710.     The Balanced Legal bank account was closed several years ago.  See July 11 Tr. at 814:16-24 (Anaya-Allen, Parwatikar).

711. Pinnacle Law has one bank account. See July 11 Tr. at 814:25-815:1 (Anaya-Allen, Parwatikar).[76]

## PROCEDURAL BACKGROUND

1. New Mexico contends that: (i) the Defendants violated the MARS Rule by accepting advance payment for mortgage relief services, and/or Mr. Parwatikar and Pinnacle Law substantially assisted the violations, see Complaint for Violations of the New Mexico Mortgage Foreclosure Consultant Fraud Prevention Act (MFCFPA), Mortgage Assistance Relief Services (MARS) Rule, the New Mexico Unfair Practices Act (UPA) and Petition for Injunctive Relief ¶¶ 77-85, at 18-19, filed February 22, 2017 (Doc. 1)("Complaint"); (ii) the Defendants, willfully and in bad faith, violated the MFCFPA by failing to provide required warnings, notices, and disclosures, by failing to give New Mexico homeowners twenty-four hours before signing attorney-client agreements, and by requiring advance payment for their services, see Complaint ¶¶ 86-101, at 19-22; and (iii) the Defendants knowingly engaged in unlawful conduct violating the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to -26 ("NMUPA"), by requiring advance fees and monthly maintenance fees while filing sham lawsuits, by leading New Mexico consumers to believe that the Defendants performed valuable legal services when the Defendants filed sham lawsuits with no value for New Mexico consumers, and by allowing New Mexico consumers to believe that the Defendants will defend foreclosure lawsuits, see Complaint ¶¶ 102-08, at 22-23. New Mexico asks that the Court enjoin the Defendants from continuing such violations, see Complaint ¶¶ 109-11, G, at 23-24, and requests restitution, disgorgement, civil penalties, and costs as the MARS Rule, the MFCFPA, and the NMUPA permit, see Complaint

---

[76]Mr. Parwatikar did not know the amount in that bank account. See July 11 Tr. at 815:2-4 (Anaya-Allen, Parwatikar).

¶¶ (A)-(F), at 24.

2.    Mr. Pratt is the only Defendant with liability issues that the Court decides in its Conclusions of Law.  On June 11, 2018, the Court entered a default judgment against Real Estate Law on all liability issues, "reserving the issues of relief, including disgorgement, restitution and civil penalties."  Default Judgment Against Real Estate Law Center at 1, filed June 11, 2018 (Doc. 75).  See id. at 1-2.  On November 5, 2018, the Honorable Laura Fashing, United States Magistrate Judge for the United States District Court for the United States District of New Mexico, recommended entering a default judgment against Mr. Davis on issues of liability, reserving for litigation the issues of relief, see Proposed Findings and Recommended Disposition at 4, filed November 5, 2018 (Doc. 91), and, on January 18, 2019, the Court adopted Magistrate Judge Fashing's recommendation, see Memorandum Opinion and Order Adopting the Magistrate Judge's Proposed Findings and Recommended Disposition at 2, 9, 2019 WL 259121, at *1, *4, filed January 18, 2019 (Doc. 106).  In the Memorandum Opinion and Order, 2019 WL 2804575, filed July 2, 2019 (Doc. 183)("MSJ MOO"), the Court granted summary judgment in the Parwatikar Defendants and Mr. Pratt's favor on New Mexico's NMUPA claims, injunctive relief claims, and theories based on: (i) Mr. Davis' alleged MARS Rule violations; (ii) Balanced Legal's and Pinnacle Law's violation of the MARS Rule independent of Real Estate Law; (iii) Mr. Parwatikar's and Mr. Pratt's participation in a common enterprise with Real Estate Law, Balanced Legal, and Pinnacle Law; and (iv) Mr. Pratt's reckless or knowing violation of the

MARS Rule, or willful violation of the MFCFPA. <u>See</u> MSJ MOO at 183-84, 2019 WL 2804575, at *68.

3.      On July 5, 2019, Mr. Pratt filed the Involuntary Petition Against a Non-Individual, No. 19-bk-17849, filed July 5, 2019 (C.D. Cal. Bankr. Doc. 1)("Bankruptcy Petition").[77]   The Court began its three-and-a-half-day bench trial on July 8, 2019. <u>See</u> Transcript of Trial Proceedings at 1 (taken July 8, 2019), filed July 12, 2019 (Doc. 194)("July 8 Tr."). The Parwatikar Defendants requested that the Court stay this case pursuant to 11 U.S.C. § 362, which provides that a bankruptcy petition operates as a stay of a judicial action. <u>See</u> July 8 Tr. at 80:7-15 (Kennedy). New Mexico responded to the Parwatikar Defendants' request by arguing that 11 U.S.C. § 362(b)(4), which provides that a bankruptcy petition does not stay a judicial action through which a governmental unit enforces its police and regulatory power, applies. <u>See</u> July 8 Tr. at 125:1-9 (Anaya-Allen). The Court concluded that § 362(b)(4) applies and that, even if § 362(b)(4) did not apply, the Court would not stay the case for Real Estate Law's co-Defendants, and the Court proceeded with the trial.

4.      New Mexico and the Parwatikar Defendants participated in the presentation of evidence. New Mexico called nineteen witnesses. The Parwatikar Defendants did not call any witnesses. Real Estate Law and Mr. Davis did not participate in the trial. On the first day of trial, July 8, 2019, Mr. Pratt did not appear in the courtroom, but the Court's Courtroom Deputy left a telephone voicemail with Mr. Pratt reminding him of the trial, and the Court joined the courtroom's telephone conference line should Mr. Pratt seek to join the trial telephonically. <u>See</u> July 8 Tr. at 3:1-3:4 (Court). The Court did not hear Mr. Pratt join the telephone conference line. <u>See</u> July 8

---

[77]July 5, 2019, is the Friday before the day that the trial began -- Monday, July 8, 2019.

Tr. at 3:4-6 (Court). Mr. Pratt did not join the telephone conference line at any point during the day. See July 8 Tr. at 3:1-223:23. For the following three days, Mr. Pratt did not join the parties for the presentation of evidence in the courtroom or on the telephone conference line. See July 9 Tr. at 227:1-485:2; July 10 Tr. at 499:4-757:12; July 11 Tr. at 760:1-876:14.

## 1. **New Mexico's Closing Argument.**

5. New Mexico gave its closing argument on July 11, 2019. See July 11 Tr. at 858:22-871:18 (Anaya-Allen). New Mexico summarized that it brought the case after receiving a consumer complaint about a scam by Real Estate Law and its owners. See July 11 Tr. at 857:21-25 (Anaya-Allen). New Mexico contended that it takes the position that the Defendants operated a common enterprise to perpetrate a scam that followed the description of the scam that the California Attorney General identifies. See July 11 Tr. at 857:25-858:9 (Anaya-Allen). New Mexico asked the Court to take judicial notice of a press release that the California Attorney General issued about State of California v. Law Offices of Kramer and Kaslow.[78] See July 11 Tr. at 858:10-14 (Anaya-Allen). New Mexico also asked that the Court take judicial notice of the Federal Trade Commission's consumer warning with respect to the activities in which Real Estate Law participated.[79] See July 11 Tr. at 858:22-859:3 (Anaya-Allen).

6. New Mexico averred that Real Estate Law advertised its services for mass joinder tort lawsuits and that the New Mexico consumers signed up for such lawsuits, but the lawsuits

---

[78]For the reader's information only and for not evidentiary purposes, the Court notes that the press release is accessible at https://www.oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-sues-law-firms-engaged-national-mass-joinder.

[79]For the reader's information only and not for evidentiary purposes, the Court notes that the Federal Trade Commission consumer warning is available at https://www.consumer.ftc.gov/articles/0256-mass-joinder-lawsuits, and is quoted in part in Plaintiff's Response to Parwatikar Motion for Summary Judgment at 8, filed May 10, 2019 (Doc. 137).

were dismissed, either voluntarily or by the court, none of the lawsuits were successful, and the dismissals' timing reflects that the lawsuits were "nonmeritorious, frivolous, really abuse of the courts." July 11 Tr. at 859:19-20 (Anaya-Allen). See id. at 859:4-20 (Anaya-Allen). New Mexico summarized the documents in evidence about the dismissals. See July 11 Tr. at 859:21-860:4 (Anaya-Allen). New Mexico averred that the Defendants used these lawsuits, in reality, as a "facade" for "running a mortgage modification operation." July 11 Tr. at 860:13-14 (Anaya-Allen). See id. at 860:5-14 (Anaya-Allen). New Mexico averred that Real Estate Law repeatedly told consumers that it would help them with foreclosures, that it named its loan modification department the FDD, and that this representation was a "false inducement to these consumers" and "a way to try to conceal what the department actually was, which was a mortgage modification department, providing mortgage modification services, collecting financial documents, having the consumers fill out application for mortgage modifications, continuously instructing them to continue providing financial documents or updates for purposes of those modification applications." July 11 Tr. at 861:3-12 (Anaya-Allen). See id. at 860:19-861:12 (Anaya-Allen). New Mexico

7. New Mexico explained that attorneys know that they cannot collect advance fees for mortgage modification services, so they developed the idea of filing mass tort lawsuits that are not based on valid legal theories. See July 11 Tr. at 861:13-18 (Anaya-Allen). New Mexico argued that the cases that Real Estate Law filed were "uniformly dismissed," July 11 Tr. at 861:19 (Anaya-Allen), that the New Mexico consumers could not reach Mr. Davis, and that Real Estate Law did not consult them about the lawsuits, see July 11 Tr. at 861:22-862:6 (Anaya-Allen). New Mexico reasoned that these facts occurred, because the lawsuits were a sham and a way to charge advance fees. See July 11 Tr. at 862:7-12 (Anaya-Allen). New Mexico argues that the Defendants

tried to use the attorney-client fee agreements and compliance calls to protect their activities to hide these illegal activities. <u>See</u> July 11 Tr. at 862:13-24 (Anaya-Allen).

8. New Mexico turned to discussing Mr. Parwatikar's, Balanced Legal's, and Pinnacle Law's liability. <u>See</u> July 11 Tr. at 862:25-863:2 (Anaya-Allen). New Mexico explained that it initially identified Pinnacle Law, because of the provision for eighty percent of Real Estate Law's retainer fees, which raised the question of Pinnacle Law's role. <u>See</u> July 11 Tr. at 863:2-10 (Anaya-Allen). New Mexico argues that Mr. Parwatikar acknowledges that he received payment from Real Estate Law, but alleges that he served as a consultant, and that he did not question the mass joinder tort litigation when Mr. Pratt and Mr. Davis told him that they believed the lawsuits were "good." July 11 Tr. at 863:17 (Anaya-Allen). <u>See</u> July 11 Tr. at 863:11-18 (Anaya-Allen). New Mexico argued that Pinnacle Law was in a common enterprise with Real Estate Law, as evidenced by the shared employees, including Branco, who had previously worked for Balanced Legal, and whom Pinnacle Law allegedly leased to Real Estate Law and did not work for Real Estate Law so he could maintain his health insurance through Pinnacle Law, despite that Pinnacle Law produced only two months of health insurance invoices for Branco. <u>See</u> July 11 Tr. at 863:18-864:14 (Anaya-Allen). New Mexico also pointed the Court to the Madrid Letters of Authorization that contain Balanced Legal's name, which suggest that Balanced Legal rebranded as Real Estate Law. <u>See</u> July 11 Tr. at 864:16-865:3 (Anaya-Allen). New Mexico also indicated that Branco emailed Ward and L. Madrid from a Balanced Legal email address, which, New Mexico suggests, indicates that Mr. Parwatikar shut down Balanced Legal's mortgage modification services, but reopened such services in California, through an arrangement for which he would not "get caught again." July 11 Tr. at 865:19 (Anaya-Allen). <u>See</u> <u>id.</u> at 865:9-19 (Anaya-Allen). New Mexico argues that, although Mr. Parwatikar contends that Mr. Clarambeau

discovered him, the story does not account for Mr. Clarambeau's Balanced Legal email address or why Mr. Clarambeau hired Mr. Parwatikar to incorporate Real Estate Law.  See July 11 Tr. at 865:20-866:8 (Anaya-Allen).

9.      New Mexico argues that, once Real Estate Law began operating, Mr. Parwatikar adopted a consultant role, and either participated in a common enterprise or substantially supported and assisted Real Estate Law's activities, in violation of the MARS Rule, and acted as an indirect foreclosure consultant in violation of the MFCFPA.  See July 11 Tr. at 866:9-19 (Anaya-Allen). New Mexico argues that Mr. Parwatikar had knowledge of Real Estate Law's activities, and that Ms. Murphy's and Mr. Paul's testimonies reflect that Mr. Parwatikar was their supervisor at Real Estate Law, and was as responsible for Real Estate Law's activities as Mr. Pratt and Mr. Davis. See July 11 Tr. at 866:20-867:15 (Anaya-Allen).  New Mexico summarized the testimony and indicated that, even after Real Estate Law ceased operations, Pinnacle Law continued Real Estate Law's activities, like sending payments for the Bryson settlement.  See July 11 Tr. at 867:16-868:1 (Anaya-Allen).  New Mexico summarized the evidence about the Bryson settlement and argued that this evidence indicates the interconnectedness of the Defendants' activities.  See July 11 Tr. at 868:7-18 (Anaya-Allen).

10.      New Mexico also questioned Mr. Parwatikar's credibility.  See July 11 Tr. at 868:19-20 (Anaya-Allen).  New Mexico argued that Mr. Parwatikar avers that he is an expert in marketing, but cannot explain the deductions for marketing on his federal tax returns, see July 11 Tr. at 868:19-869:8 (Anaya-Allen), and avers that Pinnacle Law did not pay for marketing or promotion, see July 11 Tr. at 869:9-23 (Anaya-Allen).  New Mexico concluded that the New Mexico consumers were harmed, that most of them contracted for around $5,000.00 in retainer fees, and that the Court should award that amount for disgorgement and to restore the New Mexico

consumers' losses. See July 11 Tr. at 869:24-870:10 (Anaya-Allen). New Mexico indicated that the New Mexico consumers may have been able to use those amounts to save their homes. See July 11 Tr. at 870:18-21 (Anaya-Allen). New Mexico asked that the Court hold all the Defendants' liable under a common enterprise theory for MARS Rule and MFCFPA violations, and, alternatively, that the Court find the Parwatikar Defendants liable for substantial assistance to the other Defendants' MARS Rule violations. See July 11 Tr. at 870:22-871:5 (Anaya-Allen).

2.    **The Parwatikar Defendants' Closing Argument.**

11.    The Parwatikar Defendants also gave their closing argument on July 11, 2019. See July 11 Tr. at 871:25-874:1 (Kennedy). The Parwatikar Defendants indicated their intention to address New Mexico's arguments in their proposed findings of fact and conclusions of law. See July 11 Tr. at 871:25-872:2 (Kennedy). The Parwatikar Defendants argued that the California Attorney General's press release and the Federal Trade Commission's press release are not in evidence in this case. See July 11 Tr. at 872:3-12 (Kennedy). The Parwatikar Defendants averred that the evidence shows that Pinnacle Law did not receive eighty percent of Real Estate Law's retainer fees, that Real Estate Law, Balanced Legal, and Pinnacle Law did not commingle funds, and that Mr. Parwatikar had no control over Real Estate Law. See July 11 Tr. at 872:13-23 (Kennedy). The Parwatikar Defendants summarized that Real Estate Law shared some office space with Pinnacle Law, but that it had offices at times in Pasadena, on different floors than Pinnacle Law, and subleased a small portion of Pinnacle Law's floor. See July 11 Tr. at 872:24-873:7 (Kennedy). The Parwatikar Defendants argued that the Madrid Letter of Authorization was a mistake from someone's attempt to adapt the form, that Ms. Murphy and Mr. Paul testified that Mr. Parwatikar had a separate legal practice in Pinnacle Law, and that New Mexico makes no argument about the particularized statutes at issue in this case and ignores that the MFCFPA does

not contain a substantial assistance provision.  See July 11 Tr. at 873:8-23 (Kennedy).  The

Parwatikar Defendants concluded by reiterating that they would make further argument in their

proposed legal conclusions.  See July 11 Tr. at 873:24-874:1 (Kennedy).

## RELEVANT LAW REGARDING THE MARS RULE

12.     Following the 2008 financial crisis, Congress created the Consumer Financial

Protection Bureau ("CFPB") and vested it with authority to enforce several laws previously within

the domain of the Federal Trade Commission ("FTC").  Consumer Fin. Prot. Bureau v. Mortg.

Law Grp., LLP, 157 F. Supp. 3d 813, 816-17 (W.D. Wis. 2016)(Crabb, J.).  Among these laws is

the "Omnibus Appropriations Act of 2009, Pub. L. No. 111-8, § 626, 123 Stat. 524 (March 11,

2009), which directed the Federal Trade Commission to issue rules related to mortgage loans."

Consumer Fin. Prot. Bureau v. Mortg. Law Grp., LLP, 157 F. Supp. 3d at 817.  The FTC enacted

the MARS Rule shortly before oversight over the Omnibus Appropriations Act of 2009 transferred

to the CFPB, and the CFPB republished the MARS Rule, with the same prohibitions and attorney

exemptions extant under the FTC's MARS Rule, at 12 C.F.R. § 1015.  See Consumer Fin. Prot.

Bureau v. Mortg. Law Grp., LLP, 157 F. Supp. 3d at 817-18; Mortgage Assistance Relief Services,

75 Fed. Reg. 75092 (Dec. 1, 2010); 16 C.F.R. § 322.1 ("The rules formerly at 16 CFR part 322

have been republished by the Consumer Financial Protection Bureau at 12 CFR part 1015,

'Mortgage Assistance Relief Services (Regulation O).'").

13.     In enacting the MARS Rule, the FTC acted on concerns that arose in the 2008 crisis'

aftermath about mortgage relief practices and mortgage relief providers.  See Mortgage Assistance

Relief Services, 75 Fed. Reg. 10707, 10708-13 (March 9, 2010).

> [H]istoric levels of consumer debt, increased unemployment, and a stagnant
> housing market have contributed to high rates of mortgage loan delinquency and
> foreclosure.  As a result, many consumers struggling to make their mortgage
> payments are in search of ways to avoid foreclosure. . . .  Because loan

modifications allow consumers to stay in their homes and reduce their overall debt, this possible solution often has great appeal to consumers. The Commission's law enforcement actions suggest that loan modifications may currently be the most frequently marketed and sold mortgage assistance relief service.

75 Fed. Reg. at 10708-09 (footnotes omitted). The FTC directed the MARS Rule toward

misrepresentations and advance-fee schemes involving loan modification services:

MARS providers often misrepresent the services that they will perform and the results they will obtain for consumers. Indeed, providers frequently fail to perform even the most basic of promised services. As a result, consumers not only lose the thousands of dollars they pay to the providers, but may also lose their homes.

Typically, MARS providers initiate contact with prospective customers through Internet, radio, television, or direct mail advertising. The ads instruct consumers to call a toll-free telephone number or e-mail the company. . . . Providers typically also represent that there is high likelihood, and in some instances a "guarantee," of success. Despite these promises of extremely high success rates, the vast majority of consumers do not receive the promised results.

Even if the services of MARS providers could deliver the promised results, many providers do not provide even the most basic services they claimed they would perform. After collecting their up-front fees, MARS providers often fail to make initial contact with the lender or servicer for months, if at all.

In addition, some MARS providers make the specific claim that they offer legal services, when, in fact, no attorneys are employed at the company or, even if there are, they do little or no legal work for consumers. . . . [A] growing number of attorneys themselves are engaged in deceptive and unfair practices in the marketing and sale of MARS.

75 Fed. Reg. at 10710-12 (footnotes omitted).

1.    **The Violations.**

14.    The MARS Rule prohibits:

(a)    Representing, expressly or by implication, in connection with the advertising, marketing, promotion, offering for sale, or performance of any mortgage assistance relief service, that a consumer cannot or should not contact or communicate with his or her lender or servicer.

(b)    Misrepresenting, expressly or by implication, any material aspect of any mortgage assistance relief service, including but not limited to:

(1)     The likelihood of negotiating, obtaining, or arranging any represented service or result, such as those set forth in the definition of Mortgage Assistance Relief Service in § 1015.2;

(2)     The amount of time it will take the mortgage assistance relief service provider to accomplish any represented service or result, such as those set forth in the definition of Mortgage Assistance Relief Service in § 1015.2;

(3)     That a mortgage assistance relief service is affiliated with, endorsed or approved by, or otherwise associated with:

      (i)     The United States government,

      (ii)     Any governmental homeowner assistance plan,

      (iii)     Any Federal, State, or local government agency, unit, or department,

      (iv)     Any nonprofit housing counselor agency or program,

      (v)     The maker, holder, or servicer of the consumer's dwelling loan, or

      (vi)     Any other individual, entity, or program;

(4)     The consumer's obligation to make scheduled periodic payments or any other payments pursuant to the terms of the consumer's dwelling loan;

(5)     The terms or conditions of the consumer's dwelling loan, including but not limited to the amount of debt owed;

(6)     The terms or conditions of any refund, cancellation, exchange, or repurchase policy for a mortgage assistance relief service, including but not limited to the likelihood of obtaining a full or partial refund, or the circumstances in which a full or partial refund will be granted, for a mortgage assistance relief service;

(7)     That the mortgage assistance relief service provider has completed the represented services or has a right to claim, demand, charge, collect, or receive payment or other consideration;

(8)     That the consumer will receive legal representation;

(9)     The availability, performance, cost, or characteristics of any alternative to for-profit mortgage assistance relief services through which

the consumer can obtain mortgage assistance relief, including negotiating directly with the dwelling loan holder or servicer, or using any nonprofit housing counselor agency or program;

(10)     The amount of money or the percentage of the debt amount that a consumer may save by using the mortgage assistance relief service;

(11)     The total cost to purchase the mortgage assistance relief service; or

(12)     The terms, conditions, or limitations of any offer of mortgage assistance relief the provider obtains from the consumer's dwelling loan holder or servicer, including the time period in which the consumer must decide to accept the offer;

(c)     Making a representation, expressly or by implication, about the benefits, performance, or efficacy of any mortgage assistance relief service unless, at the time such representation is made, the provider possesses and relies upon competent and reliable evidence that substantiates that the representation is true. For the purposes of this paragraph, competent and reliable evidence means tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by individuals qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.

12 C.F.R. § 1015.3.

15.     Additionally, pursuant to the MARS Rule, an entity cannot accept fees in advance for mortgage assistance relief services.  See 12 C.F.R. § 1015.5.  The regulation states:

It is a violation of this rule for any mortgage assistance relief service provider to:

(a)     Request or receive payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief the provider obtained from the consumer's dwelling loan holder or servicer;

12 C.F.R. § 1015.5.

   **2.     The Definitions.**

16.     The MARS Rule broadly defines mortgage assistance relief services and mortgage assistance relief provider.   See 12 C.F.R.§ 1015.2.   The regulation turns the definition of

"mortgage assistance relief services" on the service's purported purpose and not on the service's characteristics; the operative phrase in the definition "is represented, expressly or by implication, to assist or attempt to assist the consumer." 12 C.F.R. § 1015.2. In full, the rule states:

Mortgage Assistance Relief Service means any service, plan, or program, offered or provided to the consumer in exchange for consideration, that is represented, expressly or by implication, to assist or attempt to assist the consumer with any of the following:

(1) Stopping, preventing, or postponing any mortgage or deed of trust foreclosure sale for the consumer's dwelling, any repossession of the consumer's dwelling, or otherwise saving the consumer's dwelling from foreclosure or repossession;

(2) Negotiating, obtaining, or arranging a modification of any term of a dwelling loan, including a reduction in the amount of interest, principal balance, monthly payments, or fees;

(3) Obtaining any forbearance or modification in the timing of payments from any dwelling loan holder or servicer on any dwelling loan;

(4) Negotiating, obtaining, or arranging any extension of the period of time within which the consumer may:

(i) Cure his or her default on a dwelling loan,

(ii) Reinstate his or her dwelling loan,

(iii) Redeem a dwelling, or

(iv) Exercise any right to reinstate a dwelling loan or redeem a dwelling;

(5) Obtaining any waiver of an acceleration clause or balloon payment contained in any promissory note or contract secured by any dwelling; or

(6) Negotiating, obtaining or arranging:

(i) A short sale of a dwelling,

(ii) A deed-in-lieu of foreclosure, or

(iii) Any other disposition of a dwelling other than a sale to a third party who is not the dwelling loan holder.

12 C.F.R. § 1015.2.  A "mortgage assistance relief service provider" comes within the regulation either by providing or by offering to provide such services.  12 C.F.R. § 1015.2.  For the MARS Rule's purposes, a "mortgage assistance relief service provider" is

> any person that provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service. . . . Person means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity, except to the extent that any person is specifically excluded from the Federal Trade Commission's jurisdiction pursuant to 15 U.S.C. 44[80] and 45(a)(2).[81]

---

[80]This provision defines certain entities:

> "Corporation" shall be deemed to include any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, which is organized to carry on business for its own profit or that of its members, and has shares of capital or capital stock or certificates of interest, and any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, without shares of capital or capital stock or certificates of interest, except partnerships, which is organized to carry on business for its own profit or that of its members.
>
> . . . .
>
> "Banks" means the types of banks and other financial institutions referred to in section 57a(f)(2) of this title.
>
> "Foreign law enforcement agency" means --
>
> (1)    any agency or judicial authority of a foreign government, including a foreign state, a political subdivision of a foreign state, or a multinational organization constituted by and comprised of foreign states, that is vested with law enforcement or investigative authority in civil, criminal, or administrative matters; and
>
> (2)    any multinational organization, to the extent that it is acting on behalf of an entity described in paragraph (1).

15 U.S.C. § 44.

[81]This provision states:

12 C.F.R. § 1015.2.

17.     The MARS Rule further defines "dwelling" and "dwelling loan." 12 C.F.R. § 1015.2. "Dwelling means a residential structure containing four or fewer units, whether or not that structure is attached to real property, that is primarily for personal, family, or household purposes." 12 C.F.R. § 1015.2. "Dwelling loan means any loan secured by a dwelling, and any associated deed of trust or mortgage." 12 C.F.R. § 1015.2.

**3.     The Attorney Exemption.**

18.     The MARS Rule contains two exemptions for attorney conduct. <u>See</u> 12 C.F.R. § 1015.7. An attorney is exempt from all MARS Rule prohibitions other than § 1015.5 where the attorney:

(1)     Provides mortgage assistance relief services as part of the practice of law;

(2)     Is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located; and

(3)     Complies with state laws and regulations that cover the same type of conduct the rule requires.

---

The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of Title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

15 U.S.C. § 45(a)(2).

12 C.F.R. § 1015.7(a). An attorney who meets the above requirements "is also exempt from § 1015.5 if the attorney: (1) Deposits any funds received from the consumer prior to performing legal services in a client trust account; and (2) Complies with all state laws and regulations, including licensing regulations, applicable to client trust accounts." 12 C.F.R. § 1015.7(b).[82]

19. Mortgage assistance relief services encompass legal, including litigation, services, when the attorneys providing such services do not meet the regulation's attorney exemptions. See 12 C.F.R. § 1015.7; F.T.C. v. Kutzner, No. SA CV 16-00999-BRO (AFMx), 2017 WL 4685286, at *2, *8-9 (C.D. Cal. Sept. 5, 2017)(O'Connell, J.)(recognizing that the MARS Rule applies to attorneys and applying the MARS rule to litigation services); F.T.C. v. A to Z Mktg., Inc., No. SACV 13-00919-DOC (RNBx), 2014 WL 12479617, at *4 (C.D. Cal. Sept. 17, 2014)(Carter, J.)(recognizing that attorneys are exempt from the MARS Rule when they satisfy the MARS Rule's attorney exemptions). Cf. F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d 1238, 1282-83 (M.D. Fla. 2016)(Howard, J.)(concluding that, through the MARS Rule, the CFPB appropriately exercises regulatory authority over "attorneys engaged in the practice of law"). In

---

[82]The Honorable Marcia Howard, United States District Judge for the United States District Court for the District of Middle Florida, confronted the issue whether the attorney exemption applies to a law firm. See F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d 1238, 1279-80, 1284 (M.D. Fla. 2016)(Howard, J.). The Court concludes that, because 12 C.F.R. § 1015.7(a) requires licensure in the state of practice and law firms cannot be licensed to practice law, the attorney exemption applies to individuals only, and not to law firms. The Court reasons, however, that, should all mortgage assistance services that the law firm provides or offers be performed by exempt attorneys, the law firm would not be liable for a MARS Rule violation. Firms can act only through their employees and, if all mortgage assistance relief services their employees perform are exempt from the MARS Rule, the firm will not have committed an action within the MARS Rule's reach. Moreover, were any other rule to exist, the law firm would be liable for activities that its attorneys could legally perform. Such a result would discourage law firms from employing attorneys offering mortgage modification assistance relief services and, consequently, attorneys from engaging in such services. This situation would defeat the purpose of exempting attorneys performing legal services from the MARS Rule's prohibitions.

enacting the MARS Rule, the FTC recognizes that the attorney exemptions will cover some, but not all, legal and litigation services, and seeks to prohibit certain attorney actions:

> Such a narrowly-tailored exemption seeks to strike a balance that would protect consumers from unfair or deceptive conduct by attorneys who are engaged or otherwise involved in the practice of selling MARS, while at the same time preserve the ability of attorneys to provide bona fide legal services to homeowners.
>
> . . . .
>
> If an attorney is not licensed to practice in the state, there is no reason the proposed Rule should not apply to the attorney's activities to the same extent as any other MARS provider. If an attorney is licensed to practice in a state, the attorney would be exempt under the proposed Rule only if he or she complies with state law, including state bar rules. Several commenters advocated the inclusion of such a requirement to protect consumers from unfair and deceptive conduct of attorneys that would violate state ethics and other rules governing attorneys. For example, a frequent characteristic of MARS attorneys engaged in deception is that they offer services to borrowers outside of the state in which they are licensed. Under the proposed Rule, such an attorney would not be exempt from the rule.

75 Fed. Reg. at 10724-25.[83]

### 4. The Substantial Assistance or Support Prohibition.

20. The MARS Rule also prohibits substantially assisting or supporting MARS Rule violations. See 12 C.F.R.§ 1015.6. The regulation specifically states: "It is a violation of this rule for a person to provide substantial assistance or support to any mortgage assistance relief service provider when that person knows or consciously avoids knowing that the provider is engaged in any act or practice that violates this rule." 12 C.F.R. § 1015.6. A substantial assistance violation

---

[83]In the Court's view, that the MARS Rule exempts some legal services suggests exactly the opposite of the Parwatikar Defendants' contention. See Tr. at 21:15-23 (Harrison). If the FTC intends the MARS Rule not to embrace any litigation activities, the FTC would not have included a narrow exemption for legal services; it would have broadly exempted litigation services. The FTC does not take this approach and recognizes, instead, that the MARS Rule provides a narrow exemption, which makes all other litigation services potentially mortgage assistance relief services. See 75 Fed. Reg. at 10724-25.

requires, accordingly, three elements: "(1) an underlying violation of the MARS rule by a MARS provider; (2) substantial assistance or support by a person to that provider; and (3) knowledge or conscious avoidance, on the part of the person, of the underlying violation." F.T.C. v. Lake, 181 F. Supp. 3d at 699.

21.    "'The threshold for what constitutes substantial assistance is low.'" F.T.C. v. Lake, 181 F. Supp. 3d at 699 (quoting F.T.C. v. Consumer Health Benefits Ass'n, No. 10 Civ. 3551(ILG)(RLM), 2012 WL 1890242, at *6 (E.D.N.Y. May 23, 2012)(Glasser, J.)). According to the United States Court of Appeals for the Tenth Circuit, casual or incidental conduct, like cleaning an office, does not satisfy the substantial assistance requirement, but conduct that plays a role in another's scheme may rise to substantial assistance. See F.T.C. v. Chapman, 714 F.3d 1211, 1217 (10th Cir. 2013).[84]    See also F.T.C. v. Lake, 181 F. Supp. 3d at 699-700 (concluding that a defendant substantially assisted MARS Rule violations where he contracted with another defendant to interview and to advocate for clients, and concealed that clients' advance fees were not held in trust). The substantial assistance need not be central to the scheme, but it must enable the scheme. Cf. F.T.C. v. HES Merch. Servs. Co., No. 6:12-cv-1618-ORL-22KRS, 2016 WL

---

[84]The Tenth Circuit in F.T.C. v. Chapman discusses the substantial assistance provision of the FTC's Telemarketing Sales Rule, 16 C.F.R. § 310.1-10.9 ("TSR"), rather than the MARS Rule provision, but the TSR provision's operative language is identical to the MARS Rule provision's wording:

> It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

16 C.F.R.§ 310.3(b).

10880223, at *5 (M.D. Fla. Oct. 26, 2016)(Conway, J.)("The act of [Universal Processing Services of Wisconsin, LLC ('UPS')] providing [Treasure Your Success ('TYS')] with two merchant accounts[85] was essential to the success of the scheme, and absent these . . . accounts, the TYS Defendants would have been unable to process credit card payments; thus, UPS substantially assisted the TYS Defendants.").  The FTC described when enacting the MARS Rule:

> Proposed § 322.6 [(now 12 C.F.R. § 1015.6)] is limited to persons providing substantial -- i.e., more than casual or incidental -- assistance or support to MARS providers.  Activities that might constitute substantial assistance or support include the provision of consumer leads, contact lists, advertisements, or promotional materials.  Such activities also might include the support provided by payment processors and other entities providing essential backroom operations.

75 Fed. Reg. at 10723.

22.    Knowledge of the prohibited practice is sufficient to establish the knowing or consciously avoided knowing requirement.   See F.T.C. v. Chapman, 714 F.3d at 1217-19.  Although the Tenth Circuit has not explicitly defined what knowledge a defendant must have -- knowledge of the prohibited practice, or knowledge of the practice and knowledge that the regulation prohibits the practice -- in F.T.C. v. Chapman, the Tenth Circuit emphasizes, in concluding that the defendant Meggie Chapman satisfied the knowing or consciously avoided knowing element, evidence showing the Chapman's knowledge or avoidance of knowledge of other defendants' misrepresentations, and does not discuss evidence reflecting Chapman's knowledge or avoidance of knowledge of the Telemarketing Sales Rule, 16 C.F.R. § 310.1-10.9 ("TSR").  F.T.C. v. Chapman, 714 F.3d at 1212, 1217-18.  The Tenth Circuit mentions that Kansas Attorney General investigations should have alerted Chapman to concerns of the other defendants'

---

[85]"A merchant account is a bank account that allows businesses to accept payments by debit or credit cards.  So a merchant account is an agreement between a retailer, a merchant bank and payment processor for the settlement of credit card and/or debit card transactions."  Susan Ward, How to Get a Merchant Account, The Balance Small Business (June 19, 2019), https://www.thebalancesmb.com/merchant-account-2948421 (last accessed July 1, 2019).

marketing practices, but the Tenth Circuit does not link the investigations to Chapman's knowledge of the TSR. See F.T.C. v. Chapman, 714 F.3d at 1217-18. See also F.T.C. v. Lake, 181 F. Supp. 3d at 701 (describing the defendant's knowledge of prohibited conduct and not discussing the defendant's knowledge of the TSR); F.T.C. v. Global Mktg. Grp., Inc., 594 F. Supp. 2d 1281, 1288 (M.D. Fla. 2008)(Covington, J.)(stating "[the defendant] consciously avoided knowing the telemarketers were engaged in deceptive acts and practices given the extraordinary high return rate and [the defendant's] substantial involvement in the telemarketing scheme," but not discussing the defendant's knowledge of the TSR); F.T.C. v. Capital Choice Consumer Credit, Inc., No. 02-21050 CIV, 2004 WL 5149998, at *42 (S.D. Fla. Feb. 20, 2004)(Ungaro-Benages, J.)(concluding that the defendants "provided substantial assistance or support" to other defendants "when they knew or consciously avoided knowing" about the other defendants' misrepresentations and advance fees), aff'd, 157 F. App'x 248 (11th Cir. 2005). Cf. United States v. Dish Network LLC, 256 F. Supp. 3d 810, 928-29 (C.D. Ill. 2017)(Myerscough, J.)("The evidence also proves that it is more likely than not that [defendant] Dish [Network LLC] knew about Star Satellite's use of prerecorded calls, or consciously avoided knowing about such use, and kept paying Star Satellite to continue the violations."). But see F.T.C. v. HES Merch. Servs. Co., 2016 WL 10880223, at *5 (describing that the defendants knew of or avoided knowing of another defendant's TSR violation, because they ignored "red flags" about that defendant's activities); F.T.C. v. Lake, 181 F. Supp. 3d at 700 (mentioning both the defendants' knowledge of the prohibited actions and knowledge of the MARS Rule).

**5.     The Remedies.**

23.     A violation of the MARS Rule

shall be treated as a violation of a rule prohibiting unfair, deceptive, or abusive acts or practices under the Consumer Financial Protection Act of 2010[,

12 U.S.C. §§ 25b, 1465, 2806, 5109, 5112, 5481, 5491-97, 5511-19, 5531-36, 5551-53, 5561-67, 5581-87, 5601-03; 15 U.S.C. §§ 1691c-2, 1693; 18 U.S.C. § 3301] and a violation of a rule under section 18 of the Federal Trade Commission Act (15 U.S.C. 57a) [("FTCA")] regarding unfair or deceptive acts or practices.

12 U.S.C. § 5538(a)(1).

24.    States, as parens patriae, may bring suit against violators.  The MARS Rule states that:

> in any case in which the attorney general of a State has reason to believe that an interest of the residents of the State has been or is threatened or adversely affected by the engagement of any person subject to a rule prescribed under subsection (a) in practices that violate such rule, the State, as parens patriae, may bring a civil action on behalf of its residents in an appropriate district court of the United States or other court of competent jurisdiction.

12 U.S.C. § 5538(b)(1).  As a general matter, "[t]he doctrine of parens patriae 'refers to the right of a State to sue . . . to prevent or repair harm to its quasi-sovereign interests.'"  Sierra Club v. Two Elk Generation Partners, Ltd. P'ship, 646 F.3d 1258, 1268 (10th Cir. 2011)(quoting BP Am., Inc. v. Oklahoma, 613 F.3d 1029, 1031 (10th Cir. 2010)).  When bringing a suit parens patriae, a state does not substitute itself wholly into the residents' places; a state must have its own interest apart from its residents' interests.  See Sierra Club v. Two Elk Generation Partners, Ltd. P'ship, 646 F.3d at 1268 ("In order to maintain [a parens patriae] action, the State must articulate an interest apart from the interests of particular private parties. . . .  The State must express a quasi-sovereign interest."  (quoting Satsky v. Paramount Commc'ns, Inc., 7 F.3d 1464, 1469 (10th Cir. 1993)));  Satsky v. Paramount Commc'ns, Inc., 7 F.3d at 1469 (stating that a state cannot "sue to assert the rights of private individuals").[86]  See also Charles Alan Wright, et al., 17 Federal Practice &

---

[86]The Tenth Circuit has described that, as a constitutional matter, parens patriae standing

Procedure § 4047 (3d ed. 2019)("Parens patriae standing is most likely to be recognized if there is a widespread injury to important interests of many individuals that cannot easily be calculated in monetary terms.  More specifically individualized injury to primarily commercial or monetary interests is least likely to be recognized.").

25.     A state with a quasi-sovereign interest in preventing MARS Rule violations that satisfies the parens patriae doctrine may pursue a variety of remedies.  See 12 U.S.C. § 5538(b)(1).  When suing as parens patriae, states attorney generals have authority to bring actions seeking penalties and injunctions for MARS Rule violations.  See 12 U.S.C. § 5538(b)(1).  The MARS Rule permits, in this stance, the state's attorneys generals to seek a number of remedies:

(A)     to enjoin that practice;

(B)     to enforce compliance with the rule;

(C)     to obtain damages, restitution, or other compensation on behalf of the residents of the State; or

(D)     to obtain penalties and relief provided under the Consumer Financial Protection Act of 2010, the Federal Trade Commission Act, and such other relief as the court deems appropriate.

12 U.S.C. § 5538(b)(1).

26.     The language "on behalf of the residents of the State," 12 U.S.C. § 5538(b)(1)(C), controls for whom the state may seek damages assignable to the residents and differs in this

---

involves three requirements:

> First, the state must "articulate an interest apart from the interests of particular private parties, *i.e.*, the [plaintiff] must be more than a nominal party."  [Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 607 (1982).]  Second, the state must "express a quasi-sovereign interest" that it seeks to protect. *Id*.  Finally, the state must "allege injury to a sufficiently substantial segment of its population." *Id*. at 607 . . . ; *see also Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d [at] 1469 . . . (discussing *parens patriae* standing).

Thiebaut v. Colo. Springs Utils., 455 F. App'x 795, 799-800 (10th Cir. 2011)(unpublished).

instance from the language "on behalf of its residents" associated with the parens patriae authority that 12 U.S.C. § 5538(b)(1) grants, which describes the state's authority to bring suit for any of the remedies that the state may seek.  In the Court's view, the "residents of the State" for which a state may seek damages, restitution, or other compensation include those individuals who resided in the state during the MARS Rule violations but no longer reside in the state.  12 U.S.C. § 5538(b)(1)(C).  In the provisions exempting attorneys from the MARS Rule, the MARS Rule's language contemplates residence at the time of the MARS Rule violation.  Cf. 12 C.F.R. § 1015.7 (exempting an attorney that is "[i]s licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located," and complies with that state's laws and regulations that govern conduct that the MARS Rule "requires").  To read the language otherwise separates the state of residence from the state in which the mortgage assistance relief services apply.  To read the "residents of the State" as only those current residents of the state likewise divides the relevant state of residence from the state in which the provision of mortgage assistance relief services occurred, and the attorneys were or were not licensed, and were or were not in compliance with state law.  A current out-of-state resident's restitution would rely on another state's -- the resident's previous state of residence -- laws.  Moreover, a state will almost certainly not bring, and likely does not have the requisite quasi-sovereign interest -- which rests on actions that have occurred and deterrence of such actions from continuing -- to bring, suit based on MARS Rule violations that occurred in another state.

27.     Furthermore, to read the "residents of the State" as only those current residents of the state impedes the MARS Rule's goals.  It reduces the deterrence that a state can seek; the

provision for restitution both restores the residents' losses and adds damages deterring the unlawful conduct. It also limits the people for whom the MARS Rule provides restitution.

28.     The penalties and relief for which the Consumer Financial Protection Act of 2010 that the states attorneys generals may seek include:

(A)     rescission or reformation of contracts;

(B)     refund of moneys or return of real property;

(C)     restitution;

(D)     disgorgement or compensation for unjust enrichment;

(E)     payment of damages or other monetary relief;

(F)     public notification regarding the violation, including the costs of notification;

(G)     limits on the activities or functions of the person; and

(H)     civil money penalties, as set forth more fully in subsection (c).

12 U.S.C. § 5565(a)(2). Section 5565 also describes three tiers of penalties applicable to MARS Rule violations:

(A)     First tier

For any violation of a law, rule, or final order or condition imposed in writing by the Bureau, a civil penalty may not exceed $5,000 for each day during which such violation or failure to pay continues.

(B)     Second tier

Notwithstanding paragraph (A), for any person that recklessly engages in a violation of a Federal consumer financial law, a civil penalty may not exceed $25,000 for each day during which such violation continues.

(C)     Third tier

Notwithstanding subparagraphs (A) and (B), for any person that knowingly violates a Federal consumer financial law, a civil penalty may not exceed $1,000,000 for each day during which such violation continues.

12 U.S.C. § 5565(c)(2). "[T]he common law has generally understood [recklessness] in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Safeco Ins. of Am. v. Burr, 551 U.S. 47, 68-69 (2007)(footnote omitted)(quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994), and citing William Keeton, et al., Prosser and Keeton on Law of Torts § 34, at 213-14 (5th ed. 1984)). See Consumer Fin. Prot. Bureau v. CashCall, Inc., No. CV 15-07522-JFW (RAOx), 2018 WL 485963, at *14 (C.D. Cal. Jan. 19, 2018)(Walter, J.)(citing Consumer Fin. Prot. Bureau v. D & D Mktg., Case No. CV 15-9692 PSG (Ex), CV 16-2724 PSG (Ex), CV 16-2725 PSG (Ex), 2016 WL 8849698, at *12 n.13 (C.D. Cal. Nov. 17, 2016)(Gutierrez, J.)). For a violation to be knowing, the person must have knowledge of the MARS Rule's prohibition, and that his, her, or its action violated the rule. Cf. Consumer Fin. Prot. Bureau v. CashCall, Inc., 2018 WL 485963, at *14 ("[T]he term 'knowing' means 'actual knowledge or knowledge fairly implied . . . on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule.'" (quoting 15 U.S.C. § 45(m)(1)(A)); Consumer Fin. Prot. Bureau v. D&D Mktg., 2016 WL 8849698, at *12; United States v. Dish Network, LLC, 667 F. Supp. 2d at 961-62 (describing knowing in the FTCA context to require knowledge of the rule's existence and that the defendant's conduct violated the rule)). The Honorable James Selna, United States District Judge for the United States District Court for the Central District of California, has described evidence that counsels penalizing a defendant for a reckless or knowing violation of the law:

> Uncontroverted evidence could establish that Defendants should be penalized in one of these two tiers. (See Henderson Decl. ¶ 4 ("Alfred Clausen and [Cobb] actually ran Siringoringo's loan modification operations through their company, [CCMC]."); Salto Decl. Supp. Appl. Default J. ¶ 10 (describing a meeting that took place in February 2012 in which Siringoringo thought he'd get a slap on the wrist for his illegal conduct), Dkt. No. 71; Burge Decl. Supp. Appl. Default J. ¶ 5, Ex. 1 (describing an email from Siringoringo cc'ing Cobb on May 6, 2011

acknowledging the existence of the FTC rules that eventually became The MARS Rule), Dkt. No. 70).

Consumer Fin. Prot. Bureau v. Siringoringo, Case No. SACV 14-01155 JVS (AJWx), 2016 WL 102435, at *7 n.4 (C.D. Cal. Jan. 7, 2016)(Selna, J.). See Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin., Inc., No. 15-CV-02106-RS, 2017 WL 3948396, at *13 (N.D. Cal. Sept. 8, 2017)(Staton, J.)(imposing a penalty at the lowest tier where the defendants used aggressive sales tactics, but also pursued "training, quality control, and . . . legal counsel, in an effort to stay on the right side of the line" of the law).

29.     A court has discretion in granting appropriate relief within these tiers. See 12 U.S.C. § 5565.[87]  When considering the penalty to assess, a court should consider:

(A)     the size of financial resources and good faith of the person charged;

(B)     the gravity of the violation or failure to pay;

(C)     the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided;

(D)     the history of previous violations; and

(E)     such other matters as justice may require.

12 U.S.C. § 5565(c)(3).

**6.     Common Enterprise Liability.**

30.     Courts have adopted a common enterprise exception to common-law principles of corporate structure to permit defendants to be liable jointly and severally where the individuals and the entities may have used "corporate structures to circumvent" legal prohibitions. F.T.C. v.

---

[87]This statute provides: "The court . . . in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law." 12 U.S.C. § 5565. As discussed supra, the MARS Rule is such a consumer financial law. See 12 U.S.C. § 5538(a)(1).

PayDay Fin. LLC, 989 F. Supp. 2d 799, 808-09 (D.S.D. 2013)(Lange, J.)(citing P.F. Collier & Son Corp. v. F.T.C., 427 F.2d 261, 267 (6th Cir. 1970)).  Cf. F.T.C. v. Kuykendall, 371 F.3d 745, 759 (10th Cir. 2004)(noting that the common enterprise doctrine may have applied had the FTC supplied sufficient evidence for the theory).[88]  "'The general rule is that, absent highly unusual circumstances, the corporate entity will not be disregarded.'"  F.T.C. v. Wyndham Worldwide Corp., No. CIV.A. 13-1887 ES, 2014 WL 2812049, at *4 (D.N.J. June 23, 2014)(Salas, J.)(quoting P.F. Collier & Son Corp., 427 F.2d at 266).  The common enterprise doctrine avoids "'situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with a clear mechanism for avoiding the terms of the order.'"  F.T.C. v. Grant Connect, LLC, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011)(Pro, J.)(quoting F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)(Pannell, J.)).  "'[T]he common enterprise [inquiry] is not an alter ego analysis.  The entities formally may be separate corporations[] but operate as a common enterprise.'"  F.T.C. v. Direct Benefits Grp., LLC, No. 6:11-CV-1186-ORL-28, 2013 WL 3771322, at *18 (M.D. Fl. July 18, 2013)(Antoon, J.)(alterations in F.T.C. v. Direct Benefits Grp.)quoting F.T.C. v. Grant Connect, LLC, 827 F. Supp. 2d at 1218).  "Under the theory of common enterprise, each entity in a group of interrelated companies can be held jointly and severally liable for the actions of other entities in that group." F.T.C. v. Johnson, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015)(Du, J.)(citing F.T.C. v. Network Servs. Depot, Inc., 617 F.3d 1127, 1142-43 (9th Cir. 2010)).

---

[88]The common enterprise liability doctrine developed in the FTCA context.  See F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 808-09.  Courts have applied it to the MARS Rule, see F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1269-73; Office of the Attorney Gen. v. Berger Law Grp., P.A., No. 8:14-CV-1825-T-30MAP, 2015 WL 5922933, at *2-3 (M.D. Fla. Oct. 9, 2015)(Moody, J.), and the Court agrees with this application, because MARS Rule violations are an unfair or deceptive act or practices for FTCA purposes, see 12 U.S.C. § 5538(a)(1).

31.     "When determining whether a common enterprise exists, 'the pattern and frame-work of the whole enterprise must be taken into consideration.'" F.T.C. v. Direct Benefits Grp., LLC, 2013 WL 3771322, at *18 (quoting F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1182). "'If the structure, organization, and pattern of a business venture reveal a common enterprise or a maze of integrated business entities, the FTC Act disregards corporateness.'" F.T.C. v. Direct Benefits Grp., LLC, 2013 WL 3771322, at *18 quoting F.T.C. v. Wash. Data Res., 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012)(Merryday, J.)), aff'd, 704 F.3d 1323 (11th Cir. 2013); F.T.C. v. Johnson, 156 F. Supp. 3d at 1207 ("'Entities constitute a common enterprise when they exhibit either vertical or horizontal commonality -- qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues.'"  (quoting F.T.C. v. Network Servs. Depot, Inc., 617 F.3d at 1142-43)).  In making this determination,

> courts have looked to factors including "common control; the sharing of office space and officers; whether business is transacted through amaze [sic] of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants."

F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 809 (quoting F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1182; and citing F.T.C. v. J.K. Publ'ns, Inc., 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000)(Collins, J.)).  See F.T.C. v. Johnson, 156 F. Supp. 3d at 1207 (listing same factors); F.T.C. v. Wash. Data Res., 856 F. Supp. 2d at 1271 ("A 'common enterprise' operates if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." (citing Del. Watch Co. v. F.T.C., 332 F.2d 745, 746 (2d Cir. 1964); F.T.C. v. Neovi, Inc., 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008)(Sammartino, J.)).  See also F.T.C. v. Direct Benefits Grp., LLC, 2013 WL 3771322, at *18-19 (finding a common enterprise where, "[t]he two individual Defendants

were each sole owners and principals of two of the four corporate entities, were close working partners with each other, and were involved with one another's companies," and the companies shared office space, employees, equipment, and worked together to enroll customers in programs); F.T.C. v. LoanPointe, LLC, No. 2:10-CV-225 DAK, 2011 WL 4348304, at *10 (D. Utah Sept. 16, 2011)(Kimball, J.)("Because the Defendants have shared ownership and control, office space and addresses, and employees, they are a common enterprise and are liable for injunctive relief and, jointly and severally, for monetary relief."), aff'd, 525 F. App'x 696 (10th Cir. 2013)(unpublished);[89] F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1269-73 (finding a common enterprise where the owners shared ownership and control over several entities, shared employees, shared offices, commingled funds, shared advertising and used similar attorney client agreements); Commodity Futures Trading Comm'n v. Wall St. Underground, Inc., 281 F. Supp. 2d 1260, 1271-72 (D. Kan. 2003)(Murguia, J.)("Courts have long considered . . . common control to be indicative of a common enterprise for the purpose of attributing joint and several liability."), modified sub

---

[89]F.T.C. v. LoanPointe, LLC is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that F.T.C. v. LoanPointe, LLC, Commodities Future Trading Comm'n v. Wall St. Underground, Inc., Wilcox v. Raintree Inns of Am., Inc, Thiebaut v. Colo. Springs Utils., and Sunshine Art Studios, Inc. v. F. T. C. have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

nom. Commodities Future Trading Comm'n v. Wall St. Underground, Inc., No. CIV.A. 03-2193-CM, 2004 WL 1900588 (D. Kan. June 24, 2004)(Murguia, J.), aff'd and remanded, 128 F. App'x 726 (10th Cir. 2005)(unpublished); F.T.C. v. Neovi, Inc., 598 F. Supp. 2d at 1116 (deeming a common enterprise existed where the "Defendants shared office space, employees, payroll funds, and other expenses . . . [and] also engaged in unified advertising").[90]

---

[90]The Honorable Carlos Murguia, United States District Judge for the United States District Court for the District of Kansas, has noted: "Individuals may also be held to be participants in a common enterprise where the individual and the other members of the enterprise operate as a single economic entity." Commodity Futures Trading Comm'n v. Wall St. Underground, Inc., 281 F. Supp. 2d at 1271-72 (citing Gibson v. F.T.C., 682 F.2d 554, 568 (5th Cir. 1982); Sunshine Art Studios, Inc. v. F. T. C., 481 F.2d 1171, 1175 (1st Cir. 1973)(unpublished)). The Tenth Circuit did not address this statement on appeal. Although the Court can imagine a situation where an individual -- for instance, an individual doing business as an individual and not through a corporate entity -- might act as a member of a common enterprise, the Court notes that, in most instances, the FTCA individual liability analysis, discussed in more detail in the text's following section, controls an individual's liability, and courts restrict the common enterprise analysis to corporate entities. See, e.g., F.T.C. v. Pointbreak Media, LLC, 376 F. Supp. 3d 1257, 1270-71 (S.D. Fla. 2019)(Altonaga, J.)(describing a common-enterprise theory under which the individuals are liable as principals for the common enterprise's wrongdoing and an individual liability theory, under which the defendants are liable for directly participating in the FTCA violations); F.T.C. v. A to Z Mktg., Inc., 2014 WL 12479617, at *8 (addressing corporate entities under a common enterprise theory and individual defendants under an individual liability theory); F.T.C. v. Wash. Data Res., 856 F. Supp. 2d at 1271-72 (describing corporate entities as part of the common enterprise and addressing individual defendants' liability under the individual liability analysis); F.T.C. v. Grant Connect, LLC, 827 F. Supp. 2d at 1215-18 (addressing the entity defendants and not the individual defendants under a common-enterprise theory); F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1213-14. The individual liability analysis embraces most situations where an individual defendant exercises considerable control over a corporate entity, so such control, even when the control stems from a controlling interest in or ownership of a closely held entity, does not bring the individual into the common enterprise. Cf. F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (stating that, to establish individual liability for an FTCA unfair or deceptive act or practice, the plaintiff must "show the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control them" (citing F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d at 1170); F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1205 (noting a substantial inference of an individual defendant's authority to control unfair and deceptive acts and practices when the individual has a controlling interest in a closely held corporate defendant (citing Standard Educators, Inc. v. F.T.C., 475 F.2d 401, 403 (D.C. Cir. 1973)).

### 7. **Individual Liability.**

32.     To establish an individual's liability for a corporate entity's practices, a plaintiff must establish three elements.  See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1203 (10th Cir. 2005).[91]  First, the plaintiff must show that the entity committed a violation.  See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1202-03.  Second, the plaintiff must "show the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control them."  F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997)).  Third, the plaintiff "must establish the individual knew or should have known of the entity's" acts.  F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Amy Travel Serv., Inc., 875 F.2d 564, 574 (7th Cir. 1989)).  Cf. Consumer Fin. Prot. Bureau v. Mortg. Law Grp., LLP, 196 F. Supp. 3d 920, 944 (W.D. Wis. 2016)(Crabb, J.)(using these factors in the MARS Rule context), amended on reconsideration, No. 14-CV-513-BBC, 2016 WL 9459248 (W.D. Wis. Nov. 23, 2016)(Crabb, J.); F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1285-86 (same).

33.     Where an individual defendant has a controlling interest in a closely held corporate defendant, "a substantial inference exists" that the individual "had the authority to control the deceptive acts and practices."  F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1205 (citing Standard Educators, Inc. v. F.T.C., 475 F.2d at 403).  For deceptive acts, "'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth'"

---

[91]In F.T.C. v. Freecom Communications, Inc., the Tenth Circuit addressed the FTCA's 15 U.S.C. § 45 prohibition on "unfair or deceptive acts or practices."  15 U.S.C. § 45(a)(1).  See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1197, 1203.  The MARS Rule violation is treated as an FTCA unfair or deceptive act or practice.  See 12 U.S.C. § 5538(a)(1).  The Court concludes, accordingly, that the FTCA caselaw applies to the MARS Rule.

satisfy the knowledge requirement.  F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1207 (quoting F.T.C. v. Amy Travel Serv., Inc., 875 F.2d at 574).  Likewise, "'actual knowledge'" of the prohibited action, "'reckless indifference," or "'an awareness of a high probability of [the action] along with an intentional avoidance of [knowledge]'" satisfy the requirement for other MARS Rule violations.  F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1207 (quoting F.T.C. v. Amy Travel Serv., Inc., 875 F.2d at 574).  Cf. F.T.C. v. E.M.A. Nationwide, Inc., 767 F.3d 611, 636 (6th Cir. 2014)(citing these requirements as elements for individual MARS violation liability, but not rephrasing them for non-misrepresentation violations); Consumer Fin. Prot. Bureau v. Mortg. Law Grp., LLP, 196 F. Supp. 3d at 944 (applying these requirements as elements for individual MARS violation liability, but not rephrasing them for non-misrepresentation violations), amended on reconsideration, No. 14-CV-513-BBC, 2016 WL 9459248 (W.D. Wis. Nov. 23, 2016)(Crabb, J.); F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1285-86 (stating these factors as the test to determine individual MARS Rule liability).  The inquiry focuses on knowledge of the action and not on knowledge that the specific action is prohibited.  Cf. Consumer Fin. Prot. Bureau v. Mortgage Law Grp., LLP, 196 F. Supp. 3d at 944 (treating the inquiry as focused on knowledge of the action and not on whether the action was prohibited).  "'A defendant's participation in corporate affairs is probative of knowledge.'"  F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1207 (quoting F.T.C. v. Wilcox, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995)(Seltzer, M.J.)), aff'd, 356 F. App'x 358 (11th Cir. 2009).

## <u>RELEVANT LAW REGARDING THE MFCFPA.</u>

34.    On May 19, 2010, New Mexico enacted the MFCFPA, which provides New Mexico-specific laws governing mortgage foreclosure relief services.  <u>See</u> N.M. Stat. Ann. § 47-15-5.  Among other things, the MFCFPA provides:

> It is a violation of the Mortgage Foreclosure Consultant Fraud Prevention Act for a foreclosure consultant to:
>
> A.    claim, demand, charge, collect or receive any compensation until after the foreclosure consultant has fully performed every service the foreclosure consultant contracted to perform or represented the consultant would perform;
>
> . . . .
>
> G.    include a provision in a foreclosure consulting contract that:
>
> > (1)    attempts or purports to waive an owner's rights under the Mortgage Foreclosure Consultant Fraud Prevention Act;
> >
> > (2)    requires an owner to consent to jurisdiction for litigation or choice of law in a state other than New Mexico;
> >
> > (3)    provides for venue in a county other than the county in which the residence in foreclosure is located; or
> >
> > (4)    imposes any costs or filing fees greater than the fees required to file an action in a district court; or
>
> H.    induce or attempt to induce an owner to enter a contract that does not comply in all respects with the Mortgage Foreclosure Consultant Fraud Prevention Act.

N.M. Stat. Ann. § 47-15-5(A), (G)-(H).  The MFCFPA preserves to owners the right to rescind foreclosure consulting contracts: "In addition to any other right under law to rescind a contract, an owner may rescind a foreclosure consulting contract until midnight of the third business day after the day on which the owner signs a foreclosure consulting contract that complies with the

Mortgage Foreclosure Consultant Fraud Prevention Act." N.M. Stat. Ann. § 47-15-4(A). In addition, the MFCFPA prescribes practices, forms, and language for such contracts:

A.      A foreclosure consulting contract shall:

(1)      be provided to the owner for review at least twenty-four hours before being signed by the owner;

(2)      be printed in at least fourteen-point type and written in the same language that was used by the owner in discussions with the foreclosure consultant to describe the consultant's services or to negotiate the contract;

(3)      fully disclose the nature and extent of the foreclosure consulting services to be provided, including any foreclosure reconveyance that may be involved, and the total amount and terms of any compensation to be received by the foreclosure consultant or anyone working in association with the foreclosure consultant;

(4)      disclose the names of any other corporations, businesses or entities on behalf of which the consultant does business or with which the consultant is affiliated or employed;

(5)      separately itemize all costs, fees or expenses and the purpose of the costs, fees or expenses that are charged to the homeowner during the term of the contract;

(6)      be dated and personally signed by the owner and the foreclosure consultant; and

(7)      contain the following notice, which shall be printed in at least fourteen-point boldface type, completed with the name of the foreclosure consultant, and located in immediate proximity to the space reserved for the owner's signature:

"NOTICE REQUIRED BY NEW MEXICO LAW

..........(Name) or anyone working for him or her CANNOT ask you to sign or have you sign any lien, mortgage or deed as part of signing this agreement unless the terms of the transfer are specified in this document and you are given a separate explanation of the nature and extent of the transaction.

...........(Name) or anyone working for him or her CANNOT guarantee you that they will be able to refinance your home or arrange for you to keep your home. Continue making mortgage payments until a refinancing, if applicable, is approved. If a transfer of the deed or title to your property is involved in any way, you may rescind

the transfer any time within 3 days after the date you sign the deed or other document of sale or transfer.  See the attached Notice of Rescission form for an explanation of this right.  As part of any rescission, you must repay any money spent on your behalf as a result of this agreement within 60 days of receiving commercially reasonable documentation of the payments.

THIS IS AN IMPORTANT LEGAL CONTRACT AND COULD RESULT IN THE LOSS OF YOUR HOME.  CONTACT AN ATTORNEY OR COUNSELOR BEFORE SIGNING."

B.    A foreclosure consulting contract shall contain on the first page, in at least fourteen-point type:

     (1)    the name and address of the foreclosure consultant to which the notice of cancellation is to be mailed; and

     (2)    the date the owner signed the contract.

C.    A foreclosure consulting contract shall be accompanied by a completed form in duplicate, captioned "NOTICE OF RESCISSION RIGHTS", which shall:

     (1)    be on a separate sheet of paper attached to the contract;

     (2)    be easily detachable; and

     (3)    contain the following statement printed in at least fifteen-point type:

"NOTICE OF RESCISSION RIGHTS

(Date of Contract)

You may cancel or rescind this contract, without any penalty, at any time until midnight of the third business day after the day on which you sign this contract.  If you want to end this contract, mail or deliver a signed and dated copy of this Notice of Rescission, or any other written notice indicating your intent to rescind to (name of foreclosure consultant) at (address of foreclosure consultant, including facsimile and electronic mail).

As part of any rescission, you (the homeowner) must repay any money spent on your behalf as a result of this agreement within 60 days of receiving commercially reasonable documentation of the payments.

THIS IS AN IMPORTANT LEGAL CONTRACT AND COULD RESULT IN THE LOSS OF YOUR HOME.  CONTACT AN ATTORNEY OR COUNSELOR BEFORE SIGNING.

RESCISSION OF CONTRACT FORM

TO: (name of foreclosure consultant)

(address of foreclosure consultant, including facsimile and electronic mail)

I hereby rescind this contract.

..........(Date)

..........(Homeowner's signature)".

D.      The foreclosure consultant shall provide the owner with a signed and dated copy of the foreclosure consulting contract and the attached notice of rescission rights and rescission of contract form immediately upon execution of the contract.

E.      The time during which the owner may rescind the foreclosure consulting contract does not begin to run until the foreclosure consultant has complied with this section and the owner has signed the contract.

N.M. Stat. Ann. § 47-15-3 (capitalization in original).

35.      The MFCFPA defines "foreclosure consultant" broadly.   N.M. Stat. Ann. § 47-15-2(B).  Like the MARS Rule, the definition includes people who offer and who provide services:

"[F]oreclosure consultant":

(1)      means a person[92] who, directly or indirectly, makes a solicitation or offer to an owner to perform services for compensation or who, for compensation,[93] performs a service that the person represents will:

(a)      stop or postpone a foreclosure sale;

(b)      obtain any forbearance from a beneficiary or mortgagee;

(c)      assist the owner to exercise the right to reinstatement;

---

[92]"'[P]erson' means an individual, a partnership, a corporation, a limited liability company, an association or other group, however organized."  N.M. Stat. Ann. § 47-15-2(E).

[93]"'[C]ompensation' means monetary payment, remuneration or other benefits received, including monetary donations made in conjunction with the performance of services."  N.M. Stat. Ann. § 47-15-2(A).

(d)     obtain an extension of the period within which the owner may reinstate the owner's obligation;

(e)     obtain a waiver of an acceleration clause contained in a promissory note, deed of trust or contract secured by a mortgage on a residence in foreclosure or contained in the mortgage;

(f)     assist an owner in foreclosure or loan default to obtain a loan or advance of funds;

(g)     avoid or ameliorate the impairment of an owner's credit resulting from the recording of a notice of default or from a foreclosure sale; or

(h)     otherwise save an owner's residence from foreclosure[.]

N.M. Stat. Ann. § 47-15-2(B)(1).  "'[O]wner' means the record owner of a residence in foreclosure at the time a foreclosure notice of pendency was recorded or a summons and complaint for foreclosure was served."  N.M. Stat. Ann. § 47-15-2(D).

"[R]esidence in foreclosure" means residential real property consisting of one to four family dwelling units, one of which the owner occupies as the owner's principal place of residence, where there is a delinquency or default on any loan payment or debt secured by or attached to the residential real property, including contract for deed payments.

N.M. Stat. Ann. § 47-15-2.  Also like the MARS Rule, the MFCFPA emphasizes the purposes for which the services are promised; it regulates those services that a person "represents will" attain mortgage assistance relief results.  N.M. Stat. Ann. § 47-15-2(B)(1).  Unlike the MARS Rule, however, the MFCFPA lists forms of services to which the MFCFPA applies, but not to which the MFCFPA is limited:

G.     "service" means and includes, *but is not limited to*, any of the following:

(1)     debt, budget or financial counseling of any type;

(2)     receiving money for the purpose of distributing it to creditors in payment or partial payment of an obligation secured by a lien on a residence in foreclosure;

(3)     contacting creditors on behalf of an owner;

(4)     arranging or attempting to arrange for an extension of the period within which the owner of a residence in foreclosure may cure the owner's default and reinstate the owner's obligation;

(5)     arranging or attempting to arrange for a delay or postponement of the time of sale of the residence in foreclosure;

(6)     advising the filing of any document or assisting in any manner in the preparation of any document for filing with a bankruptcy court; or

(7)     giving advice, explanation or instruction to an owner, which in any manner relates to the cure of a default in or the reinstatement of an obligation secured by a lien on the residence in foreclosure, the full satisfaction of that obligation, or the postponement or avoidance of a sale of a residence in foreclosure, pursuant to a power of sale contained in a mortgage.

N.M. Stat. Ann. § 47-15-2(G) (emphasis added).

36.     Given the MFCFPA's breadth, the Court predicts that the Supreme Court of New Mexico would understand legal services litigation services to fall within the MFCFPA. Nothing in the MFCFPA precludes litigation services from those services that the MFCFPA regulates. Legal services may involve "contacting creditors on behalf of an owner," "arranging or attempting to arrange for an extension of the period within which the owner of a residence in foreclosure may cure the owner's default and reinstate the owner's obligation," and "arranging or attempting to arrange for a delay or postponement of the time of sale of the residence in foreclosure," and litigation provides one strategy for undertaking these actions. N.M. Stat. Ann. § 47-15-2(G)(3)-(5). The MFCFPA contains a limited attorney exemption -- excluding from the definition of foreclosure consultant "a person licensed to practice law in this state when the person renders service in the course of the person's practice as an attorney," N.M. Stat. Ann. § 47-15-2(B)(2)(a) -- and such exemption counsels the MFCFPA's application against non-exempt attorneys

performing legal services, see N.M. Stat. Ann. § 47-15-2(B)(2)(a).  Without such application, the exemption would serve to bar few attorneys and advance little purpose.  Moreover, the Supreme Court of New Mexico would likely consider the MFCFPA in light of the similar MARS Rule, and reason that the MFCFPA and the MARS Rule reach similar activities.  Cf. State ex rel. Schwartz v. Sanchez, 1997-NMSC-021, ¶ 7, 936 P.2d 334, 335 ("[T]wo statutes covering the same subject matter should be harmonized and construed together when possible, in a way that facilitates their operation and the achievement of their goals."  (citing Quintana v. Schnedar, 1993-NMSC-033, ¶ 4, 855 P.2d 562, 564-65)).  The MARS Rule, as the Court concludes in the preceding section, applies to legal services, including litigation services.

      37.     The Court also predicts that the Supreme Court of New Mexico would apply the same liability theories to the MFCFPA as federal courts apply to the MARS Rule.  As the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to -26 ("NMUPA"), directs New Mexico courts to look to the FTC for guidance in interpreting the NMUPA, see N.M. Stat. Ann. § 57-12-4, as the MFCFPA is a specific form of NMUPA violation, see N.M. Stat. Ann. § 47-15-7(A), and as the Supreme Court of New Mexico has previously looked to federal statutes similar to New Mexico statutes to interpret the New Mexico law, see Featherstone v. Bureau of Revenue, 1954-NMSC-080, ¶ 6, 273 P.2d 752, 753; Lopez v. Singh, 1949-NMSC-022, ¶ 7, 205 P.2d 492, 493, the Court predicts that the Supreme Court of New Mexico would also look to federal caselaw to interpret MFCFPA violations.  Liability for MFCFPA violations can, therefore, be shown through evidence of a common enterprise, see F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 808-09, or through evidence that satisfies the FTCA test for individual liability, see F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203.

38.     The MFCFPA provides that MFCFPA violations are deemed to be NMUPA violations.  See N.M. Stat. Ann. § 47-15-7(A).  The New Mexico attorney general may bring suit for MFCFPA violations.  See N.M. Stat. Ann. § 47-15-7(E), 57-12-8(A).  The MFCFPA permits the award of actual damages, and attorney's fees and costs on a basis cumulative with other remedies.  See N.M. Stat. Ann. § 47-15-7(B).  Additionally, the MFCFPA permits a court to award "exemplary damages up to three times the compensation charged by the foreclosure consultant if the court finds that the foreclosure consultant violated a provision of Section 5 of the Mortgage Foreclosure Consultant Fraud Prevention Act and that the foreclosure consultant's conduct was willful or in bad faith."  N.M. Stat. Ann. § 47-15-7(D).  "Willful conduct is the intentional doing of an act with knowledge that harm may result."  N.M. Civ. UJI 13-1827.[94]

39.     Under the NMUPA, the Attorney General of New Mexico is entitled to bring an action in New Mexico's name for NMUPA violations.  See N.M. Stat. Ann. § 57-12-8(A).  In such an action, the Attorney General may "petition the district court for temporary or permanent

---

[94]The Court draws this definition of willful from the New Mexico Civil Uniform Jury Instructions on punitive damages, and predicts that the Supreme Court of New Mexico would apply this definition to the MFCFPA.  See N.M. Civ. UJI 13-1827.  The N.M. Civ. UJI offers New Mexico's definition for willful in the punitive damages context.  Cf. Coffey v. United States, 906 F. Supp. 2d 1114, 1186 n.33 (D.N.M. 2012)(Browning, J.)("The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law."  (citing State v. Wilson, 1994-NMSC-009, ¶ 5, 867 P.2d 1175, 1178)).  The MFCFPA uses the concept of "willful" in such a context; it permits treble damages for defendants' willful scienter.  See Hale v. Basin Motor Co., 1990-NMSC-068, ¶ 20, 110 N.M. 314, 320 ("Multiplication of damages pursuant to statutory authority is a form of punitive damages.").  The N.M. Civ. UJI provides, therefore, a definition appropriate for "willful" in the MFCFPA's context.  Cf. Atherton v. Gopin, 2015-NMCA-003, ¶¶ 53-54, 340 P.3d 630, 641-42 (applying the N.M. Civ. UJI 13-1827 definition of willful to the NMUPA's punitive damages provision).

injunctive relief and restitution." N.M. Stat. Ann. § 57-12-8(B). Special penalties are available

against persons who act willfully:

> In any action brought under Section 57-12-8 NMSA 1978, if the court finds that a person is willfully using or has willfully used a method, act or practice declared unlawful by the Unfair Practices Act, the attorney general, upon petition to the court, may recover, on behalf of the state of New Mexico, a civil penalty of not exceeding five thousand dollars ($5,000) per violation.

N.M. Stat. Ann. § 57-12-11.

## **ANALYSIS**

40.     The Defendants violated the MARS Rule and the MFCFPA.[95]  The Court awards

---

[95]In its closing argument, New Mexico asked the Court to take judicial notice of a press release that the Attorney General of California issued about State of California v. Law Offices of Kramer and Kaslow, see July 11 Tr. at 858:10-14 (Anaya-Allen), and of the Federal Trade Commission's consumer warning with respect to the activities in which Real Estate Law participated, see July 11 Tr. at 858:22-859:3 (Anaya-Allen).  In response, the Parwatikar Defendants argued that neither document is in evidence before the Court.  See July 11 Tr. at 872:3-12 (Kennedy).  The Court may judicially notice adjudicative facts.  "Adjudicative facts are simply the facts of the particular case."  Fed. R. Evid. 201 advisory committee's notes.  The Federal Rules of Evidence juxtapose such facts with legislative facts, see Fed. R. Evid. 201(a), which "are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."  Fed. R. Evid. 201 advisory committee's notes.  The Court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The Court does not understand New Mexico to point it to the press release and the consumer warning as facts of this case, but understands New Mexico to argue that it should take judicial notice of the press release and the consumer warning as evidence that the activities in which Real Estate Law engaged were a scam.  See July 11 Tr. at 858:5-9 (Anaya-Allen); id. at 858:22-859:3 (Anaya-Allen).  To consider the press release and the consumer warning for such a purpose, the Court must take judicial notice of the factual statements within those documents.  The Court will not take judicial notice of the Attorney General of California's and the FTC's factual findings that the press release and the consumer warnings reflect.  See Attorney General of California, Attorney General Kamala D. Harris Sues Law Firms Engaged in National Mass Joinder Mortgage Fraud (August 18, 2011), https://www.oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-sues-law-firms-engaged-national-mass-joinder; F.T.C., Mass Joinder Lawsuits (March, 2012), https://www.consumer.ftc.gov/articles/0256-mass-joinder-lawsuits.  Courts do not even take judicial notice of another courts' factual findings, because those findings do not satisfy the not-

judgment against the Real Estate Law, Mr. Davis, Pinnacle Law, and Mr. Pratt in the following amounts: (i) Real Estate Law: $42,610.70; (ii) Mr. Davis: $17,413.40; (iii) Mr. Parwatikar: $54,286.73; (iv) Pinnacle Law: $54,286.73; and (v) Mr. Pratt: $18.477.50. Preliminarily, as the Court concludes that the Parwatikar Defendants and Mr. Pratt are liable for MARS Rule and MFCFPA violations, the Court addresses the Default Judgment Against Real Estate Law Center at 1-2, and the Memorandum Opinion and Order Adopting the Magistrate Judge's Proposed Findings and Recommended Disposition at 2, 9, granting default judgments against Real Estate Law and Mr. Davis. Per these defaults, Real Estate Law and Mr. Davis are liable for the MARS Rule and the MFCFPA violations.[96] See Frow v. De La Vega, 82 U.S. 552, 554 (1872); Wilcox v. Raintree Inns of Am., Inc., 76 F.3d 394, 1996 WL 48857 at *2-3 (10th Cir. 1996)(unpublished table opinion)(directing a court to consider a case's merits as to the remaining defendants and to dismiss the case against all defendants, including the defaulter, if the merits logically show the defendants, including the defaulters, not liable). To determine the Parwatikar Defendants' and

---

subject-to-reasonable-dispute requirement. See, e.g., Taylor v. Charter Med. Corp., 162 F.3d 827, 830 (5th Cir. 1998); Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998); Walker v. Woodford, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006), aff'd in part, 393 F. App'x 513 (9th Cir. 2010). The Court sees even less reason to take judicial notice of the Attorney General of California's and the FTC's findings in public, and possibly politically motivated, press release and consumer warning.

[96]The Court notes that it did not, in its MSJ MOO, grant summary judgment for Mr. Davis, see New Mexico's Proposed Findings at 90 n.9, but concluded that New Mexico did not produce evidence sufficient to survive, at the summary judgment stage, a theory that the Parwatikar Defendants and Pinnacle Law had substantially assisted Mr. Davis, as opposed to substantially assisting Real Estate Law and Mr. Pratt, in violating the MARS Rule, see MSJ MOO at 6-7, 131. The Court also notes that, in the MSJ MOO, it recognized the default judgment against Real Estate Law, see MSJ MOO at 33, but, to answer whether a genuine issue of material fact existed as to the Parwatikar Defendants' and Mr. Pratt's liability, the Court had to address whether Real Estate Law violated the MARS Rule and the MFCFPA, see MSJ MOO at 5. Without Real Estate Law's actions violating the MARS Rule and/or the MFCFPA, neither the Parwatikar Defendants nor Mr. Pratt could be liable.

Mr. Pratt's liability, nevertheless, the Court must consider the case's merits against the Parwatikar Defendants and Mr. Pratt. The merits include whether Real Estate Law acted such that it violated the MARS Rule and/or the MFCFPA. Neither the Parwatikar Defendants nor Mr. Pratt can be liable if Real Estate Law did not violate the MARS Rule and the MFCFPA.

## I.     MR. PRATT IS LIABLE FOR MARS RULE VIOLATIONS.

41.     The Defendants violated the MARS Rule. Mr. Pratt is liable if New Mexico satisfies the FTCA test for individual liability. See F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203.

42.     As an initial matter, New Mexico has authority to bring the suit parens patriae and to seek restitution for Ward, L. Madrid and M. Madrid, Leary, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Silva, Jaramillo, Mondragon, Humble, June Valdez, Jose Valdez, Woods, Starrett, and Marcelli. New Mexico has its own interest quasi-sovereign interest in pursuing this action. See 12 U.S.C. § 5538(b)(1). New Mexico seeks to deter future action like the Defendants' conduct. See July 8 Tr. at 13:5-17 (Anaya-Allen). New Mexico does not seek solely compensation for the New Mexico consumers; New Mexico seeks also civil penalties against the Defendants and disgorgement. See New Mexico's Proposed Findings ¶¶ 664-668, at 91. Moreover, the request for restitution, in the amount of $97,591.95, see New Mexico's Proposed Findings ¶ 671, at 92, of itself, advances these deterrence interests. Additionally, Ward, L. Madrid and M. Madrid, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Silva, Jaramillo, Mondragon, Humble, June Valdez, Jose Valdez, Woods, Starrett, and Marcelli were New Mexico residents at the time of the MARS Rule violations. See FOF ¶¶ 241, 281, 328, 354, 403, 439, 458, 483, 509, 536, 572, 579, 581, 620, 651, 670, at 54-129.

## A. MR. PRATT IS NOT EXEMPT FROM THE MARS RULE.

43. Mr. Pratt is not exempt from the MARS Rule. An attorney is exempt from the advance fee prohibition if the attorney: (i) provides mortgage assistance relief services as part of the practice of law, see 12 C.F.R. § 1015.7(a)(1); (ii) is licensed in the consumer's state of residence or dwelling, see 12 C.F.R. § 1015.7(a)(2); (iii) "[c]omplies with state laws and regulations that cover the same type of conduct the rule requires," 12 C.F.R. § 1015.7(a)(3). See 75 Fed. Reg. at 10724-25; (iv) deposits advance fees in client trust accounts, see 12 C.F.R.§ 1015.7(b)(1); and (v) complies with state laws, including licensing requirements, regulating client trust accounts, see 12 C.F.R. § 1015.7(b)(2). Mr. Pratt is not licensed in New Mexico, and Real Estate Law employed only attorneys licensed in California. See FOFs ¶¶ 2, 4, 128, at 3, 27. Were any Real Estate Law attorneys licensed in New Mexico, as discussed, infra, they did not comply with New Mexico law, such as the MFCFPA, in relation to those New Mexico consumers that the MFCFPA protects. Accordingly, the Real Estate Law attorneys are not exempt from the MARS Rule.

44. Real Estate Law cannot argue soundly that the attorney exemption applies to it. The attorney exemption does not apply to law firms. See supra. Cf. F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1279-80, 1284 (addressing arguments that 12 C.F.R. § 1015.7 applies to law firms). Moreover, as Real Estate Law attorneys are not exempt from the MARS Rule, see supra ¶ 706, Real Estate Law, whose liability turns on the actions of Real Estate Law attorneys, cannot argue soundly that the MARS Rule equally does not apply to it.

## B. REAL ESTATE LAW VIOLATED THE MARS RULE.

45. Real Estate Law was a mortgage assistance relief services provider. Real Estate Law violated the MARS Rule's advance fee prohibition. Even if Real Estate Law violated other

MARS Rule provisions, the Court will not deem Real Estate Law liable on these theories, as New Mexico mentioned them for the first time at trial.

### 1.      Real Estate Law was a Mortgage Assistance Relief Services Provider.

46.      Real Estate Law was a mortgage assistance relief services provider.  The Parwatikar Defendants do not even argue that Real Estate Law was not a mortgage assistance relief services provider.  See Parwatikar Defs.' Proposed Findings at 12.  The Court explains, regardless, its reasoning for reaching this conclusion.

47.      An entity is a mortgage assistance relief services provider if a Real Estate Law "provides, offers to provide, or arranges for others to provide," mortgage assistance relief services. 12 C.F.R. § 1015.2.  See 12 C.F.R § 1015.5.  Mortgage assistance relief services include services that are "represented, expressly or by implication, to assist or attempt to assist the consumer with" activities, including "[s]topping, preventing, or postponing" a foreclosure of a dwelling and modifying a dwelling loan.  12 C.F.R. § 1015.2(1)-(2).  "Dwelling means a residential structure containing four or fewer units, whether or not that structure is attached to real property, that is primarily for personal, family, or household purposes."  12 C.F.R. § 1015.2. "Dwelling loan means any loan secured by a dwelling, and any associated deed of trust or mortgage."  12 C.F.R. § 1015.2.

48.      New Mexico demonstrates that Real Estate Law meets the above definition.  As a general matter, Real Estate Law's business revolved around providing mortgage assistance relief services.  Real Estate Law emerged from Balanced Legal's mortgage assistance relief services and was created to provide mortgage assistance relief services.  See FOF ¶ 7, 10, 11, 14, 12, 13, 58, at 3-13.  Mr. Parwatikar knew that Real Estate Law offered mortgage assistance relief services, see FOF ¶¶ 14, 178, 179, at 5, 36, and described Real Estate Law's business as helping people who

faced foreclosure, see FOF ¶ 24, at 7. Real Estate Law had folders dedicated to consumers' foreclosures and prioritized resolving those foreclosures. See FOF ¶ 26, at 7.[97]

49.     As a specific matter, Real Estate Law acted as a mortgage assistance relief service provider in relation to the New Mexico consumer witnesses. All New Mexico consumer witnesses from trial occupied their homes, i.e., used them for "personal, family, or household purposes." 12 C.F.R. § 1015.2. Ward, L. Madrid and M. Madrid, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Silva, Jaramillo, Mondragon, Humble, June Valdez, Jose Valdez, Woods, Starrett, and Marcelli occupied dwellings for which they sought assistance "[s]topping, preventing, or postponing" a foreclosure of a dwelling and/or modifying a dwelling loan. FOF ¶¶ 241, 281, 328, 354, 403, 439, 458, 483, 509, 536, 572, 579, 581, 620, 651, 670, at 54-129. June Valdez alone sought assistance with a property that she did not occupy. See FOF ¶ 609, at 121. The evidence before the Court does not reflect whether Alexander, Cedeno, Maness, or Sullivan -- additional alleged New Mexico consumers with attorney-client fee agreements and for whom Mr. Pratt was involved with the attorney-client fee agreement -- sought Real Estate Law's assistance with the foreclosure of dwellings or with dwelling loans. See FOF ¶¶ 700, 702, at 135-36. As the evidence does not establish by a preponderance of the evidence that June Valdez's 1840 Lamar Circle property, and Alexander's, Cedeno's, M. Maness', and Sullivan's properties were occupied as dwellings, the Court concludes that the MARS Rule does not apply to these properties and will disregard these properties in the following discussion.

---

[97]Additionally, the evidence admitted against Real Estate Law, Mr. Davis, and Mr. Pratt shows that Real Estate Law sought clients using advertisements like: "Principal Balance Reduction," "Going after your Fraudulent Mortgage Note," "Interest Rate Reduction," "Forgiveness of Past Due Payments," "Foreclosure Defense to Help Postpone Sale Dates and Keep You in Your Home." FOF ¶ 47, at 10-11.

50.     Real Estate Law engaged in mortgage assistance relief services in its work for Ward, L. Madrid and M. Madrid, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Silva, Jaramillo, Mondragon, Humble, June Valdez, Jose Valdez, Woods, Starrett, and Marcelli mortgage assistance relief services.  It provided or offered to provide assistance preventing or postponing foreclosures, and obtaining loan modifications, through direct representations to the New Mexico consumers in initial communications about Real Estate Law's services and in assurances to the consumers during its service for them, such that the New Mexico consumers understood that Real Estate Law would assist them in avoiding foreclosure and/or obtaining a loan modification.  See, e.g., FOFs ¶¶ 268, 285, 292, 308-312, 314, 320, 333, 348, 358-59, 405-06, 451, 461-62, 501-06, 512, 539, 556, 558, 599, 601, 608, 609, 613-14, 624-25, 655, 675, at 59-130.  It told New Mexico consumers to send it their foreclosure documents, and it worked with New Mexico consumers on FDD packages, requesting financial documents, completing loan modification documents, and representing that the packages would postpone foreclosure.  See, e.g., ¶¶ FOFs 261-264, 268, 316, 320, 349, 375-377, 380-381, 391, 426, 431, 434, 486, 501-506, 556, 557, 608, 609, 689, at 58-132. Real Estate Law even received loan modifications or settlements with lenders for V. Trujillo, Mondragon, Woods, and Starrett.  See FOFs ¶¶ 435, 557, 641, 665, at 93-129.

51.     Real Estate Law's mass joinder tort lawsuits were themselves mortgage assistance relief services.  Real Estate Law used these lawsuits as a means to achieve mortgage assistance relief.  See FOF ¶ 14, at 5.  Real Estate Law told Marcelli that the suit would decrease her payments.  See FOF ¶ 675, at 130.  Real Estate Law likewise told Mondragon that the lawsuit against JP Morgan Chase would get him money against his mortgage payments.  See FOF ¶ 539, at 109.  In the compliance calls, Real Estate Law specifies that it does not guarantee that the lawsuit will delay or stop a foreclosure and counsels what a consumer should do if they receive a

foreclosure notice and if Real Estate Law does not obtain an order or a settlement effecting the foreclosure, so Real Estate Law envisioned and represented the lawsuits as potentially delaying or stopping foreclosures.  See FOF ¶¶ 289, 374, 409, 445, 515, 554, 660, at 64-119.  Real Estate Law named Ward, L. Madrid and M. Madrid, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Mondragon, June Valdez, Jose Valdez, Marcelli, and Woods in these lawsuits against lenders.  See FOFs ¶¶ 265-267, 272, 315, 382, 389, 429, 432, 452, 479-481, 539, 558, 575, 605, 611, 643-644, 690, at 58-132.  The Court concludes by a preponderance of the evidence that Real Estate Law named him in such a lawsuit or was at least going to name him in such a suit, and that it represented that the suit would help him with his mortgage payments and his foreclosure.  The record reflects that Humble was having trouble with his mortgage payments, see FOF ¶ 573, at 115, and that he asked for a refund from Real Estate Law, because he did not want to be part of what he realized would be a mass joinder tort litigation, when he wanted and expected individual litigation, see FOF ¶ 575, at 115.  For Humble to have realized that he would be part of a mass joinder tort litigation, he must have received from Real Estate Law communications reflecting that he was, or would be, named in such a case, and that Humble was having trouble with his mortgage payments and wanted individual litigation suggests that more likely than not Real Estate Law represented to Humble that it would provide litigation against his lender to help him with his mortgage payments and his foreclosure.  Accordingly, the Court concludes that Real Estate Law was a mortgage assistance relief services provider.

## 2. The Court Considers the Defendants' Liability for Only the Advance Fee Violations.

52.     The Court will not adopt New Mexico's Proposed Findings ¶¶ 613-615, 620-621, 634-636, 646, at 121-126.  New Mexico raises these theories of liability for the first time in its Proposed Findings.

53. Rule 15(b)(2) of the Federal Rules of Civil Procedure provides directions for when a court should consider issues that a party does not raise in its pleadings but that the party raises at trial.

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move -- at any time, even after judgment -- to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2). "A party impliedly consents to the trial of an issue not contained within the pleadings either by introducing evidence on the new issue or by failing to object when the opposing party introduces such evidence." Perea v. City of Albuquerque, No. CIV 13-263 RB/RHS, 2014 WL 12621251, at *3 (D.N.M. Dec. 16, 2014)(Brack, J.)((quoting Green Country Food Mkt., Inc. v. Bottling Grp., LLC, 371 F.3d 1275, 1280 (10th Cir. 2004))). "[I]mplied consent cannot be based on the introduction of evidence that is relevant to an issue already in the case when there is no indication that the party presenting the evidence intended to raise a new issue." Green Country Food Mkt., Inc. v. Bottling Grp., LLC, 371 F.3d at 1280 (quoting Moncrief v. Williston Basin Interstate Pipeline Co., 174 F.3d 1150, 1162 (10th Cir. 1999)). In making these determinations, "[t]he district court must determine 'whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment.'" Aldridge v. Forest River, Inc., 635 F.3d 870, 875 (7th Cir. 2011)(quoting In re Rivinius, Inc., 977 F.2d 1171, 1175 (7th Cir. 1992)).

54. New Mexico now asks that the Court conclude that Mr. Pratt is liable because he represented to New Mexico consumers that they should not have communicated with their lenders or services, see New Mexico's Proposed Findings ¶ 613, at 79, misrepresenting material aspects of the mortgage assistance relief services, including offering to stop or postpone a foreclosure, reducing interest rates, principal balances, and/or monthly payments, stating the amount of money

that a New Mexico consumer could save by using Real Estate Law's mortgage assistance relief services, see New Mexico's Proposed Findings ¶¶ 613-615, 634-635, at 71, 84, making representations about the benefits of the mortgage assistance relief services, including stating that New Mexico consumers would receive legal representation, representing that Real Estate Law had a high success rate, see New Mexico's Proposed Findings ¶¶ 613, 635, at 81, 84 failing to include MARS Rule general and specific disclosures in its communications, see New Mexico's Proposed Findings ¶¶ 620-621, at 81, and failing to make other required notices and disclosures, see New Mexico's Proposed Findings ¶ 646, at 87.

55.     New Mexico did not raise these issues previously such that the Defendants would know of these theories. The evidence that supports New Mexico's new theories is relevant to other issues in the case, and New Mexico did not indicate its intent to bring these new theories. See Green Country Food Mkt., Inc. v. Bottling Grp., LLC, 371 F.3d at 1280. New Mexico does not include these issues in its Complaint's statements about the Defendants' MARS Rule violations but focuses, rather, on the Defendants' requesting and receiving advance fees. See Complaint ¶¶ 77-85, at 18-19. New Mexico's opening statement and closing statement do not mention these theories. See July 8 Tr. at 5:10-13:17 (Anaya-Allen); July 11 Tr. at 858:22-871:18 (Anaya-Allen). New Mexico focused on the advance fee issue in its opening statement and closing statement. See July 8 Tr. at 7:10-8:5 (Anaya-Allen); July 11 Tr. at 860:15-18 (Anaya-Allen); id. at 871:13-21 (Anaya-Allen). New Mexico noted that the Defendants made misrepresentations and false inducements to the New Mexico consumers, but such language was not clearly a theory of the case as opposed to argumentative language about the Defendants' actions or arguments that the Defendants engaged in lawsuits as a sham to cover their mortgage assistance relief services. See July 11 Tr. at 860:15-861:12 (Anaya-Allen); id. at 862:13-24 (Anaya-Allen). The Defendants did

not, and had no reason to, address the theories that New Mexico now raises. See July 8 Tr. at 13:23-19:11 (Harrison); July 11 Tr. at 871:25-874:1 (Kennedy); Parwatikar Defs.' Proposed Findings at 13-14.

56.     The evidence for New Mexico's new theories is relevant to the advance fee theory. The evidence for the theories relates to Real Estate Law's communications with clients. See, e.g., New Mexico's Proposed Findings ¶ 614, at 80 (citing as evidence, among other things, Real Estate Law's communications to Ward and M. Maness about an FDD package); id. ¶ 615, at 80 (citing, for instance, Real Estate Law's communications to V. Trujillo about an FDD package and loan modification, and that Starrett heard a radio advertisement for Real Estate Law); id. ¶ 617, at 80 (citing communications in the Madrid Real Estate Law Welcome Documents, emails from Real Estate Law to M. Maness related to M. Maness' litigation, and the Silva Welcome Package); id. ¶¶ 620, 621 at 81 (citing, for instance, the Madrid Compliance Call, the Mondragon Compliance Call, and communications denying Jaramillo a refund); id. ¶ 621, at 81 (citing Real Estate Law Mailers at 212, 215, 217, 219, 221, 223, 224, 227, 229, 233, 235, 237, 238, 240, 243, 245, 247, 249, 251, 253); id. ¶ 646 at 87 (citing communications to V. Trujillo and Mondragon about loan modifications). All this evidence advances other facts that New Mexico had to prove at trial. The information is evidence that Real Estate Law provided or offered to provide mortgage assistance relief services to New Mexico consumers. Evidence of Real Estate Law's statements regarding the lawsuits and any evidence of the lawsuit's dismissals, see New Mexico Proposed Findings ¶¶ 638-642, at 85-86, supports New Mexico's theory that the lawsuits were a sham to cover Real Estate Law's purpose of offering mortgage assistance relief services. See July 11 Tr. at 862:13-24 (Anaya-Allen). The Court did not suspect at trial that New Mexico intended to raise any theories other than the advanced fees violation theory, and, likewise, the Defendants had no reason

to believe that New Mexico had such an intention or that they needed to address any alleged MARS Rule violations other than the alleged advance fees. The Defendants did not have a fair opportunity to defend against these theories. See Aldridge v. Forest River, Inc., 635 F.3d at 875.

**3. Real Estate Law Accepted Advance Fees in Violation of the MARS Rule.**

57. Real Estate Law violated the MARS Rule by requesting and receiving advance fees. To show that Real Estate Law violated the MARS Rule by requesting advance fees, New Mexico must show: (i) that Real Estate Law requested or received consideration; (ii) for mortgage assistance relief services from a consumer; (iii) before mortgage assistance relief is obtained. See 12 C.F.R. § 1015.5. Regarding the first element, Real Estate Law requested and/or received retainer fees from Ward, Madrid, Leary, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Silva, Jaramillo, Mondragon, Humble, June Valdez, Jose Valdez, Woods, Starrett, and Marcelli. See FOFs ¶¶ 247, 255, 293, 303, 336, 345, 363, 371, 412, 422, 447, 466, 476, 488, 497, 520, 528, 542, 550, 574, 587, 595, 603, 630, 639, 657, 667, 677, 685, at 32-95. Real Estate Law also requested and/or received monthly maintenance fees from Ward, Madrid, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Silva, Jaramillo, Mondragon, June Valdez, Woods, Starrett, and Marcelli. See FOFs ¶¶ 247, 255, 304, 371, 372, 412, 423, 448, 466, 476, 490, 488, 520, 529, 542, 551, 588, 596, 630, 640, 657, 677, 686, at 54-55, 66, 76, 88-89, 94, 96, 98, 100-01, 105-06, 108, 118, 124-25, 127, 130, 131. Regarding the third element, Real Estate Law made all these requests and received this money before it provided any mortgage assistance relief to any of the New Mexico consumers. See FOFs ¶¶ 276, 277, 322, 323, 398, 412, 423, 435-36, 457, 482, 507, 535, 567-68, 609, 615, 649, 666, 694, at 37-96.

58. Real Estate Law requested the consideration in exchange for mortgage assistance relief services. As discussed, supra, Real Estate Law performed or offered to perform mortgage

assistance relief services for the New Mexico consumers, and Real Estate Law's litigation services were mortgage assistance relief services. That New Mexico consumers allegedly retained Real Estate Law for litigation services and did not pay Real Estate Law for the other mortgage assistance relief services does not mean that the consumers' consideration was not for non-litigation mortgage assistance relief services. See FOFs ¶¶ 249, 295, 334, 362, 391, 414, 427, 469, 491, 522, 545, 584, 586, 632, 660, 679, at 32-94. Contra Parwatikar Defs.' Proposed Findings ¶¶ 46-47, at 13-14; Pratt's Proposed Findings at 2-3. Real Estate Law charged, in addition to the retainer fee and monthly maintenance fees, a thirty-percent contingency fee, see FOFs ¶¶ 248, 294, 337, 364, 413, 468, 489, 521, 543, 589, 631, 659, 678, at 32-93, so Real Estate Law contemplated the retainer fee and monthly maintenance fees as consideration for services beyond the lawsuit. New Mexico consumers received Real Estate Law's services only after signing the attorney-client fee agreements that requested the advance fees, see FOFs ¶¶ 241-699, at 52-133, and Mr. Parwatikar specifically provided that Real Estate Law must receive some payment before it assigned a client's file to an attorney, see FOFs ¶ 185, at 25. See also Consumer Fin. Prot. Bureau v. Gordon, 819 F.3d 1179, 1194-95 (9th Cir. 2016)(describing the defendant's argument that he charged fees for legal products and provided loan modification services for free as an "obvious attempt to evade the requirements of Regulation O;" "It is undisputed that Gordon's 'pro bono' services were in reality in exchange for consideration, because consumers were eligible for the 'pro bono' modification services only if they signed up for and paid the fees for the legal products.")(quoting 12 C.F.R. §§ 1015.3-5). Accordingly, Real Estate Law is liable for violating the MARS Rule's prohibition on advance fees.

**C. PINNACLE LAW, BUT NOT BALANCED LEGAL, WOULD BE LIABLE UNDER A COMMON ENTERPRISE THEORY.**

59.     Pinnacle Law was part of a common enterprise with Real Estate Law.  As Balanced Legal had ceased to exist by the time of Real Estate Law's MARS Rule violations, the Court will not hold it liable under such a theory.  See FOFs ¶ 8, at 3-4.  For evidence of a common enterprise, the Court looks to "common control; the sharing of office space and officers [and employees]; whether business is transacted through amaze [sic] of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants.'"  F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 809 (alteration added)(quoting F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1182; and citing F.T.C. v. J.K. Publ'ns, Inc., 99 F. Supp. 2d at 1201).

60.     Real Estate Law and Pinnacle Law grew from Balanced Legal.  See FOFs ¶¶ 7-14, 311, at 3-5, 67.  Initially, beginning in 2008, Balanced Legal operated as a law firm and a dba of Mr. Parwatikar.  See FOFs ¶¶ 6-9, at 3-4.  Balanced Legal offered services in immigration law and loan modifications.  See FOFs ¶ 7, at 3.  In 2011, Balanced Legal ceased operations and was replaced with Pinnacle Law, with Mr. Parwatikar as sole shareholder and corporate officer, and with Real Estate Law, with Mr. Clarambeau -- Balanced Legal employee -- as shareholder and corporate officer, and with Mr. Parwatikar's, Arzakanyan's -- a Balanced Legal employee's, and Pinnacle Law's assistance in incorporation.  See FOFs ¶¶ 8-14, at 3-4.  Balanced Legal ceased to exist as an entity that provided legal services and became solely a dba of Mr. Parwatikar.  See FOFs ¶¶ 8, 9, at 3-4.  Real Estate Law continued Balanced Legal's mortgage relief services.  See FOFs ¶ 14, at 5.  Branco, who had performed loan modification work for Balanced Legal, continued performing the work for Real Estate Law.  See FOFs ¶ 58, at 13.  Real Estate Law drew several employees from Balanced Legal, and Pinnacle Law continued to use these same employees in various capacities.  See FOFS ¶¶ 11-13, 49, 53, 56-58, 60, 66-67, 76, at 4-5, 11-17.

61.     Once Real Estate Law and Pinnacle Law formed, overlaps appeared in their operations.  Although Real Estate Law moved offices a couple times, Real Estate Law and Pinnacle Law from relatively early in their relationship shared office space in a suite with no law firm name.  See FOFs ¶ 122-127, at 26-27; F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1271 (citing shared office building as evidence of a common enterprise).  Pinnacle Law employees are listed on Real Estate Law's telephone list.  See FOFs ¶¶ 74-75, at 17; F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1270 (noting, in concluding that a common enterprise existed, that a document listed contact information for the various defendants in the common enterprise).  Pinnacle Law shared employees with Real Estate Law, and Arzakanyan and Branco received checks from Real Estate Law and from Pinnacle Law.[98]  See FOFs ¶¶ 53-56, 63-64, 66 at 12, 14; F.T.C. v. Lanier Law, LLC, 194 F. Supp. 3d at 1270 ("With respect to common officers and employees, . . . these entities all have numerous employees in common.").  Mr. Parwatikar assigned at least one Pinnacle Law attorney to a Real Estate Law matter.  See FOFs ¶¶ 77-78, at 17.

62.     The Parwatikar Defendants want the Court to conclude that Pinnacle Law operated separately from Real Estate Law, because, according to the Parwatikar Defendants, Pinnacle Law operated its own business model, had separate owners, had its own clients and separate sales tactics, marketing, and client agreements, and did not commingle funds with Real Estate Law.  See Parwatikar Defs.' Proposed Findings ¶¶ 53-57, at 15-16.  The Parwatikar Defendants' contentions do not, however, persuade the Court.  Preliminarily, that Pinnacle Law replaced its computer system in 2018, during this litigation, see New Mexico's Proposed Findings ¶ 713, at 101, gives

---

[98]The Court deems whether Pinnacle Law leased Branco to Real Estate Law irrelevant, see New Mexico's Proposed Findings ¶ 711, at 101, as, even if Pinnacle Law leased Branco to Real Estate Law, the Court would conclude that the arrangement reflected an interweaving of Real Estate Law's and Pinnacle Law's operations.

the Court little faith in the Parwatikar Defendants' representations about their relationship with Real Estate Law. Pinnacle Law may not have, under the name Pinnacle Law, operated a business essentially identical to Real Estate Law's business. See Parwatikar Defs.' Proposed Findings ¶¶ 53-57, at 15-16. Pinnacle Law provided, however, the platform through which Mr. Parwatikar engaged with Real Estate Law in his "hand to hand" consulting with Real Estate Law, such that Pinnacle Law was the entity in which considerable control over Real Estate Law resided. FOFs ¶ 102, at 14. Mr. Parwatikar was Pinnacle Law's sole shareholder and corporate officer. See FOFs ¶ 10, at 4. From this position, he influenced Mr. Pratt's and Mr. Davis' assumptions of their roles with Real Estate Law. See FOFs ¶¶ 144-147, at 30-31. He was at the Real Estate Law and the Pinnacle Law office daily, and was involved in Real Estate Law's daily operations, including interviewing, assigning and organizing work, and commenting on consumer payment policies. See FOFs ¶¶ 159-172, at 29-35. He directed that Real Estate Law attorneys not work on client files until Real Estate Law received some payment from the client. See FOFs ¶ 185, at 36-37. That, for instance, Mr. Davis assumed ownership of Real Estate Law after working at Real Estate Law under Mr. Pratt suggests that Mr. Parwatikar more likely than not continued his role in controlling Real Estate Law through Mr. Pratt's and Mr. Davis' tenures. See FOFs ¶¶ 145-147, at 29.

63.    Real Estate Law and Pinnacle Law contemplated an approximately twenty/eighty split in Real Estate Law's earnings, with Pinnacle Law receiving the majority of funds. See FOFs ¶¶ 150, 156, 247, 297, 340, 366, 416, 466, 493, at 31-101. This arrangement finds expression in the Mr. Pratt-era attorney-client fee agreements and the Mr. Davis-era Consulting Agreement. See FOFs ¶¶ 150, 156, 247, 297, 340, 366, 416, 466, 493, at 31-101. The Court deems that this arrangement reflects the division of revenue between Real Estate Law and Pinnacle Law regardless whether Pinnacle Law invoiced Real Estate Law for its share of the revenue or received a

straightforward eighty percent of Real Estate Law's retainer fees.  See Parwatikar Defs.' Proposed Findings ¶ 57, at 16.  Both the attorney-client fee agreements and the Consulting Agreement reflect the same revenue division.  See FOFs ¶¶ 150, 156, 247, 297, 340, 366, 416, 466, 493, at 31-101. Mr. Parwatikar avers that he told Real Estate Law to remove the provision from the attorney-client fee agreements when he became aware that clients who saw the provision believed that Pinnacle Law was involved with Real Estate Law.  See FOFs ¶ 173, at 36; July 10 Tr. at 666:14-667:9 (Anaya-Allen, Parwatikar).  Real Estate Law and Pinnacle Law did not move the agreement's reflection from the attorney-client fee agreements into a consulting agreement until after the State Bar of California disciplined Mr. Pratt and Mr. Davis took over Real Estate Law.  See FOFs ¶ 223, at 49 (reflecting that Mr. Parwatikar knew of Mr. Pratt's disciplining); FOFs ¶¶ 247, 297, 300, 340, 343, 361, 366, 411, 416, 466, 474, 493, 487, at 55-100 (reflecting the division in the Mr. Pratt-era attorney-client fee agreements); FOFs ¶¶ 150, 525, 527, 540, 548, 591, 593, 634, 636, 657, 663, 682-83, at 31-132 (reflecting the division in the consulting agreement when Mr. Davis gained control of Real Estate Law and the provision in the consulting agreement).  This decision more likely than not evidences an attempt to further protect Pinnacle Law from liability after Mr. Pratt's sanctioning.

64.     The financial relationship between Real Estate Law and Pinnacle Law does not match that of two separate business entities, or of a business entity and its consultant.  The twenty/eighty division alone suggests that Pinnacle Law did more than provide consulting services. No pure consultant would receive four-fifths of its clients' revenue.  In addition to this arrangement, Pinnacle Law received most of its revenue from Real Estate Law; at least from 2013 and on, the amount of money that Pinnacle Law received from Real Estate Law came close to the total gross receipts that Pinnacle Law represented on its federal tax returns.  See FOFs ¶¶ 85, 88,

92, 95, 98, at 18-20.  Moreover, despite the Parwatikar Defendants' contentions about Pinnacle Law's invoicing process, see Parwatikar Defs.' Proposed Findings ¶ 57, at 16, the invoicing process between Real Estate Law and Pinnacle Law was circular, with Solomon giving the invoice to the Real Estate Law owner and then processing the check from Real Estate Law to Pinnacle Law, see FOFs ¶ 103, at 21, and non-existent, with Real Estate Law making payments without an invoice or Pinnacle Law requesting payments without an invoice, see FOFs ¶¶ 105-107, at 22.  The invoicing and payments between Real Estate Law and Pinnacle Law are irreconcilable, despite Solomon's attempts to reconcile them.  See FOFs ¶ 104, at 22.  Accordingly, the Court concludes that Real Estate Law and Pinnacle Law operated as a common enterprise.  Concluding otherwise would result in a roadmap to absolving Real Estate Law's controller from liability.  Cf. F.T.C. v. Grant Connect, LLC, 827 F. Supp. 2d at 1216 (suggesting that common enterprise liability applies where "absolving one of [the defendants] of liability would provide the other defendants with a clear mechanism for avoiding the terms of the order").

65.  Balanced Legal was not part of the common enterprise.  Although Real Estate Law grew from Balanced Law, see FOFs ¶¶ 7, 10-15, 49, 56, 60, 66, at 3-5, 11-15, Balanced Legal has none of the characteristics of a common enterprise with Real Estate Law.  As Balanced Legal did not operate during Real Estate Law's activities, see FOF ¶ 8, at 2, it did not share office space and employees, or otherwise interweave with Real Estate Law.  Balanced Legal's role in the business operations shifted to Real Estate Law and Pinnacle Law.  While Balanced Legal more likely than not initiated MARS Rule violations, at the time in question in this matter, Balanced Legal's remaining bank account served as Mr. Parwatikar's personal account, and the Court will not hold it independently liable for the MARS Rule violations.  See FOFs ¶ 9, at 4.  Accordingly, Pinnacle Law, but not Balanced Legal, is liable for MARS Rule violations

## D.     MR. PRATT VIOLATED THE MARS RULE.

66.     To establish Mr. Pratt's individual liability, New Mexico must show: (i) that Real Estate Law violated the MARS Rule, see F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1202-03; (ii) that Mr. Pratt "participated directly in the business entity's deceptive acts or practices, or had the authority to control them," F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d at 1170); and (iii) that he "knew or should have known of the entity's" acts, F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Amy Travel Serv., Inc., 875 F.2d at 574).  "'[A]ctual knowledge'" of the prohibited action, "'reckless indifference," or "'an awareness of a high probability of [the action] along with an intentional avoidance of [knowledge]'" satisfy the requirement for other MARS Rule violations.  F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1207 (quoting F.T.C. v. Amy Travel Serv., Inc., 875 F.2d at 574).  The Court has already concluded that Real Estate Law violated the MARS Rule, and it now concludes that Mr. Pratt directly participated in MARS Rule violations, that, alternatively, that Mr. Pratt knew of Real Estate Law's acts.

67.     Mr. Pratt is individually liable for MARS Rule violations.  Mr. Pratt directly participated in the violations by writing and signing, or serving as the designated signatory on, the attorney-client fee agreements that Real Estate Law entered during Mr. Pratt's tenure, including the Ward Attorney-Client Fee Agreement, Madrid Attorney-Client Fee Agreement, the Leary Attorney-Client Fee Agreement, the M. Maness Attorney-Client Fee Agreement, the V. Trujillo Attorney-Client Fee Agreement, the Dickerson Attorney-Client Fee Agreement, and the Silva Attorney-Client Fee Agreement.  See FOFs ¶¶ 237, 247, 300, 343, 361, 411, 474, 487, at 53-100. The record reflects that Mr. Pratt also more likely than not directly participated in Real Estate Law's provision of mortgage assistance relief services.  He received authorizations to speak with

lenders, see FOFs ¶¶ 259, 360 at 57, 76; his name appears on the Madrid Real Estate Welcome Documents and the Silva Welcome Package that discuss mortgage assistance relief services, see FOFs ¶¶ 306-309, 500-502, at 67-68, 102, and he was the lead attorney for some lawsuits, see FOFs ¶ 444, at 94. As Mr. Pratt wrote the attorney-client fee agreements, he knew of the requests for advance fees, and, as he participated in the mortgage assistance relief services, he knew of those services. As discussed, supra, the Court concludes that Real Estate Law requested the advance fees not only for litigation services, but also for mortgage assistance relief services. Given Mr. Pratt's involvement with Real Estate Law's mortgage assistance relief services, in writing the attorney-client fee agreements, and in owning Real Estate Law, see FOFs ¶¶ 17-18, 131 at 5-6, 28, the Court concludes that Mr. Pratt acted with at least reckless indifference to the reality that Real Estate Law accepted the advance fees for all its mortgage assistance relief services. Mr. Pratt's role in Real Estate Law suggests that Mr. Pratt more likely than not knew that Real Estate Law requested and/or received advance fees before it provided litigation, FDD, or other mortgage assistance relief services to its clients. See F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1207 ("'A defendant's participation in corporate affairs is probative of knowledge.'" (quoting F.T.C. v. Wilcox, 926 F. Supp. at 1104)). Even if Mr. Pratt did not consciously acknowledge that Real Estate Law accepted the advance fees for all its mortgage assistance relief services, with the knowledge of the facts that Mr. Pratt had, his actions manifest reckless indifference to the reality.[99]

---

[99]The Court will not say by a preponderance of the evidence that Mr. Pratt had the authority to control the MARS Rule violations. The Court's analysis of any such control on Mr. Pratt's part would be confused, because the record clearly establishes that Mr. Pratt participated immediately in the MARS Rule violations, and Mr. Pratt can control his own actions. Moreover, although Mr. Pratt had a role in operating Real Estate Law and was the sole shareholder, see FOFs ¶¶ 17-18, 131 at 5-6, 28, such that he controlled Real Estate Law's payments and gave Solomon directions, see FOFs ¶¶ 131-133, at 28, the Court cannot say by a preponderance of the evidence that Mr. Pratt, rather than Mr. Parwatikar, ran Real Estate Law and could have controlled the MARS Rule

## II.    **MR. PRATT VIOLATED THE MFCFPA.**

68.     For reasons similar to those discussed in the preceding MARS Rule section, the Court concludes that Mr. Pratt is liable for MFCFPA violations.  New Mexico shows Mr. Pratt's individual liability by satisfying the FTCA test for individual liability, see F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203.

---

violations.  See, e.g., FOFs ¶ 141, at 30.  Cf. F.T.C. v. World Media Brokers, 415 F.3d 758, 764 (7th Cir. 2005)(stating that "active participation in the corporate affairs, including assuming duties as a corporate officer," establishes an individual's participation or control (citing F.T.C. v. Amy Travel Serv., Inc., 875 F.2d at 574)); F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d at 1170-71 (treating the role of president and of the authority to sign business documents as evidence warranting summary judgment regarding the control issue), as amended (April. 11, 1997); F.T.C. v. Partners In Health Care Ass'n, Inc., 189 F. Supp. 3d 1356, 1367-68 (S.D. Fla. 2016)(Scola, J.)(concluding that the role of president and sole officer, and the exercise of day-to-day control of entities alone establishes the first element for individual liability); F.T.C. v. Wash. Data Res., 856 F. Supp. 2d at 1276 (deeming governing sales and financing, controlling operations within an enterprise, employing the entities' employees, and owning and overseeing an entity's activities to establish authority to control).

Based on the analysis in the text, supra, the Court rejects Mr. Pratt's contentions in the Pratt's Proposed Findings:

NO evidence of any "MARS" activity by PRATT.

NO documents of any "MARS" activity by PRATT.

NO "MARS" activity by PRATT period.

Any alleged "MARS" activity was allegedly, if at all, done by 3d parties and

RELC, if any. NO such thing as 3d party liability or attempted "MARS" acts.

NO showing of any "MARS" activity directly by PRATT , therefore, not liable

indirectly for alleged "criminal" "administrative" acts NOT done directly by

PRATT.

Pratt's Proposed Findings at 3.

69. As an initial matter, the MFCFPA's attorney exemption does not apply to Mr. Pratt. The MFCFPA exempts from its coverage "a person licensed to practice law in this state when the person renders service in the course of the person's practice as an attorney." N.M. Stat. Ann. § 47-15-2(B)(2)(a). As the Court discusses, <u>supra</u>, Mr. Pratt and the Real Estate Law attorneys were not licensed in New Mexico.

70. Additionally, the exemption does not apply to Real Estate Law. The Court predicts that the Supreme Court of New Mexico would look to the MFCFPA's plain meaning to determine whether the exemption applies to law firms, <u>see</u> <u>Griego v. Oliver</u>, 2014-NMSC-003, ¶ 21, 316 P.3d 865, 875 ("'Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance.'" quoting <u>N.M. Attorney Gen. v. N.M. Pub. Regulation Comm'n</u>, 2013-NMSC-042, ¶ 26, 309 P.3d 89, 97)), and that the Supreme Court of New Mexico would conclude that, because the exemption applies only to persons practicing law as "attorney[s]," it does not exempt law firms, N.M. Stat. Ann. § 47-15-2. In the Court's view, the Supreme Court of New Mexico would conclude that, where a law firm employs an attorney licensed in New Mexico and, consistent with the MFCFPA, provides foreclosure consultant services in his or her law practice, the MFCFPA also exempts the law firm, because reaching another conclusion would impede the provision of useful legal services to New Mexico citizens. As Real Estate Law attorneys are not exempt from the MARS Rule, <u>see</u> <u>supra</u> FOFs ¶ 706, at 137, Real Estate Law cannot argue soundly that the MARS Rule does not apply to it. The attorney exemption does not apply to law firms, <u>see</u> <u>supra</u>; <u>cf.</u> <u>F.T.C. v. Lanier Law, LLC</u>, 194 F. Supp. 3d at 1279-80, 1284 (addressing arguments that 12 C.F.R. § 1015.7 applies to law firms), and, because Real Estate Law attorneys are not exempt from the MARS Rule, <u>see</u> <u>supra</u> FOFs ¶ 706, at

137, Real Estate Law, whose liability turns on the Real Estate Law attorneys' actions, cannot argue soundly that the exemption applies to it.

**A.  REAL ESTATE LAW VIOLATED THE MFCFPA.**

64.  Real Estate Law was a foreclosure consultant.  Real Estate Law violated the MFCFPA's advance fee prohibition.  Real Estate Law also violated various requirements in relation to foreclosure contracts.

**i.  <u>Real Estate Law is a Foreclosure Consultant</u>.**

65.  To show the alleged MFCFPA violations, New Mexico must establish that Real Estate Law was a "foreclosure consultant" for the MFCFPA's purposes.  N.M. Stat. Ann. § 47-15-2(B)(1).  A foreclosure consultant is an individual or entity

> who, directly or indirectly, makes a solicitation or offer to an owner to perform services for compensation or who, for compensation, performs a service that the person represents will:
>
> (a)  stop or postpone a foreclosure sale;
>
> (b)  obtain any forbearance from a beneficiary or mortgagee;
>
> (c)  assist the owner to exercise the right to reinstatement;
>
> (d)  obtain an extension of the period within which the owner may reinstate the owner's obligation;
>
> (e)  obtain a waiver of an acceleration clause contained in a promissory note, deed of trust or contract secured by a mortgage on a residence in foreclosure or contained in the mortgage;
>
> (f)  assist an owner in foreclosure or loan default to obtain a loan or advance of funds;
>
> (g)  avoid or ameliorate the impairment of an owner's credit resulting from the recording of a notice of default or from a foreclosure sale; or
>
> (h)  otherwise save an owner's residence from foreclosure[.]

N.M. Stat. Ann. § 47-15-2(B)(1). "'[O]wner' means the record owner of a residence in foreclosure at the time a foreclosure notice of pendency was recorded or a summons and complaint for foreclosure was served." N.M. Stat. Ann. § 47-15-2(D).

> "[R]esidence in foreclosure" means residential real property consisting of one to four family dwelling units, one of which the owner occupies as the owner's principal place of residence, where there is a delinquency or default on any loan payment or debt secured by or attached to the residential real property, including contract for deed payments.

N.M. Stat. Ann. § 47-15-2.

66.     Preliminarily, the MFCFPA's prescriptions do not apply in relation to all New Mexico consumers in this case.  The MFCFPA applies where a homeowner occupies the property as "a principal place of residence." N.M. Stat. Ann. § 47-15-2.  As discussed, supra, Ward, L. Madrid and M. Madrid, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Silva, Jaramillo, Mondragon, Humble, June Valdez, Jose Valdez, Woods, Starrett, and Marcelli occupied the homes for which they sought assistance, so the dwellings were their principal places of residence.  See FOFs ¶¶ 241, 281, 328, 354, 403, 439, 458, 483, 509, 536, 572, 579, 581, 620, 651, 670, at 54-129. As the Court does for the MARS Rule analysis, the Court disregards in the following analysis June Valdez's 1840 Lamar property, and Alexander's, Cedeno's, M. Maness', and Sullivan's properties, which New Mexico does not show by a preponderance of the evidence were the owner's principal places of residence.  See FOFs ¶¶ 609, 700, 702, at 121, 135-36.

67.     The MFCFPA also applies only where an individual or an entity performs activities for an owner of a home in foreclosure.  Not all New Mexico consumer witnesses in this case were in foreclosure when they began working with Real Estate Law, although, as discussed, infra, Real Estate Law continued providing services to several New Mexico consumers after they entered foreclosure.  See FOFs ¶¶ 257, 287, 335, 376, 425, 479, 566, 688, at 57-132.  The Court cannot,

however, soundly conclude by a preponderance of the evidence that five New Mexico consumer witnesses entered foreclosure or had a relationship with Real Estate Law after entering foreclosure. Woods did not enter foreclosure. See FOFs ¶ 629, at 124. The Court cannot determine from the evidence before it if or when Jaramillo or Silva entered foreclosure, whether Mondragon was still working with Real Estate Law after he entered foreclosure, see FOFs ¶ 566, at 114, or if Jose Valdez entered foreclosure.

68.     The MFCFPA applies to, and Real Estate Law was, a foreclosure consultant for Ward, L. Madrid and M. Madrid, Leary, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Humble, June Valdez, Starrett, and Marcelli. Real Estate Law performed, or offered to perform services, such as obtaining a loan modification or reducing loan payments, that it said would save a home from foreclosure for individuals who entered foreclosure services. See FOFs ¶ 262, 268, 270, 289, 310, 316, 320, 333, 348, 358, 359, 380, 391, 406, 409, 431, 435-436, 445, 451, 461-461, 479, 689, 653, 644, 674 at 58-130. These activities satisfy the MFCFPA's requirement that, to be a foreclosure consultant, a person or an entity provide "services" to the owner, and includes trying to arrange to delay or postpone foreclosure sales, through the litigation and through the FDD, FOFs ¶¶ 265-272, 322, 349, 377-84, 380, 389, 425-26, 428-29, 432, 452, 479, 575, 609-11, 688-90, at 58-132, contacting lenders, see FOFs ¶¶ 435, 665, at 93, 129, and advising the filing of bankruptcy, see FOFs ¶ 613, at 121. See also N.M. Stat. Ann. § 47-15-2(G) (providing a non-exclusive list of services that a foreclosure consultant might provide). As discussed, supra, in relation to the MARS Rule violations, Real Estate Law performed all these services -- not only the litigation services -- in exchange for compensation through retainer fees and monthly maintenance fees. See FOFs ¶¶ 247, 255, 293, 303-04, 336, 345, 363, 371, 412, 423, 447, 466, 476, 574, 587-88, 595-97, 657, 667, 677, 685-86, at 55-132. Moreover, Humble and L. Trujillo had entered

foreclosure before communicating with Real Estate Law, see FOFs ¶¶ 456, 573, at 96, 115, and Real Estate Law represented that it would assist them with delaying or stopping the foreclosures, or would obtain a loan modification, see FOFs ¶¶ 445, 451, 575,[100] at 94-115.  Accordingly, Real Estate Law was a foreclosure consultant.

### 2.     Real Estate Law Did Not Comply with the MFCFPA's Requirements.

69.     As a foreclosure consultant, Real Estate Law had a duty to comply with the MFCFPA.  Real Estate Law violated the MFCFPA.  New Mexico has shown that Real Estate Law requested advance fees in violation of the MARS Rule and that its attorney-client fee agreements violated the MFCFPA.

70.     First, Real Estate Law requested advance fees in violation of the MFCFPA.  "It is a violation of the Mortgage Foreclosure Consultant Fraud Prevention Act for a foreclosure consultant to: A. claim, demand, charge, collect or receive any compensation until after the foreclosure consultant has fully performed every service the foreclosure consultant contracted to perform or represented the consultant would perform."  N.M. Stat. Ann. § 47-15-5.  Real Estate Law charged and received compensation in the form of a retainer fee and monthly maintenance fees from Ward, L. Madrid and M. Madrid, Leary, M. Maness, V. Trujillo, L. Trujillo, Dickerson, Humble, June Valdez, Starrett, and Marcelli.  See FOFs ¶¶ 247, 255, 293, 303-04, 336, 345, 363, 371, 412, 423, 447, 466, 476, 574, 587-88, 595-97, 657, 667, 677, 685-86, at 55-132.  As discussed, supra, for all of these New Mexico consumers, Real Estate Law represented that it would postpone or stop a foreclosure, obtain a loan modification, avoid an impairment of their credit, or reduce payments so that Real Estate Law saved their homes once they were in foreclosure, see FOFs

---

[100]For the Court's discussion of Real Estate Law's representations to Humble, see the section on Real Estate Law's acceptance of late fees in violation of the MARS Rule, supra.

¶¶ 262, 268, 270, 289, 310, 316, 320, 333, 348, 358, 359, 380, 391, 406, 409, 431, 435-436, 445, 451, 461-461, 479, 689, 653, 644, 674, at 58-130, through activities that qualify as "services," including trying to arrange to delay or postpone foreclosure sales, see FOFs ¶¶ 265-272, 322, 349, 377-84, 380, 389, 425-26, 428-29, 432, 452, 479, 575, 609-11, 688-90, at 58-132, contacting lenders, see FOFs ¶¶ 435, 665, at 93, 129, and advising the filing of bankruptcy, see FOFs ¶ 613 at 121. Moreover, as discussed, in the section on the MARS Rule violations, supra, Real Estate Law charged the retainer fees and the monthly maintenance fees for its litigation and other FDD services. For none of these services did Real Estate Law perform the services for which it contracted and that it represented it would perform before charging the compensation for the services through the attorney-client fee agreements. Instead, Real Estate Law requested the fees in its attorney-client fee agreement, through which it contracted with the New Mexico consumers, and it required the retainer fee as a retainer charged to obtain its services and the monthly maintenance fees each month while its services were ongoing. See FOFs ¶¶ 262, 268, 270, 289, 310, 316, 320, 333, 348, 358, 359, 380, 391, 406, 409, 431, 435-436, 445, 451, 461-461, 479, 689, 653, 644, 674 at 58-130. Real Estate Law violated, therefore, the MFCFPA's advance fee prohibition.

71. Second, Real Estate Law did not comply with several specific MFCFPA requirements regarding foreclosure consultant contracts. The MFCFPA does not define "foreclosure consulting contract." Regarding statutory interpretation, the Supreme Court of New Mexico has noted: "The first rule of statutory construction is that '[t]he plain language of a statute is the primary indicator of legislative intent.'" Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 27, 12 P.3d at 439 (quoting General Motors Acceptance Corp. v. Anaya, 1985-NMSC-066, ¶ 15, 703 P.2d 169, 173)). The Supreme Court of New Mexico has reasoned:

"Cases manifesting . . . a willingness to depart from the literal wording of a statute also appear frequently in the caselaw of this state." Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 27, 685, 12 P.3d 431, 439 (quoting State ex rel. Helman v. Gallegos, 1994-NMSC-023, ¶ 19, 871 P.2d 1352, 1357). "In interpreting statutes, we seek to give effect to the legislature's intent and 'will not rest our conclusions upon the plain meaning of the language if the intention of the legislature suggests a meaning different from that suggested by the literal language of the law.'" Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 27, 12 P.3d at 439 (quoting Cummings v. X-Ray Assocs., 1996-NMSC-035, ¶ 45, 918 P.2d 1321). The Supreme Court of New Mexico further has noted: "We interpret remedial statutes 'liberally to facilitate and accomplish [their] purposes and intent.'" In re Esther V., 2011-NMSC-005, ¶ 17, 248 P.3d 863, 869 (quoting State ex rel. Stratton v. Gurley Motor Co., 1987-NMCA-063, ¶ 27, 737 P.2d 1180, 1185).

72.    The MFCFPA reflects that a foreclosure consulting contract is a contract between a foreclosure consultant and an owner. A plain language interpretation of the phrase "foreclosure consulting contract" suggests that it is a contract for foreclosure consulting services, which are activities that a foreclosure consultant provides an owner. Cf. N.M. Stat. Ann. § 47-15-2(B)(1)(describing a foreclosure consultant as "a person who, directly or indirectly, makes a solicitation or offer to an owner to perform services for compensation or who, for compensation, performs a service" related to foreclosures). Moreover, the specific rules for foreclosure consulting contracts reflect two entities involved with the contract -- the foreclosure consultant and the owner. See N.M. Stat. Ann. § 47-15-2. The MFCFPA contemplates, for instance, that those two persons will sign the contract and reflects that those two persons will be the persons to have engaged in discussions about the foreclosure consultant services. See N.M. Stat. Ann.

§ 47-15-3(A)(2) (requiring that the foreclosure consulting contract be written in the same language in which the foreclosure consultant and the owner discussed the foreclosure consultant's services); N.M. Stat. Ann. § 47-15-3(A)(6) (requiring that the foreclosure consultant and the owner sign the foreclosure consulting contract).

73.     The MFCFPA does not, however, specify whether, where a residence enters foreclosure after the consumer signs a contract for services to save the residence from foreclosure, the contract is still a foreclosure consulting contract. The Court predicts that the Supreme Court of New Mexico would treat such contracts as foreclosure consulting contracts. In such a situation, the consumer entering a contract is literally "the record owner of a residence in foreclosure at the time a foreclosure notice of pendency was recorded or a summons and complaint for foreclosure was served," N.M. Stat. Ann. § 47-15-2, and the contract controls what services, i.e., what foreclosure consultant services, the foreclosure consultant will provide. Reading the MFCFPA not to cover such situations would defeat the MFCFPA's purpose. The statute governs relations between foreclosure consultants and homeowners without the money to keep their homes. The MFCFPA requires disclosures for foreclosure consulting services such that these homeowners will understand the services and the costs that the homeowners will face. See N.M. Stat. Ann. § 47-15-3 (requiring, among other things, that the foreclosure consulting contract should be written in at least fourteen-point type, and in the language in which the foreclosure consultant and homeowner discussed the services; disclose the service's nature; disclose the names of other entities with which the foreclosure consultant works, itemize costs; and provide notice that the homeowner should continue to make loan payments; and that the homeowner may rescind a transfer of the home). All the same concerns that apply to homeowners already in foreclosure apply to homeowners that are facing a foreclosure so close that it begins while the consultant is

performing under the contract. These contracts are, in nature, foreclosure consultant contracts, and the Court concludes that the Supreme Court of New Mexico would view them as foreclosure consultant contracts.

74. Real Estate Law violated, therefore, several MFCFPA provisions in entering attorney-client fee agreements with many New Mexico consumer witnesses. Preliminarily, the record includes several, but not all, of the attorney-client fee agreements, which constitute foreclosure consulting contracts, between Real Estate Law and these New Mexico consumers. The record includes the Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, June Valdez, Starrett, and Marcelli Attorney-Client Fee Agreements, and these attorney-client fee agreements are foreclosure consultant contracts, because, as discussed, <u>supra</u>, Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, June Valdez, Starrett, and Marcelli entered foreclosure while working with Real Estate Law. The record does not contain the L. Trujillo or Humble Attorney-Client Fee Agreements, so the Court cannot determine by a preponderance of the evidence whether these attorney-client fee agreements violated the MFCFPA.

75. In the Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, June Valdez, Starrett, and Marcelli Attorney-Client Fee Agreements, Real Estate Law violated several MFCFPA provisions in entering these attorney-client fee agreements. First, in violation of N.M. Stat. Ann. § 47-15-3(A)(7), Real Estate Law did not provide to Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, June Valdez, Starrett, or Marcelli a Notice Required by New Mexico Law "printed in at least fourteen-point boldface type, completed with the name of the foreclosure consultant, and located in immediate proximity to the space reserved for the owner's signature." N.M. Stat. Ann. § 47-15-3. <u>See</u> FOFs ¶¶ 254, 302, 342, 370, 420, 475, 598, 664, 684, at 55-132. Second, in violation of N.M. Stat. Ann. § 47-15-2(B), Real Estate Law did not include on the first page of the

Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, June Valdez, Starrett, and Marcelli Attorney-Client Fee Agreements, in at least fourteen-point font, Real Estate Law's name and address, or the date that the respective New Mexico consumers signed the attorney-client fee agreements. See FOFs ¶¶ 253, 301, 344, 369, 419, 473, 594, 664, 684, at 55-132. Third, in violation of N.M. Stat. Ann. § 47-15-2(C), Real Estate Law did not provide these New Mexico consumers with a Notice of Rescission Rights and a Rescission of Contract Form. See FOFs ¶¶ 254, 302, 342, 370, 421, 475, 598, 664, 684, at 55-132. Fourth, in violation of N.M. Stat. Ann. § 47-15-5(G)(3), the Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, June Valdez, Starrett, and Marcelli Attorney-Client Fee Agreements contain a provision providing for venue in either Los Angeles County or in Los Angeles, which is outside the New Mexico counties in which Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, June Valdez, Starrett, and Marcelli resided. See FOFs ¶¶ 241, 252, 281, 299, 328, 342, 354, 368, 403, 418, 458, 472, 651, 663, 670, 681, at 54-131. (describing the New Mexico consumers' residences, and that venue will be in or disputes from the attorney-client fee agreements will be adjudicated in Los Angeles County or in Los Angeles). Fifth, in violation of in violation of N.M. Stat. Ann. § 47-15-5(G)(2), the Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, June Valdez, Starrett, and Marcelli Attorney-Client Fee Agreements require the New Mexico consumers to consent to California law. See FOFs ¶¶ 252, 299, 342, 368, 418, 472, 663, 681, at 56-131.[101]

[101]New Mexico asks that the Court conclude that the attorney-client fee agreements violate N.M. Stat. Ann. § 47-15-5(G)(2), because they require that the New Mexico consumers consent to jurisdiction for litigation in a state other than New Mexico. The Court concludes, however, that the attorney-client fee agreements do not require jurisdiction for litigation in a state other than New Mexico. The attorney-client fee agreements prescribe a venue, or place of adjudication, and a choice of law. See FOFs ¶¶ 252, 299, 342, 368, 418, 472, 663, 681, at 56-131. These prescriptions do not dictate that the Court has jurisdiction over the matter.

76.     The Court will not, as New Mexico proposes, conclude that Real Estate Law violated N.M. Stat. Ann. § 47-15-5(A) by providing that the retainer fee was nonrefundable so that a New Mexico consumer could not rescind a foreclosure consulting contract before "midnight of the third business day after the day on which the owner signs a foreclosure consulting contract that complies with the" MFCFPA.   N.M. Stat. Ann. § 47-15-5(A).   See New Mexico's Proposed Finding ¶ 689, at 96.   The Court predicts that the Supreme Court of New Mexico would conclude that N.M. Stat. Ann. § 47-15-5(A) does not describe an MFCFPA violation.   The provision adds to existing New Mexico law a right of rescission for an established period following the execution of a foreclosure consulting contract.   See N.M. Stat. Ann. § 47-15-5(A).   The provision states: "In addition to any other right under law to rescind a contract, an owner may rescind a foreclosure consulting contract until midnight of the third business day after the day on which the owner signs a foreclosure consulting contract that complies with the Mortgage Foreclosure Consultant Fraud Prevention Act."   N.M. Stat. Ann. § 47-15-4(A).   That the MFCFPA specifies, in the provision that it describes rescission of a foreclosure consulting contract that complies with the MFCFPA, underlines that it does not establish that precluding rescission is an MFCFPA violation, but that it explains a right to rescind a contract otherwise lawful for the MFCFPA's purposes.[102]   Were the provision intended to make generally the denial of rescission within that timeframe an MFCFPA violation, the provision would apply to all foreclosure consulting contracts and not merely those contracts that comply with the MFCFPA.

---

[102]Another circumstance in which New Mexico permits rescission is "where there has been a misrepresentation of a material fact, the misrepresentation was made to be relied on, and has in fact been relied on."   Prudential Ins. Co. of Am. v. Anaya, 1967-NMSC-132, ¶ 8, 428 P.2d at 643.

77.     Moreover, the provision appears in a section with other statements that describe legal standards governing cancellation of a foreclosure consulting contract but that do not define MFCFPA violations.  See N.M. Stat. Ann. § 47-15-4(B) (describing when cancellation of a foreclosure consulting contract occurs); § 47-15-4(C) (explaining when cancellation by mail is effective); § 47-15-4(D) (describing what form cancellation of a foreclosure consulting contract should take).  The provision does not appear in the MFCFPA section on violations, N.M. Stat. Ann. § 47-15-5, "Violations," or in the MFCFPA section that identifies the requirements for a foreclosure consulting contract, i.e., what a foreclosure consulting contract "shall" do, N.M. Stat. Ann. § 47-15-3(A)-(D).  Accordingly, the Court does not conclude that Real Estate Law violated the provision.[103]

78.     The Court also will not conclude, as New Mexico suggests, that Real Estate Law and/or Mr. Pratt violated N.M. Stat. Ann. § 47-15-3(A)(6), (D), because it did not consistently provide New Mexico consumers with "a signed and dated copy of the foreclosure consulting

_____

[103]Furthermore, as N.M. Stat. Ann. § 47-15-4(A) applies only to foreclosure consulting contracts that comply with the MFCFPA, it does not apply to Real Estate Law's contracts, which, as discussed in the text, supra, do not comply with the MFCFPA.  Additionally, although Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, June Valdez, Starrett, and Marcelli Attorney-Client Fee Agreements provide for non-refundable retainer fees, see FOFs ¶¶ 247, 293, 336, 363, 412, 467, 587, 658, 677, at 55-130, New Mexico has produced no evidence of any New Mexico consumer attempting to rescind a contract or of Real Estate Law denying rescission within the statute's designated timeframe such that Real Estate Law's denial of the rescission would have violated a New Mexico consumers' MFCFPA right.  Real Estate Law refunded Humble, at least in part, when he sought a refund.  See FOFs ¶¶ 575-76, at 115-16.  Although the Court deems it highly unlikely that Real Estate Law would rescind an attorney-client fee agreement within the three days after a consumer executed the agreement, as Real Estate Law refunded Humble a small amount – nine-tenths of his retainer fee, see FOFs ¶¶ 575-76, at 115-16, vehemently denied Jaramillo a refund, see FOFs ¶ 532, at 107, and provided M. Maness a refund only with the New Mexico Office of the Attorney General's intervention, see FOFs ¶ 399, at 84, the Court cannot say that a preponderance of the evidence shows that Real Estate Law denied a New Mexico consumer rescission, and the Court will not conclude that Real Estate Law violated the MFCFPA based on the hypothetical that Real Estate Law would deny rescission.

contract," New Mexico's Proposed Finding ¶ 688, at 96, and because Mr. Pratt did not consistently sign and date the attorney-client fee agreements, see New Mexico's Proposed Findings ¶ 684, at 95. As evidence for these assertions, New Mexico cites New Mexico's First Requests, Request for Admission No. 5, at 2; Pratt's Further Responses ¶ 5, at 2; the Robert Alexander Attorney-Client Fee Agreement at 10; Jose Cedeno Attorney-Client Fee Agreement at 13; C. Maness Attorney-Client Fee Agreement 34; Dickerson Attorney-Client Fee Agreement at 3; Madrid Attorney-Client Fee Agreement at 3; M. Maness Attorney-Client Fee Agreement at 3; V. Trujillo Attorney-Client Fee Agreement at 3; Lloyd Trujillo Attorney-Client Fee Agreement at 3; Ward Attorney-Client Fee Agreement at 3; and Silva Attorney-Client Fee Agreement at 3. New Mexico suggests that Mr. Pratt signed only some of these cited attorney-client fee agreements. See New Mexico's Proposed Findings ¶ 598, at 76. This evidence does not reflect by a preponderance of the evidence whether Real Estate Law and Mr. Pratt signed, dated, and returned to the New Mexico consumers the attorney-client fee agreements. The evidence reveals only what the attorney-client fee agreements that the New Mexico consumers provided New Mexico contain. Most of the events in this matter occurred at least five years ago, and people lose documentation or forget what documentation they sent and what they received. Without more information about what Real Estate Law provided the New Mexico consumers, the Court cannot say by a preponderance of the evidence that Real Estate Law and/or Mr. Pratt did not provide signed and dated copies of the attorney-client fee agreements to New Mexico consumers.

**B.      MR. PRATT IS INDIVIDUALLY LIABLE FOR REAL ESTATE'S LAW MFCFPA VIOLATIONS.**

79.     Mr. Pratt is liable for MFCFPA violations. The Court does not find Balanced Legal liable for such violations. The Court applies the FTCA individual liability analysis to determine Mr. Pratt's liability.

80.    To establish Mr. Pratt's individual liability, New Mexico must show that: (i) Real Estate Law violated the MFCFPA rule, see F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1202-03; (ii)  Mr. Pratt "participated directly in the business entity's deceptive acts or practices, or had the authority to control them," F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d at 1170); and (iii) they "knew or should have known of the entity's" acts, F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d at 1203 (citing F.T.C. v. Amy Travel Serv., Inc., 875 F.2d at 574).  The Court has already concluded that Real Estate Law violated the MFCFPA, and it now concludes that Mr. Pratt directly participated in all the MFCFPA violations.  Mr. Pratt knew of Real Estate Law's acts.

## 1.    Mr. Pratt Is Individually Liable for MFCFPA Violations.

85.    Mr. Pratt is individually liable for the MFCFPA violations.  Within Real Estate Law, Mr. Pratt acted such that he was a foreclosure consultant under the MFCFPA.  As discussed, supra, he worked within Real Estate Law to provide, or to offer to provide, foreclosure consultant services, including representing that he would speak with lenders, offering FDD services, and aiding with litigation.  See FOFs ¶¶ 259, 306-309, 360, 444, 500-502, at 57-102.  Mr. Pratt likely received compensation from Real Estate Law because he was the sole stock owner during his tenure at Real Estate Law and Mr. Davis, Mr. Pratt's successor, received $11,925.00 per month, see FOFs ¶¶ 20, 140, 231, 237-40, at 6-53.  As discussed in the section on Mr. Pratt's individual liability for MARS Rule violations, Mr. Pratt directly participated in the request for advance fees. Mr. Pratt also directly participated in the other MFCFPA violations.  He wrote the attorney-client fee agreements that contain the prohibited provisions and did not include the required notices.  See FOFs ¶ 237, at 53.  He also signed or was the designated signatory on attorney-client fee agreements, including the Ward Attorney-Client Fee Agreement, Madrid Attorney-Client Fee

Agreement, the Leary Attorney-Client Fee Agreement, the M. Maness Attorney-Client Fee Agreement, the V. Trujillo Attorney-Client Fee Agreement, and the Dickerson Attorney-Client Fee Agreement. <u>See</u> FOFs ¶¶ 237, 247, 300, 343, 361, 411, 474, at 53-98. As Mr. Pratt participated in Real Estate Law's foreclosure consultant services, he knew of those services, and, as he wrote the attorney-client fee agreements, he knew of the requests for advance fees and of the provisions in the attorney-client fee agreements. As discussed, <u>supra</u>, Mr. Pratt's knowledge of the advance fees' purposes satisfies the knowledge requirement for individual liability. Accordingly, Mr. Pratt is individually liable for the MFCFPA violations.

## III.  MR. PRATT'S ARGUMENTS IN THE PRATT'S PROPOSED FINDINGS DO NOT PERSUADE THE COURT.

86. Mr. Pratt's arguments about the individual New Mexico consumers do not persuade the Court. Mr. Pratt's contentions mirror closely those argument that he previously raised in his Motion Limine #1 of Chad T-W Pratt, Sr. to Exclude Undisclosed Evidence, filed June 24, 2019 (Doc. 160), on which the Court ruled in MIL MOO. Mr. Pratt now offers:

> The ONLY individual claimants presented in the Rule 26 disclosure were "LARRY M.", and "MIKE M". [Two unknown, un-named fake persons] All other such individual claimants must be dismissed for non-Rule 26 disclosure. On AUGUST 9th, 2019 at Dallas, Texas in motion for sanctions NMAG said All individuals were NOT represented by NMAG. As such, they cannot present "individual" claims without notice, due process, substitution of attorney. The individual claimant(s), therefore, are totally and completely devoid of any claims period.
>
> 1. ROBERT ALEXANDER alleged plaintiff is now DECEASED.
>
> .... No probate, no personal representative, cannot proceed against PRATT.
>
> No "standing" to proceed.
>
>  . . . .

2. JOSE CEDENO, "in rem" judgment adverse to him and sold his rights to an investor. As per the adverse judgment and selling of his rights Mr. Cedeno has no claim here. No "harm" or "damage" to Cedeno.

. . . .

3. MARTHA LEARY , foreclosure judgment adverse to her so claim barred.

. . . .

4. LARRY MADRID, foreclosure judgment adverse to him bars claim.

. . . .

5. CREIGHTEN MANESS, foreclosure judgment adverse to him bars claim.

. . . .

6. MIKE MANESS, foreclosure judgment adverse to him bars claim.

. . . .

7. RACHEL SILVA, foreclosure judgment adverse to her bars claim.

PRATT LEFT RELC SEP 13TH AND THIS PLAINTIFF IS NOT HIS RESPONSIBILITY AS ALL ALLEGED MARS ACTIVIY WAS SUBSEQUENT.

. . . .

8. VICKI SULLIVAN (DECEASED) No standing to proceed.

No probate, no personal representative, cannot proceed against PRATT.

. . . .

9. LLOYD TRUJILLO. Stipulated judgment of foreclosure bars suit here as he ADMITTED to the foreclosure per the stipulation. ·

. . . .

10. VALERIE TRUJILLO. (SAME AS LLOYD TRUJILLO)

. . . .

11. LINDA WARD . no information or facts.

. . . .

Pratt's Proposed Findings at 2-3 (formatting, capitalization, and spacing in original). The Court herein incorporates its Rule 26 ruling and its comments on Mr. Pratt's other arguments from its MIL MOO. See MIL MOO at 43-48. The Court emphasizes that New Mexico, and not the individual New Mexico consumers, brings this suit, so the New Mexico consumers' "standing" is irrelevant, contrary to Mr. Pratt's assertions. Moreover, as the above discussion indicates, the outcome of the New Mexico consumers' foreclosure litigation is irrelevant to the analysis under the MARS Rule.

## IV.     THE COURT AWARDS JUDGMENTS AGAINST CERTAIN DEFENDANTS IN THE AMOUNTS LISTED BELOW.

87.     Real Estate Law, Mr. Davis, and Mr. Pratt are liable for MARS Rule violations. The Court requires Real Estate Law, Mr. Davis, and Mr. Pratt to pay restitution for the New Mexico consumers' retainer fees and monthly maintenance fees. The Court will not order disgorgement, because New Mexico has not presented enough evidence from which the Court can determine the profit that the Defendants unfairly earned through their activities. The Court awards judgment against the Real Estate Law, Mr. Davis, and Mr. Pratt in the following amounts: (i) Real Estate Law: $85,941.20; (ii) Mr. Davis: $34,826.80; and (iii) Mr. Pratt: $36,955.00.

## A. THE COURT WILL ORDER THAT CERTAIN DEFENDANTS PAY RESTITUTION TO THE NEW MEXICO CONSUMERS.

88.     The Court will order certain Defendants to pay restitution to the injured New Mexico consumers who fall within the MARS Rule's and the MFCFPA's prescriptions.  See 12 U.S.C. § 5538(b)(1)(C); N.M. Stat. Ann. § 47-15-7(B).  The Court does not issue separate orders of restitution under the MARS Rule and the MFCFPA such that a double order of restitution would be issued.  One order of restitution compensates the New Mexico consumers for their losses in retainer fees and monthly maintenance fees.  The Court does not order other compensatory damages, because it sees no evidence in the record that enables it to calculate other losses.

89.     The Court calculates the restitution owed in two sub-totals, based on whether Mr. Pratt or Mr. Davis were involved in the interactions with the consumer.  Real Estate Law and Mr. Pratt are liable for restitution to Ward, Madrid, Leary, M. Maness, V. Trujillo, Dickerson, and Silva in an amount of $36,955.00.  See FOFs ¶¶ 237, 247, 300, 343, 361, 411, 474, 487, at 53-100 (identifying Mr. Pratt as the signatory).  See also FOFs ¶¶ 256, 305, 346, 400, 424, 449, 477, 499, at 57-102.  Under joint-and-several liability, cf. F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d at 808-09 (stating that corporate entities are joint and severally liable under a common enterprise theory), Real Estate Law and Mr. Pratt are liable for $18,477.50 in restitution to these New Mexico consumers.  Real Estate Law and Mr. Davis are liable for restitution to Jaramillo, Mondragon, June Valdez, Jose Valdez, Woods, Starrett, and Marcelli in the amount of $34,826.80.  See FOFs ¶¶ 527, 540, 593, 636, 657, 636, 683, 601,[104] 604, 534, 552, 617, 650, 669, 687, at 106-32.  Under

---

[104]Although the record does not contain the Jose Valdez Attorney-Client Fee Agreement, the Court concludes that, as June Valdez communicated with Real Estate Law about Jose Valdez' property during the same time that she worked with Real Estate Law on her properties, more likely than not, Mr. Davis was the designated signatory on the Jose Valdez Attorney-Client Fee Agreement, as he was on the June Valdez Attorney-Client Fee Agreement.  See FOFs ¶ 593, at

joint and several liability, Real Estate Law and Mr. Davis are liable for $17,413.40 in restitution

to these New Mexico consumers.[105]   Real Estate Law is liable for L. Trujillo's $6,179.70 and

Humble's $900.00 losses to Real Estate Law.  See FOFs ¶¶ 447-49, 577, at 95-116.  Real Estate

Law owes, therefore $7,079.70 in restitution for L. Trujillo's and Humble's losses.  Real Estate

Law owes a total of $42,970.60 in restitution.  Mr. Pratt owes a total of $18,477.50 in restitution,

and Mr. Davis owes a total of $17,413.30 in restitution.

### B. THE COURT WILL NOT ORDER THAT THE DEFENDANTS PAY DISGORGEMENT UNDER THE MARS RULE.

90.     The Court will not order disgorgement.  Cf. 12 U.S.C. § 5565(a)(2)(D).  New

---

118.

[105]Under the MARS Rule, courts have granted restitution for the amount that defendants receive from consumers.  See F.T.C. v. Kutzner, No. CIV 16-00999-BRO (AFMX), 2017 WL 5230898, at *6 (C.D. Cal. Aug. 28, 2017)(O'Connell, J.); F.T.C. v. E.M.A. Nationwide, Inc., No. 1:12-CV-2394, 2013 WL 4545143, at *8 (N.D. Ohio Aug. 27, 2013)(Gwin, J.), aff'd, 767 F.3d 611 (6th Cir. 2014).  The Court adopts the same approach.  As a practical matter and considering the evidence before the Court, such a measure for restitution provides the best, if not the only, means for compensating the New Mexico consumers' losses.  The Court has the numbers for the amounts that the New Mexico consumers paid Real Estate Law; it can tally these numbers to reach a restitution award.  The Court has no other numbers by which to judge the harm Real Estate Law caused the New Mexico consumers.

Mr. Pratt's contention that he "would ONLY be liable for 20% per the RELC contracts, if" New Mexico produces proof of New Mexico consumers' payment does not convince the Court. Pratt's Proposed Findings at 3.  Mr. Pratt's attorney-client fee agreements provide that Real Estate Law will receive twenty percent of the retainer fees, see FOFs ¶¶ 247, 297, 300, 340, 343, 361, 366, 411, 416, 466, 474, 493, 487, at 55-100, and, strictly speaking, restitution generally correlates to "the defendant's gain" and not the "plaintiff's loss," Restitution, Black's Law Dictionary (11th ed. 2019).  Restitution refers also, however, to the "compensation for loss," especially in a criminal context.  Restitution, Black's Law Dictionary, supra.  In the MARS Rule context, courts associate restitution with consumers' loss.  See Fed. Trade Comm'n v. Kutzner, 2017 WL 5230898, at *6; F.T.C. v. E.M.A. Nationwide, Inc., 2013 WL 4545143, at *8.  This loss correlates to the Defendants' gain from the consumers' payments, but stops at the revenue, without considering the breakdown of profits.  Here, the Court follows suit and measures the restitution according to the New Mexico consumers' losses through payments to the Real Estate Law enterprise.  The liability for that loss lies across those persons involved in the enterprise, and the Court calculates the restitution accordingly.

Mexico asks for disgorgement "of all moneys received in perpetration of the RELC scheme." New Mexico's Proposed Findings ¶ 668, at 91. The parties agree that disgorgement is a remedy by which a party divests itself of ill-gotten profits. <u>See</u> New Mexico's Proposed Findings ¶ 669, at 92; Parwatikar Defs.' Proposed Findings ¶ 73, at 21. "The primary purpose of disgorgement as a remedy . . . is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." <u>S.E.C. v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1474 (2d Cir. 1996). <u>U.S. S.E.C. v. Maxxon, Inc.</u>, 465 F.3d 1174, 1179 (10th Cir. 2006)(citing favorably <u>S.E.C. v. First Jersey Sec., Inc.</u>). "The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation.'" <u>S.E.C. v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1475 (2d Cir. 1996)(quoting SEC v. Patel, 61 F.3d at 139).

91.     New Mexico has presented evidence of profit only for Mr. Davis, in that New Mexico demonstrated that Mr. Davis received $11,925.00 in paychecks for thirty-nine months. <u>See</u> New Mexico's Proposed Findings ¶ 668(d), at 92. The Court has no way to determine the profits that Real Estate Law and Mr. Pratt received. New Mexico asks that the Court order that Real Estate Law and the Parwatikar Defendants disgorge all money that Pinnacle Law received from Real Estate Law, <u>see</u> New Mexico's Proposed Findings ¶ 668, at 91, that Real Estate Law disgorge what would be twenty percent of its revenue, <u>see</u> New Mexico's Proposed Findings ¶ 668, at 91 & 91 n.12, and that Mr. Pratt disgorge an amount equal to the retainer fees that he requested in the attorney-client fee agreements that he wrote and for which he was the signatory, <u>see</u> New Mexico's Proposed Findings ¶ 668, at 91. The Court cannot determine from these numbers the amounts that these Defendants gained from their unlawful actions. The variation in New Mexico's calculations for disgorgement reflect its inability to present the Court with an adequate means of calculating disgorgement. Accordingly, the Court declines to order disgorgement as a remedy. As

the Court will not order disgorgement as a remedy against Real Estate Law and Mr. Pratt, the Court, in the interests of assessing comparable remedies against the Defendants, also does not order that Mr. Davis disgorge his profits.

## C. THE COURT ASSESSES CIVIL PENALTIES AGAINST CERTAIN DEFENDANTS.

92. The Court assesses civil penalties against the Defendants. The Court addresses separately the civil penalties for the MARS Rule and the MFCFPA violations. The Court predicts that the Supreme Court of New Mexico would consider civil penalties available under the MFCFPA even where the same conduct triggers MFCFPA and MARS Rule civil penalties. The Supreme Court of New Mexico would reason that the MARS Rule and the MFCFPA are separate statutes, and that New Mexico intends to penalize individuals who violate the MFCFPA. Moreover, New Mexico enacted the MFCFPA in March, 2010, around the time that the FTC debated the MARS Rule's enactment and likely had some awareness that the FTC considered regulations that resembled the MFCFPA's rules. See 75 Fed. Reg. 10707 (dated March 9, 2010); H.B. No. 205 (2010). The MFCFPA's enactment reflects that New Mexico enacted the MFCFPA and its civil penalty provisions despite the overlap.

### i. The Court Assesses the Civil Penalties Described Below Under the MARS Rule.

93. Real Estate Law is liable for reckless MARS Rule violations. No evidence reflects that Real Estate Law would have known specifically of the MARS Rule, so the Court will not assess penalties for a knowing violation. Cf. Consumer Fin. Prot. Bureau v. CashCall, Inc., 2018 WL 485963, at *14 ("[T]he term 'knowing' means 'actual knowledge or knowledge fairly implied . . . on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule.'" (quoting 15 U.S.C. § 45(m)(1)(A))); Consumer Fin. Prot. Bureau v.

D&D Mktg., 2016 WL 8849698, at *12; United States v. Dish Network, LLC, 667 F. Supp. 2d at 961-62 (describing knowing in the FTCA context to require knowledge of the rule's existence and that the defendant's conduct violated the rule)).  Given Real Estate Law's origins in Balanced Legal, and Mr. Parwatikar, Arzakanyan, Mr. Clarambeau's, Branco's, and Solomon's knowledge, or likely knowledge, of Minnesota v. Balanced Legal Group, however, Real Estate Law acted with knowledge of or in spite of "'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Safeco Ins. of Am. v. Burr, 551 U.S. at 68-69 (footnote omitted)(quoting Farmer v. Brennan, 511 U.S. at 836).  See FOFs ¶¶ 11-13, 52, 56, 218-19, 222, at 4-49.  These people and Balanced Legal had previously been involved in a suit for violating such laws.  See FOFs ¶ 218, at 48.  Having formed in the aftermath of Balanced Legal's operations, Real Estate Law should have been on alert that many states have, and that the United States might have, prohibitions on requesting advance fees for mortgage assistance relief services, or similar services. Mr. Paul also alerted Real Estate Law to his concerns about his activities, see FOFs ¶¶ 209-14, at 45-47, and Real Estate Law entered a consent decree with Connecticut for violating its licensure requirements for mortgage assistance relief service providers, see FOFs ¶¶ 228-230, at 50-51. Despite these warnings of the high risk that its actions would be unlawful or unethical, Real Estate Law proceeded to request advance fees for its mortgage assistance relief services.  Additionally, Mr. Pratt's disciplining from the California State Bar also later put Real Estate Law on notice to examine the activities within its business, although the record does not reflect for what the California State Bar disciplined Mr. Pratt.  See FOFs ¶ 223, at 49.

94.     Real Estate Law is, therefore, liable for civil penalties not to exceed $25,000.00 per day for the period during which the violations occurred.  In considering the penalty to assess against Real Estate Law, the Court considers:

(A)     the size of financial resources and good faith of the person charged;

(B)     the gravity of the violation or failure to pay;

(C)     the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided;

(D)     the history of previous violations; and

(E)     such other matters as justice may require.

12 U.S.C. § 5565(c)(3). First, given that Real Estate Law acted recklessly, the Court cannot say that Real Estate Law acted wholly in good faith. Since New Mexico brought this matter, however, Real Estate Law has ceased operations and has entered bankruptcy. See FOFs ¶ 23, at 6; COL ¶ 4, at 140. Although the Court requires restitution from Real Estate Law for its actions toward only sixteen New Mexico consumers, the gravity of Real Estate Law's violations and the severity of the consumers' losses are not de minimis. Real Estate Law took money from, without providing the promised services to, homeowners during a recession when those homeowners could not afford their mortgage payments. See FOFs ¶¶ 24-43, 45-46, 48, at 7-11. Real Estate Law at times told these homeowners to pay it rather than their mortgage payments. See, e.g., FOFs ¶¶ 656, 674, at 127, 130. Real Estate Law's business model rested on the requirement of these advance fees, and it had a history of violations beyond the New Mexico consumers. See FOFs ¶¶ 24-43, 45-46, 48, 233-35, at 7-53. The Court assesses, therefore, against Real Estate Law civil penalties in an amount equal to the restitution that the Court orders from Real Estate Law -- $42,970.60.[106]

---

[106]The Court notes that, although it considers Real Estate Law to have acted recklessly, its civil penalties would still be permissible had Real Estate Law not acted with scienter. The Court's civil penalties fall far below the maximum civil penalties that it could order under even the lowest tier for civil penalties. The Court addresses requests for advance fees from sixteen New Mexico consumers. Were the Court to consider only these days as the days during which the MARS Rule violation occurred, the Court's order of civil penalties would still fall below the amount permitted under the lowest tier of civil penalties for MARS Rule violations. Were the Court to order

95. Mr. Davis is liable for civil penalties at the lowest tier of MARS Rule penalties. The Court sees no evidence in the record that Mr. Davis knew of the MARS Rule, so the Court will not assess civil penalties for a knowing MARS Rule violation. The Court also concludes that Mr. Davis did not recklessly violate the MARS Rule. Mr. Davis associated with several individuals -- Mr. Parwatikar, Arzakanyan, Mr. Clarambeau, Branco, and Solomon -- with connections to Balanced Legal, who knew, or should have known, of <u>Minnesota v. Balanced Legal Group</u>, and the high likelihood that states other than Minnesota, or the United States, regulate mortgage assistance relief services. <u>See</u> FOFs ¶¶ 11-13, 52, 56, 218-19, 222, at 4-49. No evidence reflects, however, that Mr. Davis learned through these individuals of the risks that Real Estate Law ran such that he would be on notice of the risks, and the Court cannot comfortably impute the notice that others had to Mr. Davis to determine with what mental state Mr. Davis acted at the time. Mr. Davis should have had some awareness of risks that Real Estate Law's activities ran. At Mr. Davis' transition into Real Estate Law, Mr. Pratt informed Mr. Davis of:

1. Existing complaints from regulatory bodies, including the State Bar of California

2. Any potential complaints from regulatory bodies, including the State Bar of California

3. Complaint to the State Bar filed by a previous compliance attorney, Michael Paul

4. Violations of State Bar of California's Rules of Professional Conduct

5. Existing lawsuits filed against the corporation, including those filed in small claims court

6. Any potential lawsuits against the corporation

7. Existing and potential refund requests from clients

$5,000.00 a day for each of the sixteen days that Real Estate Law requested the advance fees, the Court would order $80,000.00 in civil penalties.

FOFs ¶ 225, at 50. This summary does not, however, reveal what Mr. Davis learned of these complaints, violations, lawsuits, and refunds, or whether Mr. Davis would have been alerted to the risks of advance fees, and the record does not reflect for what the State Bar of California disciplined Mr. Pratt, such that the Court can determine to what Mr. Davis would have been alerted after Mr. Pratt's suspensions. Mr. Davis also knew that Real Estate Law had violated mortgage assistance relief service rules in Connecticut, because Real Estate Law entered a consent decree with that state. See FOFs ¶ 229-30, at 51. Mr. Davis certainly received notice to consider whether Real Estate Law acted lawfully or ethically, and, while Mr. Davis' actions border on recklessness regarding the advance fee requirements, the Court will not say that a preponderance of the evidence reflects that Mr. Davis acted recklessly in relation to the advance fee violations.

96.     Mr. Davis is liable for civil penalties not to exceed $5,000.00 a day for the period during which the MARS Rule violations occurred. The Court does not have before it evidence of Mr. Davis' financial resources, and the record does not contain evidence to analyze Mr. Davis' good faith. Like Real Estate Law, however, Mr. Davis engaged in violations that caused consumers serious harm, and Mr. Davis joined Real Estate Law's business model over a period of several years of requesting advance fees for mortgage assistance relief services, so he had a history of such violations. See FOFs ¶¶ 24-43, 45-46, 48, 234-35, at 7-53. Moreover, Mr. Davis was the designated signatory on several of the attorney-client fee agreements that requested the advance fees. See FOFs ¶¶ 527, 540, 593, 636, 657, 636, 683, 601,[107] 604, 534, 552, 617, 650, 669, 687,

----

[107]Although the record does not contain the Jose Valdez Attorney-Client Fee Agreement, the Court concludes that, as June Valdez communicated with Real Estate Law about Jose Valdez' property during the same time that she worked with Real Estate Law on her properties, more likely than not, Mr. Davis was the designated signatory on the Jose Valdez Attorney-Client Fee Agreement, as he was on the June Valdez Attorney-Client Fee Agreement. See FOFs ¶ 593, at 118.

at 106-132.  The Court assesses, therefore, against Mr. Davis civil penalties in an amount equal to the restitution that the Court orders from Mr. Davis -- $17,413.30.

97.     Mr. Pratt is liable for civil penalties not to exceed $5,000.00 a day for the period during which the MARS Rule violations occurred.  The Court does not have evidence of Mr. Pratt's financial resources.  The Court also does not have considerable evidence about Mr. Pratt's good or bad faith.  The Court notes that Mr. Pratt associated with several individuals -- Mr. Parwatikar, Arzakanyan, Mr. Clarambeau, Branco, and Solomon -- with connections to Balanced Legal, who knew, or should have known, of <u>Minnesota v. Balanced Legal Group,</u> and the potential that states other than Minnesota, or the federal government, regulated mortgage assistance relief services.  <u>See</u> FOFs ¶¶ 11-13, 52, 56, 218-19, 222, at 4-49.  No evidence suggests, however, that Mr. Pratt may have learned through these individuals of the risks that Balanced Legal ran to be on notice of rules like the MARS Rule, and the Court cannot comfortably impute the notice that others had to Mr. Pratt and determine with what mental state Mr. Pratt acted at the time.  As discussed, <u>supra</u>, however, in relation to Mr. Parwatikar, Mr. Pratt participated and/or controlled a system within Real Estate Law that harmed numerous consumers and had a history of MARS Rule violations.  <u>See</u> FOFs ¶¶ 24-43, 45-46, 48, 233-35, at 7-53.[108]  The gravity of Mr. Pratt's violations is not de minimis.  He wrote and entered the attorney-client fee agreements, and he participated in providing the mortgage assistance relief services.  <u>See</u> FOFs ¶¶ 237, 247, 259, 300, 306-309, 343, 360-61, 411, 444, 474, 487, at 53-100.  Given the two-year history of Mr. Pratt's activities at Real Estate Law, <u>see</u> FOFs ¶ 17, at 5, the Court will assess

---

[108]Mr. Pratt has, throughout this case, vehemently denied any potential MARS Rule liability without discussing rationally, or within the bounds of the controlling law, the merits of the evidence against him.  <u>See</u>, <u>e.g.</u>, Pratt's Proposed Findings at 1-3.  Mr. Pratt's arguments support the Court's conclusion about the good faith with which he conducts business and about his credibility.

against him civil penalties in an amount equal to the restitution that he owes under the MARS Rule -- $18,477.50 in restitution.

**2.     The Court Assesses the Civil Penalties Described Below Under the MFCFPA.**

98.     The Court will not, as New Mexico requests, require that the Defendants pay up to $5,000.00 in civil penalties for willful MFCFPA violations.  As the Court discusses in the preceding section on the MARS Rule civil penalties, the Court will not say that more likely than not any Defendants committed the MFCFPA violations willfully.

99.     In conclusion, Real Estate Law, Mr. Davis, and  Mr. Pratt violated the MARS Rule and the MFCFPA.  The Court will order that: (i) Real Estate Law will pay $85,941.20; (ii) Mr. Davis will pay $34,826.80; and (iii) Mr. Pratt will pay $36,955.00.  With all claims before the Court resolved, this case is dismissed with prejudice, and Final Judgment will be entered.

**IT IS ORDERED** that: (i) Defendants Real Estate Law Center, P.C., Erikson M. Davis, and Chad T. Pratt violated the Mortgage Assistance Relief Services Rule, 12 C.F.R. § 1015 "Regulation O"; (ii) Real Estate Law, Mr. Davis, and Mr. Pratt violated the New Mexico Mortgage Foreclosure Consultant Fraud Prevention Act, N.M. Stat. Ann. §§ 47-15-1 to -8; (iii) Real Estate Law will pay $85,941.20; (iv) Mr. Davis will pay $34,826.80; and (v) Mr. Pratt will pay $36,955.00; (vi) this case is dismissed with prejudice; (vii) Final Judgment will be entered.

_____
UNITED STATES DISTRICT JUDGE

*Counsel and parties:*

Hector H. Balderas
   Attorney General of the State of New Mexico
Angelica Anaya-Allen
Lisa Giandomenico
   Assistant Attorney General of the State of New Mexico
Attorney General of the State of New Mexico's Office
Santa Fe, New Mexico

   *Attorneys for the Plaintiff*

Real Estate Law Center, P.C.
Los Angeles, California

   *Defendant*

Erikson M. Davis
Newbury Park, California

   *Defendant pro se*

Paul J. Kennedy
Jessica M. Hernandez
Elizabeth Harrison
Kennedy, Hernandez & Associates, P.C.
Albuquerque, New Mexico

   *Attorneys for Defendants Deepak S. Parwatikar, Pinnacle Law Center, PC , and*
      *Balanced Legal Group*

Chad Thomas Pratt
Los Angeles, California

   *Defendant pro se*